**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE**

| | |
|---|---|
| FRED ROBINSON; ASHLEY SPRAGUE;<br>and JOHNNY GIBBS, on behalf of<br>themselves and all others similarly situated,<br><br>               Plaintiffs,<br><br>     v.<br><br>DAVID W. PURKEY, Commissioner of the<br>Tennessee Department of Safety and Homeland<br>Security, in his official capacity; DEBBIE MOSS,<br>Circuit Court Clerk of Wilson County, Tennessee,<br>in her official capacity; MELISSA HARRELL,<br>Circuit Court Clerk of Rutherford County,<br>Tennessee, in her official capacity; COREY<br>LINVILLE, Court Clerk of the Municipal Court<br>of Lebanon, Tennessee, in his official capacity;<br>SUSAN GASKILL, Court Clerk of the City Court<br>of Mt. Juliet, Tennessee, in her official capacity;<br>WILSON COUNTY, TENNESSEE;<br>RUTHERFORD COUNTY, TENNESSEE;<br>LEBANON, TENNESSEE; and MT. JULIET,<br>TENNESSEE,<br><br>               Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     **COMPLAINT – CLASS ACTION**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## INTRODUCTION

1.     Over the past five years, Tennessee has suspended more than a quarter of a million driver's licenses for nonpayment of fines, court costs, and litigation taxes arising from driving offenses and traffic citations (together, "Traffic Debt"). These suspensions are not part of the punishment for any traffic-related infraction; they relate solely to debt collection. Plaintiffs and class members in this case lost their licenses simply because of their poverty.

2.     In most of Tennessee, a driver's license is essential to economic self-sufficiency and to meaningful participation in society. Without their driver's licenses, Plaintiffs and class

members have difficulty finding and maintaining employment, going to the doctor, attending church or other religious services, caring for and spending time with family members, taking their children to school, grocery shopping, and participating in other fundamental aspects of daily life.

3.     Throughout Tennessee, county and municipal court clerks collect Traffic Debt without any inquiry into the debtor's ability to pay. If the clerks do not receive payment, they notify the Tennessee Department of Safety and Homeland Security ("the Department"). They make no inquiry into the reasons for nonpayment.

4.     Upon being notified of nonpayment by a clerk's office, the Department, under the purview of Defendant Purkey, suspends driver's licenses automatically, without conducting any inquiry into the driver's ability to pay.

5.     As alleged in more detail below, under the statutory scheme and pursuant to the Department's policy and practice, many of these suspensions occur entirely without notice to the licensees.

6.     Moreover, the Department *never* provides licensees with an opportunity to be heard on the central issue of whether they have the ability to pay the Traffic Debt.

7.     Because the Department does not routinely notify people that their licenses have been or will be suspended, many people continue to drive in the mistaken belief that they have a valid license.

8.     Others knowingly drive without a license because they need to get to work or important medical appointments and they have no other means of transportation.

9.     Many Tennessee residents are charged with driving on suspended licenses, for which they incur more fines and costs that they cannot afford to pay, and for which they may even

be incarcerated. Defendants' policies and practices thus trap indigent Tennesseans in a vicious cycle of debt from which escape is virtually impossible.

10. Defendants violate the Due Process and Equal Protection Clauses of the United States Constitution (1) by effecting the suspension of the licenses of Plaintiffs and class members without notice and without consideration of their ability to pay, in violation of *Bearden v. Georgia*, 461 U.S. 660 (1983), and *Bell v. Burson*, 402 U.S. 535 (1971); and (2) by subjecting people who owe Traffic Debt to unduly harsh and discriminatory treatment as compared to other judgment debtors, in violation of *James v. Strange*, 407 U.S. 128 (1972).

11. Plaintiffs and class members seek declaratory and injunctive relief, on behalf of themselves and all others similarly situated, prohibiting Defendants from suspending driver's licenses without providing notice and without considering ability to pay, in violation of the United States Constitution.

## JURISDICTION AND VENUE

12. This Court has jurisdiction over this action pursuant to 42 U.S.C. § 1983, 28 U.S.C. § 1331, and the Fourteenth Amendment to the United States Constitution. Declaratory relief is available pursuant to 28 U.S.C. §§ 2201 and 2202.

13. Venue in this district is proper under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to this claim occurred in the district.

## PARTIES

14. Plaintiff Fred Robinson resides in Murfreesboro, Tennessee.

15. Plaintiff Ashley Sprague resides in Lebanon, Tennessee.

16. Plaintiff Johnny Gibbs resides in Murfreesboro, Tennessee.

3

17.     Defendant David W. Purkey is the Commissioner of the Tennessee Department of Safety and Homeland Security. He is sued in his official capacity.

18.     Defendant Melissa Harrell is the Circuit Court Clerk of Rutherford County, Tennessee and, as such, is also the Clerk of other Rutherford County courts, including the General Sessions Court.  She is sued in her official capacity.

19.     Defendant Debbie Moss is the Circuit Court Clerk of Wilson County, Tennessee and, as such, is also the Clerk of other Wilson County courts, including the General Sessions Court. She is sued in her official capacity.

20.     Defendant Corey Linville is the Clerk of the Municipal Court of Mount Juliet, Tennessee. He is sued in his official capacity.

21.     Defendant Susan Gaskill is the Clerk of the City Court of Lebanon, Tennessee. She is sued in her official capacity.

22.     Rutherford and Wilson Counties are two of the 95 counties of the State of Tennessee.

23.     Mt. Juliet and Lebanon are municipalities in Wilson County, Tennessee.

## FACTUAL ALLEGATIONS

### *Collection of Traffic Debt*

24.     In Tennessee, those who have the means to pay Traffic Debt keep their driver's licenses; drivers without such means lose their licenses when they cannot pay Traffic Debt.

25.     Collection of Traffic Debt is the responsibility of county court clerks and the clerks of municipal or city courts throughout Tennessee.

26.     Clerks generally provide a 30-90 day window for collection of the full amount of Traffic Debt. The number of days varies by jurisdiction.

27.     When the deadline passes without payment, the clerks, as an act of debt collection, notify the Department of the nonpayment.

28.     Court clerks in general, and Defendants Moss, Harrell, Linville, and Gaskill (collectively, the "Clerks" or the "Clerk Defendants") in particular, send notices of nonpayment to the Department to effect suspensions without conducting any individualized inquiry into the reasons for nonpayment, including into the driver's ability to pay Traffic Debt.

### *Tennessee's Driver's License Suspension Law*

29.     Under Tennessee law:

> The Department is authorized to suspend the license of an operator or chauffeur upon a showing by its records or other sufficient evidence that the licensee . . .
>
> (H)     Has been finally convicted of any driving offense in any court *and has not paid or secured any fine and costs* imposed for that offense . . . ; [or]
>
> (I)     Has failed to appear in any court to answer or to satisfy any traffic citation issued for violating any statute regulating traffic.

Tenn. Code Ann. § 55-50-502(a)(1), (a)(1)(H), (I) (West 2015) (together, the "Statute") (emphases added).

### *License Suspension Under Subsection (H) – Driving Offenses*

30.     When the Department receives notice from a clerk that a license-holder has not paid fines and costs imposed for a driving offense under subsection (a)(1)(H), it suspends that person's driver's license immediately.

31.     If a person never had a valid driver's license, the Department creates a license number for that person and then "suspends" that "license."

32.     Although the Statute merely "authorize[s]" such suspension, it is the policy and practice of the Department, under Defendant Purkey, to effect suspensions immediately and automatically upon receiving the clerk's notice of nonpayment under subsection (a)(1)(H).

5

33. The Statute does not require the Department to send a pre-suspension notice under subsection (a)(1)(H), and the Department under Defendant Purkey in fact does not provide such notice.

34. As a result, license-holders receive no notice stating that their license will be suspended, the basis for the suspension, the date of the suspension, and how to challenge the suspension, including by raising the license holder's inability to pay by reason of poverty.

35. Because they do not receive notice, many people regularly drive on the roads and highways of Tennessee without knowing that they may be committing an offense for which they could be subject to arrest, prosecution, and incarceration.

36. The statute allows for a person whose license was suspended under subsection (a)(1)(H) to apply to the court for a restricted license. However, the restricted license provisions are constitutionally inadequate because:

    (a) The restricted license is valid only for going to and from work at the person's regular place of employment.

    (b) As a condition of receiving the restricted license, a person must make payments "calculated to fully pay the moneys owing." The statute does not require that the payments be affordable.

    (c) People who do not work, or who work but do not earn enough to make payments, cannot obtain or benefit from a restricted license.

    (d) The statute mandates that failure to make timely payments shall result in suspension of the restricted license, without inquiry into a person's ability to pay or whether the person had a good reason for missing the payment.

    (e) The statute allows the court to issue restricted licenses only one time per person. If a person's restricted license is suspended because of a missed payment, that person may not ever obtain a restricted license again.

Tenn. Code Ann. § 55-50-502(j).

37. Restricted licenses are also largely unavailable. As a matter of policy and practice, neither the Department under Defendant Purkey, nor the Counties under Defendants Moss and Harrell, nor the municipalities under Defendants Linville and Gaskill, inform Traffic Debtors of

the existence of restricted licenses under section 55-50-502(j), and the Clerk Defendants affirmatively tell Traffic Debtors that they must pay Traffic Debt in full in order to regain their licenses.

### *License Suspension under Subsection (I) – Traffic Citations*

38.     When the Department receives a notice from a clerk that someone has not paid fines and costs imposed for a traffic citation under subsection (a)(1)(I), the Department suspends the person's driver's license. The Department ostensibly provides written notice to the licensee giving 30 days to request a hearing, but as alleged below as to Plaintiff Sprague, this notice is not in fact provided in all cases.

39.     In any event, even when notice is provided, the hearing is limited to whether there was a clerical or technical error in the records received by the Department, *not* whether, as the Constitution requires, the nonpayment was willful.

40.     "Error in the records received by the Department" is the only basis for a hearing provided by the statute.  The statute does not offer the opportunity to be heard on ability to pay Traffic Debt.

41.     No hearings addressing ability to pay are offered, and no such hearings are in fact held even if requested.

42.     Restricted licenses are not available for suspensions under subsection (a)(1)(I).

43.     Regardless of whether suspension is effected under subsection (a)(1)(H) or subsection (a)(1)(I), in no case is there a notice that offers the opportunity for a determination of ability to pay prior to suspension, and in no case is such a determination is made.

### *County-Based Payment Plans for Traffic Debt*

44.     Payment plans for Traffic Debt are offered in only a few of Tennessee's 95 counties and even fewer municipalities. The vast majority of counties and municipalities refuse partial payment toward Traffic Debt and demand payment in full.

45.     Tennessee law provides that people with Traffic Debt "subject to the approval of the court, may pay any local fines or costs, arising from the convictions or failure to appear in any court, by establishing a payment plan with the local court or the court clerk of the jurisdiction." Tenn. Code Ann. § 55-50-502(d)(2); *see also id.* § 55-50-303(d).

46.     The Department may reinstate a person's driving privileges upon receiving notice that the license-holder has entered into a payment plan and meets all other requirements for reinstatement. § 55-50-303(d)(2); 55-50-502(d)(3).

47.     However, only Shelby County is required by statute to offer payment plans prior to suspension. Other counties may, at best, offer payment plans at their discretion, but the vast majority have not offered any. In 94 of Tennessee's 95 counties, pre-suspension payment plans are offered, if at all, only haphazardly. Outside of Shelby County, therefore, most people can enter into payment plans only *after* their license is suspended and they have already incurred a mandatory reinstatement fee.

48.     These counties are not required to offer post-suspension payment plans. Rather, each individual county may decide whether to offer a payment plan.

49.     Municipalities are likewise not required by state law to offer post-suspension payment plans and, on information and belief, few municipalities do so.

8

50.     Defendant Wilson County and Defendant Moss do not offer payment plans for Traffic Debt in Wilson County General Sessions Court or in any other Court for which Defendant Moss is Clerk.

51.     Defendant Rutherford County and Defendant Harrell do not offer payment plans for Traffic Debt in Rutherford County General Sessions Court or in any other Court for which Defendant Harrell is Clerk.

52.     Defendant City of Mt. Juliet, and Defendant Gaskill as Clerk of the Mt. Juliet Municipal Court, do not offer payment plans for Traffic Debt.

53.     Defendant City of Lebanon, and Defendant Linville, as Clerk of the Lebanon City Court, do not offer payment plans for Traffic Debt.

54.     Bradley, Hamblen, Hamilton, Jefferson, Madison, Maury, Sumner, Washington, and Williamson Counties do not offer payment plans for Traffic Debt.

55.     Tennessee law does not require that payment plans be affordable to the license-holder when offered. § 55-50-502(d)(4); 55-50-502(d)(3). Tennessee law does not require notice to the license-holder of the existence of a potential payment plan.

56.     Under Tennessee law, if a person misses a single payment on a payment plan, the Clerk must inform the Department. The Department then sends a written notice of proposed suspension to the licensee and allows the license-holder 30 days to request a hearing "to show that the person has, in fact, complied with" the payment plan.

57.     Tennessee law mandates that the Department suspend the license from anyone who misses a single payment no matter the reason for missing the payment.

58.     License-holders are never permitted to be heard on the question whether they are able to afford their payment plans or whether they had good reasons for missing payments.

59.     Any person who has defaulted once on the payment plan is ineligible to participate in the payment plan ever again. It is a "one strike and you're out" plan.

60.     A person who is too poor to pay anything at all cannot, in practice, benefit from a payment plan, even if one is theoretically offered.

### ***Reinstatement of Driver's Licenses***

61.     Once a driver's license is suspended, it must be reinstated in order for the license-holder to regain legal authorization to drive.

62.     This "reinstatement" requirement applies even to those who never possessed a valid license.

63.     To get reinstatement, an individual must pay a reinstatement fee, which can amount to hundreds of dollars or more.

64.     Pursuant to a regulation issued under the auspices of Defendant Purkey, the Department offers payment plans for people who owe more than $200 in reinstatement fees, but these payment plans are themselves out of reach for indigent Tennesseans. The payment plans require a down payment of $200 and a processing fee of $25. Payments must be made in the amount of at least $300 every quarter, and the entire amount must be paid within two years. Debtors who default on payment plans for any reason—including unexpected financial hardship—lose their licenses and can never enter into another payment plan again. *See generally* Tenn. Comp. R. & Regs. 1340-2-5.

65.     For indigent Tennesseans, reinstatement fees are yet another barrier to regaining legal authorization to drive.

## *Consequences of Tennessee's Driver's License Suspension Law*

66.    Since 2012, at least 250,000 driver's licenses have been suspended for nonpayment of traffic fines and costs.

67.    In most such cases, the drivers did not willfully choose not to pay Traffic Debt; they were unable to pay because they were indigent.

68.    The available data strongly suggests that people who *can* pay their Traffic Debt *do* pay their Traffic Debt.

69.    Across Tennessee, there is a strong, positive, and statistically significant correlation between the number of poor people in a county and the number of suspensions in that county. Controlling for county size, counties with higher poverty rates have significantly more suspensions than do counties with lower poverty rates.

70.    Without a driver's license, it is extraordinarily difficult to find or keep employment in Tennessee. The law thus creates a vicious cycle: people lose their driver's licenses because they cannot pay Traffic Debt; they cannot maintain or obtain jobs because they do not have driver's licenses; and they cannot pay Traffic Debt because they do not have jobs.

71.    The need for Tennessee residents to drive in order to be able to work is illustrated by Census Bureau data showing the percentage of people working in various metropolitan areas in Tennessee who drive to work:

> a.    92.5% of the people who work in the Chattanooga metro area metro area drive to work.
>
> b.    94.6% of the people who work in the Clarksville metro area drive to work.
>
> c.    93.1% of the people who work in the Cleveland metro area drive to work.
>
> d.    93.4% of the people who work in the Jackson metro area drive to work.

11

e.  92.5% of the people who work in the Johnson City metro area drive to work.

f.  93.8% of the people who work in the Knoxville metro area drive to work.

g.  93.5% of the people who work in the Memphis metro area drive to work.

h.  92.4% of the people who work in the Nashville metro area drive to work.

72.  A driver's license is required for many professions, even those that are not directly related to driving. For example, the following professions often require a driver's license as a condition of employment:  automotive technician, cable installation technician, caregiver, construction worker, delivery driver, housecleaner, HVAC technician, landscaping crew member, maintenance worker, plumber and plumber's helper, pressure washer, truck driver, truck washer, unarmed security officer, valet parking attendant, and warehouse worker.

73.  In much of Tennessee, there is no public transportation at all. And even in cities with some public transportation, many people still cannot use it for work. According to a Brookings Institution analysis, in Memphis, Nashville, and Knoxville, approximately 75% of jobs are not reasonably accessible by public transportation. And in Nashville, Knoxville, and Chattanooga, more than two thirds of working-age residents lack access to public transportation.

74.  Many indigent people whose licenses have been suspended still need to drive in order to get to work, school, or medical appointments.

75.  Tennessee's license suspension statute therefore presents impoverished people with the impossible choice of driving illegally or failing to meet the basic necessities of life and survival for themselves and their families.

76.  Each year, thousands of low-income Tennesseans are stopped for minor traffic violations and then arrested for driving on suspended licenses. For the first offense, driving on a suspended license is a Class B Misdemeanor, punishable by up to six months in jail and a fine of

up to $500, or both. Tenn. Code Ann. §§ 40-35-111(e)(2); 55-50-504(a)(1). For second and subsequent offenses, driving on a suspended license is a Class A Misdemeanor, punishable by up to 11 months and 29 days in jail, a fine of up to $2,500, or both. Tenn. Code Ann. §§ 40-35-111(e)(2); 55-50-504(a)(2).

77.     The subsequent charges generate their own fines and costs, making it less likely that these individuals will ever be able to get their driver's licenses back. Some people even serve jail time for driving on suspended licenses—punishments to which they never would have been subject had the Department considered their ability to pay prior to suspending their driver's licenses.

78.     Local courthouses throughout the State of Tennessee now have entire dockets devoted to processing the cases of people arrested and charged with driving on suspended licenses. For example, in Hamilton County, many of the daily dockets in General Sessions courts consist of driving cases, including a large number related to driving on suspended or revoked licenses. During a single seven-day period in July 2017, Hamilton County General Sessions Court had over 100 cases in which people were charged with driving without lawful licenses.[1]

### *Discriminatory Debt Collection*

79.     Judgment debtors in private civil actions in Tennessee are not subject to the suspension of their driver's licenses if they are too poor to pay.

80.     The Department likewise cannot take driver's licenses from people who owe money for welfare overpayments or income tax debts.

---

[1] *See* Sessions Court - Criminal Division Dockets, General Government of Hamilton County (2017), www.hamiltontn.gov/courts/sessions/dockets/CriminalDockets.aspx (last visited July 22, 2017).

81. People who have failed to pay court-ordered child support could be subject to deprivation of their driver's licenses, but only after the State has provided robust procedural protections, including notice and the opportunity for an ability-to-pay hearing.

82. Even with respect to child support, withholdings from the debtor's income "shall not exceed fifty percent (50%) of the employee's income after FICA, withholding taxes, and a health insurance premium that covers the child, are deducted." Tenn. Code Ann. § 36-5-501.

83. Federal and state laws impose other requirements exempting a person's basic survival resources from garnishment or attachment by any creditor, including the state. *See, e.g.*, Social Security Act, 42 U.S.C. § 407 (West 2017) (barring federal disability payments from being subject to "execution, levy, attachment, garnishment or other legal process," including collection by the state); Tenn. Code Ann. § 26-2-105(a), -111(1) (noting that state, federal, and local pension and disability benefits "shall be exempt from execution, seizure or attachment"); Tenn. Code Ann. § 26-2-104 (exempting clothing, family portraits, family Bibles, and school books from execution, seizure or attachment); *id.* at §§ 26-2-106, -108 (except for child support or alimony, wage garnishments may not exceed the lessor of: 25% of the debtor's disposal earnings, or the amount by which the disposal earnings exceed 30 times the federal minimum wage).

84. Under the Statute, there is no requirement that payments toward Traffic Debt be limited to amounts in excess of the amounts that would be exempt from execution and/or garnishment.

85. Only people who owe criminal and Traffic Debt to the State or its counties or municipalities are singled out for the harsh and discriminatory treatment described in this Complaint.

14

***The Individual Plaintiffs***

   ***Fred Robinson – Wilson County***

   86.     Fred Robinson is 32 years old and lives in Murfreesboro. Mr. Robinson lives with serious physical disabilities: ulcerative colitis and liver cirrhosis. He also suffers from severe internal bleeding due to chronic stomach ulcers.  He has a regular course of approximately 20 prescription medications for his illnesses. These illnesses cause Mr. Robinson constant pain.

   87.     Mr. Robinson is unable to work due to his chronic illnesses. His sole source of income is Social Security Disability benefits of $759 per month.  That amount is well below the federal poverty level for a family of one in Tennessee and about $240 less than Mr. Robinson's own basic and necessary monthly expenses. He depends on his family, when they can help, to make up the difference. Even with this assistance, Mr. Robinson cannot afford to purchase all of his prescribed medications and must forgo taking some of them even though they are extremely important for his health.

   88.     Mr. Robinson's ulcerative colitis and cirrhosis require frequent travel to a gastroenterologist in Nashville. The only practicable way to get from his home in Murfreesboro to his doctor's office in Nashville, over 30 miles away, is to drive.

   89.     Due to the severity of his liver disease, Mr. Robinson's physician has recommended that he start consultation for a liver transplant with specialists at the University of Tennessee in Memphis. Mr. Robinson will need to drive from Murfreesboro to Memphis, about 250 miles away, for such appointments. Missing appointments—in either Nashville or Memphis--will deny him critical medical care.

90.     On June 24, 2016, while driving his sister's car in Wilson County, Tennessee, Mr. Robinson received misdemeanor traffic citations for speeding and failing to maintain valid insurance. As a result of these citations, the Wilson County General Sessions Court assessed $169 for speeding and $272 for driving without valid insurance, for a total Traffic Debt of $441.

91.     Of the total Traffic Debt of $441, the state litigation tax plus $60 accrued to the State under Tenn. Code Ann. §§ 55-10-303. The remaining amount accrued to Defendant Wilson County.

92.     Mr. Robinson could not pay the Traffic Debt because of his indigence.

93.     Defendant Moss's office sent notification to the Department that Mr. Robinson had not paid the Traffic Debt.

94.     On August 17, 2016, the Department mailed Mr. Robinson a notice stating that his driver's license would be suspended unless he paid the Traffic Debt within 30 days. Consistent with its policy and practice, the Department's notice neither requested information about Mr. Robinson's ability to pay nor stated that he could contest the suspension based on inability to pay the Traffic Debt.

95.     The notice stated that Mr. Robinson could request a hearing on the proposed suspension, but that the "scope of the hearing would be limited to the issue of whether or not the citation has been satisfied prior to the proposed date of suspension."

96.     Mr. Robinson, through *pro bono* counsel, requested a payment plan from the Wilson County General Sessions Clerk's Office so that he could avoid losing his license. The Wilson County General Sessions Clerk's Office is overseen by Defendant Moss.

97.     Defendant Moss has a policy and practice of not allowing payment plans or partial payments for Traffic Debt in any of the Courts for which she is Clerk.

16

98.    Consistent with that policy and practice, the Clerk denied Mr. Robinson's request for a payment plan.

99.    The Department, as a result of receiving notification of Mr. Robinson's nonpayment from Wilson County, suspended his driver's license on or after September 16, 2016. Consistent with its policy and practice, the Department never inquired into or considered Mr. Robinson's ability to pay the Traffic Debt. It did not provide Mr. Robinson the opportunity to address his ability to pay, and it would have refused to consider the issue had he raised it.

100.    The only way for Mr. Robinson to regain his driver's license is to make two separate payments.  First, he must pay $441 in one lump sum to Defendant Moss, in her capacity as Wilson County General Sessions Clerk, after which her office would notify the Department that the payment had been made. Second, he must pay a separate and additional $323 reinstatement fee directly to the Department. Mr. Robinson cannot afford to make either of these payments, nor can he afford to pay the $200 initial payment and $25 administrative fee to enter into the Department's payment plan for reinstatement fees.

101.    Mr. Robinson sees three doctors frequently—for his primary care, liver care, and gastrointestinal care—including his liver doctor in Nashville every other week. Mr. Robinson currently relies on his mother or sister to drive him to and from his doctor's appointments, including those in other cities, but they are not always available to drive him. Mr. Robinson's sister works and has children to take care of, and she cannot always take time away from work and family responsibilities to drive Mr. Robinson to the doctor. Mr. Robinson's mother is a full-time caretaker for his father who has cancer, needs help at home, and himself has many doctor's appointments.

102.     For this reason, Mr. Robinson's family members cannot always drive him to Nash-ville and will not be able to drive him to Memphis. They would be able to loan him a car so that he could drive himself to Nashville or Memphis.

103.     When his family members cannot drive him to the doctor, Mr. Robinson has to miss his appointments, even when they are very important to his health. For example, because of a lack of transportation, Mr. Robinson recently missed two appointments with one of his doctors, includ-ing a critical ultrasound of the tubes between his liver and heart to detect blockage, which can result in severe internal bleeding. Mr. Robinson has experienced such blockages three times in the past, and each time he vomited blood, experienced great pain, and was hospitalized for about a week. Mr. Robinson has been unable to reschedule the ultrasound because he currently lacks trans-portation to his doctor's office.

104.     The actions of Defendants Purkey, Moss, and Wilson County, undertaken pursuant to their policies and practices, have gravely imperiled Mr. Robinson's health and continue to do so. As a result of his inability to afford the Traffic Debt and reinstatement fee, Mr. Robinson's opportunity to receive critical medical care and to pursue a potentially life-sustaining liver trans-plant is in jeopardy.

### *Ashley Sprague – Wilson County, Mt. Juliet, and Lebanon*

105.     Ashley Sprague is 26 years old and a resident of Lebanon, Tennessee.  Ms. Sprague is a single mother of five children, one of whom lives with her and four of whom live with their grandparents, over 30 miles away, because Ms. Sprague cannot afford to care for them.

106.     In April 2015, Ms. Sprague was issued a civil traffic citation by Defendant City of Mt. Juliet for speeding and failure to have proof of insurance.

107.    The maximum fine for each violation was $50, but with costs and litigation taxes the total amount was $477.50. All of this amount, except the state litigation tax, accrues to Defendant City of Mt. Juliet.

108.    At the time, Ms. Sprague was working as a server at Waffle House; she earned $2.13/hour plus tips. Her basic life expenses far exceeded her income. She could not afford to pay the Traffic Debt.

109.    In September 2015, upon notification from Defendant City of Mt. Juliet and Defendant Gaskill (or her predecessor), the Department, pursuant to its policy and practice, suspended Ms. Sprague's license for nonpayment of the Traffic Debt.  Consistent with its policy and practice, the Department never inquired into or considered Ms. Sprague's ability to pay the Mt. Juliet ticket, nor did it offer Ms. Sprague the opportunity to be heard on this issue.

110.    Ms. Sprague never received any notice that her license would be suspended or that it had been suspended.

111.    At the time, Ms. Sprague was residing at the address on file with the Department, and she regularly received mail at that address.

112.    Ms. Sprague was unemployed for a short time thereafter.  In February 2016, she began working part-time at a Speedway service station. At Speedway, Ms. Sprague earned little more than she had as a server at Waffle House, and still not enough to pay for basic living expenses.

113.    In March 2016, Ms. Sprague was issued a civil traffic citation by Defendant City of Lebanon for failure to have proof of insurance, in the amount of $224.50. The issuing officer did not issue Ms. Sprague a ticket for driving on a suspended license, nor did he inform Ms. Sprague of any license suspension. Ms. Sprague could not afford to pay the $224.50 citation.

114. In May 2016, Ms. Sprague was issued civil traffic citations by Defendant City of Lebanon for expired registration, failure to have proof of insurance, and driving on a suspended license. The total amount of these citations was $244. This was the first time that Ms. Sprague learned that her license had been suspended.

115. As of the end of May 2016, the collective sum of Traffic Debt imposed on Ms. Sprague was $946, due about half each to Defendants City of Mt. Juliet and City of Lebanon.

116. On September 15, 2016, and October 17, 2016, pursuant to notifications from the City of Lebanon, the Department again suspended Ms. Sprague's license because of nonpayment of the Traffic Debt arising from the Lebanon tickets. Again, consistent with its policy and practice, the Department never inquired into or considered Ms. Sprague's ability to pay the Lebanon tickets, nor did it provide Ms. Sprague the opportunity to be heard on that issue.

117. On July 25, 2016, Ms. Sprague appeared in the Wilson County General Sessions Court and entered into a conditional guilty plea as to the driving while suspended charge.

118. After that hearing, Ms. Sprague attempted to pay $80 towards her tickets.

119. It is Defendant Moss's policy and practice, for all Wilson County Courts for which she is Clerk, not to accept partial payment of Traffic Debt, not to offer payment plans for Traffic Debt, and not to notify the Department that a suspension may be lifted until the Traffic Debt has been satisfied in full.

120. On information and belief, Defendants Linville, Gaskill, and the Cities of Mt. Juliet and Lebanon have similar policies and practices of not allowing partial payments or payment plans on Traffic Debt and, in particular, of refusing to notify the Department that a suspension may be lifted until the Traffic Debt has been satisfied in full.

121.     Consistent with the foregoing policies and practices, Ms. Sprague was told that payment plans are not available and that she must pay the outstanding debt of $946 in two separate lump sums of nearly $500 each in order to get her license back.

122.     In March 2017, Ms. Sprague entered into a payment plan for the additional fines and costs arising from her conditional guilty plea on the driving-while-suspended charge, which amounted to $439.50. So far, Ms. Sprague has managed to make minimal payments on this plan. That payment plan, however, does not include the $946 owed on the Mt. Juliet and Lebanon tickets.

123.     Defendants Wilson County and the Cities of Mt. Juliet and Lebanon, pursuant to the policies and practices of respective Defendant Clerks, continue to refuse to accept any kind of payment plan on the original Traffic Debt. Because Ms. Sprague cannot drive, she cannot maintain basic employment, let alone the higher-paying job she would need to repay Traffic Debt and support her family.

124.     Since losing her driver's license, Ms. Sprague has not been able to maintain a job for more than a few months at a time because she does not have affordable, reliable transportation to work.

125.     In the last year, Ms. Sprague has worked short stints at two gas stations and a Waffle House, each about 10 miles from her home. She lost these jobs because she did not have adequate transportation. At her most recent Waffle House position, Ms. Sprague's manager told her that she could return to work there if she could obtain her license and reliably drive to work.

126.     Ms. Sprague currently works for her parents, who have a cleaning business. Ms. Sprague's parents drive her to and from work, and she does office work for them. Ms. Sprague takes home only $150 per week, which is even less than she had earned at previous jobs.

127.     While Ms. Sprague once had the ability to make partial payments on the Mt. Juliet and Lebanon tickets, she now cannot make any payments at all because she earns so little and already has to make partial payments toward the driving while suspended charge (a charge she never would have incurred had her initial suspension complied with constitutional requirements).

128.     Ms. Sprague wants to go back to school and learn a trade so that she can get a higher paying job and better take care of her family. The educational opportunity she seeks is in Nashville, over 30 miles from where she lives, and Ms. Sprague cannot commute to Nashville without driving.

129.     Because she cannot obtain and maintain a higher paying job, she cannot afford a larger apartment and cannot afford to support her family. Her family thus remains separated, with her children living in separate homes.

130.     Ms. Sprague cannot afford to pay the $946 in original Traffic Debt, nor the $388 reinstatement fee to get her license back. Nor can she afford to pay the $200 initial payment and $25 administrative fee to enter into the Department's payment plan for reinstatement fees.

### *Johnny Gibbs – Rutherford County*

131.     Johnny Gibbs is 36 years old and lives in Murfreesboro.

132.     Mr. Gibbs currently lives with his mother, ailing father, and sister in a motel room, where they have lived for over three years. After paying the weekly rent, the family has very little money left at the end of each week. The family has been unable to make the security deposit and first month's rent required for moving into a more affordable, stable residence. The family struggles to meet basic needs; any loss of income could cause them to become homeless.

133. When Mr. Gibbs's mother was recently in the hospital and unable to make her hours at work, the family fell behind rent for two weeks. Only with the assistance of a charitable foundation did the Gibbs family avoid immediate eviction.

134. Mr. Gibbs struggles to meet the basic necessities of life. The Gibbs family has, in the past, gone entirely without food for as long as two days. Mr. Gibbs and his sister insist that their parents eat before they do.

135. In 1999, Mr. Gibbs's license was suspended until the age of 21 due to truancy from school. In 2002, before he turned 21, Mr. Gibbs received a ticket in Rutherford County for driving on a suspended license and incurred Traffic Debt of $404.50. At the time he was working part-time in construction and did not earn enough money to pay the ticket.

136. After Mr. Gibbs turned 21, he went to the local Department of Motor Vehicles (DMV) with his birth certificate and identification card and filled out paperwork to obtain a valid driver's license. However, DMV staff turned him away after determining that the Department's records still listed Mr. Gibbs's status as suspended.

137. Mr. Gibbs never received notice from the Department or from Rutherford County or Defendant Harrell (or her predecessor) of any license suspension related to the unpaid Traffic Debt. He was never given an opportunity to be heard on his ability to pay, either by the Department or by Rutherford County, prior to the Department's suspension of his license for nonpayment.

138. Mr. Gibbs served jail time and probation as a result of that ticket. In addition to the $404.50 amount of the ticket itself, he was charged probation supervision fees and court fines and fees; he made payments in increments toward the probation and court fees, but could not pay the $404.50 ticket amount in one lump sum.

139. Defendant Harrell (or her predecessor), consistent with Rutherford County's policy and practice, permitted Mr. Gibbs to make partial payments toward his other court and probation debt, but not toward Traffic Debt.

140. In 2006, Mr. Gibbs received a second ticket for driving on a suspended license and incurred Traffic Debt in the amount of $742.

141. Mr. Gibbs sought to make partial payments toward his Traffic Debt. At the time, Mr. Gibbs had a steady job and could have afforded to make partial payments. Consistent with the policy and practice of Defendant Rutherford County and its Court Clerk(s), he was told that a payment plan was not an option for paying Traffic Debt. Mr. Gibbs never had enough money to pay the ticket in one lump sum, so he could not pay it at all.

142. Defendant Harrell continues to maintain a policy and practice of not offering any payment plans for Traffic Debt but, instead, requiring payment of each Traffic Debt in full.

143. Mr. Gibbs cannot afford to pay the $1,146.50 he owes to Rutherford County, nor the additional $236 license reinstatement fee he would now owe to the Department in order to get his license back. Nor can he afford to pay the $200 initial payment and $25 administrative fee to enter into the Department's payment plan for reinstatement fees.

144. Mr. Gibbs owes fines, costs, and litigation taxes ("Court Debt") from separate, un-related criminal proceedings against him. In July 2017, his license was revoked pursuant to Tenn. Code Ann. § 40-24-105(b) for nonpayment of that Court Debt. He is a member of the putative class in *Thomas v. Purkey*, No. 3:17-cv-00005, pending in this Court.

145. Mr. Gibbs is caught in a vicious cycle. Because of his outstanding Court and Traffic Debt, Mr. Gibbs cannot obtain a driver's license. But without a driver's license, Mr. Gibbs cannot obtain employment sufficient to repay the Court and Traffic Debt.

146.    Mr. Gibbs lack of transportation has directly harmed his employment opportunities and prevents him from earning enough money to meet minimal basic needs.  Mr. Gibbs currently works as a day laborer through People Ready, which provides short-term day jobs, such as stocking shelves or construction work. He typically earns $30-$40 a day if he is offered a job; currently, he is offered a job once or twice a week, and those jobs are further limited by his transportation restrictions.  As a result, he often takes home only $40 per week.  Mr. Gibbs relies on his sister, who moved in with the family to provide full-time care to their ailing father, to use their mother's car to drive him to and from work each day.  Many of the job opportunities offered by People Ready are in Nashville.  Given her caregiving responsibilities at home, Mr. Gibbs's sister cannot always drive him to and from Nashville; if Mr. Gibbs could obtain a valid driver's license, he could drive himself to work.

147.    Because Mr. Gibbs must rely on others for transportation, he has lost promising vocational opportunities. Mr. Gibbs has a passion for cooking and was a trained and certified chef, but his certification lapsed when he was unable to find transportation to attend required training in Nashville.

148.    Mr. Gibbs is often forced to walk or ride a bicycle along the sides of roads, which can be dangerous. In early 2016, Mr. Gibbs was hit by a car while biking home after working the closing shift at Outback Steakhouse. It was raining and pitch black. The patch of road lacked a sidewalk. A pickup truck hit Mr. Gibbs and continued driving. Mr. Gibbs suffered cuts, scrapes, and bruises. Fearing the cost of medical treatment and having no alternative transportation, he limped home. His bicycle was irreparably damaged in the accident.

## CLASS ACTION ALLEGATIONS

149.    Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23(b)(2) on behalf of a class and three subclasses of similarly situated people, defined as follows:

*The Statewide Class*. All persons whose Tennessee driver's licenses have been or will be suspended by the Department under Tenn. Code Ann. § 55-50-502(a)(1)(H) or (I) for nonpayment of Traffic Debt and who cannot now and could not at the time of suspension afford to pay such debt.

*The Wilson County Subclass*. All members of the Statewide Class whose driver's licenses have been or will be suspended at the instance of Wilson County and/or its Clerks.

*The Rutherford County Subclass*. All of the Statewide Class persons whose driver's licenses have been or will be suspended at the instance of Rutherford County and/or its Clerks.

*The Multi-Barrier Subclass*. All members of the Statewide Class who, as of the date of judgment in this action, also had outstanding driver's license revocations under Tenn. Code Ann. § 40-24-105(b) for nonpayment of Court Debt.

150. All Plaintiffs represent the Statewide Class. Plaintiff Robinson represents the Wilson County Subclass, and Plaintiff Gibbs represents the Rutherford County Subclass and the Multi-Barrier Subclass.

151. The members of the Class and Subclasses are so numerous that joinder of all members is impracticable. Since 2012, the Department has suspended more than 250,000 driver's licenses for nonpayment of Traffic Debt. Wilson County accounted for 4,355 such suspensions in the same period, while Rutherford County accounted for 8,629. On information and belief, the members of the Multi-Barrier Subclass number in the thousands. As alleged above, most of the individuals whose licenses were suspended were too poor to pay the amounts due.

152. There are numerous questions of fact and law common to the classes, including:

a. Whether Defendants violate the Due Process and Equal Protection clauses by effecting and continuing the suspension of driver's licenses for nonpayment of Traffic Debt without considering the license-holders' ability to pay;

b.  Whether Defendants violate the Due Process Clause by effecting the suspension of driver's licenses under subsection (a)(1)(H) without notice and an opportunity to be heard;

c.  Whether the limited scope hearings provided under Tenn. Code Ann. §§ 55-50-502(a)(1)(I), 55-50-502(d)(4), and 55-50-303(d)(3) violate the Due Process Clause by preventing the Department from considering the license-holder's ability to pay;

d.  Whether Defendants violate the Equal Protection Clause by effecting and continuing suspensions of driver's licenses to collect Traffic Debt and thereby imposing unduly harsh and discriminatory methods for collection of Traffic Debt in violation of *James v. Strange*, 407 U.S. 128 (1972);

e.  Whether Defendant Purkey violates the Due Process and Equal Protection Clauses by refusing reinstatement to drivers who have satisfied their Traffic Debt but cannot afford the reinstatement fees imposed by the Department; and

f.  Whether the County and Clerk Defendants have procedures to avoid suspending the licenses of Traffic Debtors who cannot (as opposed to will not) pay, and whether their lack of (or inadequate) procedures bars them from using the Statute as a debt-collection tool.

153.    All of the named Plaintiffs have had their driver's licenses suspended for nonpayment of Traffic Debt. All of them were and are unable to pay because of their indigence. Their claims are typical of those other members of the Class and Subclasses.

154.    Declaratory and injunctive relief is appropriate with respect to the Class as a whole and each Subclass as a whole, because the Defendants have acted on grounds applicable to the members thereof.

155.    The named Plaintiffs and the proposed Class and Subclasses are represented by Baker Donelson, Civil Rights Corps, Just City, and the National Center for Law and Economic Justice. Plaintiffs' attorneys are experienced in class action litigation and will adequately represent the classes.

## FIRST CLAIM FOR RELIEF
### *Violation of Equal Protection and Due Process – Fundamental Fairness*

156.    Defendants' effecting and continuing the suspension of people's driver's licenses for nonpayment of Traffic Debt without any inquiry into or consideration of the license holder's ability to pay violates the right to fundamental fairness guaranteed by the Fourteenth Amendment to the United States Constitution.

## SECOND CLAIM FOR RELIEF
### *Violation of Due Process – Notice and Opportunity to be Heard*

157.    Defendants' effecting the suspension of driver's licenses under Tenn. Code Ann. 55-50-502(a)(1)(H), without providing notice and an ability to pay hearing, violates the right to procedural fairness guaranteed by the Fourteenth Amendment to the United States Constitution.

158.    The limitation of the scope of the hearings under Tenn. Code Ann. §§ 55-50-502(a)(1)(I), 55-50-502(d)(4), and 55-50-303(d)(3), which prevents the Department from considering the license-holder's ability to pay, likewise violates that guarantee of procedural fairness.

## THIRD CLAIM FOR RELIEF
### *Violation of Equal Protection—Unduly Harsh and Discriminatory Collection Methods*

159.    Defendants' effecting and continuing the suspension of driver's licenses from indigent people who owe Traffic Debt to the State and its counties and municipalities, but not from

other judgment debtors, violates the right to equal protection under law guaranteed by the Fourteenth Amendment to the United States Constitution.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiffs and class members request the Court enter a judgment in favor of Plaintiffs and the Class and Subclasses that they represent as follows:

a. Certifying this case as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(2) on behalf of the Statewide Class and the three Subclasses.

b. On behalf of the Class and the Subclasses, declaring that Defendants' practices with respect to suspensions as alleged herein violate the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution;

c. On behalf of the Class, preliminarily and permanently enjoining Defendant Purkey from suspending or permitting the suspension of any driver's license pursuant to Tenn. Code Ann. § 55-50-502(a)(1)(H) or (I) without either

    i. notice to the licensee that includes the offer of a fact-based inquiry, with participation by the licensee, as to the licensee's ability to pay and, if such inquiry is requested, a factual determination, prior and as a prerequisite to license suspension, that the amount sought is within the licensee's ability to pay, or

    ii. certification from the reporting county that notice containing such offer has been afforded and (if inquiry is requested) such factual determination has been made;

d.  On behalf of the Wilson and Rutherford County Subclasses, preliminarily and permanently enjoining the Counties and Defendants Moss and Harrell from notifying the Department of nonpayment of Traffic Debt in any circumstance where there has not been notice to the licensee that includes the offer of a fact-based inquiry, with participation by the licensee, as to the licensee's ability to pay and, if such inquiry is requested, a factual determination, prior and as a prerequisite to license suspension, that the amount sought is within the licensee's ability to pay;

e.  On behalf of Plaintiff Sprague, preliminarily and permanently enjoining Defendants Linville, Gaskill, and Mt. Juliet and Lebanon, Tennessee, from notifying the Department of nonpayment of Traffic Debt in any circumstance where there has not been notice to the licensee that includes the offer in each instance of a fact-based inquiry, with participation by the licensee, as to the licensee's ability to pay and, if such inquiry is requested, a factual determination, prior and as a prerequisite to license suspension that the amount sought is within the licensee's ability to pay;

f.  On behalf of Plaintiffs Robinson and Sprague and the members of the Class except for the members of the Multi-Barrier Subclass, ordering Defendant Purkey to (i) reinstate all driver's licenses that were suspended prior to the date of judgment in this matter for nonpayment of Traffic Debt, at no cost to the license holders; (ii) waive all reinstatement fees; and (iii) notify all persons whose licenses were suspended of the reinstatement;

g. On behalf of Plaintiff Gibbs and the Multi-Barrier Subclass, ordering Defendant Purkey to (i) expunge their suspensions under Tenn. Code Ann. § 55-50-502 without payment of reinstatement or other fees, so that, upon resolution of their revocations pursuant to Tenn. Code Ann. § 40-24-105(b), they may regain or be eligible to apply for legal driving authorization, and (ii) notify the members of the Multi-Barrier Subclass of such expungement;

h. On behalf of the Class, preliminarily and permanently enjoining Defendant Purkey from imposing reinstatement costs and fees without considering ability to pay where the reinstatement relates to a suspension for nonpayment of Traffic Debt;

i. Awarding litigation costs and reasonable attorneys' fees to Plaintiffs, as provided by 42 U.S.C. § 1988; and,

j. Ordering such other and further relief as the Court deems just and proper.

31

s/ Matthew G. White
_____
Matthew G. White (TN #30857)
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC
First Tennessee Bank Building
165 Madison Avenue, Suite 2000
Memphis, Tennessee 38103
901-577-8182
lpatterson@bakerdonelson.com
mwhite@bakerdonelson.com


s/ Premal Dharia
_____
Premal Dharia (DC #484091)*
Jonas Wang (NY #5531769)*
CIVIL RIGHTS CORPS
910 17th Street NW, Suite 500
Washington, DC 20006
202-670-4809
premal@civilrightscorps.org
jonas@civilrightscorp.org


September 13, 2017

*   Pro Hac Vice Application
    Filed or Forthcoming

s/ Claudia Wilner
_____
Claudia Wilner (NY #4264156)*
Edward P. Krugman (NY #1665892)*
Theresa Lau (NY #5496526)*
NATIONAL CENTER FOR LAW AND
ECONOMIC JUSTICE
275 Seventh Avenue, Suite 1506
New York, NY 10001
212-633-6967
wilner@nclej.org
krugman@nclej.org
lau@nclej.org


s/ Josh Spickler
_____
Josh Spickler (TN #21019)
JUST CITY
902 South Cooper Street
Memphis, TN 38104
901-206-2226
josh@justcity.org