**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE**

FRED ROBINSON; ASHLEY SPRAGUE;   )
and JOHNNY GIBBS, on behalf of   )
themselves and all others similarly situated,   )
   )   Case No. 3:17-cv-01263
                 Plaintiffs,   )
   )
      v.   )
   )
DAVID W. PURKEY, Commissioner of the   )
Tennessee Department of Safety and   )
Homeland Security, in his official capacity, *et al.*,   )
   )
                 Defendants.   )

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR A PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

STATEMENT OF FACTS ................................................................. 2

Tennessee's Driver's License Suspension Scheme ........................... 2

County-Based Payment Plans for Traffic Debt ............................... 3

Reinstatement of Driver's Licenses ................................................ 4

Consequences of Tennessee's Driver's License Suspension Scheme ............ 4

The Named Plaintiffs ................................................................. 6

    Fred Robinson ................................................................. 6

    Ashley Sprague ................................................................ 7

    Johnny Gibbs .................................................................. 9

ARGUMENT

I.   PLAINTIFFS ARE HIGHLY LIKELY TO SUCCEED ON THE MERITS BECAUSE DEFENDANTS' POLICY AND PRACTICE VIOLATES BASIC EQUAL PROTECTION AND DUE PROCESS PRINCIPLES ................................................................. 11

    A.   Defendants Violate Due Process and Equal Protection by Suspending Plaintiffs' Driver's Licenses Without Considering Whether They Have the Ability to Pay ............... 11

    B.   The Suspension of Driver's Licenses Without Providing Notice and a Hearing on Ability to Pay Violates Procedural Due Process ....................................................... 15

    C.   Defendants Violate the Equal Protection Clause by Subjecting Plaintiffs to Unduly Harsh and Discriminatory Debt-Collection Practices ............................ 18

II.  PLAINTIFFS AND CLASS MEMBERS WILL SUFFER IRREPARABLE CONSTITUTIONAL HARM IF THIS COURT DOES NOT ISSUE AN INJUNCTION ............................................... 21

III. AN INJUNCTION WILL SERVE THE PUBLIC INTEREST AND WILL NOT CAUSE HARM ............................................................. 22

IV. THE COURT SHOULD NOT REQUIRE THE POSTING OF SECURITY ................................................................. 23

CONCLUSION ............................................................................ 25

*Page*

**Cases**

*ACLU v. McCreary Cnty.*, 354 F.3d 438 (6th Cir. 2003) .................................. 21

*Alexander v. Johnson*, 742 F.2d 117 (4th Cir. 1984)........................................ 16, 20

*Alkire v. Irving*, 330 F.3d 802 (6th Cir. 2003) ................................................... 11

*Appalachia Regional Healthcare, Inc. v. Coventry Health & Life Ins. Co.*, 714 F.3d 424 (6th Cir. 2013) .............................. 23

*Baldwin v. Hale*, 68 U.S. (1 Wall.) 223 (1863) ................................................ 16

*Bass v. Richardson*, 338 F. Supp. 478 (S.D.N.Y.1971)...................................... 24

*Bearden v. Georgia*, 461 U.S. 660 (1983) ........................................................... *passim*

*Bell v. Burson*, 402 U.S. 535 (1971)................................................................... *passim*

*Bredesen v. Rumsfeld*, 2005 U.S. Dist. Lexis 34876, (M.D. Tenn. Sept. 7, 2005)........................................................................ 10

*Coleman v. Watt*, 40 F.3d 255 (8th Cir. 1994)................................................... 15

*Council on Am.-Islamic Rels. v. Gaubatz*, 667 F. Supp. 2d 67 (D.D.C. 2009) ...................................................................... 24

*Dixon v. Love*, 431 U.S. 105 (1977) ................................................................... 16, 17, 21

*DSE v. United States*, 169 F.3d 21 (D.C. Cir. 1999) ......................................... 23

*Elrod v. Burns*, 427 U.S. 347 (1976) .................................................................. 21

*Fuentes v. Shevin*, 407 U.S. 67 (1972).............................................................. 16

*Fuller v. Oregon*, 417 U.S. 40 (1974)................................................................. 12, 20

*G & V Lounge v. Mich. Liquor Control Comm'n*, 23 F.3d 1071 (6th Cir. 1994).................................................................... 22

*Giovani Carandola v. Bason*, 303 F.3d 507 (4th Cir. 2002) ............................ 22

*Griffin v. Illinois*, 351 U.S. 12 (1956)................................................................ 11, 12

*Howe v. City of Akron*, 723 F.3d 651 (6th Cir. 2013)....................................... 22

*James v. Strange*, 407 U.S. 128 (1972).............................................................. 1, 18, 19, 20

*Johnson v. Bd. of Police Comm'rs*, 351 F. Supp. 2d 929 (E.D. Mo. 2004)........................................................................ 24

*Johnson v. Bredesen*, 624 F.3d 742 (6th Cir. 2010) .......................................... 13

*Kratt v. Garvey*, 342 F.3d 475 (6th Cir. 2003) ................................................. 16

*Lee v. Rhode Island*, 942 F. Supp. 750 (D.R.I. 1996)........................................ 13, 17

|  | *Page* |
|---|---|
| *Mackey v. Montrym*, 443 U.S. 1 (1979) | 21 |
| *Med Corp. v. City of Lima*, 296 F.3d 404 (6th Cir. 2002) | 15 |
| *Moltran Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171 (6th Cir. 1995) | 23 |
| *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306 (1950) | 16, 17 |
| *Obama for Am. v. Husted*, 697 F.3d 423 (6th Cir. 2012) | 21 |
| *Olson v. James*, 603 F.2d 150 (10th Cir. 1979) | 20 |
| *Padberg v. McGrath-McKechnie*, 203 F. Supp. 2d 261 (E.D.N.Y. 2002) | 12, 17 |
| *Papasan v. Allain*, 478 U.S. 265 (1986) | 23 |
| *Planned Parenthood Ass'n v. Cincinnati*, 822 F.2d 1390 (6th Cir. 1987) | 21, 22 |
| *Raper v. Lucey*, 488 F.2d 748 (1st Cir. 1973) | 13 |
| *Sanderson v. Greenhills*, 726 F.2d 284 (6th Cir. 1984) | 16 |
| *Schroeder v. Ryan*, 1995 U.S. Dist. Lexis 13322 (N.D. Ill. Sept. 6, 1995) | 17 |
| *Schuman v. California*, 584 F.2d 868 (9th Cir. 1978) | 13 |
| *Stypmann v. San Francisco*, 557 F.2d 1338 (9th Cir. 1977) | 15 |
| *Swanson v. Univ. of Haw. Prof'l Assembly*, 269 F. Supp. 2d 1252 (D. Haw. 2003) | 24 |
| *Tate v. Short*, 401 U.S. 395 (1971) | 11, 12, 13 |
| *Turner v. Turner*, 919 S.W.2d 340 (Tenn. Ct. App. 1995) | 19 |
| *United States v. Bracewell*, 569 F.2d 1194 (2d Cir. 1978) | 20 |
| *United States v. James Daniel Good Real Prop.*, 510 U.S. 43 (1993) | 16 |
| *Wayne Chem. v. Columbus Agency Serv. Corp.*, 567 F.2d 692 (7th Cir. 1977) | 24 |
| *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008) | 10 |
| *Wooley v. Maynard*, 430 U.S. 705 (1977) | 15 |

**Statutes**

| Tenn. Code Ann. §§ 26-1-101 *et seq.* | 14 |
|---|---|

|  | *Page* |
|---|---|
| Tenn. Code Ann. §§ 26-2-101 to -115 ............................................................... | 20 |
| Tenn. Code Ann. § 36-5-703 ............................................................................... | 19 |
| Tenn. Code Ann. § 36-5-704 ............................................................................... | 19 |
| Tenn. Code Ann. § 40-24-105 ............................................................................. | 8, 14 |
| Tenn. Code Ann. § 55-12-129(c) ......................................................................... | 4 |
| Tenn. Code Ann. § 55-50-303(d) ......................................................................... | 4 |
| Tenn. Code Ann. § 55-50-502(d) ......................................................................... | 4 |
| Tenn. Code Ann. §§ 67-1-1401 *et seq.* ............................................................... | 19 |
| Tenn. Code Ann. § 71-1-123(a)(6) ...................................................................... | 19 |

**Other Authorities**

| | |
|---|---|
| 11A Charles A. Wright, Arthur R. Miller, et al., Federal Practice and Procedure § 2954 (2d ed.) .................................................. | 24 |
| Alana Semuels, "No Driver's License, No Job," *The Atlantic* (June 15, 2016) ................................................................................ | 23 |
| Jon A. Carnegie, Ian M. Voorhees Transportation Center, Rutgers, *Driver's License Suspensions, Impacts and Fairness Study* (2007) .................................................................... | 23 |

**Regulations**

| | |
|---|---|
| Tenn. Comp. R. & Regs. 1340-02-05.06 (2017) ............................................... | 4 |

**Constitutional Provisions**

| | |
|---|---|
| U.S. Const. Amend XIV ...................................................................................... | *passim* |

Plaintiffs and the putative classes they seek to represent respectfully submit this Memorandum of Law in support of their Motion for a Preliminary Injunction prohibiting the Defendants—the Commissioner of the Tennessee Department of Safety and Homeland Security ("the Department"), Wilson and Rutherford Counties, the Cities of Lebanon and Mt. Juliet, and all their respective court clerks—from suspending driver's licenses for nonpayment of fines, costs, and litigation taxes arising from misdemeanor driving offenses or civil traffic violations (collectively, "Traffic Debt") without a determination in each instance that the driver had the ability to pay but willfully failed to do so. Because the harm to Plaintiffs Fred Robinson and Ashley Sprague from the suspension of their licenses is immediate and acute, they have filed a separate Motion for a Temporary Restraining Order restoring their licenses pending the hearing on the Motion for Preliminary Injunction.

### Statement of Factual and Legal Issues

The Defendants employ a Traffic Debt collection enforcement system that imposes unduly harsh consequences on Tennessee's poorest residents. When drivers do not pay Traffic Debt, the Defendants—often without notice and always without considering ability to pay—suspend their driver's licenses. From January 1, 2012, to December 31, 2016, the Department automatically suspended *more than a quarter of a million* driver's licenses for nonpayment of Traffic Debt. In the vast majority of those cases, the drivers simply could not afford to pay.

Plaintiffs are likely to succeed on the merits of this lawsuit because the Defendants take their ability to drive (1) without notice and an opportunity to be heard on their ability to pay, in violation of *Bearden v. Georgia*, 461 U.S. 660 (1983), and *Bell v. Burson*, 402 U.S. 535 (1971); and (2) as an unduly harsh and discriminatory method of debt collection in violation of *James v. Strange*, 407 U.S. 128 (1972).

The harm Plaintiffs and class members suffer is irreparable. Without their driver's licenses, they lose their primary means of transportation to work, school, childcare, medical appointments, and other basic necessities of life. Trapped in a cycle of poverty, they cannot earn enough to support themselves or repay the Traffic Debt. Some people, left with no other practical choice, continue to drive, exposing themselves to criminal prosecution, further fines and costs, and sometimes even jail.

Plaintiffs respectfully request that this Court preliminarily enjoin (a) Defendant Purkey from suspending driver's licenses without certification by the reporting court clerk in each instance that the licensee has been given prior notice of the suspension and an opportunity to demonstrate inability to pay and (b) the County and Municipal Defendants from reporting nonpayment of Traffic Debt to Defendant Purkey without providing such notice and opportunity. Plaintiffs further request immediate reinstatement of all licenses unconstitutionally suspended.

## STATEMENT OF FACTS

The description of the statutory scheme set forth below is taken from the Complaint and from the statutes themselves. The descriptions of Defendants' policies and practices in implementing the statutory scheme reflect what Plaintiffs have alleged and expect to prove at the preliminary injunction hearing following expedited discovery. The separate request for a Temporary Restraining Order for the two individual named Plaintiffs, however, is based solely on the specific facts of Defendants' conduct *toward them*. These facts are established in Plaintiffs' Declarations and thus need not await further confirmation through discovery.

### Tennessee's Driver's License Suspension Scheme

In Tennessee, court clerks are responsible for collecting Traffic Debt. Tenn. Code Ann. § 18-1-105. Whenever a person does not pay within a prescribed amount of time, the clerk

2

notifies the Department. Under subsections (H) and (I) of Tenn. Code Ann. § 55-50-502(a)(1) (the "Statute"):

> The Department is authorized to suspend the license of an operator or chauffeur upon a showing by its records or other sufficient evidence that the licensee . . .
>
> > (H) Has been finally convicted of any driving offense in any court and *has not paid or secured any fine and costs* imposed for that offense . . . ; [or]
> >
> > (I) Has failed to appear in any court to answer or *to satisfy* any traffic citation issued for violating any statute regulating traffic. (Emphases added.)

When the Department receives notification that a license-holder has not paid Traffic Debt under (a)(1)(H), it suspends that person's driver's license immediately, without notice. Cplt. ¶¶ 30, 33, 34. When the suspension occurs under (a)(1)(I), the Department must provide written notice prior to suspension and allow the licensee 30 days to request a hearing to show that there was an error in the records received by the Department. Cplt. ¶¶ 38-40. However, some people whose licenses are suspended pursuant to subsection (I) do not receive any notice at all despite the statutory mandate. *Id.*; Sprague Dec. ¶ 6. Moreover, the hearing provided under (a)(1)(I) does not address ability to pay. Under both subsections, therefore, the Department automatically suspends licenses for nonpayment of Traffic Debt without any determination that the driver actually has the ability to pay and without providing notice and opportunity to be heard on that central issue. Cplt. ¶¶ 6, 34, 41.

### *County-Based Payment Plans for Traffic Debt*

Only a few of Tennessee's counties and municipalities offer payment plans for Traffic Debt. Cplt ¶¶ 44-54. Most court clerks refuse partial payment toward Traffic Debt and instead demand payment in full. *Id.* The County and Municipal Defendants in this action do not allow payment plans or partial payments on Traffic Debt. *Id.* ¶¶ 50-53; Robinson Dec. ¶ 8; Sprague Dec. ¶ 10.

3

Even where payment plans are offered, the Statute does not require that they be affordable, and it mandates the Department to suspend the license of anyone who misses a single payment, regardless of the circumstances. A person who defaults once may never participate in another payment plan ever again. License-holders who miss payments are never heard on whether they had good reasons for the default. Cplt. ¶¶ 56-60; Tenn. Code Ann. §§ 55-50-502(d), 55-50-303(d).

Moreover, many people, such as Plaintiff Robinson, are too poor to pay *anything* toward Traffic Debt. Payment plans, even if theoretically available, cannot help many impoverished people avoid suspension.

### *Reinstatement of Driver's Licenses*

Once a driver's license is suspended, it must be reinstated in order for the licensee to regain legal driving privileges. Reinstatement requires paying a fee of $65 per "incident," Tenn. Code Ann. § 55-12-129(c), which can end up amounting to hundreds of dollars. The Department offers payment plans for people who owe more than $200 in reinstatement fees, but these plans are themselves out of reach for indigent Tennesseans because of their onerous terms. Debtors who default on payment plans for any reason—including unexpected financial hardship—lose their licenses and can never enter into another payment plan again. For indigent Tennesseans, reinstatement fees are yet another barrier to regaining legal driving privileges. Cplt. ¶¶ 61-65; Tenn. Comp. R. & Regs. 1340-02-05.06 (2017).

### *Consequences of Tennessee's Driver's License Suspension Scheme*

In Tennessee, those who have the means to pay Traffic Debt keep their driver's licenses; drivers who lack the ability to pay lose their licenses. Since 2012, the Department has suspended

4

more than 250,000 Tennessee driver's licenses for nonpayment of Traffic Debt. Krugman Dec. §¶ 9, 11. Most people who did not satisfy their Traffic Debt were unable, not unwilling, to pay.[1]

Without a driver's license, it is extraordinarily difficult to find or keep employment. Cplt. ¶¶ 70-74; Gibbs Dec. ¶¶ 15, 16; Sprague Dec. ¶¶ 15-18. Even in those Tennessee urban areas with some public transportation, most people cannot use it for work.[2] Well over 90% of Tennesseans drive to work, Krugman Dec. ¶¶ 6, 7 & Ex. 3—because that is the only way to get there. Many indigent people whose licenses have been suspended still need to drive in order to get to work, school, or medical appointments.

Tennessee's license suspension statute therefore presents impoverished people with the impossible choice of driving illegally or failing to meet the basic necessities of life and survival for themselves and their families. Inevitably, many are stopped for minor traffic violations and then arrested for driving on suspended licenses. The subsequent charges generate their own fines and costs, making it less likely that these individuals will ever be able to get their driver's licenses back. Some people even serve jail time for driving on suspended licenses—punishments to which they never would have been subject had the Defendants considered their ability to pay prior to suspending their driver's licenses. Cplt. ¶¶ 76-77.

In most of Tennessee, a driver's license is essential to economic self-sufficiency and to meaningful participation in society. Without their driver's licenses, Plaintiffs and class members

---

[1]    As set forth in detail in the Memorandum in support of the co-pending Motion for Class Certification (at 5-6), *see* Krugman Dec. ¶¶ 8-16 & Exs. 4-8, the large number of suspensions, the relatively smaller number of reinstatements, the strong correlation between poverty rates and suspension rates, and the importance of being able to drive all lead to the conclusion that—as Senator Dickerson acknowledged in the related context of license revocations for nonpayment of Court Debt—those who *can* pay Traffic Debt *do* pay Traffic Debt.

[2]    In Memphis, Nashville, and Knoxville, 72% to 75% of jobs are not reasonably accessible by public transportation. Krugman Dec. Ex. 1, App. 2, at p. 36. In Nashville, Knoxville, and Chattanooga, more than two thirds of working-age residents lack access to public transportation. *Id.* at p. 8 (lines 93, 98, 100). "Access to transit" is defined for these purposes as the ability to use transit to reach work within 90 minutes. *Id* at pp. 5, 12, 13.

have difficulty accessing life-sustaining medical care, finding and maintaining employment, grocery shopping, supporting their children, caring for and spending time with their family members, and participating in other fundamental aspects of daily life.

The circumstances of the named Plaintiffs demonstrate some of the range of harms that are caused by Defendants' unconstitutional conduct.

### *The Named Plaintiffs*

#### *Fred Robinson*

As set forth in his Declaration and as discussed in more detail in the Motion for Temporary Restraining Order, Fred Robinson is 32 years old and lives in Murfreesboro. Robinson Dec. ¶ 2. He has severe ulcerative colitis and liver cirrhosis, and he also suffers from severe internal bleeding due to chronic stomach ulcers. *Id.* ¶ 3. His illnesses cause him constant pain. *Id.*

Mr. Robinson cannot work, and his sole source of income is Social Security Disability benefits of $759 per month. *Id.* ¶ 4. Mr. Robinson depends on his family to provide him financial and other support. *Id.* Even with this assistance, Mr. Robinson cannot afford to purchase all of his prescribed medications and typically eats one meal a day. *Id.*

On June 24, 2016, while driving his sister's car in Wilson County, Tennessee, Mr. Robinson received traffic citations for speeding and failing to maintain valid insurance. *Id.* ¶ 5. Mr. Robinson could not pay the Traffic Debt because of his poverty. *Id.* ¶ 6.

The Department, upon notification by the Defendant Moss's office of Mr. Robinson's nonpayment, mailed Mr. Robinson a notice stating that his driver's license would be suspended unless he satisfied his Traffic Debt within 30 days. *Id.* ¶ 7. The Department then suspended Mr. Robinson's driver's license without considering his ability to pay or giving him an opportunity to have an ability to pay hearing. *Id.* ¶ 10. In order to reinstate his license, Mr. Robinson must pay

$441 to Defendant Moss and a $323 fee to the Department. *Id.* ¶ 11. Mr. Robinson cannot afford to pay anything at this time, and his circumstances are unlikely to change. *Id.* ¶ 8.

The massive impact on Mr. Robinson's life and health of Defendants' deprivation of his driver's license is set forth in detail in his Declaration and the Motion for Temporary Restraining Order. *Id.* ¶¶ 13-15, 17, 18. The only practicable way for him to get to his doctors and get his medication is by car. *Id.* ¶¶ 13-18. When others cannot drive him, he cannot access critical care, treatment, and medication. *Id.*

### Ashley Sprague

As set forth in her Declaration and in the Motion for Temporary Restraining Order, Ashley Sprague is 26 years old and lives in Lebanon, Tennessee. Sprague Dec. ¶ 2. Ms. Sprague is a single mother of five children, one of whom lives with her and four of whom live with their grandparents. She cannot afford to care for her entire family. *Id.* ¶ 3.

In April 2015, Ms. Sprague received traffic tickets from Defendant City of Mt. Juliet for speeding and failure to have proof of insurance, in the amount of $477.50. *Id.* ¶ 4. At the time, Ms. Sprague was working as a server earning $2.13/hour plus tips. *Id.* ¶ 5. She did not earn enough to cover essential expenses like food, shelter, and transportation. *Id.* She could not afford to pay the Traffic Debt. *Id.*

In September 2015, the Department, upon notification of the nonpayment by the Defendant City of Mt. Juliet and Defendant Gaskill (or her predecessor), suspended Ms. Sprague's license for nonpayment of the Traffic Debt. *Id.* ¶ 6. The Department did not consider Ms. Sprague's ability to pay, nor did it offer her an ability to pay hearing. *Id.* ¶ 11. Ms. Sprague never received notice either that her license would be suspended or that it had been suspended, even though she was living at the address on file with the Department, and she regularly received mail at that address. *Id.* ¶ 6.

7

In March 2016, Ms. Sprague received traffic citations from Defendant City of Lebanon for failure to have proof of insurance, in the amount of $224.50. *Id.* ¶ 7. The officer did not inform Ms. Sprague that her license was suspended. *Id.*

In May 2016, Ms. Sprague received traffic citations from Defendant City of Lebanon for expired registration, failure to have proof of insurance, and driving on a suspended license, in the amount of $244. *Id.* ¶ 8. This was Ms. Sprague's first notice that her license was suspended. *Id.*

Ms. Sprague attempted to pay $80 towards the Traffic Debt but was told that no payment plans are available and that she must pay the Traffic Debt in one lump sum. *Id.* ¶¶ 9-10.

To get her license back, Ms. Sprague must pay $946 to the Cities of Mt. Juliet and Lebanon, in two lump sums of about $500 each, along with a $388 reinstatement fee to the Department. *Id.* ¶ 12. But without a driver's license, Ms. Sprague cannot maintain employment. *Id.* ¶ 15. In the last year since losing her license, Ms. Sprague has worked short stints at two gas stations and a Waffle House, each about 10 miles from her home. *Id.* She lost each of these jobs because she did not have adequate, reliable transportation to work. *Id.* However, her old manager at the Waffle House has conveyed to her that she could come back to work once she has a driver's license. *Id.* ¶ 18.

Ms. Sprague currently works for her mother's cleaning business and is driven to and from work by her parents. *Id.* ¶ 16. She makes $150 a week, falling short of even paying her $200 per week rent. *Id.* To make up the difference, she must pick up odd jobs from her father, who is a mechanic. *Id.* ¶ 17. Needing to forgo basic necessities, she goes without food several days a month. *Id.* Ashley Sprague's circumstances represent the vicious cycle alleged in the Complaint.

8

*Johnny Gibbs*[3]

As set forth in his Declaration, Johnny Gibbs is 36 years old and lives in Murfreesboro, Tennessee. Gibbs Dec. ¶ 2. Mr. Gibbs lives with his mother, ailing father, and sister in a motel room. *Id.* ¶ 3. The family struggles to meet basic needs; any loss of income could cause them to become homeless, and they sometimes go a day or two entirely without food. *Id.*

In 1999, Mr. Gibbs's license was suspended due to truancy until the age of 21. *Id.* ¶ 5. In 2002, before turning 21, Mr. Gibbs was ticketed in Rutherford County for driving on a suspended license and fined $404.50. *Id.* ¶ 6. At the time he was working part-time in construction and did not earn enough money to pay the ticket. *Id.*

After turning 21, Mr. Gibbs went to his local Department of Motor Vehicles (DMV) with his birth certificate and identification card and filled out paperwork to obtain a valid driver's license. *Id.* ¶ 7. However, the DMV staff turned him away after determining that the Department's records still listed his status as suspended. *Id.* Mr. Gibbs never received notice from the Department of Safety or any Rutherford County Court Clerk that his license was or would be suspended due to the unpaid traffic ticket, nor did he have the opportunity for a hearing on his ability to pay. *Id.* ¶¶ 8, 13.

Mr. Gibbs served jail time as a result of the ticket and was charged probation supervision fees and court costs. *Id.* ¶ 9. He was allowed to pay the probation fees and costs in increments, but Defendant Harrell's office would not accept partial payments on traffic tickets. *Id.*

---

[3]    Mr. Gibbs joins only the portion of the Motion for Preliminary Injunction that seeks prospective relief against future suspensions. He does not join the request for immediate reinstatement because he is a member of the "Multi-Barrier Subclass," which, as alleged in the Complaint (¶¶ 144, 149), faces license suspensions under the Statute at issue in this action and *also* license revocations under Tenn. Code Ann. § 40-24-105(b) for nonpayment of "Court Debt," as more fully described in *Thomas v. Purkey*, No. 3:17-cv-00005, pending in this Court. Mr. Gibbs and the Multi-Barrier Subclass need relief in both this action and *Thomas v. Purkey* in order to regain their licenses.

9

Mr. Gibbs never had enough money to pay the ticket in one lump sum, so he could not pay it at all. *Id.* ¶ 10.

In 2006, Mr. Gibbs was again ticketed for driving on a suspended license and fined $742. *Id.* ¶ 11. Now to reinstate his driver's license, Mr. Gibbs must pay $1,146.50 to Defendant Harrell and a $236 reinstatement fee to the Department. *Id.* ¶ 12.

Not having a driver's license limits Mr. Gibbs' employment opportunities and prevents him from earning the income necessary to repay the Traffic Debt. *Id.* ¶ 15. Mr. Gibbs currently works as a day laborer through People Ready, and he relies on his sister to drive him to and from work. *Id.* He typically earns $30-$40 a day if he is offered a job; currently, he is offered a job once or twice a week, but those jobs are further limited by his transportation restrictions. *Id.* Many of the job opportunities offered by People Ready are in Nashville, but Mr. Gibbs' sister cannot drive him to and from Nashville. *Id.* As a result, he often takes home only $40 per week. *Id.* If Mr. Gibbs could obtain a valid driver's license, he could drive himself to work. *Id.*

Because Mr. Gibbs must rely on others for transportation, he has forgone vocational opportunities. *Id.* ¶ 16. Mr. Gibbs has a passion for cooking and was a certified chef, but his certification lapsed when he was unable to find transportation to attend mandatory training in Nashville. *Id.*

Lack of a driver's license has harmed Mr. Gibbs in other ways. In early 2016, for example, Mr. Gibbs was hit by a car while biking home in the dark from the closing shift at Outback Steakhouse. *Id.* ¶ 17. Mr. Gibbs was injured and his bicycle destroyed. *Id.* Without a driver's license, he cannot see his step-daughter. *Id.* ¶ 18. He recently had to miss her birthday because he could not afford pay someone to drive him to Madison County, where she lived. *Id.*

10

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). The test for a temporary restraining order (sought here on behalf of two of the named Plaintiffs) is generally the same, with perhaps greater emphasis on the immediacy of the harm and the clarity of the showing of right to relief. *E.g.*, *Bredesen v. Rumsfeld*, 2005 U.S. Dist. Lexis 34876, at *16 (M.D. Tenn. Sept. 7, 2005).

## I. PLAINTIFFS ARE HIGHLY LIKELY TO SUCCEED ON THE MERITS BECAUSE DEFENDANTS' POLICY AND PRACTICE VIOLATES BASIC EQUAL PROTECTION AND DUE PROCESS PRINCIPLES

Defendants violate the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution by suspending Plaintiffs' driver's licenses without a determination that they have the ability to pay Traffic Debt, without notice and an opportunity to be heard on the reason for nonpayment, and by subjecting Plaintiffs to unduly harsh and discriminatory treatment as compared to persons owing civil debts.

### A. Defendants Violate Due Process and Equal Protection by Suspending Plaintiffs' Driver's Licenses Without Considering Whether They Have the Ability to Pay

The Statute is unconstitutional because it violates the equal protection and due process principles enshrined in *Griffin v. Illinois*, 351 U.S. 12 (1956); *Tate v. Short*, 401 U.S. 395 (1971), *Williams v. Illinois*, 399 U.S. 235 (1970), and *Bearden v. Georgia*, 461 U.S. 660 (1983). In these seminal cases, the Supreme Court explained that equal protection and due process "converge" when a person is subjected to different treatment or sanctions in the criminal system solely because she cannot make a monetary payment. In analyzing the coercive actions that the gov-

ernment can impose for nonpayment of a fine, the *Bearden* Court formulated a four-part test that considers: (1) the nature of the individual interest affected; (2) the extent to which it is affected; (3) the rationality of the connection between legislative means and purpose; and (4) the existence of alternative means for effectuating the purpose. *Bearden*, 461 U.S. at 666-67 (quoting *Williams*, 399 U.S. at 260 (Harlan, J., concurring)). The Statute fails this test.

In *Bearden*, the Supreme Court held that jailing someone because he is unable to pay a sum of money violates equal protection and due process. 461 U.S. at 667-69; *see also Alkire v. Irving*, 330 F.3d 802, 816 (6th Cir. 2003) ("'[F]undamental fairness' requires that a court inquire into an individual's reasons for failing to pay a fine or court costs."); *Rodriguez v. Providence Cmty. Corr. Inc.*, 155 F. Supp. 3d 758 (M.D. Tenn. 2015) (holding that Fourteenth Amendment requires indigency determination before holding probationers on secured money bonds or jailing them on the basis of nonpayment); *cf. Fuller v. Oregon*, 417 U.S. 40, 46 (1974) (state court debt recoupment statute found constitutional because directed only at people who have the ability to pay). In *Tate*, the Supreme Court considered a state statutory scheme governing traffic offenses in which the maximum possible penalty was a fine. But anyone who could not pay the fine was ordered to serve out the debt in the local jail at the rate of $5 per day. 401 U.S. at 397.

In striking down this statutory scheme, the Court held that a "statutory ceiling cannot, consistently with the Equal Protection Clause, limit the punishment to payment of the fine if one is able to pay it, yet convert the fine into a prison term for an indigent defendant without the means to pay his fine." *Id.* at 399. In *Williams*, the statute at issue permitted the state to hold a prisoner in confinement past the maximum term of his sentence solely because he could not afford to pay the fine imposed as part of his punishment. 399 U.S. at 237. The Court recognized that "a law nondiscriminatory on its face may be grossly discriminatory in its operation." *Id.* at

242 (quoting *Griffin*, 351 U.S. at 17 n.11). Although the statute appeared to offer all those imprisoned an equal opportunity to avoid excess imprisonment by paying their fines, this was "an illusory choice" for "any indigent who, by definition, is without funds." *Id.* at 242. For that reason, the statute worked "an impermissible discrimination that rests on ability to pay." *Id.* at 241.

Here, the nature of the individual interest affected—a driver's license—is also significant. A driver's license is, of course, a property interest, but in our society it is much more than that. It is "essential in the pursuit of a livelihood," *Bell*, 402 U.S. at 539, and thus is directly tied to basic subsistence. *Accord Padberg v. McGrath-McKechnie*, 203 F. Supp. 2d 261, 277 (E.D.N.Y. 2002) ("Suspending their licenses does far more than inconvenience drivers; it deprives them of their very livelihood."); *Lee v. Rhode Island*, 942 F. Supp. 750, 755 (D.R.I. 1996) ("Depriving a person of the use of her own motor vehicle impacts on her property—on her ability to earn a livelihood"). Deprivation of a driver's license also impacts fundamental liberty interests—the ability to get from place to place—that are necessary to maintain health, to care for children and other family members, and to pursue all aspects of a safe and flourishing life. *See Schuman v. California*, 584 F.2d 868, 870 (9th Cir. 1978) (recognizing liberty interest in use of automobile); *Raper v. Lucey*, 488 F.2d 748, 752 (1st Cir. 1973) (same). In many areas of Tennessee, the lack of meaningful public transportation means that the loss of a drivers' license is a threat to a person's social and physical survival. An individual's interest in maintaining his or her driver's license is profound. And the Defendants' implementation of the Statute completely deprives Plaintiffs of that interest.

As for the rationality of the connection between legislative means and purpose, as a method of debt collection it makes no more sense to deprive indigent people of their driver's licenses than it does to deprive them of their liberty. As in *Bearden*, "[r]evoking the [driver's li-

13

cense] of someone who through no fault of his own is unable to make [payments] will not make [payments] suddenly forthcoming." 461 U.S. at 670; *see also Tate*, 401 U.S. at 399 (imprisoning people who are indigent for failing to pay their fines does not increase collections). Rather, such practices are "little more than punishing a person for his poverty." *Bearden*, 461 U.S. at 671; *see also Johnson v. Bredesen*, 624 F.3d 742, 750 n.3 (6th Cir. 2010) (distinguishing *Bearden* cases; debts at issue in *Johnson* were set with an inquiry into the debtors' ability to pay them).

License suspension is actually counter-productive when applied to the indigent Plaintiffs and class members in this case. The situations of Plaintiffs Gibbs and Sprague demonstrate the Statute's senselessness. Both are trapped in cycles of debt and poverty because without licenses they cannot earn enough money to repay their Traffic Debts.

The State cannot justify its license suspension scheme on highway safety grounds. People who have committed *exactly* the same traffic violations or driving offenses as have Plaintiffs and the class members *can* continue to drive—if they have the means to pay their way out of trouble. Nor need the State fear that poor people can violate traffic laws with impunity if enforcement of the Statutes is enjoined, for they cannot. Points on the license still accumulate, and Plaintiffs here do not challenge points-based license suspensions. Nor do Plaintiffs challenge suspensions for DUI or similar offenses.

The State has ample means for enforcing traffic laws where highway safety *is* the issue,[4] but the Statute here is a collection measure, not a highway safety measure. Tennessee law

---

[4] Some jurisdictions, for example, allow individuals who cannot be deterred through a payment of a monetary traffic ticket—for such deterrence fails when a person lacks ability to pay—to instead do community service or attend a traffic safety course. *E.g.*, Dallas TX, http://dallascityhall.com/departments/courtdetentionservices/pages/unable-to-pay.aspx (offering under "Unable to Pay Options," "Community Service involves working at a non-profit organization to satisfy a citation" and listing out a table of fine amount and required hours of service required);Tuscaloosa AL Municipal Court (2014), http://www.tuscaloosa.com/Government/Muncipal-Court-1/community-service ("Community Service is granted in limited circumstances when the defendant is unable to pay a minor traffic ticket or other fines and court costs."); San Mateo CA Superior Court (2017), https://www.sanmateo-

14

allows for the State to collect debts owed to it in the same manner as other civil debt, which includes the ability to garnish wages and bank accounts and place liens on real and personal property. Tenn. Code Ann §§ 26-1-101 *et seq.* (execution of judgments); 40-24-105(a). These collection methods, unlike the driver's license suspensions at issue in this lawsuit, incorporate constitutional safeguards, like notice, and are narrowly tailored to obtain payment only from people who have the ability to pay. Cplt. ¶¶ 81-83.

Plaintiffs have strong property and liberty interests in maintaining their driver's licenses and using them for employment and to care for themselves and family members—and, eventually, to repay their debts. Defendants, on the other hand, have no rational reason to deprive indigent people of their driver's licenses, and they have reliable alternative methods of enforcing traffic laws and collecting outstanding Traffic Debt from people who have the ability to pay. Under these circumstances, as in *Bearden*, the driver's license suspension scheme at issue here is "contrary to the fundamental fairness required by the Fourteenth Amendment." 461 U.S. at 673.

### B. The Suspension of Driver's Licenses Without Providing Notice and a Hearing on Ability to Pay Violates Procedural Due Process

To establish a procedural due process violation, Plaintiffs must show: "(1) that they have a life, liberty, or property interest protected by the Due Process Clause of the Fourteenth Amendment, (2) that they were deprived of this protected interest within the meaning of the Due Process Clause, and (3) that the state did not afford them adequate procedural rights prior to depriving them of their protected interest." *Med Corp. v. City of Lima*, 296 F.3d 404, 409 (6th Cir. 2002) (internal alteration and citations omitted). These elements are clearly met here.

---

court.org/court_divisions/traffic/options.php ("Also, if you are ordered to pay a fine you may ask the court for an installment payment plan that is based on your ability to pay, or ask the court to approve community service due to financial hardship."); Traffic, Disposition Alternatives, Sumter County, FL (no date), http://www.sumterclerk.com/index.cfm/ disposition-alternatives ("Payable civil infractions may be satisfied by the following means: . . . Elect to attend a driver improvement course . . . ."). All cited websites were last visited August 9, 2017.

15

First, driver's licenses involve "important" property interests that are protected by the Constitution. *Bell*, 402 U.S. at 539. Courts have repeatedly recognized the central importance of the ability to drive in modern American life. *See, e.g.*, *Wooley v. Maynard*, 430 U.S. 705, 715 (1977) ("driving an automobile [is] a virtual necessity for most Americans"); *Coleman v. Watt*, 40 F.3d 255, 260-61 (8th Cir. 1994) ("Automobiles occupy a central place in the lives of most Americans, providing access to jobs, schools, and recreation as well as to the daily necessities of life."); *Stypmann v. San Francisco*, 557 F.2d 1338, 1342-43 (9th Cir. 1977) ("A person's ability to make a living and his access to both the necessities and amenities of life may depend upon the availability of an automobile . . . ."). Suspension of a driver's license is a complete deprivation within the meaning of the due process clause, *see Dixon v. Love*, 431 U.S. 105, 112 (1977), and it is well-established that driver's licenses "are not to be taken away without that procedural due process required by the Fourteenth Amendment." *Bell*, 402 U.S. at 539; *Sanderson v. Greenhills*, 726 F.2d 284, 286 (6th Cir. 1984) ("[A] driver confronting cancellation of his license . . . possessed a clear, legitimate claim to . . . [the] license . . . . In such cases, the property right could not be removed without due process.") (citation omitted).

The Statute provides—and Defendants employ—none of the required procedural protections prior to suspension. At a minimum, the government must provide notice and an opportunity to be heard prior to suspending a license. *Kratt v. Garvey*, 342 F.3d 475, 483 (6th Cir. 2003) ("Notice and an evidentiary hearing . . . are the touchstones of procedural due process."); *see also United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 53 (1993) ("The right to prior notice and a hearing is central to the Constitution's command of due process."); *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950) (deprivation of property must "be preceded by notice and opportunity for hearing appropriate to the nature of the case"); *Alexander*

*v. Johnson*, 742 F.2d 117 (4th Cir. 1984) (to recoup indigent defense fees, state must provide "notice of the contemplated action and a meaningful opportunity to be heard"). As the Supreme Court has explained, "For more than a century, the central meaning of procedural due process has been clear: 'Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right, they must first be notified.'" *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972) (quoting *Baldwin v. Hale*, 68 U.S. (1 Wall.) 223 (1863)); *see also Bell*, 402 U.S. at 542 (requiring hearing before suspending driver's license).

Defendants do not provide pre-suspension notice before depriving people of their driver's licenses for nonpayment under subsection (H). The absence of notice alone means the Statute—and Defendants' practices—cannot stand.

Even where notice is given, moreover, as it ostensibly is under subsection (I),[5] the notice is constitutionally insufficient because it does not provide an opportunity to be heard on ability to pay. As the Court held in *Mullane*, a "fundamental requisite of due process of law is the opportunity to be heard." 339 U.S. at 314. Defendants here *never* provide a hearing on the key issue of whether the nonpayment was willful.

As set forth above, it is unconstitutional to deprive a person of his or her driver's license for nonpayment of Traffic Debt unless the person had the *ability* to pay but willfully did not do so. Accordingly, procedural due process mandates that, in every case involving suspension for nonpayment of Traffic Debt, the Defendants provide license-holders with pre-suspension notice and an opportunity for an ability-to-pay hearing. *See Bell*, 402 U.S. at 542 (since liability is an important element of suspension scheme, state must provide pre-suspension hearing on liability); *Lee*, 942 F. Supp. at 755-56 (since knowledge is important element of driver's-license-

---

[5]     As the Gibbs and Sprague declarations demonstrate, notice is not always given even under subsection (I). Gibbs Dec. ¶ 8; Sprague Dec. ¶ 6.

suspension scheme, state must provide pre-revocation hearing on knowledge); *Padberg*, 203 F. Supp. 2d at 281-82 (requiring pre-suspension hearing before revoking taxi license in service-refusal cases); *Schroeder v. Ryan*, 1995 U.S. Dist. LEXIS 13322, at *5 (N.D. Ill. Sept. 6, 1995) (requiring pre-deprivation hearing before revoking auto registration); *cf. Dixon*, 431 U.S. at 335-36 (no pre-deprivation hearing is required where license suspension is based on prior traffic convictions on which there was opportunity for full judicial hearing and significant road-safety concerns are present). Defendants provide neither, and they have deprived Plaintiffs and the class of procedural due process.

### C. Defendants Violate the Equal Protection Clause by Subjecting Plaintiffs to Unduly Harsh and Discriminatory Debt-Collection Practices

Defendants violate long-established Supreme Court precedent that the government in its capacity as creditor cannot use its sovereign powers to impose on indigent debtors unduly harsh debt collection methods that are unavailable to private creditors.

In *James v. Strange*, 407 U.S. 128 (1972), the Supreme Court confronted Kansas's attempt to collect court fees and costs imposed for the conviction of a crime. Kansas law authorized the state to use harsh collection techniques for these court fees and costs, including depriving people of the standard protections available under state law for judgment debtors. For example, although Kansas limited the percentage of a private judgment-debtor's wages that could be subject to garnishment for private judgments, indigent individuals who had certain court costs imposed by the state could lose their entire paycheck. *Id*. at 135. The Court struck down Kansas's scheme because Kansas was taking advantage of its status as the government to impose stringent debt-collection methods that private creditors could not. *Id*. at 139. The Court held that the State may not "impose unduly harsh or discriminatory terms merely because the obligation is to the public treasury rather than to a private creditor." *Id*. at 138.

18

Defendants violate this longstanding principle by using the State's unique power over the allocation of driver's licenses to coerce payment from those who do not pay Traffic Debt—even when they cannot pay because of their poverty. Such suspensions are both "unduly harsh" and "discriminatory."

To demonstrate the essential inequality at the heart of the statutory scheme, consider what would happen if a person took out a private loan to pay off Traffic Debt. If the person subsequently could not repay that loan, the private creditor could not fundamentally alter the debtor's life by prohibiting the person from driving. But Tennessee, like Kansas, has taken it upon itself to impose those harsh debt collection practices because the debt is to the "public treasury."

Likewise, Defendants single out people who owe Traffic Debt for unduly harsh treatment—suspensions of their driver's licenses—not imposed on people who owe other kinds of debts to the State. For example, people who owe income tax or welfare overpayments to the State are not subject to suspension of their driver's licenses. *See* Tenn. Code Ann. §§ 67-1-1401 *et seq.* (tax collection procedures); 71-1-123(a)(6) (welfare overpayments). People who have failed to pay court-ordered child support could be subject to revocation of their driver's licenses, but only after the court has provided notice and an opportunity for a hearing. At the hearing, an indigent person has the opportunity to argue that such a sanction should not be imposed because the order of support is beyond the person's means. *Compare* Tenn. Code Ann. § 36-5-704, *with Turner v. Turner*, 919 S.W.2d 340, 344 (Tenn. Ct. App. 1995) (discussing necessity of determining income when setting or modifying order); *see also* Tenn. Code Ann. § 36-5-703.

*Strange* bars the Defendants from collecting Traffic Debt from the Plaintiffs in a manner so wildly out of line with how state law mandates other judgments be collected from

19

other debtors. The Equal Protection Clause requires "more even treatment of indigent criminal defendants with other classes of debtors." 407 U.S. at 141. As the Supreme Court concluded:

> State recoupment laws, notwithstanding the state interests they may serve, need not blight in such discriminatory fashion the hopes of indigents for self-sufficiency and self-respect. The statute before us embodies elements of punitiveness and discrimination which violate the rights of citizens to equal treatment under the law.

*Id.* at 141-42; *see also, e.g.*, *Fuller v. Oregon*, 417 U.S. 40, 47 (1974) (upholding Oregon scheme when "[t]he convicted person from whom recoupment is sought thus retains all the exemptions accorded other judgment debtors, in addition to the opportunity to show at any time that recovery of the costs of his legal defense will impose 'manifest hardship'"); *Olson v. James*, 603 F.2d 150, 154 (10th Cir. 1979) ("[T]he Court held that indigent defendants were entitled to evenhanded treatment in relationship to other classes of debtors."); *United States v. Bracewell*, 569 F.2d 1194, 1198-1200 (2d Cir. 1978) (discussing the need for individualized consideration of repayment so as not to require repayment that creates hardship in violation of *Strange* and *Fuller*); *Alexander v. Johnson*, 742 F.2d at 124 (upholding scheme of payments for appointed counsel costs as long as the indigent defendant is not "exposed to more severe collection practices than the ordinary civil debtor").

The Defendants force Traffic Debtors to choose between maintaining their licenses and meeting the other basic necessities of modern life. Through use of its power to suspend the ability to drive, Tennessee seeks to collect debts from sources normally off limits to judgment creditors, including money from veterans benefits, social security disability benefits, or other public assistance for the needy. *See, e.g.*, Tenn. Code Ann. §§ 26-2-101 to -115 (setting forth protections for debtors); 42 U.S.C. § 407 (protecting federal disability benefits from legal process); 38 U.S.C. § 5301 (protecting veterans benefits). This case is on all fours with *Strange*. Kansas's elimination of important garnishment protections in collecting monetary penalties due

20

the state mirrors Tennessee's use of its monopoly over the physical ability to get around the world for the same purpose. By making the ability to get a job or even just to leave one's home—to visit relatives, to care for family, to go to church, or for any other purpose—contingent on the payment of Traffic Debt, Defendants deprive indigent Traffic Debtors of the basic legal protections afforded to all other debtors.

The Statute, and Defendants' conduct thereunder, subjects people who owe Traffic Debt to uniquely and unduly harsh methods of collection. It is unconstitutional.

## II. PLAINTIFFS AND CLASS MEMBERS WILL SUFFER IRREPARABLE CONSTITUTIONAL HARM IF THIS COURT DOES NOT ISSUE AN INJUNCTION.

A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages. *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012). When constitutional rights are threatened or impaired, the injury is nearly always irreparable. *Id.* (citing *ACLU v. McCreary Cnty.*, 354 F.3d 438, 445 (6th Cir. 2003)); *Planned Parenthood Ass'n v. Cincinnati*, 822 F.2d 1390, 1400 (6th Cir. 1987) ("[T]here is potential irreparable injury in the form of a violation of constitutional rights."). The loss of constitutional rights "for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

Plaintiffs and the class are suffering the loss of their constitutional right to due process and equal protection under the Fourteenth Amendment. As the Supreme Court has held, a state can never make drivers whole for the "personal inconvenience and economic hardship" suffered during an erroneous suspension. *Mackey v. Montrym*, 443 U.S. 1, 11 (1979). Because retroactive payments for the loss of the license are not available, "a licensee is not made entirely whole" if the suspension is later reversed. *Dixon*, 431 U.S. at 113. Accordingly, the harm to Plaintiffs and the class here is irreparable.

With respect to two of the individual named Plaintiffs here, the harm is not merely irreparable but immediate and acute. Mr. Robinson needs to drive in order to access critical medical care. Ms. Sprague needs her driver's license in order to obtain employment and see her children.[6] Both Plaintiffs are in particularly desperate circumstances and neither can wait months for resolution of the class-wide preliminary injunction motion. The need for the requested TRO on their behalf is clear.

## III. AN INJUNCTION WILL SERVE THE PUBLIC INTEREST AND WILL NOT CAUSE HARM

As the Sixth Circuit has held, "it is always in the public interest to prevent the violation of a party's constitutional rights." *G & V Lounge v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994); *accord*, *e.g.*, *Planned Parenthood Ass'n*, 822 F.2d at 1400 ("[T]he public is certainly interested in the prevention of enforcement of ordinances which may be unconstitutional."); *Giovani Carandola v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002) ("The final prerequisite to the grant of a preliminary injunction is that it serve the public interest. Again, we agree with the district court that upholding constitutional rights surely serves the public interest."). It is hard to imagine anything more in the public interest than remedying clear constitutional violations.

Nor would an injunction harm the Defendants. At worst, the Defendants would be required to do what other jurisdictions throughout the country do every day: enforce traffic law with inquiry into ability to pay, notice and hearing, and non-discriminatory collection measures, and with non-monetary options for those who cannot pay. *See supra*, footnote 4. Nor can the government be harmed by enjoining an unlawful practice. *Planned Parenthood Ass'n*, 822 F.2d at 1400 ("[T]here is a likelihood that the Ordinance will be found unconstitutional; it is therefore

_____

[6] Lost employment opportunities constitute irreparable harm where, as here, Plaintiffs cannot later obtain retroactive compensation for those losses. *Howe v. City of Akron*, 723 F.3d 651, 662 (6th Cir. 2013).

questionable whether the City has any 'valid' interest in enforcing the Ordinance. Consequently, we find no substantial harm in preventing the City from enforcing."). Nor would there be any harm even if "accompanied by a substantial ancillary effect on the state treasury." *Papasan v. Allain*, 478 U.S. 265, 278 (1986).

No harm to the public would flow from the issuance of the injunction. Plaintiffs and putative class members present no special safety risk on the roads and highways of Tennessee. As noted above, people who commit *exactly* the same traffic violations and driving offenses as Plaintiffs and the members of the class *are* permitted to drive simply by paying a sum of money. Indeed, the practice of suspending driver's licenses from those who are too poor to pay Traffic Debt has significant *negative* consequences for the public interest because it traps people, like Plaintiffs Gibbs and Sprague, in a cycle of poverty from which there is no escape. *See* Alana Semuels, "No Driver's License, No Job," *The Atlantic* (June 15, 2016) ("Not all jobs require a driver's license . . . . But having one is a very common requirement for the sorts of job that can actually lift people out of poverty."); Jon A. Carnegie, Ian M. Voorhees Transportation Center, Rutgers, *Driver's License Suspensions, Impacts and Fairness Study* 56 (2007) (finding that 42% of New Jersey drivers lost their jobs after their driving privileges were suspended).

## IV.   THE COURT SHOULD NOT REQUIRE THE POSTING OF SECURITY

Rule 65(c) provides that the court require the moving party to post security to protect the other party from any financial harm likely to be caused by a temporary injunction if that party is later found to have been wrongfully enjoined. Rule 65(c), however, "vest[s] broad discretion in the district court to determine the appropriate amount of an injunction bond," *DSE v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999), **including the discretion to require no bond at all.** In this Circuit, "the rule . . . has long been that the district court possesses discretion over whether to require the posting of security." *Moltran Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d

23

1171, 1176 (6th Cir. 1995); *accord, e.g.*, *Appalachia Regional Healthcare, Inc. v. Coventry Health & Life Ins. Co.*, 714 F.3d 424, 431 (6th Cir. 2013). Here, for several important reasons, the Court should use its considerable discretion to find that no security (or a nominal security of $1) is required.

First, the likelihood of the Defendants' suffering any harm from an improperly issued injunction requiring them to comply with constitutional law is almost non-existent. *See, e.g.*, *Council on Am.-Islamic Rels. v. Gaubatz*, 667 F. Supp. 2d 67, 81 (D.D.C. 2009) (no bond; defendant would not be substantially injured by the issuance of an injunction); 11A Charles A. Wright, Arthur R. Miller, et al., Federal Practice and Procedure § 2954 (2d ed.) ("[T]he court may dispense with security altogether if the grant of an injunction carries no risk of monetary loss to the defendant.").

Second, Plaintiffs are living in poverty, and the very reason for bringing this case is their lack of financial resources. *See, e.g.*, *Swanson v. Univ. of Haw. Prof'l Assembly*, 269 F. Supp. 2d 1252, 1261 (D. Haw. 2003) (bond waived based on ability to pay and because injunction sought enforcement of constitutional rights); *Johnson v. Bd. of Police Comm'rs*, 351 F. Supp. 2d 929, 952 (E.D. Mo. 2004) (bond waived for homeless plaintiffs); *Wayne Chem. v. Columbus Agency Serv. Corp.*, 567 F.2d 692, 701 (7th Cir. 1977) (bond waived for indigent person); *Bass v. Richardson*, 338 F. Supp. 478, 490 (S.D.N.Y. 1971) ("[I]ndigents, suing individually or as class plaintiffs, ordinarily should not be required to post a bond under Rule 65(c)."); *see also* 11A Wright & Miller § 2954 (courts can waive bond for poor plaintiffs).

Finally, Plaintiffs are likely to succeed on the merits. Plaintiffs could not pay Traffic Debt because of their poverty, and Defendants suspended their licenses without notice and op-

portunity to be heard on their ability to pay and subjected them to unduly harsh and discriminatory debt collection practices using the apparatus of the state.

## CONCLUSION

A preliminary injunction should enter requiring Defendants (1) to refrain from enacting and continuing the suspension of driver's licenses without providing notice, an opportunity to be heard, and a determination that the licensee has the ability to pay Traffic Debt, and (2) to reinstate those licenses unconstitutionally suspended, including waiving any reinstatement fees.

Respectfully submitted,

s/ Matthew G. White
_____
Matthew G. White (TN #30857)
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC
First Tennessee Bank Building
165 Madison Avenue, Suite 2000
Memphis, Tennessee 38103
901-577-8182
mwhite@bakerdonelson.com

s/ Claudia Wilner
_____
Claudia Wilner (NY #4264156) (*admitted pro hac*)
Edward P. Krugman (NY #1665892) (*admitted pro hac*)
Theresa Lau (NY #5496526) (*admitted pro hac*)
NATIONAL CENTER FOR LAW AND
ECONOMIC JUSTICE
275 Seventh Avenue, Suite 1506
New York, NY 10001
212-633-6967
wilner@nclej.org
krugman@nclej.org
lau@nclej.org

s/ Premal Dharia
_____
Premal Dharia (DC #484091) (*admitted pro hac*)
Jonas Wang (NY #5531769) (*admitted pro hac*)
CIVIL RIGHTS CORPS
910 17th Street NW, Suite 500
Washington, DC 20006
202-670-4809
premal@civilrightscorps.org
jonas@civilrightscorps.org

s/ Josh Spickler
_____
Josh Spickler TN (TN #21019) (*pro hac vice admission forthcoming*)
JUST CITY
902 South Cooper Street
Memphis, TN 38104
901-206-2226
josh@justcity.org

September 21, 2017

25

<u>**CERTIFICATE OF SERVICE**</u>

       The undersigned hereby certifies that on this 21st day of September, 2017, a true and correct copy of the foregoing will be served as follows:

<u>On the following via U.S. Mail and Email</u>:

Mike Jennings
Wilson County Attorney
326 North Cumberland Street
Lebanon, TN  37087
*mjenningslaw@aol.com*

Josh McCreary
Rutherford County Attorney
16 Public Square North
Murfreesboro, TN  37130
*jmccreary@mborolaw.com*

Andy Wright
Lebanon City Attorney
200 N. Castle Heights Avenue
Lebanon, TN  37087
*andy.wright@lebanontn.org*

Gino Marchetti
Mount Juliet City Attorney
2908 Poston Avenue
Nashville, TN  37203
*gmarchetti@tpmblaw.com*

David W. Purkey, in his official capacity as Commissioner
for the Tennessee Department of Safety and Homeland Security
c/o Michael A. Meyer
Tennessee Attorney General, Special Counsel
Law Enforcement and Special Prosecutions
P.O. Box 20207
Nashville, TN 37202
*michael.meyer@ag.tn.gov*

          /s/ Matthew G. White
          Matthew G. White