# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | | |
|---|---|---|
| **FRED ROBINSON, ASHLEY SPRAGUE,** | ) | |
| **and JOHNNY GIBBS, on behalf of themselves** | ) | |
| **and all others similarly situated,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:17-cv-1263** |
| | ) | **Judge Aleta A. Trauger** |
| **DAVID W. PURKEY, Commissioner of the** | ) | |
| **Tennessee Department of Safety and Homeland** | ) | |
| **Security, in his official capacity,** ***et al.***, | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

Before the court is Fred Robinson and Ashley Sprague's Motion for Temporary Restraining Order Directing Immediate Restoration of their Driver's Licenses ("TRO Motion") (Docket No. 24), to which Tennessee Department of Safety and Homeland Security ("TDSHS") Commissioner David W. Purkey has filed a Response (Docket No. 47), and Robinson and Sprague have filed a Reply (Docket No. 61). The court held a hearing on that motion on October 4, 2017 ("TRO Hearing"). For the reasons below, the TRO Motion will be granted and Commissioner Purkey will be ordered to direct the TDSHS to reinstate the driver's licenses of Robinson and Sprague pending a hearing on a preliminary injunction.

## BACKGROUND AND PROCEDURAL HISTORY

On September 13, 2017, Sprague and Robinson, along with their co-plaintiff Johnny Gibbs, filed the Complaint in this matter against various defendants involved in the administration of Tennessee's driver's license system, in particular in Wilson and Rutherford Counties. (Docket No. 1.) According to the Complaint, Robinson is a resident of Murfreesboro,

1

and Sprague is a resident of Lebanon. (*Id.* ¶¶ 14–15.) Robinson's driver's license was suspended on September 16, 2016. (*Id.* ¶ 99.) Sprague's license was suspended in September 2015, although she claims not to have been aware of the suspension until May 2016. (*Id.* ¶¶ 109, 114.) Purkey, the only defendant subject to Robinson and Sprague's proposed TRO (Docket No. 24-1), is the Commissioner of the TDSHS, the agency charged with the administration of Tennessee's Uniform Classified and Commercial Driver License Act, Tenn. Code Ann. § 55-50-201.

## A. Tennessee's Driver's License Laws Regarding 'Traffic Debt'

The State of Tennessee generally prohibits drivers from using its streets and highways without a driver's license. Tenn. Code Ann. § 55-50-301(a)(1). An applicant for a Tennessee driver's license must furnish certain required information confirming her eligibility and submit to an examination, including "an actual demonstration of ability to exercise ordinary and reasonable control in the operation of a motor vehicle." Tenn. Code Ann. §§ 55-50-321, 55-50-322(a)(1)(A). In certain statutorily prescribed situations, an individual who has previously obtained a valid driver's license may have the associated privileges rescinded, through revocation, suspension, or cancellation of the license. Tenn. Code Ann. §§ 55-50-501, 55-50-502(a) & (b). As relevant to this case, the TDSHS "is authorized to suspend the license of an operator or chauffeur upon a showing by its records or other sufficient evidence that the licensee," *inter alia*, "[h]as been finally convicted of any driving offense in any court and has not paid or secured any fine or costs imposed for that offense" or "[h]as failed to appear in any court to answer or to satisfy any traffic citation issued for violating any statute regulating traffic." Tenn. Code Ann. § 55-50-502(a)(1), (a)(1)(H)–(I). The plaintiffs refer to the payment obligations pursuant to which a driver's license may be suspended under Tenn. Code Ann. § (a)(1)(H) & (I) collectively as "Traffic Debt."

2

Based on the briefing of the parties and representations by counsel at the TRO Hearing, the parties appear to agree that TDSHS itself is not charged with the initial collection of Traffic Debt, which is instead overseen by county and municipal court clerks. If a driver fails to pay Traffic Debt, however, the relevant clerk provides notice of the nonpayment to the TDSHS, which then effects the suspension of the driver's license. Tennessee's license suspension statute "authorize[s]," but does not by its language require, the TDSHS to suspend the license of an individual who is eligible for suspension for nonpayment of Traffic Debt. Robinson and Sprague contend that, despite TDSHS's statutory discretion, its policy and practice is to automatically suspend the license of any driver who is subject to a notice of nonpayment. For the purpose of the instant motion, it is sufficient for the court to observe that there has been no suggestion, by Purkey or otherwise, that Robinson and Sprague's licenses were suspended for any reason other than the TDSHS's receipt of notices of Traffic Debt nonpayment from the relevant clerks. (Docket No. 47, at 3–4.)

Tennessee law expressly contemplates that a county or municipal court may offer a driver the option of agreeing to a payment plan that would allow her to retain her license, despite failing to pay her Traffic Debt immediately in full:

> A person whose license has been suspended, pursuant to subdivision (a)(1)(H) or (a)(1)(I), subject to the approval of the court, may pay any local fines or costs, arising from the convictions or failure to appear in any court, by establishing a payment plan with the local court or the court clerk of the jurisdiction. Notwithstanding § 55-50-303(b)(2), the fines and costs for a conviction of driving while suspended, when the conviction was a result of a suspension pursuant to subdivision (a)(1)(H) or (a)(1)(I), may be included in such payment plan, subject to the approval of the court.

Tenn. Code Ann. § 55-50-502(d)(2). The TDSHS is authorized to reinstate the individual's driving privileges upon receipt of certification that the payment plan was approved and the driver

Case 3:17-cv-01263   Document 62   Filed 10/05/17   Page 3 of 22 PageID #: 545

has "satisfied all other provisions of law relating to the issuance and restoration of a driver license." Tenn. Code Ann. § 55-50-502(d)(3).

Subsection (d), however, does not on its face require any court to "approv[e]" payment plans or require any court or clerk to "establish[]" a payment plan system.[1] Nor does it set forth any specific situation in which a driver would be entitled to a payment plan or any standard to which payment plans must adhere. Moreover, the provision of the statute governing the apportionment of costs for payment plan administration appears to acknowledge that some counties may participate in the offering of such plans while some counties may not:

> *Any county that participates* in the payment plan authorized by this subsection (d) shall pay to the state any expense required to be paid for state implementation of this subsection (d). The payment shall be divided pro rata among the counties to which this subsection (d) applies. The payment shall be made prior to the implementation by the county of this subsection (d).

Tenn. Code Ann. § 55-50-502(d)(6) (emphasis added). For jurisdictions that do offer payment plans, there is no statutory requirement that the plan be calculated to be affordable based on the driver's economic status. *See* Tenn. Code Ann. § 55-50-502(d)(3)–(4).

At the TRO hearing, however, counsel for Commissioner Purkey premised his argument against a temporary restraining order, at least in part, on a reading of subsection (d) that would not only guarantee a driver the opportunity for a payment plan, but also the right to have that plan consider and account for the driver's indigence:

> [T]he state process here meets—goes beyond what is required. There is—first of all, once someone is cited for a traffic violation, there is the ability to contest the citation. Once that's done then, again, the second step is under the payment plan.

---

[1] Tenn. Code Ann. § 55-50-502(d)(1) provides that the subsection of the statute authorizing payment plans "applies statewide." This language appears intended to contrast with the requirement, in Tenn. Code Ann. § 55-50-502(a)(1)(H), that pre-suspension installment plans be available to drivers in "any county having a population of not less than eight hundred ninety-seven thousand four hundred (897,400) nor more than eight hundred ninety-seven thousand five hundred (897,500), according to the 2000 federal census or any subsequent federal census." While subsection (d)(1) makes clear that payment plans are permitted statewide, it does not by its language impose an obligation for any particular jurisdiction to make such plans available.

> If you can't pay, you get a plan. . . . [A]nd they have a right to be heard on that indigence—indigency claim. So that—they've had all that.

(Statement by Michael Alan Meyer, TRO Hearing (transcript pending).) At this stage in proceedings, the court is unable to conclude whether or to what extent Tennessee's various local clerk's offices share Purkey's interpretation of the statute. Although the court will, in short order, presumably have the opportunity to be more fully briefed on the local defendants' positions on the matter, the court must, for the purpose of the TRO Motion only, rely on the evidence before it, which consists primarily of the statutory text and Robinson and Sprague's accounts of their own Traffic Debt experiences.

Finally, state law imposes additional reinstatement fees when a driver whose license was suspended becomes eligible to restore her driving privileges. Tenn. Code Ann. § 55-12-129. Such fees vary, based on the particulars of the individual suspension, and TDSHS regulations permit individuals with reinstatement fees over $200 to enter into payment plans. Those plans, however, require a $200 down payment along with a $25 processing fee and minimum quarterly payments of $300. Tenn. Comp. R. & Regs. 1340-02-05-.02, -.04, -.10.

**B. Robinson and Sprague's Traffic Debt**

Robinson and Sprague have filed 28 U.S.C. § 1746 unsworn declarations under penalty of perjury attesting to their respective economic circumstances and their experiences under the state's system for the suspension of driver's licenses for the nonpayment of Traffic Debt. (Doc. Nos. 16 & 28.) Both describe series of events whereby they, despite being financially unable to satisfy their Traffic Debt, were not afforded the opportunity for any accommodations based on indigence and accordingly had their licenses suspended. The below facts were taken primarily from Robinson and Sprague's declarations and are recounted without prejudice to future refutation or impeachment by any defendant.

5

### 1. Robinson

On June 24, 2016, while driving his sister's car in Wilson County, Robinson received misdemeanor traffic citations for speeding and failing to maintain valid insurance, for which he was assessed fines in the total amount of $441. (Docket No. 16 ¶ 5.) Unable to pay that sum, Robinson inquired, through pro bono counsel, into whether Wilson County authorities were willing to place him on a payment plan. Through that inquiry, he learned that Wilson County does not permit partial payments or payment plans for traffic tickets. (*Id.* ¶ 8.) In order to reinstate his license, Robinson now must satisfy his $441 in Traffic Debt, as well as pay a minimum of $200 (plus a $25 fee) toward a total of $323 in reinstatement fees. (*Id.* ¶ 11.)

Purkey has been able to locate and produce correspondence from TDSHS to Robinson regarding the suspension of his license. In a letter from TDSHS's Director of Financial Responsibility, Susan Lowe, dated November 23, 2016, Lowe informed Robinson:

> Our Department was notified by [the] Wilson County [General Sessions] Clerk that you failed to satisfy citation #[*******] issued to you on June 24, 2016. To avoid suspension of your driving privileges, our Department must receive certification from the Clerk of the Court that the citation has been satisfied. If the certification is not received, your driver license, driving privileges, and privilege to obtain a license will be suspended effective thirty (30) days from the date of this notice, (55-50-502 T.C.A.).
>
> [. . . .]
>
> If the information received from the court is in error, you should contact the court and have them submit any corrections to our Department. If there is an error, you are entitled to a hearing by the Department if your request is made in writing within thirty (30) days from the date of this notice. The scope of the hearing would be limited to the issue of whether or not the citation has been satisfied prior to the proposed date of suspension.

(Docket No. 50-3.) A second letter, dated January 9, 2017, informed Robinson that his license was suspended. (Docket No. 50-4.)

Robinson suffers from severe ulcerative colitis and cirrhosis of the liver, which have left him with serious physical disabilities and unable to work. (*Id.* ¶ 3.) His sole source of income is a monthly Social Security Disability benefit of $759. Because Robinson's disability benefit is less than his living expenses, he relies on his family for assistance and sometimes forgoes prescribed medications that he cannot afford. He says that he does not have enough money for food or rent and typically eats only one meal per day. (*Id.* ¶ 4.)

Robinson receives regular treatment for his ailments from at least two doctors, including one whose office is in Nashville, over thirty miles from Robinson's home. One of Robinson's treating physicians has recommended that he begin consultation with a Memphis-based specialist about the possibility of a liver transplant. (*Id.* ¶ 13.) Robinson maintains that driving is the only practicable method of transportation that would allow him to pursue the transplant in Memphis and to avoid routinely missing his appointments in Murfreesboro and Nashville. (*Id.* ¶¶ 13, 17.) He currently relies on his mother and sister to drive him to appointments, but their availability is limited by their own work and family responsibilities. (*Id.* ¶ 15.) Robinson claims that, because his mother and sister were unavailable and he could not lawfully drive himself, he recently missed a scheduled ultrasound to detect blockage in tubes between his heart and liver. Robinson has suffered such blockages in the past, resulting in increased pain, vomiting blood, and hospitalization. (*Id.* ¶ 17.)

2. Sprague

In April 2015, Sprague was issued traffic citations by the City of Mt. Juliet for speeding and failure to have proof of insurance, resulting in Traffic Debt of $477.50. (Docket No. 28 ¶ 4.) In September 2015, the TDSHS suspended Sprague's license, based on her failure to pay that amount. Sprague claims that, although she was living and receiving mail at an address on file

with the TDSHS, she never received any notice that her license would be or had been suspended. (*Id.* ¶ 6.)

In March 2016, Sprague was issued a civil traffic citation by the City of Lebanon in the amount of $224.50 for failure to have proof of insurance. Although Sprague's license had been suspended by that time, the issuing officer did not inform her that her license was no longer effective or cite her for driving on a suspended license. In May 2016, Sprague was again issued civil traffic citations by the City of Lebanon, this time for driving with an expired registration, failure to have proof of insurance, and driving on a suspended license. The total amount of these citations was $244. According to Sprague, the May 2016 citation was her first notice that her license had been suspended. (*Id.* ¶¶ 7–8.)

Sprague says that she attempted to pay $80 toward her tickets but was informed that payment plans were not available. Accordingly, she would be required to pay her Traffic Debt in lump sums of nearly $500 each to the relevant jurisdictions. (*Id.* ¶¶ 9–10.) Sprague attests that she was never offered, nor had the opportunity to have, a hearing regarding her suspension and that, if she had been provided a hearing, she would have argued that she was unable to satisfy the full amount owed. (*Id.* ¶ 11.) In order to have her license reinstated now, Sprague would have to satisfy the $946 in Traffic Debt and pay a minimum of $200 (plus a $25 fee) toward a total of $388 in reinstatement fees. (*Id.* ¶ 12.)

Sprague is the single mother of five children, one of whom lives with her. Sprague's other four children live with their grandparents because she is financially unable to care for them. (*Id.* ¶ 3.) At the time she incurred her initial Traffic Debt in April 2015, Sprague was working as a server at a Waffle House, where she made $2.13 an hour plus tips. (*Id.* ¶ 5.) She says that she lost that job because of her lack of reliable, affordable transportation to work. (*Id.* ¶ 15.) Sprague

has also recently had short stints of employment at gas stations near her house, but she lost those jobs due to a lack of reliable transportation as well. Currently, Sprague works for her mother's cleaning business, from which she receives take-home pay of about $150 per week, less than her current rent. (*Id.* ¶¶ 15–16.)

## C. Procedural History

Robinson, Sprague, and Gibbs brought the Complaint on their own behalf and on behalf of similarly situated people pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure. They raise three constitutional challenges to the state's laws governing suspension of driver's licenses for nonpayment of Traffic Debt:

1. The plaintiffs' First Claim for Relief alleges that the defendants' effecting and continuing the suspension of people's driver's licenses for nonpayment of Traffic Debt without any inquiry into, or consideration of, the license holder's ability to pay violates the right to fundamental fairness guaranteed by the Fourteenth Amendment (Docket No. 1 ¶ 156);

2. The plaintiffs' Second Claim for Relief alleges that the defendants' effecting the suspension of driver's licenses—with either no notice or right to an ability-to-pay hearing (with regard to Tenn. Code Ann. § 55-50-502(a)(1)(H) suspensions), or with notice but only a right to a hearing on whether the license holder has failed to pay the relevant Traffic Debt (with regard to Tenn. Code Ann. § 55-50-502(a)(1)(I) suspensions)—violates the right to procedural fairness guaranteed by the Fourteenth Amendment (*Id.* ¶¶ 157–58); and

3. The plaintiffs' Third Claim for Relief alleges that the defendants' effecting and continuing the suspension of driver's licenses from indigent people who owe Traffic

Debt to the state and its counties and municipalities, but not imposing similar sanctions on other judgment debtors, violates the right to equal protection under law guaranteed by the Fourteenth Amendment (*Id.* ¶ 159).

The plaintiffs seek declaratory and injunctive relief, including reinstatement of the driver's licenses of Robinson, Sprague, and all members of the putative class other than members of the multi-barrier subclass. (*Id.* at 30.)

On September 21, 2017, Robinson and Sprague filed a Motion for Temporary Restraining Order, requesting that Purkey immediately be required to restore Robinson and Sprague's driver's licenses without payment of fees. (Docket No. 24.) The plaintiffs have also filed motions for class certification, a preliminary injunction, and expedited discovery, which are not yet ripe for disposition. (Docket Nos. 13, 25, 29.)

The court entered an Order providing that the TRO Motion would be held in abeyance until Robinson and Sprague filed proof that they had obtained the necessary insurance to comply with Tennessee's driver financial responsibility laws, which are not being challenged in this action. (Docket No. 38.) Robinson and Sprague filed proof of insurance on September 26, 2017. (Docket No. 41.) The court held the TRO Hearing on October 4, 2017.

## LEGAL STANDARD

Temporary restraining orders and preliminary injunctions are extraordinary remedies that "should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington–Fayette Urban Co. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). Purkey argues that Robinson and Sprague face a heightened standard because they seek a mandatory injunction that goes beyond preserving the pre-litigation status quo. The Sixth Circuit, however, has been skeptical of such arguments, confirming that "[t]he difference

10

between mandatory and prohibitory injunctive relief does not warrant application of differing legal standards." *NACCO Materials Handling Grp., Inc. v. Toyota Materials Handling USA, Inc.*, 246 F. App'x 929, 935 n.2 (6th Cir. 2007) (quoting *United Food and Commercial Workers Union, Local 1099 v. Sw. Ohio Regional Transit Auth.*, 163 F.3d 341, 348 (6th Cir. 1998)).

To determine whether a temporary restraining order or a preliminary injunction should issue, the court must generally consider four factors: (1) the movant's likelihood of success on the merits; (2) whether the movant will suffer irreparable harm without the injunction; (3) whether granting the injunction will cause substantial harm to others; and (4) the impact of the injunction on the public interest. *See, e.g.*, *Workman v. Bredesen*, 486 F.3d 896, 905 (6th Cir. 2007); *Rock & Roll Hall of Fame & Museum v. Gentile Prods.*, 134 F.3d 749, 753 (6th Cir. 1998). These four factors "are factors to be balanced not prerequisites that must be met." *Six Clinics Holding Corp., II v. Cafcomp Sys.*, 119 F.3d 393, 400 (6th Cir. 1997). Nonetheless, the court must address each factor "unless fewer factors are dispositive of the issue." *Id.* at 399.

## ANALYSIS

### A. Likelihood of Success on the Merits

Robinson and Sprague argue that they are likely to succeed on the merits because their argument that a driver's license cannot be suspended for nonpayment of fines and costs without an indigence determination rests on a straightforward application of a number of relevant Supreme Court precedents, namely *Griffin v. Illinois*, 351 U.S. 12 (1956); *Williams v. Illinois*, 399 U.S. 235 (1970); *Tate v. Short*, 401 U.S. 395 (1971); and *Bearden v. Georgia*, 461 U.S. 660 (1983) ("*Bearden* Cases"); as well as the related case of *James v. Strange*, 407 U.S. 128 (1972). Purkey argues that those cases are inapplicable to the question of driver's license suspensions and that Robinson and Sprague are unlikely to succeed on the merits because the state's scheme

11

is subject only to rational basis review and is rationally related to legitimate government objectives. *See Midkiff v. Adams Cty. Reg'l Water Dist.*, 409 F.3d 758, 770 (6th Cir. 2005) ("Under rational basis review, the governmental policy at issue will be afforded a strong presumption of validity and must be upheld as long as there is a rational relationship between the disparity of treatment and some legitimate government purpose." (citations omitted)).

    1. The *Bearden* Cases (First Claim for Relief)

    In the *Bearden* Cases, the Supreme Court set forth and refined certain core protections for indigent individuals facing state-imposed consequences based on their failure to pay sums owed related to their convictions. First, in *Griffin*, the Supreme Court held that the State of Illinois had violated both the Due Process and Equal Protection Clauses of the Fourteenth Amendment by failing to furnish trial transcripts to criminal defendants who needed the transcripts to obtain appellate review of their convictions but were unable to afford the required fees. The Court observed that, although Illinois's requirements on their face applied equally to all criminal appellants, their effect was "to deny adequate appellate review to the poor while granting such review to all others." *Griffin*, 351 U.S. at 13. The Court did not explain its holding in terms of either "rational basis" or "strict scrutiny," presumably because those rubrics had not yet taken the firm hold they now possess over so much constitutional litigation. *See Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2327 (2016) (Thomas, J., dissenting) (observing that "[o]nly in the 1960's did the Court begin in earnest to speak of 'strict scrutiny' versus reviewing legislation for mere rationality, and to develop the contours of these tests"). Rather, the Court explained its holding as an extension of the basic principle, dating in its roots at least back to the Magna Carta, that "due process and equal protection both call for procedures in criminal trials which allow no invidious discriminations between persons and different groups of persons." *Id.* at 17. The Court

12

stressed that Illinois' scheme offended the Constitution, even though the Constitution itself did not require Illinois to provide any appellate courts at all. *Id.* at 18 (citing *McKane v. Durston*, 153 U.S. 684, 687–88 (1894)).

Next, in *Williams*, the Court extended the logic of *Griffin* to hold that a court could not increase an indigent defendant's imprisonment past his maximum sentence, based solely on his inability to pay fines arising out of his conviction:

> Since only a convicted person with access to funds can avoid the increased imprisonment, the Illinois statute in operative effect exposes only indigents to the risk of imprisonment beyond the statutory maximum. By making the maximum confinement contingent upon one's ability to pay, the State has visited different consequences on two categories of persons since the result is to make incarceration in excess of the statutory maximum applicable only to those without the requisite resources to satisfy the money portion of the judgment.

399 U.S. at 242. The Court stressed that its holding did not render the state "powerless to enforce judgments against those financially unable to pay a fine," but rather merely required it to avail itself of the "numerous alternatives" on which it could rely to enforce the convicted person's debts without unconstitutionally imposing a greater maximum sentence on the indigent than the non-indigent. *Id.* at 244.

In *Tate*, the Court relied on *Williams* to hold that a Texas court violated the Equal Protection Clause by ordering the imprisonment of an indigent person based on his failure to pay traffic fines. 401 U.S. at 399. Again, the Court emphasized that the constitutional defect was not in the act of imposing a consequence on nonpayment, but in the fact that applying that consequence to a truly indigent person had the practical effect of imposing greater punishment based on the economic status of the violator. *Id.* at 401 ("We emphasize that our holding today does not suggest any constitutional infirmity in imprisonment of a defendant with the means to pay a fine who refuses or neglects to do so.").

13

Finally, in *Bearden* itself, the Court held that Georgia could not revoke an individual's probation for failure to pay a fine or make restitution without first finding that the probationer was responsible for that failure or that alternative forms of punishment were inadequate. 461 U.S. at 672–73. The Court explained that "depriv[ing] the probationer of his conditional freedom simply because, through no fault of his own, he [could not] pay the fine" was "contrary to the fundamental fairness required by the Fourteenth Amendment." *Id.* The *Bearden* Court took the opportunity to consider the *Williams* line of cases in the context of developments in the law emphasizing the now-commonplace tiered system of judicial review of state actions, noting that "[t]he parties, following the framework of *Williams* and *Tate*, have argued the question primarily in terms of equal protection, and debate vigorously whether strict scrutiny or rational basis is the appropriate standard of review." *Id.* at 665. The Court, however, noted that the considerations at issue occupied a place in the Court's constitutional case law where "[d]ue process and equal protection principles converge" and that, "[w]hether analyzed in terms of equal protection or due process, the issue cannot be resolved by resort to easy slogans or pigeonhole analysis, but rather requires a careful inquiry into such factors as 'the nature of the individual interest affected, the extent to which it is affected, the rationality of the connection between legislative means and purpose, [and] the existence of alternative means for effectuating the purpose.'" *Id.* at 666–67 (quoting *Williams*, 399 U.S. at 260 (Harlan, J., concurring)).

The Sixth Circuit gave substantial consideration to the *Bearden* Cases in *Johnson v. Bredesen*, in which the court held that Tennessee's law requiring felons to pay child support and restitution before having their voting rights restored did not offend constitutional principles, despite lacking an indigence exception. 624 F.3d 742, 748 (6th Cir. 2010). The majority opinion in *Johnson* faulted *Griffin* and *Williams* for "fail[ing] to articulate a precise standard of review,"

but ultimately found them inapposite based on its conclusion that, because those cases involved access to courts or a risk of imprisonment, they were "concerned [with] fundamental interests" and, therefore, the challenged state actions were "subject to heightened scrutiny." *Id.* at 749. Despite the fact that *Bearden* eschewed the question of strict scrutiny and cited, in its analysis, the Court's consideration of "the rationality of the connection between legislative means and purpose," the *Johnson* majority similarly concluded that *Bearden* applied a heightened level of scrutiny, in light of the underlying threat of imprisonment, and therefore was inapposite. *Id.* at 748–49.

Although Robinson and Sprague may take issue with aspects of the *Johnson* analysis, the court is required to accept *Johnson* as binding for the purpose of considering their likelihood of success on the merits. Accordingly, the court accepts that, where a plaintiff raises a challenge to the lack of an indigence exception under the principles embodied by the *Bearden* Cases, but the underlying right at issue is not one that has been recognized by the courts as fundamental, then the governing test is the rational basis test set forth in *Johnson*. The *Johnson* court complained of the Supreme Court's history of "propound[ing] inconsistent iterations of the rational basis standard" but offered a formulation intended to "align[] with this Circuit's and the Supreme Court's most recent pronouncements." 624 F.3d at 749. As set forth in *Johnson*, a law challenged under the rational basis standard "will be sustained if it can be said to advance a legitimate government interest, even if the law seems unwise or works to the disadvantage of a particular group, or if the rationale for it seems tenuous." *Id.* (quoting *E. Brooks Books, Inc. v. Shelby Cnty.*, 588 F.3d 360, 364 (6th Cir. 2009)).

"While a fundamental right to travel exists, there is no fundamental right to drive a motor vehicle." *Duncan v. Cone*, No. 00-5705, 2000 WL 1828089, at *2 (6th Cir. Dec. 7, 2000).

15

Accordingly, the rational basis test set forth in *Johnson* applies. Even under that comparatively tolerant standard, however, Robinson and Sprague have demonstrated a likelihood of success on the merits, because the ostensible justification for the state's lack of an indigence exception is not merely tenuous, but wholly without basis in reason in light of the underlying dynamics at issue.

Purkey first argues that the suspensions are rationally related to the state's legitimate interest in ensuring the safety of the roadways. For that to be so, however, the underlying laws would have to draw some distinction based on actual expectation of safety risk, such as, for example, a distinction based on the severity or numerousness of the underlying offenses. The provisions at issue here are concerned only with whether the offender has paid her Traffic Debt or not. An individual capable of paying her fines and costs may, in any particular case, in fact be demonstrably more dangerous than an individual who cannot, but the provisions at issue do not take account of that fact. The state's interest in safety, therefore, is insufficient to support the distinction challenged by Robinson and Sprague.

Purkey argues next that the suspension provisions are rationally related to the legitimate government interest in enforcing the law by collecting fines and costs imposed by law. That argument is persuasive insofar as it is applied to individuals who are actually capable of paying those fines but unwilling to do so. For such a person, the threat of losing her license would serve as an incentive to ensure payment. No person, however, can be threatened or coerced into doing the impossible, and no person can be threatened or coerced into paying money that she does not have and cannot get. It is therefore difficult to discern the rational basis for the aspect of the scheme that Robinson and Sprague have challenged—the lack of an exception for the truly indigent.

*Johnson* upheld the lack of an indigence exception in that case on the ground that "[t]he legislature may have been concerned, for instance, that a specific exemption for indigent felons would provide an incentive to conceal assets and would result in the state being unable to compel payments from some non-indigent felons." 624 F.3d at 748. The court reasoned that, although the lack of an indigence exception rendered the statute arguably overbroad, it was "of no moment under rational basis review" "[t]hat the state used a shotgun instead of a rifle to accomplish its legitimate end." *Id.* at 748. That reasoning is persuasive insofar as it is applied to the right to vote, because the law's overbreadth is still consistent with the ultimate purpose of increasing the likelihood that the underlying obligations will be paid.

A far different calculus prevails, however, when the privilege lost is the ability to operate a car on the state's roadways. Unlike the power to vote, the ability to drive is crucial to the debtor's ability to actually establish the economic self-sufficiency that is necessary to be able to pay the relevant obligations. Robinson and Sprague have previewed substantial evidence demonstrating the necessity of driving to the ability to earn a living in Tennessee (*see* Docket No. 19-1 to -10), but one needs only to observe the details of ordinary life to understand that an individual who cannot drive is at an extraordinary disadvantage in both earning and maintaining material resources. Suspending a driver's license is therefore not merely out of proportion to the underlying purpose of ensuring payment, but affirmatively destructive of that end. In the parlance of *Johnson*, taking an individual's driver's license away to try to make her more likely to pay a fine is not using a shotgun to do the job of a rifle: it is using a shotgun to treat a broken arm. There is no rational basis for that.

At the core of the *Bearden* cases is not the distinction between fundamental and non-fundamental rights, but the principle that, when it comes to assessing the constitutionality of a

material burden, "[l]aw addresses itself to actualities," not merely the abstract. *Griffin*, 351 U.S. at 23 (Frankfurter, J., concurring). In the abstract, perhaps one could imagine that it makes sense to threaten even the indigent with the loss of their licenses, so as to give the state the harshest and least encumbered tool available to ensure payment by the non-indigent. In the realm of actualities, however, any such rationale collapses under the weight of its own contradictions. Providing a marginally more efficient tool for collecting from the non-indigent is simply no rational justification for aggressively reducing the likelihood of payment by the indigent. Whatever bare minimum of rationality is required to pass muster under *Johnson*, a law that is transparently counterproductive to the professed legitimate purpose falls short. Robinson and Sprague have therefore demonstrated a likelihood of success on the merits with regard to their legal arguments under the *Bearden* Cases.

### 2. *James v. Strange* (Third Claim for Relief)

In *James v. Strange*, the Supreme Court struck down, on equal protection grounds, a Kansas scheme that imposed aggressive measures for the collection of amounts expended on counsel and other fees related to the defense of indigent defendants. 407 U.S. at 128. The Court held that the state may not "impose unduly harsh or discriminatory terms merely because the obligation is to the public treasury rather than to a private creditor," *id.* at 138, taking particular issue with the Kansas scheme's omission of exemptions, available to other debtors, designed to protect the debtor's core personal resources. *Id.* at 135–36. Purkey has argued that *Strange* is inapposite because Robinson and Sprague's fines are punitive in nature and therefore should not be treated as the equivalent of ordinary debt. The plaintiffs, however, challenge the imposition of the Tennessee scheme to all Traffic Debt, and the statutes at issue authorize suspension not just for a driver's failure to pay fines but her failure to pay costs. *See* Tenn. Code Ann. § 55-50-

18

502(a)(1)(H). *James v. Strange* is therefore arguably apposite to at least certain aspects of the challenged scheme.

Because *James v. Strange* offers fairly little by way of explanation of what amounts to an "unduly harsh" collection mechanism, it is somewhat difficult to predict how it will apply to any given case. In this instance, however, Robinson and Sprague challenge a regime that offers no exemptions or accommodations whatsoever that are designed to protect even the barest survival resources. They accordingly have shown at least some likelihood of success under their *James v. Strange* equal protection claim.

### 3. Procedural Due Process (Second Claim for Relief)

Because the court has concluded that Robinson and Sprague have a likelihood of success on their claim that they are entitled to a substantive exception to the license suspension regime based on indigence, it inevitably follows that they have a likelihood of success on their procedural due process claim. Purkey does not dispute that a driver's license, once issued, creates an interest substantial enough that it cannot be deprived without affording some minimum of due process. *See Dixon v. Love*, 431 U.S. 105, 112 (1977) ("It is clear that the Due Process Clause applies to the deprivation of a driver's license by the State"); *Bell v. Burson*, 402 U.S. 535, 539 (1971) ("Suspension of issued licenses . . . involves state action that adjudicates important interests of the licensees. In such cases the licenses are not to be taken away without that procedural due process required by the Fourteenth Amendment."). Robinson and Sprague, by their accounts, have been afforded no opportunity for a determination of their indigence, and therefore procedural due process has not been satisfied. The court need not, at this juncture, opine about the precise nature of notice and hearing to which a potentially indigent driver is entitled, given that no such hearing was afforded here.

19

**B. Other Factors**

The remaining factors governing a request for a temporary restraining order similarly counsel in favor of granting Robinson and Sprague the limited relief they have requested. Robinson and Sprague have established not only the substantial and irreparable harm that ordinarily accompanies an unconstitutional deprivation, but an imminent risk of escalating and irreversible material consequences if they are not allowed to drive. Robinson faces a need for regular medical care that appears likely only to worsen as long as it is unaddressed. Sprague has attested that her position is so economically precarious that the detriments to her well-being and ability to parent are only accumulating. These harms are more than sufficient to warrant preliminary relief.

Purkey argues that the imminence of the harm to Robinson and Sprague is belied by the fact that they did not seek relief sooner. Robinson and Sprague, however, have persuasively described their previous efforts to mitigate the harm caused by the loss of their licenses, as well as the ultimate inadequacy of those efforts and the resultant worsening of the associated harms. The court will not punish Robinson and Sprague for first trying to address their injuries through their own power before resorting to a request for equitable relief.

Restoring the licenses of two people who would already have those licenses if they had simply had the resources to pay their debts would pose a minimal harm to either Purkey or the public at large. Indeed, Purkey would only be asked to restore the licenses of two individuals whose deprivations were effected inconsistently with his own professed reading of the relevant statutes at the TRO Hearing. The discretion not to suspend the license of such an individual appears to be well within his statutory authorization.

20

Finally, the public interest would be served not only by righting a probable constitutional wrong, but by making both movants, particularly Sprague, more likely to pay the funds they owe to the relevant governments. This is not a case about whether Robinson and Sprague should be permitted to avoid the fines and costs that they owe. Reinstating Robinson and Sprague's licenses would in no way erase their debts, nor would it preclude local authorities from seeking to enforce those debts through other means. Sprague in particular appears, at one time, to have possessed the financial ability at least to pay her Traffic Debt over time, before her earning power was substantially reduced by her inability to drive. Restoring that ability to drive would serve the important public purpose of increasing the likelihood that those debts are paid.

## C. Bond

"The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Robinson and Sprague ask that they not be required to post bond in this matter, because the burdens associated with the re-issuance of their licenses are small and their likelihood of success is high. The costs that Purkey faces, however, are not nonexistent. Moreover, Robinson and Sprague's success on the merits, though likely based on the facts before the court, is far from certain, particularly in light of the substantial tensions underlying the *Bearden* Cases and their application under *Johnson*. There are, moreover, factual questions about Robinson and Sprague's respective cases and situations that the defendants may ultimately have persuasive reasons to contest.

Robinson and Sprague also ask the court to decline to impose bond on the ground that they are currently living in poverty and posting bond would present an onerous requirement in

light of their resources. It is apparent to the court, however, that substantial resources have already been expended in the furtherance of Robinson and Sprague's claims, and the court sees little reason to think an additional reasonable obligation related to their request for preliminary relief would be prohibitive. The court will accordingly fix the security bond at a sum of $1,000.

## **CONCLUSION**

For the above reasons, Robinson and Sprague's Motion for Temporary Restraining Order Directing Immediate Restoration of their Driver's Licenses (Docket No. 24) will be granted and Commissioner Purkey will be ordered to direct the TDSHS to reinstate the two movants' driver's licenses.

An appropriate order will issue.

ENTER this 5th day of October 2017.

ALETA A. TRAUGER
United States District Judge