# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### AT NASHVILLE

| | | |
|---|---|---|
| FRED ROBINSON; ASHLEY SPRAGUE; JOHNNY GIBBS; and BRIANNA BOOHER, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>DAVID W. PURKEY, Commissioner of the Tennessee Department of Safety and Homeland Security, in his official capacity; DEBBIE MOSS, Circuit Court Clerk of Wilson County, Tennessee, in her official capacity; MELISSA HARRELL, Circuit Court Clerk of Rutherford County, Tennessee, in her official capacity; COREY LINVILLE, Court Clerk of the Municipal Court of Lebanon, Tennessee, in his official capacity; SUSAN GASKILL, Court Clerk of the City Court of Mt. Juliet, Tennessee, in her official capacity; WILSON COUNTY, TENNESSEE; RUTHERFORD COUNTY, TENNESSEE; LEBANON, TENNESSEE; and MT. JULIET, TENNESSEE,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 3:17-cv-01263<br>JUDGE TRAUGER |

## CORRECTED AMENDED COMPLAINT - CLASS ACTION

Plaintiffs Fred Robinson, Ashley Sprague, Johnny Gibbs, and Brianna Booher (collectively "Plaintiffs") respectfully submit this Corrected Amended Complaint[1] in support of their claims against Defendants.

---

[1] From their Amended Complaint, Plaintiffs have corrected the date from 2017 to 2016 in Paragraph 119; deleted Paragraphs 171 and 172, as those were redundant of Paragraphs 160 and 161; renumbered all subsequent paragraphs as a result; and added the phrase "and continuing" to Paragraph 249 to conform to Paragraphs 248 and 251.

## INTRODUCTION

1.     Over the past five years, Tennessee has suspended more than a quarter of a million driver's licenses for nonpayment of fines, court costs, and litigation taxes arising from driving offenses and traffic citations (together, "Traffic Debt"). These suspensions are not part of the punishment for any traffic-related infraction; they relate solely to debt collection.

2.     In most of Tennessee, a driver's license is essential to economic self-sufficiency and to meaningful participation in society. Without their driver's licenses, Plaintiffs and class members have difficulty finding and keeping employment, going to the doctor, attending church or other religious services, caring for and spending time with family members, taking their children to school, grocery shopping, and participating in other fundamental aspects of daily life. Deprived of their driver's licenses, they cannot secure and maintain the jobs necessary to earn the money to pay Traffic Debt.

3.     No court orders these suspensions; they are not part of the punishment for any traffic-related infraction. The suspensions are administrative acts of debt collection, initiated by court clerks and effected by the Tennessee Department of Safety and Homeland Security ("the Department"). For Plaintiffs and putative class members, these suspensions for nonpayment occur only because they are too poor to pay Traffic Debt.

4.     Throughout Tennessee, county and municipal court clerks collect Traffic Debt without any inquiry into the debtor's ability to pay. If the clerks do not receive payment, they notify the Department. The clerks make no inquiry into the reasons for nonpayment.

5.     Upon being notified of nonpayment by a clerk's office, the Department, under the purview of Defendant Purkey, suspends driver's licenses automatically, without conducting any

inquiry into the driver's ability to pay and without having received any information from the clerks as to the driver's ability to pay.

6. Many court clerks—such as the Defendants in this case—refuse to accept partial payments and do not offer payment plans for Traffic Debt. Indigent Tennesseans, if they can pay at all, are too poor to pay Traffic Debt in one lump sum. Unable to secure enough money to pay their Traffic Debt in a single payment, they cannot pay it at all. For this reason, for Plaintiffs and class members, Traffic Debt serves as an absolute barrier to regaining their driver's licenses.

7. As alleged in more detail below, under the statutory scheme and pursuant to the Department's policy and practice, many of these suspensions occur entirely without notice to the licensees.

8. Moreover, the Department *never* provides licensees with an opportunity to be heard on the central issue of whether they have the ability to pay the Traffic Debt.

9. Because the Department does not routinely notify people that their licenses have been or will be suspended, many people continue to drive in the mistaken belief that they have a valid license.

10. Others knowingly drive without a license because they need to get to work or important medical appointments and they have no other means of transportation.

11. Many Tennessee residents are charged with driving on suspended licenses, for which they incur more fines and costs that they cannot afford to pay, and for which they may even be incarcerated. Defendants' policies and practices thus trap indigent Tennesseans in a vicious cycle of debt from which escape is virtually impossible.

12. Defendants violate the Due Process and Equal Protection Clauses of the United States Constitution (1) by effecting the suspension of the licenses of Plaintiffs and class members

3

without notice and without consideration of their ability to pay, in violation of *Bearden v. Georgia*, 461 U.S. 660 (1983), and *Bell v. Burson*, 402 U.S. 535 (1971); and (2) by subjecting people who owe Traffic Debt to unduly harsh and discriminatory treatment as compared to other judgment debtors, in violation of *James v. Strange*, 407 U.S. 128 (1972).

13.     Plaintiffs and class members seek declaratory and injunctive relief, on behalf of themselves and all others similarly situated, prohibiting Defendants from suspending driver's licenses without providing notice and without considering ability to pay, in violation of the United States Constitution.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this action pursuant to 42 U.S.C. § 1983, 28 U.S.C. § 1331, and the Fourteenth Amendment to the United States Constitution. Declaratory relief is available pursuant to 28 U.S.C. §§ 2201 and 2202.

15.     Venue in this district is proper under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to this claim occurred in the district.

## PARTIES

16.     Plaintiff Fred Robinson resides in Murfreesboro, Tennessee.

17.     Plaintiff Ashley Sprague resides in Lebanon, Tennessee.

18.     Plaintiff Johnny Gibbs resides in Murfreesboro, Tennessee.

19.     Plaintiff Brianna Booher resides in Bristol, Tennessee.

20.     Defendant David W. Purkey is the Commissioner of the Tennessee Department of Safety and Homeland Security. He is sued in his official capacity.

4

21. Defendant Melissa Harrell is the Circuit Court Clerk of Rutherford County, Tennessee and, as such, is also the Clerk of other Rutherford County courts, including the General Sessions Court. She is sued in her official capacity.

22. Defendant Debbie Moss is the Circuit Court Clerk of Wilson County, Tennessee and, as such, is also the Clerk of other Wilson County courts, including the General Sessions Court. She is sued in her official capacity.

23. Defendant Corey Linville is the Clerk of the Municipal Court of Lebanon, Tennessee. He is sued in his official capacity.

24. Defendant Susan Gaskill is the Clerk of the City Court of Mt. Juliet, Tennessee. She is sued in her official capacity.

25. Together, Defendants Harrell, Moss, Linville, and Gaskill are the "Clerk Defendants."

26. Rutherford and Wilson Counties are two of the 95 counties of the State of Tennessee.

27. Mt. Juliet and Lebanon are municipalities in Wilson County, Tennessee.

## FACTUAL ALLEGATIONS

### *Collection of Traffic Debt*

28. In Tennessee, drivers without the ability to pay Traffic Debt lose their licenses under Tenn. Code Ann. § 55-50-502; those who have the ability to pay Traffic Debt keep their driver's licenses.

29. Collection of Traffic Debt is the responsibility of county court clerks and the clerks of municipal or city courts, including the Clerk Defendants, throughout Tennessee.

5

30. Tennessee law requires county and municipal court clerks to report convictions for violations of traffic laws to the Department within 30 days. Tenn. Code. Ann. § 55-10-306(b)(1).

31. No Tennessee law requires county and municipal court clerks to report nonpayment of Traffic Debt to the Department.

32. Nevertheless, most if not all county and municipal court clerks—including the Clerk Defendants—have adopted a policy and practice of notifying the Department whenever a person does not pay Traffic Debt within a certain period of time ("Notification Policy").

33. The Clerk Defendants know that Tennessee law permits the Department to suspend the licenses of any person who has not paid Traffic Debt.

34. The Clerk Defendants also know that the policy and practice of the Department is to suspend the license of every person about whom it has received notification of nonpayment of Traffic Debt, unless the Department receives subsequent notification from the clerk that the Traffic Debt has been paid.

35. The Clerk Defendants have chosen to adopt Notification Policies so that they can use the threat of suspension by the Department as a coercive tool to collect unpaid Traffic Debt.

36. Under their respective Notification Policies, the Clerk Defendants do not consider a driver's ability to pay Traffic Debt before sending notification of nonpayment to the Department.

37. Clerks generally provide a 30-90 day window for collection of the full amount of Traffic Debt. The number of days varies by jurisdiction.

38. When the deadline passes without payment, the clerks, as an act of debt collection, notify the Department of the nonpayment.

6

39.     The Clerk Defendants (or their predecessors in office) have each adopted Notification Policies under which they send notifications of nonpayment to the Department. The Clerk Defendants know that the reporting of nonpayment will trigger license suspension by the Commissioner. The Clerk Defendants engage in this discretionary act as part of their debt collection efforts. They do so without conducting any individualized inquiry into the reasons for nonpayment, including into the driver's ability to pay Traffic Debt.

### *Tennessee's Driver's License Suspension Law*

40.     Under Tennessee law:

> The Department is authorized to suspend the license of an operator or chauffeur upon a showing by its records or other sufficient evidence that the licensee . . .
>
> > (H)  Has been finally convicted of any driving offense in any court *and has not paid or secured any fine and costs* imposed for that offense . . . ; [or]
> >
> > (I)  *Has failed* to appear in any court to answer or *to satisfy any traffic citation* issued for violating any statute regulating traffic.

Tenn. Code Ann. § 55-50-502(a)(1), (a)(1)(H), (I) (West 2015) (together, the "Statute") (emphases added).

41.     When the Department receives notice from a clerk that a license-holder has not paid fines and costs imposed under subsection (a)(1)(H) or (I), it suspends that person's driver's license.

42.     If a person never had a valid driver's license, the Department creates a license number for that person and then "suspends" that "license."

43.     The Department ostensibly provides written notice to the licensee giving 30 days to request a hearing, but as alleged below in the cases of the named Plaintiffs, this notice frequently fails to reach the license-holders.

44.     Although the Statute merely "authorize[s]" such suspension, it is the policy and practice of the Department, under Defendant Purkey, to effect suspensions immediately and automatically upon expiration of the 30 day period following the Department's receipt of the clerk's notification of nonpayment. The Department, as a matter of policy and practice, conducts no inquiry into and makes no individualized determination as to a license-holder's ability to pay.

45.     Because they do not receive notice, many people regularly drive on the roads and highways of Tennessee without knowing that they may be committing an offense for which they could be subject to arrest, prosecution, and incarceration.

46.     In any event, even when the Department provides notice, the putative hearing is limited to whether there was a clerical or technical error in the records received by the Department, *not* whether, as the Constitution requires, the nonpayment was willful.

47.     "Error in the records received by the Department" is the only basis for a hearing provided by the Statute.  The Statute does not offer the opportunity to be heard on ability to pay Traffic Debt.

48.     The Department has a policy and practice of not offering hearings on the issue of ability to pay, and of not holding such hearings even if they are requested.

49.     The Statute allows for a person whose license was suspended under subsection (a)(1)(H) to apply to the court for a restricted license. However, the restricted license provisions are constitutionally inadequate because:

   (a)   The restricted license is valid only for going to and from work at the person's "regular place of employment."

   (b)   As a condition of receiving the restricted license, a person must make payments "calculated to fully pay the moneys owing." The statute does not require that the payments be affordable.

   (c)   People who are unemployed and searching for work, do not work, or who work but do not earn enough to make payments, cannot obtain or benefit from a restricted license.

8

(d)    The statute mandates that failure to make timely payments shall result in suspension of the restricted license, without inquiry into a person's ability to pay or whether the person had a good reason for missing the payment.

(e)    The statute allows the court to issue restricted licenses only one time per person. If a person's restricted license is suspended because of a missed payment, that person may not ever obtain a restricted license again.

Tenn. Code Ann. § 55-50-502(j).

50.    Restricted licenses are also largely unavailable. As a matter of policy and practice, neither the Department under Defendant Purkey, nor the Counties under Defendants Moss and Harrell, nor the municipalities under Defendants Linville and Gaskill, inform Traffic Debtors of the existence of restricted licenses under section 55-50-502(j), and the Clerk Defendants affirmatively tell Traffic Debtors that they must pay Traffic Debt in full in order to regain their licenses.

51.    Restricted licenses are not available for suspensions under subsection (a)(1)(I).

52.    Regardless of whether suspension is effected under subsection (a)(1)(H) or (I), the Department never provides a notice that offers the opportunity for a determination of ability to pay prior to or after suspension, and in no case is such a determination ever made.

### *Payment Plans for Traffic Debt*

53.    Payment plans for Traffic Debt are offered in only a few of Tennessee's 95 counties and even fewer municipalities. The vast majority of counties and municipalities refuse partial payment toward Traffic Debt and demand payment in full.

54.    Tennessee law provides that people with Traffic Debt "subject to the approval of the court, may pay any local fines or costs, arising from the convictions or failure to appear in any court, by establishing a payment plan with the local court or the court clerk of the jurisdiction." Tenn. Code Ann. § 55-50-502(d)(2); *see also id.* § 55-50-303(d).

9

55. The Department may reinstate a person's driving privileges upon receiving notice that the license-holder has entered into a payment plan and meets all other requirements for reinstatement. §§ 55-50-303(d)(2); 55-50-502(d)(3).

56. However, only Shelby County is required by statute to offer payment plans prior to suspension. Other counties may, at best, offer payment plans at their discretion, but the vast majority have not offered any. In 94 of Tennessee's 95 counties, pre-suspension payment plans are offered, if at all, only haphazardly. Outside of Shelby County, therefore, most people can enter into payment plans only *after* their license is suspended and they have already incurred a mandatory reinstatement fee.

57. These counties are not required to offer post-suspension payment plans.

58. Defendant Moss, in her official capacity as Circuit Court Clerk for Wilson County, has responsibility for deciding whether to offer payment plans for Traffic Debt in Wilson County General Sessions Court and in any other Court for which Defendant Moss is Clerk.

59. Defendant Moss (or her predecessor in office) has promulgated and continues to enforce a policy under which the Wilson County General Sessions Court offers payment plans for violations of § 55-50-504 (driving while license cancelled, suspended, or revoked) but not for any violations of § 55-8-103 (rules of the road).

60. Defendant Harrell, in her official capacity as Circuit Court Clerk for Rutherford County, has responsibility for deciding whether to offer payment plans for Traffic Debt in Rutherford County General Sessions Court and in any other Court for which Defendant Harrell is Clerk.

61. Defendant Harrell (or her predecessor in office) has promulgated and continues to enforce a policy under which the Rutherford County General Sessions Court does not offer pay-

ment plans for Traffic Debt. Defendant Harrell does offer payment plans under § 40-24-105(b), but the minimum payment is $50 per month.

62.     Bradley, Hamblen, Hamilton, Jefferson, Madison, Maury, Sumner, Sullivan, Washington, and Williamson Counties do not offer payment plans for Traffic Debt.

63.     Municipalities are likewise not required by state law to offer post-suspension payment plans and, on information and belief, few municipalities do so.

64.     Defendant Linville, in his official capacity as Clerk of the Lebanon City Court, has responsibility for deciding whether to offer payment plans for Traffic Debt in Lebanon City Court.

65.     Defendant Linville, on behalf of the City of Lebanon, has promulgated and continues to enforce a policy under which people must pay Traffic Debt in full. Defendant Linville and the City of Lebanon do not offer payment plans for Traffic Debt.

66.     Defendant Gaskill, in her official capacity as Clerk of the Mt. Juliet Municipal Court, has responsibility for deciding whether to offer payment plans for Traffic Debt in the Mt. Juliet City Court.

67.     Defendant Gaskill, on behalf of the City of Mt. Juliet, has promulgated and continues to enforce a policy under which people must pay Traffic Debt in full. Defendant Gaskill and the City of Mt. Juliet do not offer payment plans for Traffic Debt.

68.     Tennessee law does not require that payment plans be affordable to the license-holder when offered. § 55-50-502(d)(4); 55-50-502(d)(3).

69.     Tennessee law does not require notice to the license-holder of the existence or terms of a potential payment plan.

70.     Whether a given county or municipality offers payment plans is not a matter knowable from official sources of law.

71.     Under Tennessee law, if a person misses a single payment on a payment plan, the clerk must inform the Department. The Department then sends a written notice of proposed suspension to the licensee and allows the license-holder 30 days to request a hearing "to show that the person has, in fact, complied with" the payment plan.

72.     Tennessee law mandates that the Department suspend the license of anyone who misses a single payment no matter the reason for missing the payment.

73.     License-holders are never permitted to be heard on the question whether they are able to afford their payment plans.

74.     Any person who has defaulted once on the payment plan is ineligible to participate in the payment plan ever again. It is a "one strike and you're out" plan.

75.     A person who is too poor to pay anything at all cannot, in practice, benefit from a payment plan, even if one is theoretically offered.

### ***Reinstatement of Driver's Licenses***

76.     Once a driver's license is suspended, it must be reinstated in order for the license-holder to regain legal authorization to drive.

77.     This "reinstatement" requirement applies even to those who never possessed a valid license.

78.     A person whose license is suspended may request from the Department a document called "Reinstatement Requirements" that lists all of the things that person must do in order to obtain reinstatement of driving privileges.

79. For people whose licenses were suspended for nonpayment of Traffic Debt, the Reinstatement Requirements document states that the person must "Submit certification from the court(s) where convicted that all fines and costs have been paid for the following list of violations" or "Submit verification from the court(s) that the following list of ticket(s) has been satisfied."

80. The Reinstatement Requirements document does not provide information about alternatives for people who are too poor to pay Traffic Debt, nor does it offer the opportunity to be heard on ability to pay Traffic Debt.

81. Some indigent people whose licenses are suspended for nonpayment of Traffic Debt also have license suspensions or revocations on other grounds, such as under § 40-24-105 for nonpayment of criminal court fines, costs, and litigation tax ("Court Debt") (as with Plaintiff Gibbs) or under § 55-12-115 for failure to show proof of insurance (as with Plaintiff Robinson).

82. Suspension of a license for nonpayment of Traffic Debt is, for thousands of Tennessee license-holders, an insurmountable hurdle.

   a. Even if such license-holders have additional suspensions on other grounds, for the indigent, the nonpayment suspension is often the most significant barrier to reinstatement of a license.

   b. Conversely, resolution of a suspension for nonpayment of Traffic Debt will often provide a foundation for a driver to be able to resolve his or her other barriers to reinstatement and, thus, regain his or her driver's license.

83. Regardless of any additional suspensions that may exist, Plaintiffs and putative class members face indefinite license suspension so long as Defendants maintain their current policies of demanding payment without consideration of Plaintiffs' poverty and inability to pay.

13

84.     The Department maintains certified driver records ("Driver Record") for each person for whom a driver's license number has been issued.

85.     For drivers who have, or have had, multiple suspensions and/or revocations, the Driver Record identifies and tracks each one separately.

86.     The Department has procedures, which it exercises, to "remove" a given suspension or revocation when the requirements for such removal have been met, and it does so regardless of whether other suspensions or revocations remain on the Driver Record.

87.     To obtain reinstatement of a driver's license, an individual must pay the Department a reinstatement fee in addition to the Traffic Debt. The reinstatement fee can amount to hundreds of dollars or more.

88.     Pursuant to a regulation issued under the auspices of Defendant Purkey, the Department offers payment plans for people who owe more than $200 in reinstatement fees, but these payment plans are themselves out of reach for indigent Tennesseans.

89.     The only payment plans offered by the Department for reinstatement fees require a down payment of $200 and a processing fee of $25. Payments must be made in the amount of at least $300 every quarter, and the entire amount must be paid within two years. Debtors who default on such payment plans for any reason—including unexpected financial hardship—lose their driver's licenses and can never enter into another payment plan again. *See generally* Tenn. Comp. R. & Regs. 1340-2-5.

90.     For indigent Tennesseans, reinstatement fees are yet another barrier to regaining legal authorization to drive.

### *Consequences of Tennessee's Driver's License Suspension Law*

91.     Since 2012, at least 250,000 driver's licenses have been suspended for nonpayment of Traffic Debt.

92.     In most such cases, the drivers did not willfully choose not to pay Traffic Debt; they were unable to pay because they were indigent.

93.     The available data strongly suggests that people who *can* pay their Traffic Debt *do* pay their Traffic Debt.

94.     Across Tennessee, there is a strong, positive, and statistically significant correlation between the number of poor people in a county and the number of suspensions in that county. Controlling for county size, counties with higher poverty rates have significantly more suspensions than do counties with lower poverty rates.

95.     Without a driver's license, it is extraordinarily difficult to find or keep employment in Tennessee. The law thus creates a vicious cycle: people lose their driver's licenses because they cannot pay Traffic Debt; they cannot maintain or obtain jobs because they do not have driver's licenses; and they cannot pay Traffic Debt because they do not have jobs.

96.     The need for Tennessee residents to drive in order to be able to work is illustrated by Census Bureau data showing the percentage of people working in various metropolitan areas in Tennessee who drive to work:

> a.  92.5% of the people who work in the Chattanooga metro area metro area drive to work.
>
> b.  94.6% of the people who work in the Clarksville metro area drive to work.
>
> c.  93.1% of the people who work in the Cleveland metro area drive to work.
>
> d.  93.4% of the people who work in the Jackson metro area drive to work.

e.   92.5% of the people who work in the Johnson City metro area drive to work.

f.   93.8% of the people who work in the Knoxville metro area drive to work.

g.   93.5% of the people who work in the Memphis metro area drive to work.

h.   92.4% of the people who work in the Nashville metro area drive to work.

97.   A driver's license is required for many professions, even those that are not direct-ly related to driving. For example, the following professions often require a driver's license as a condition of employment:  automotive technician, cable installation technician, caregiver, con-struction worker, housecleaner, HVAC technician, landscaping crew member, maintenance worker, plumber and plumber's helper, pressure washer, truck washer, unarmed security officer, and warehouse worker.

98.   In much of Tennessee, there is no public transportation at all. And even in cities with some public transportation, many people still cannot use it for work. According to a Brook-ings Institution analysis, in Memphis, Nashville, and Knoxville, approximately 75% of jobs are not reasonably accessible by public transportation. And in Nashville, Knoxville, and Chattanoo-ga, more than two thirds of working-age residents lack access to public transportation.

99.   Many indigent people whose licenses have been suspended still need to drive in order to get to work, school, or medical appointments.

100.   Tennessee's license suspension statute therefore presents impoverished people with the impossible choice of driving illegally or failing to meet the basic necessities of life and survival for themselves and their families.

101.   Each year, thousands of low-income Tennesseans are stopped for minor traffic vi-olations and then arrested for driving on suspended licenses. For the first offense, driving on a suspended license is a Class B Misdemeanor, punishable by up to six months in jail and a fine of

up to $500, or both. Tenn. Code Ann. §§ 40-35-111(e)(2); 55-50-504(a)(1).[2] For second and subsequent offenses, driving on a suspended license is a Class A Misdemeanor, punishable by up to 11 months and 29 days in jail, a fine of up to $2,500, or both. Tenn. Code Ann. §§ 40-35-111(e)(2); 55-50-504(a)(2).

102.    The subsequent charges generate their own fines and costs, making it less likely that these individuals will ever be able to get their driver's licenses back. Some people even serve jail time for driving on suspended licenses—punishments to which they never would have been subject had the Department considered their ability to pay prior to suspending their driver's licenses.

103.    Local courthouses throughout the State of Tennessee now have entire dockets devoted to processing the cases of people arrested and charged with driving on suspended licenses. For example, in Hamilton County, many of the daily dockets in General Sessions courts consist of driving cases, including a large number related to driving on suspended or revoked licenses. During a single seven-day period in July 2017, Hamilton County General Sessions Court had over 100 cases in which people were charged with driving without lawful licenses.[3]

104.    The Statute and Defendants' practices and policies in connection with it present an ongoing and future threat to Plaintiffs and countless indigent people across the state of Tennessee.

  a.    Traffic stops, and citations for traffic violations, are a part of everyday life nationwide, but particularly in Tennessee.

---

[2] In 2016, Tenn. Code Ann. § 55-50-504(a)(1) was amended to delete the provision that conviction of driving on suspended requires extension of the suspension for a like period (eff. Jan. 1, 2017).
[3] *See* Sessions Court - Criminal Division Dockets, General Government of Hamilton County (2017), www.hamiltontn.gov/courts/sessions/dockets/CriminalDockets.aspx (last visited July 22, 2017).

b. Entirely law-abiding individuals are at risk of being stopped for traffic violations that they may not even know they have committed.

c. Such citations almost invariably lead to Traffic Debt—and, for those who are neither provided notice nor afforded the opportunity to be heard on their ability to pay such Debt, such violations, under the current unconstitutional scheme, lead to suspension

d. Nationwide, there are about 100 traffic stops per year for each 1,000 driving-age individuals, or about 10%. The percentage of stops per 1,000 individuals who actually drive is higher, because not all driving-age individuals drive.

e. In the metropolitan Nashville area in the period 2011 to 2015, there were nearly two million traffic stops, about 786 per 1,000 driving-age residents of the area.

f. Based on Tennessee Highway Patrol traffic stop data, a comparison of the number of suspensions reported as between the County and its municipalities for Rutherford and Wilson Counties, and some limited data produced in discovery in this action, Plaintiffs estimate that there are each year about 400 traffic stops per 1,000 driving-age residents in each of Wilson and Rutherford Counties.

g. The likelihood of repeat suspensions under the current, unconstitutional scheme is high. Data provided by the Department indicate that the great majority of people whose licenses are suspended pursuant to the Statute are suspended more than once over a four-year period, indicating that the risk of being repeatedly subject to the Statute is real and immediate.

18

### *Discriminatory Debt Collection*

105. Judgment debtors in private civil actions in Tennessee are not subject to the suspension of their driver's licenses if they are too poor to pay.

106. The Department likewise cannot take driver's licenses from people who owe money for welfare overpayments or income tax debts.

107. People who have failed to pay court-ordered child support could be subject to deprivation of their driver's licenses, but only after the State has provided robust procedural protections, including notice and the opportunity for an ability-to-pay hearing.

108. Even with respect to child support, withholdings from the debtor's income "shall not exceed fifty percent (50%) of the employee's income after FICA, withholding taxes, and a health insurance premium that covers the child, are deducted." Tenn. Code Ann. § 36-5-501.

109. Federal and state laws impose other requirements exempting a person's basic survival resources from garnishment or attachment by any creditor, including the state. *See, e.g.*, Social Security Act, 42 U.S.C. § 407 (West 2017) (barring federal disability payments from being subject to "execution, levy, attachment, garnishment or other legal process," including collection by the state); Tenn. Code Ann. § 26-2-105(a), -111(1) (noting that state, federal, and local pension and disability benefits "shall be exempt from execution, seizure or attachment"); Tenn. Code Ann. § 26-2-104 (exempting clothing, family portraits, family Bibles, and school books from execution, seizure or attachment); *id.* at §§ 26-2-106, -108 (except for child support or alimony, wage garnishments may not exceed the lessor of: 25% of the debtor's disposal earnings, or the amount by which the disposal earnings exceed 30 times the federal minimum wage).

110.    Under the Statute, there is no requirement that payments toward Traffic Debt be limited to amounts in excess of the amounts that would be exempt from execution and/or garnishment.

111.    Only people who owe criminal and Traffic Debt to the State or its counties or municipalities are singled out for the harsh and discriminatory treatment described in this Complaint.

### *The Individual Plaintiffs*

#### *Fred Robinson – Wilson County*

112.    Fred Robinson is 32 years old and lives in Murfreesboro. Mr. Robinson lives with serious physical disabilities: ulcerative colitis and liver cirrhosis. He also suffers from severe internal bleeding due to chronic stomach ulcers.  He has a regular course of approximately 20 prescription medications for his illnesses. These illnesses cause Mr. Robinson constant pain.

113.    Mr. Robinson is unable to work due to his chronic illnesses. His sole source of income is Social Security Disability benefits of $759 per month.  That amount is well below the federal poverty level for a family of one in Tennessee and about $240 less than Mr. Robinson's own basic and necessary monthly expenses. He depends on his family, when they can help, to make up the difference. Even with this assistance, Mr. Robinson cannot afford to purchase all of his prescribed medications and must forgo taking some of them even though they are extremely important for his health.

114.    Mr. Robinson's ulcerative colitis and cirrhosis require frequent travel to a gastroenterologist in Nashville. The only practicable way to get from his home in Murfreesboro to his doctor's office in Nashville, over 30 miles away, is to drive.

115.    Due to the severity of his liver disease, Mr. Robinson's physician has recommended that he start consultation for a liver transplant with specialists at the University of Ten-

20

nessee in Memphis. Mr. Robinson will need to drive from Murfreesboro to Memphis, about 250 miles away, for such appointments. Missing appointments—in either Nashville or Memphis—will deny him critical medical care.

116.    On June 24, 2016, while driving his sister's car in Wilson County, Tennessee, Mr. Robinson received misdemeanor traffic citations for speeding and failing to provide evidence of financial responsibility, with a court date scheduled for August 1, 2016.  Those citations carried $441 in Traffic Debt.

117.    Mr. Robinson could not pay the Traffic Debt because of his indigence.

118.    Mr. Robinson intended to go to court on August 1, but he missed that court date because of his medical condition.

119.    On August 16, 2016, Defendant Moss's office sent notification to the Department that Mr. Robinson had failed to appear for his court date.

120.    On August 17, 2016, in response to the notification received from Defendant Moss, the Department mailed Mr. Robinson a notice stating that his driver's license would be suspended unless he paid the Traffic Debt within 30 days. Consistent with its policy and practice, the Department's notice neither requested information about Mr. Robinson's ability to pay nor stated that he could contest the suspension based on inability to pay the Traffic Debt.

121.    The notice stated that Mr. Robinson could request a hearing on the proposed suspension, but that the "scope of the hearing would be limited to the issue of whether or not the citation has been satisfied prior to the proposed date of suspension."

122.    Mr. Robinson could not pay the Traffic Debt because of his indigence.

123. On October 20, 2016, Mr. Robinson appeared with counsel in the Wilson County General Sessions Court and pled guilty to speeding and failing to provide evidence of financial responsibility.

124. The Wilson County General Sessions Court assessed $169 for speeding and $272 for driving without valid insurance, for a total Traffic Debt of $441.

125. Of the total Traffic Debt of $441, the state litigation tax, along with an additional $60, accrued to the State under § 55-10-303. The remaining amount accrued to Defendant Wilson County.

126. That same day, Mr. Robinson, through counsel, requested a payment plan from the Wilson County General Sessions Clerk's Office. The Wilson County General Sessions Clerk's Office is overseen by Defendant Moss.

127. Defendant Moss has a policy and practice of not allowing payment plans or partial payments for traffic violations issued under § 55-8-103 in any of the Courts for which she is Clerk.

128. Consistent with that policy and practice, on October 20, 2016, the Clerk, under Defendant Moss, denied Mr. Robinson's request for a payment plan.

129. Because Mr. Robinson could not pay the Traffic Debt in one lump sum, he could not pay it at all.

130. On October 23, 2016, the Department removed the suspension for failure to appear.

131. Sometime before November 23, 2016, the Wilson County Court Clerk's office, acting pursuant to its Notification Policy, notified the Department that Mr. Robinson had not paid Traffic Debt. Pursuant to its policy and practice, the Clerk did not consider Mr. Robinson's

ability to pay in connection with sending the notification of nonpayment. The Clerk did not offer Mr. Robinson the opportunity for an ability to pay hearing and would have refused to give him one if he had requested it.

132.    On November 23, 2016, the Department suspended Mr. Robinson's license pursuant to § 55-12-115 based on his conviction for failing to show evidence of financial responsibility.

133.    On December 23, 2016, the Department separately suspended Mr. Robinson's license for nonpayment of the Wilson County Traffic Debt.

134.    Mr. Robinson did not receive notice from the Department of these suspensions.

135.    The Department did not consider Mr. Robinson's ability to pay in connection with the suspension for nonpayment of Traffic Debt. It did not offer Mr. Robinson the opportunity for an ability to pay hearing and would have refused to give him one if he had requested it.

136.    The only way for Mr. Robinson to remove the suspension for nonpayment was to make a lump sum payment of $441 to Defendant Moss, in her capacity as Wilson County General Sessions Clerk, after which her office would notify the Department that the payment had been made.

137.    Mr. Robinson simply could not afford to make that payment. For this reason, the Wilson County Traffic Debt suspension formed an absolute barrier to Mr. Robinson's ability to regain his driver's license.

138.    On top of the Traffic Debt owed to Wilson County, the Department imposed a separate and additional $323 reinstatement fee. Mr. Robinson could not afford to pay $323 in one lump sum, nor could he afford the $200 initial payment and $25 administrative fee to enter

into the Department's payment plan for reinstatement fees. The reinstatement fee formed yet another insurmountable barrier to reinstating his driver's license.

139. Mr. Robinson must see doctors frequently—for his primary care, liver care, and gastrointestinal care—including his liver doctor in Nashville every other week. Without a license, Mr. Robinson relied on his mother or sister to drive him to and from his doctor's appointments, including those in other cities, but they were not always available to drive him. Mr. Robinson's sister works and has children to take care of, and she could not always take time away from work and family responsibilities to drive Mr. Robinson to the doctor. Mr. Robinson's mother is and was a full-time caretaker for his father who has cancer, needs help at home, and himself has many doctor's appointments.

140. For this reason, Mr. Robinson's family members could not always drive him to Nashville, nor could or can they drive him to Memphis. They can, however, loan him a car so that he can drive himself to Nashville or Memphis.

141. When his family members could not drive him to the doctor, Mr. Robinson missed his appointments, even when they were very important to his health. For example, because of a lack of transportation, Mr. Robinson recently missed two appointments with one of his doctors, including a critical ultrasound of the tubes between his liver and heart to detect blockage, which can result in severe internal bleeding. Mr. Robinson has experienced such blockages three times in the past, and each time he vomited blood, experienced great pain, and was hospitalized for about a week. Mr. Robinson was unable to reschedule the ultrasound while he lacked transportation to his doctor's office.

142. Subsequent to the filing of this case, this Court entered a temporary restraining order requiring the Department to reinstate Mr. Robinson's driver's license without the necessity

of his paying Traffic Debt or a reinstatement fee as a prerequisite. (With the Traffic Debt and reinstatement fee barriers removed, Mr. Robinson was able to address the insurance barrier to the Department's satisfaction, which was the last hurdle preventing him from regaining his driving privileges.)

143.    Since regaining his driver's license, Mr. Robinson has been able to see his doctors regularly. Now that he has a valid driver's license, Mr. Robinson frequently drives in Wilson County in order to access his doctors, obtain medications from the pharmacy, and take care of other daily needs.

144.    However, this Court granted Mr. Robinson only temporary relief. Mr. Robinson still cannot pay his outstanding Traffic Debt, and certainly not in one lump sum. Wilson County continues actively to seek collection of the Traffic Debt. Should the temporary relief expire, Mr. Robinson will face the exact same problem all over again – he will again be without a valid driver's license.

145.    If Mr. Robinson receives another traffic citation in Wilson County, it would carry additional Traffic Debt that he would not be able to pay in one lump sum, and he would then be subject to the same unconstitutional policies and practices employed by Defendants Purkey, Moss, and Wilson County as described above, which would once again result in Mr. Robinson's license being suspended without consideration of his ability to pay and without the procedural protections mandated by the Due Process Clause.

### *Ashley Sprague – Mt. Juliet and Lebanon*

146.    Ashley Sprague is 26 years old and a resident of Lebanon, Tennessee.  Ms. Sprague is a single mother of five children, one of whom lives with her and four of whom live with their grandparents, over 30 miles away; Ms. Sprague cannot afford to care for them.

147.    In April 2015, Defendant City of Mt. Juliet issued a municipal ordinance violation to Ms. Sprague for speeding and failure to provide evidence of financial responsibility.

148.    The Mt. Juliet Municipal Court is located inside the City of Mt. Juliet Police Department. The clerks of the Mt. Juliet Municipal Court, including Defendant Gaskill, are employees of the City of Mt. Juliet. The revenue collected from the violation of municipal ordinances is paid to the City of Mt. Juliet.

149.    The maximum fine for each violation was $50, but with costs and litigation taxes the total amount was $477.50. All of this amount, except the state litigation tax, accrues to Defendant City of Mt. Juliet.

150.    At the time she received the violation, Ms. Sprague was working as a server at Waffle House; she earned $2.13/hour plus tips. Her basic life expenses far exceeded her income. She could not afford to pay the Traffic Debt.

151.    In July 2015, pursuant to its Notification Policy, the Mt. Juliet Municipal Court Clerk under Defendant Gaskill notified the Department that Ms. Sprague had not paid Traffic Debt. Pursuant to its policy and practice, the Clerk did not consider Ms. Sprague's ability to pay in connection with sending this notification. The Clerk did not offer Ms. Sprague the opportunity for an ability to pay hearing and would have refused to give her one if she had requested it.

152.    In September 2015, upon notification from Defendant City of Mt. Juliet and Defendant Gaskill (or her predecessor), the Department suspended Ms. Sprague's license for non-payment of the Traffic Debt.  Consistent with its policy and practice, the Department never inquired into or considered Ms. Sprague's ability to pay the Mt. Juliet ticket, nor did it offer Ms. Sprague the opportunity to be heard on this issue.

153.    Ms. Sprague never received any notice that her license would be suspended or that it had been suspended.

154.    At the time, Ms. Sprague was residing at the address on file with the Department, and she regularly received mail at that address.

155.    Ms. Sprague was unemployed for a short time thereafter. In February 2016, she began working part-time at a Speedway service station. At Speedway, Ms. Sprague earned little more than she had as a server at Waffle House, and still not enough to pay for basic living expenses.

156.    In March 2016, Defendant City of Lebanon issued a municipal ordinance violation to Ms. Sprague for failure to provide evidence of financial responsibility, in the amount of $224.50. The officer did not issue Ms. Sprague a citation for driving on a suspended license, nor did he inform Ms. Sprague of any license suspension. Ms. Sprague could not afford to pay the $224.50 violation.

157.    In May 2016, Defendant City of Lebanon issued municipal ordinance violations to Ms. Sprague for expired registration and failure to provide evidence of financial responsibility, along with a misdemeanor citation for driving on a suspended license. The total amount of these violations was $244. This was the first time that Ms. Sprague learned that her license had been suspended.

158.    As of the end of May 2016, the collective sum of Traffic Debt imposed on Ms. Sprague was $946, due about half each to Defendants City of Mt. Juliet and City of Lebanon.

159.    In July 2016, Ms. Sprague attempted to pay $80 towards her Traffic Debt to Defendant City of Lebanon, but the Lebanon Municipal Court Clerk, under Defendant Linville, re-

fused to take a partial payment and stated that Ms. Sprague must pay the outstanding debt of $946 in two separate lump sums of nearly $500 each in order to get her license back.

160. On July 25, 2016, Ms. Sprague appeared in the Wilson County General Sessions Court and entered into a conditional guilty plea as to the driving while suspended charge and set a new date for March 27, 2017.

161. Under the terms of the conditional guilty plea, if Ms. Sprague could reinstate her license by the time of the next court date on March 27, 2017, the charges against her would be dismissed.

162. On August 16 and September 16, 2016, pursuant to its Notification Policy, the Lebanon Municipal Court under Defendant Linville notified the Department that Ms. Sprague had not paid Traffic Debt. Pursuant to its policy and practice, the Clerk did not consider Ms. Sprague's ability to pay in connection with sending this notification. The Clerk did not offer Ms. Sprague the opportunity for an ability to pay hearing and would have refused to give her one if she had requested it.

163. The Lebanon Municipal Court is located inside the City of Lebanon Police Department. The revenue collected from the violation of municipal ordinances is paid to the City of Lebanon.

164. On September 15 and October 17, 2016, pursuant to the notifications from the City of Lebanon, the Department suspended Ms. Sprague's license because of nonpayment of the Traffic Debt owed to the City of Lebanon. Again, consistent with its policy and practice, the Department never inquired into or considered Ms. Sprague's ability to pay the Lebanon tickets, nor did it provide Ms. Sprague the opportunity to be heard on that issue. Each of these two new sus-

pensions imposed additional procedural requirements, reinstatement fees, and other hurdles to regaining a valid driver's license.

165. All suspensions of Ms. Sprague's driver's license by Defendant Purkey have been based on nonpayment of Traffic Debt.

166. Ms. Sprague's Driver Record, obtained from the Department and reflecting all official license activity for the past three years, reflects no suspension for failure to provide evidence of financial responsibility.

167. Defendant Purkey has not suspended Ms. Sprague's driver's license pursuant to § 55-12-115 (suspension of driver's license "[u]pon receipt by the commissioner of a record of conviction for failing to provide evidence of financial responsibility").

168. A letter to Ms. Sprague from the Department entitled "Reinstatement Requirements," dated February 25, 2017, reflects that the only basis for suspension of Ms. Sprague's driver's license at that time was unpaid Traffic Debt.

169. The Reinstatement Requirements letter states that in order to reinstate her driving privileges, Ms. Sprague must "submit verification from the court(s) that the following list of ticket(s) has been satisfied" and pay a reinstatement fee of $270. The letter does not require Ms. Sprague to provide proof of financial responsibility, nor does it direct her to obtain SR-22 insurance.

170. The Reinstatement Requirements letter does not provide information about alternatives for people who are too poor to pay Traffic Debt, nor does it offer the opportunity to be heard on ability to pay Traffic Debt.

171. In January 2017, Ms. Sprague called the two phone numbers listed on the Reinstatement Requirements letter, in Mt. Juliet and Lebanon, and asked if partial payments toward

Traffic Debt would be accepted. Both denied Ms. Sprague a payment plan and told Ms. Sprague that payments had to be made in full.

172.    Because Ms. Sprague could not pay each Traffic Debt in a lump sum, she could not pay it all. Ms. Sprague therefore could not reinstate her license prior to her March 27, 2017, court date.

173.    On March 27, 2017, Ms. Sprague pled guilty to driving on a suspended license and was given until April 3, 2017, to enter into a payment plan with the Wilson County General Sessions Court Clerk for the fines, court costs, and litigation tax arising out of that charge, which amounted to $439.50.

174.    On April 3, 2017, Ms. Sprague entered into a payment plan for the $439.50. So far, Ms. Sprague has managed to make minimal payments on this plan. That payment plan, however, does not include the $946 owed on the Mt. Juliet and Lebanon tickets.

175.    Because Ms. Sprague could not make partial payments on the Mt. Juliet and Lebanon Traffic Debt, it formed an absolute barrier to her ability ever to regain her license.

176.    Throughout 2017, both Mt. Juliet and Lebanon made efforts collect Ms. Sprague's Traffic Debt from her.

177.    Ms. Sprague obtained a second "Reinstatement Requirements" letter on September 13, 2017. In addition to stating that Ms. Sprague must satisfy the Mt. Juliet and Lebanon tickets, this second letter states that in order to obtain her driver's license Ms. Sprague must "[s]ubmit certification from the court(s) where convicted that all fines and costs have been paid" for the Wilson County driving while suspended charge, obtain SR-22 insurance, and pay a reinstatement fee of $388.

178.     By this time, Ms. Sprague's earning capacity had greatly diminished as a result of the loss of her driver's license. She could not afford to pay the $388 reinstatement fee, nor could she afford the $200 initial payment and $25 administrative fee to enter into the Department's payment plan for reinstatement fees. The reinstatement fee formed yet another insurmountable barrier to reinstating her driver's license.

179.     The loss of her driver's license caused Ms. Sprague's economic circumstances to decline precipitously.

180.     Because she could not drive, she could not maintain basic employment, let alone the higher-paying job she would need to repay Traffic Debt and support her family.

181.     Without a driver's license, Ms. Sprague could not maintain a job for more than a few months at a time because she did not have affordable, reliable transportation to work.

182.     After losing her driver's license, Ms. Sprague worked short stints at two gas stations and a Waffle House, each about 10 miles from her home. She lost these jobs because she did not have adequate transportation. At her last Waffle House position, Ms. Sprague's manager told her that she could return to work there if she could obtain her license and reliably drive to work.

183.     Because she could not drive, Ms. Sprague could only work for her parents, who have a cleaning business. Ms. Sprague's parents drove her to and from work, and she did office work for them. Ms. Sprague took home only $150 per week, which was even less than she had earned at previous jobs.

184.     While Ms. Sprague once had the ability to make partial payments on the Mt. Juliet and Lebanon tickets, at the time of filing of the instant lawsuit she could not make any payments at all because she earned so little and already had to make partial payments toward the driving

31

while suspended charge (a charge she never would have incurred had her initial suspension complied with constitutional requirements).

185. Ms. Sprague wants to go back to school and learn a trade so that she can get a higher paying job and better take care of her family. The educational opportunity she seeks is in Nashville, more than 30 miles from where she lives, and Ms. Sprague cannot commute to Nashville without driving.

186. Because she cannot obtain and maintain a higher paying job, she cannot afford a larger apartment and cannot afford to support her family. Her family thus remains separated, with her children living in separate homes.

187. Subsequent to the filing of this lawsuit, this Court entered a temporary restraining order requiring the Department to reinstate Ms. Sprague's driver's license without the necessity of her paying Traffic Debt or a reinstatement fee as a prerequisite. (Ms. Sprague was able to obtain SR-22 insurance as required by the Department.)

188. Since regaining her driver's license, Ms. Sprague has found a new job at another Waffle House, where she earns more than she did working for her parents, but not yet enough to pay Traffic Debt in one lump sum. Ms. Sprague has been able to see her children more often now that she can drive, and she visits them regularly.

189. However, this Court granted Ms. Sprague only temporary relief. Ms. Sprague still cannot pay her outstanding Traffic Debt in one lump sum.

190. Defendants Cities of Mt. Juliet and Lebanon, pursuant to the policies and practices of their respective Defendant Clerks, continue to refuse to accept partial payment or a payment plan on the Traffic Debt, but yet they are actively seeking to collect Ms. Sprague's Traffic

Debt. Should the temporary relief expire, Ms. Sprague will face the exact same problem and will again be without a valid driver's license.

191.    Now that she has a valid driver's license, Ms. Sprague drives frequently through Wilson County and the Cities of Mt. Juliet and Lebanon.  She passes through these areas as she commutes to work, in order to visit her children, to see her doctors, and to take care of other daily needs.

192.    If Ms. Sprague receives another traffic citation in Wilson or Rutherford County, or from the Cities of Mr. Juliet or Lebanon, she would not be able to pay the resulting Traffic Debt in one lump sum and would then be subject to the same unconstitutional policies and practices employed by Defendants Purkey, Gaskill, Linville, and the Cities of Lebanon and Mt. Juliet, as described above, which would once again result in Ms. Sprague's license being suspended without consideration of her ability to pay and without the procedural protections mandated by the Due Process Clause.

### *Johnny Gibbs – Rutherford County*

193.    Johnny Gibbs is 36 years old and lives in Murfreesboro.

194.    At the time of filing, Mr. Gibbs lived with his mother, ailing father, and sister in a motel room, where they lived for over three years. After paying the weekly rent, the family had very little money left at the end of each week. The family could not save the security deposit and first month's rent required for moving into a more affordable, stable residence. The family struggles to meet basic needs; any loss of income could cause them to become homeless.

195.    When Mr. Gibbs's mother was in the hospital and unable to make her hours at work, the family fell behind rent for two weeks. Only with the assistance of a charitable foundation did the Gibbs family avoid immediate eviction.

196.  Subsequent to the filing of this case, the Gibbs household was evicted from their motel room after falling too far behind on rent. Mr. Gibbs and his family were forced to live in a car and tent.

197.  Mr. Gibbs struggles to meet the basic necessities of life. The Gibbs family has, in the past, gone entirely without food for as long as two days. Mr. Gibbs and his sister insist that their parents eat before they do.

198.  In 1999, Mr. Gibbs's license was suspended until the age of 21 due to truancy from school. In 2002, before he turned 21, Mr. Gibbs received a ticket in Rutherford County for driving on a suspended license and incurred Traffic Debt of $404.50. At the time he was working part-time in construction and did not earn enough money to pay the ticket.

199.  After Mr. Gibbs turned 21, he went to the local Department of Motor Vehicles (DMV) with his birth certificate and identification card and filled out paperwork to obtain a valid driver's license. However, DMV staff turned him away after determining that the Department's records still listed Mr. Gibbs's status as suspended.

200.  Mr. Gibbs never received notice from the Department or from Rutherford County or Defendant Harrell (or her predecessor) of any license suspension related to the unpaid Traffic Debt. He was never given an opportunity to be heard on his ability to pay, either by the Department or by Rutherford County, prior to the Department's suspension of his license for nonpayment.

201.  Mr. Gibbs served jail time and probation as a result of that ticket. In addition to the $404.50 amount of the ticket itself, he was charged probation supervision fees and court fines and fees; he made payments in increments toward the probation and court fees, but could not pay the $404.50 ticket amount in one lump sum.

202.    Defendant Harrell (or her predecessor), consistent with Rutherford County's policy and practice at the time, permitted Mr. Gibbs to make partial payments toward his other court and probation debt, but not toward Traffic Debt.

203.    In 2006, Mr. Gibbs received a second ticket for driving on a suspended license and incurred Traffic Debt in the amount of $742.

204.    Mr. Gibbs sought to make partial payments toward his Traffic Debt. At the time, Mr. Gibbs had a steady job and could have afforded to make partial payments. Consistent with the policy and practice of Defendant Rutherford County and its Court Clerk(s) at that time, he was told that a payment plan was not an option for paying Traffic Debt. Mr. Gibbs never had enough money to pay the ticket in one lump sum, so he could not pay it at all.

205.    Mr. Gibbs also owes fines, costs, and litigation taxes ("Court Debt") from separate, unrelated criminal proceedings against him. In July 2017, his license was revoked pursuant to Tenn. Code Ann. § 40-24-105(b) for nonpayment of that Court Debt. He is a member of the putative class in *Thomas v. Purkey*, No. 3:17-cv-00005, pending in this Court.

206.    On November 21, 2016, and September 7, 2017, Mr. Gibbs sought and obtained "Reinstatement Requirements" letters from the Department. These letters state that in order to reinstate his driving privileges, Mr. Gibbs must "[s]ubmit certification from the court(s) where convicted that all fines and costs have been paid" for the Traffic Debt incurred in Rutherford County. The second letter also states that Mr. Gibbs must "[s]ubmit verification from the court(s) that all fines and costs have been satisfied" for a non-driving-related criminal charge.

207.    The Reinstatement Requirements letters do not require Mr. Gibbs to provide proof of financial responsibility, nor do they direct him to obtain SR-22 insurance.

208.     The Reinstatement Requirements letters do not provide information about alternatives for people who are too poor to pay Traffic Debt, nor do they offer the opportunity to be heard on ability to pay Traffic Debt.

209.     Defendant Harrell's current policy and practice either does not allow for payment plans for Traffic Debt at all or permits payment plans with a $50 monthly minimum payment. Mr. Gibbs cannot afford to pay $50 per month because he earns so little.

210.     Mr. Gibbs cannot afford to pay the $1,146.50 he owes to Rutherford County, nor the additional $236 license reinstatement fee he now owes to the Department in order to get his license back. Nor can he afford to pay the $200 initial payment and $25 administrative fee to enter into the Department's payment plan for reinstatement fees.

211.     Mr. Gibbs is caught in a vicious cycle. Because of his outstanding Court and Traffic Debt, Mr. Gibbs cannot obtain a driver's license. But without a driver's license, Mr. Gibbs cannot obtain employment sufficient to repay the Court and Traffic Debt.

212.     Mr. Gibbs lack of transportation has directly harmed his employment opportunities and prevents him from earning enough money to meet minimal basic needs. Mr. Gibbs currently works as a day laborer through People Ready, which provides short-term day jobs, such as stocking shelves or construction work. He typically earns $30-$40 a day if he is offered a job; currently, he is offered a job once or twice a week, and those jobs are further limited by his transportation restrictions. As a result, he often takes home only $40 per week. Mr. Gibbs relies on his sister, who moved in with the family to provide full-time care to their ailing father, to use their mother's car to drive him to and from work each day. Many of the job opportunities offered by People Ready are in Nashville. Given her caregiving responsibilities at home, Mr.

Gibbs's sister cannot always drive him to and from Nashville; if Mr. Gibbs could obtain a valid driver's license, he could drive himself to work.

213.    Because Mr. Gibbs must rely on others for transportation, he has lost promising vocational opportunities. Mr. Gibbs has a passion for cooking and was a trained and certified chef, but his certification lapsed when he was unable to find transportation to attend required training in Nashville.

214.    Mr. Gibbs is often forced to walk or ride a bicycle along the sides of roads, which can be dangerous. In early 2016, Mr. Gibbs was hit by a car while biking home after working the closing shift at Outback Steakhouse. It was raining and pitch black. The patch of road lacked a sidewalk. A pickup truck hit Mr. Gibbs and continued driving. Mr. Gibbs suffered cuts, scrapes, and bruises. Fearing the cost of medical treatment and having no alternative transportation, he limped home. His bicycle was irreparably damaged in the accident.

### ***Brianna Booher***

215.    Brianna Booher is 21 years old and lives in Bristol, Tennessee.  Ms. Booher is a single mother of two young daughters, ages 2 and 4.

216.    Ms. Booher struggles to meet the basic necessities of life for herself and her children.  She must rely on family support for herself and her children.

217.    Most recently, Ms. Booher worked at a call center.  She made $9 per hour.

218.    The only way for Ms. Booher to get to and from work was to drive; the drive from her home in Bristol was about 40 minutes each way.

219.    Ms. Booher shares a car with her family.

220.    Ms. Booher could not maintain the call center job without a valid driver's license. She is now unemployed and struggles to find employment closer to where she lives.

221.    Ms. Booher and her daughters have ongoing medical needs, but since Ms. Booher lost her license, they have difficulty accessing their doctors.

222.    Ms. Booher relies on family support for subsistence and the care of her daughters. Since she became unemployed, she has sought to make small amounts of money by finding work in and around her neighborhood. She cleans houses, rakes leaves, and performs other odd jobs to support herself and her children.

223.    In June 2016, Ms. Booher received two citations in Bristol City Court for improper equipment (broken taillight) and speeding. The two citations, including costs, together totaled $219.50.

224.    The Bristol City Clerk does not offer a payment plan and requires that Traffic Debts be paid in one lump sum, which Ms. Booher could not afford to do.

225.    On August 3, 2016, Ms. Booher received three citations in Bristol City Court for a seatbelt violation, improper equipment (broken taillight), and failure to show proof of insurance. The citations together, including costs, totaled $164.75.

226.    By this time, Ms. Booher owed Traffic Debt of $384.25. She could not afford to pay the Traffic Debt at all or in one lump sum.

227.    Sometime before December 31, 2016, Bristol City sent notification to the Department of Ms. Booher's nonpayment of Traffic Debt.

228.    Ms. Booher never received notice from the Department informing her that her license would be suspended or that it had been suspended.

229.    On December 31, 2016, the Department suspended Ms. Booher's driver's license for nonpayment of Traffic Debt.  Nonpayment was and is the sole basis for the suspension of Ms. Booher's driver's license.

230.    The Department did not consider Ms. Booher's ability to pay in connection with her license suspension. It did not offer Ms. Booher the opportunity for an ability to pay hearing and would have refused to give her one if she had requested it.

231.    On August 3, 2017, Ms. Booher was stopped and charged with driving on a suspended license and having a broken tail light.

232.    This was the first time Ms. Booher was told that her license had been suspended.

233.    Ms. Booher went to the Bristol City Clerk's Office and attempted to pay $50 to regain her license.

234.    However, it is the policy and practice of the Bristol City Clerk to require a full payment on a Traffic Debt before sending notification to the Department to remove a nonpayment suspension.

235.    On October 26, 2017, Ms. Booher was stopped and charged with driving on a suspended license and failure to provide evidence of financial responsibility.

236.    On October 31, 2017, Ms. Booher was stopped and charged with driving on a suspended license and speeding.

237.    Ms. Booher paid a reinstatement fee of $140 to the Department on November 1, 2017, by borrowing money from family.

238.    Ms. Booher mistakenly believed that simply paying the reinstatement fee—and not the full amount of Traffic Debt—would result in reinstatement of her license.  As a result, she requested a duplicate driver's license from the Department so that she could regain her driving privileges and provide for her family.  That request was unsuccessful, as Ms. Booher had not satisfied the Traffic Debt.

239.     Ms. Booher must pay a lump sum payment of $384.25 to Bristol City Court to satisfy her Traffic Debt and remove the nonpayment suspension on her license.

240.     Ms. Booher cannot afford to make that payment. For this reason, the Bristol City Traffic Debt suspension is an impenetrable barrier to Ms. Booher's ability to regain her driver's license.

241.     Ms. Booher's ability to provide for herself and her family, and to pay Traffic Debt, is dependent on her ability to drive.  Without a valid driver's license, Ms. Booher is unable to find gainful employment, transport herself or her children to medical appointments, transport her children to school, or provide for any of the other needs of her family.

## CLASS ACTION ALLEGATIONS

242.     Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23(b)(2) on behalf of a class and two subclasses of similarly situated people, defined as follows:

> ***The Statewide Class***.  All persons whose Tennessee driver's licenses have been or will be suspended by the Department under Tenn. Code Ann. § 55-50-502(a)(1)(H) or (I) for nonpayment of Traffic Debt and who cannot now and could not at the time of suspension afford to pay such Debt.
>
> ***The Wilson County Subclass***.  All members of the Statewide Class whose driver's licenses have been or will be suspended at the instance of Wilson County and/or its Clerks.
>
> ***The Rutherford County Subclass.***  All of the Statewide Class persons whose driver's licenses have been or will be suspended at the instance of Rutherford County and/or its Clerks.

243.     All Plaintiffs represent the Statewide Class. Plaintiff Robinson represents the Wilson County Subclass, and Plaintiff Gibbs represents the Rutherford County Subclass.  The members of the Class and Subclasses are so numerous that joinder of all members is impracticable. Since 2012, the Department has suspended more than 250,000 driver's licenses for nonpayment of Traffic Debt. Wilson County accounted for 4,355 such suspensions in the same period, while

Rutherford County accounted for 8,629. As alleged above, most of the individuals whose licenses were suspended for nonpayment were too poor to pay the amounts due.

244. There are numerous questions of fact and law common to the classes, including:

    a. Whether Defendants violate the Due Process and Equal Protection clauses by effecting and continuing the suspension of driver's licenses for nonpayment of Traffic Debt without considering the license-holders' ability to pay;

    b. Whether Defendants violate the Due Process Clause by effecting the suspension of driver's licenses under subsections (a)(1)(H) and (I) without notice and an opportunity to be heard;

    c. Whether the limited scope hearings provided under Tenn. Code Ann. §§ 55-50-502(a)(1)(I), 55-50-502(d)(4), and 55-50-303(d)(3) violate the Due Process Clause by preventing the Department from considering the license-holder's ability to pay;

    d. Whether Defendants violate the Equal Protection Clause by effecting and continuing suspensions of driver's licenses to collect Traffic Debt and thereby imposing unduly harsh and discriminatory methods for collection of Traffic Debt in violation of *James v. Strange*, 407 U.S. 128 (1972);

    e. Whether Defendant Purkey violates the Due Process and Equal Protection Clauses by refusing reinstatement to drivers who have satisfied their Traffic Debt but cannot afford the reinstatement fees imposed by the Department; and

    f. Whether the County Defendants have procedures to avoid effecting the suspensions of the licenses of Traffic Debtors who cannot (as opposed to will

not) pay, and whether their lack of (or inadequate) procedures bars them from using the Statute as a debt-collection tool.

245.    All of the named Plaintiffs have had their driver's licenses suspended for non-payment of Traffic Debt. All of them were and are unable to pay such Debt because of their indigence. Their claims are typical of those other members of the Class and Subclasses.

246.    Declaratory and injunctive relief is appropriate with respect to the Class as a whole and each Subclass as a whole, because the Defendants have acted on grounds applicable to the members thereof.

247.    The named Plaintiffs and the proposed Class and Subclasses are represented by Baker Donelson, Civil Rights Corps, Just City, and the National Center for Law and Economic Justice. Plaintiffs' attorneys are experienced in class action litigation and will adequately represent the classes.

### FIRST CLAIM FOR RELIEF
*Violation of Equal Protection and Due Process – Fundamental Fairness*

248.    Defendants' effecting and continuing the suspension of people's driver's licenses for nonpayment of Traffic Debt without any inquiry into or consideration of the license holder's ability to pay violates the right to fundamental fairness guaranteed by the Fourteenth Amendment to the United States Constitution.

### SECOND CLAIM FOR RELIEF
*Violation of Due Process – Notice and Opportunity to be Heard*

249.    Defendants' effecting and continuing the suspension of driver's licenses under Tenn. Code Ann. 55-50-502(a)(1)(H) and (I), without providing notice and an ability to pay hearing, violates the right to procedural fairness guaranteed by the Fourteenth Amendment to the United States Constitution.

250. The limitation of the scope of the hearings under Tenn. Code Ann. §§ 55-50-502(a)(1)(I), 55-50-502(d)(4), and 55-50-303(d)(3), which prevents the Department from considering the license-holder's ability to pay, likewise violates that guarantee of procedural fairness.

## THIRD CLAIM FOR RELIEF
### *Violation of Equal Protection—Unduly Harsh and Discriminatory Collection Methods*

251. Defendants' effecting and continuing the suspension of driver's licenses from indigent people who owe Traffic Debt to the State and its counties and municipalities, but not from other judgment debtors, violates the right to equal protection under law guaranteed by the Fourteenth Amendment to the United States Constitution.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiffs and class members request the Court enter a judgment in favor of Plaintiffs and the Class and Subclasses that they represent as follows:

a. Certifying this case as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(2) on behalf of the Statewide Class and the two Subclasses.

b. On behalf of the Class and the Subclasses, declaring that Defendants' practices with respect to suspensions as alleged herein violate the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution;

c. On behalf of the Class, preliminarily and permanently enjoining Defendant Purkey from suspending, permitting, or continuing the suspension of any driver's license pursuant to Tenn. Code Ann. § 55-50-502(a)(1)(H) or (I) without either

    i. notice to the licensee that includes the offer of a fact-based inquiry, with participation by the licensee, as to the licensee's ability to pay and, if such inquiry is requested, a factual determination, prior and as a prerequisite to license suspension, that the amount sought is within the licensee's ability to pay, or

    ii. certification from the reporting county or municipality that notice containing such offer has been afforded and (if inquiry is requested) such factual determination has been made;

d. On behalf of the Wilson and Rutherford County Subclasses, preliminarily and permanently enjoining the Counties and Defendants Moss and Harrell from notifying the Department of nonpayment of Traffic Debt without either:

    i. notice to the licensee that includes the offer of a fact-based inquiry, with participation by the licensee, as to the licensee's ability to pay and, if such inquiry is requested, a factual determination, prior and as a prerequisite to license suspension, that the amount sought is within the licensee's ability to pay; or

    ii. until such time as Defendant Purkey establishes procedures and policies pursuant to which the Department will provide all elements of such notice, inquiry, and factual determination if the Counties do not;

e. On behalf of Plaintiff Sprague, preliminarily and permanently enjoining Defendants Linville, Gaskill, and Mt. Juliet and Lebanon, Tennessee, from notifying the Department of nonpayment of Traffic Debt without either:

    i. notice to the licensee that includes the offer in each instance of a fact-based inquiry, with participation by the licensee, as to the licensee's ability to pay and, if such inquiry is requested, a factual determination, prior and as a prerequisite to license suspension that the amount sought is within the licensee's ability to pay; or

    ii. until such time as Defendant Purkey establishes procedures and policies pursuant to which the Department will provide all elements of such notice, inquiry, and factual determination if the municipalities do not;

f. On behalf of Plaintiffs and the members of the Class, ordering Defendant Purkey:

    i. to remove all suspensions of driver's licenses for nonpayment of Traffic Debt that were effected prior to the date of judgment in this matter;

    ii. to notify each member of the Class whose license was suspended for nonpayment of Traffic Debt of the removal of such suspension(s) and of the remaining requirements of law, if any, relating to the issuance and restoration of a driver's license that are applicable to such Class member, provided that such notification shall

        1. state that payment of a reinstatement fee shall not be required of license-holders who do not have the ability to pay such fee, and

        2. inform the recipient of the procedure for demonstrating inability to pay Traffic Debt and reinstatement fees;

44

iii. so long as such Plaintiff and/or Class Member has satisfied any applicable remaining requirements, or upon satisfaction thereof, to reinstate the license of such Plaintiff or Class member; and

iv. to waive all reinstatement fees relating to suspensions for nonpayment of Traffic Debt that existed prior to the date of judgment in this matter.

g. On behalf of the Class, preliminarily and permanently enjoining Defendant Purkey from imposing reinstatement costs and fees without considering ability to pay where the reinstatement relates to a suspension for nonpayment of Traffic Debt;

h. Awarding litigation costs and reasonable attorneys' fees to Plaintiffs, as provided by 42 U.S.C. § 1988; and,

i. Ordering such other and further relief as the Court deems just and proper.

s/ Matthew G. White
Jonathan Cole (TN #16632)
Matthew G. White (TN #30857)
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC
First Tennessee Bank Building
165 Madison Avenue, Suite 2000
Memphis, Tennessee 38103
901-577-8182
mwhite@bakerdonelson.com
jcole@bakerdonelson.com

s/ Claudia Wilner
Claudia Wilner (NY #4264156)*
Edward P. Krugman (NY #1665892)*
Theresa Lau (NY #5496526)*
NATIONAL CENTER FOR LAW AND
ECONOMIC JUSTICE
275 Seventh Avenue, Suite 1506
New York, NY 10001
212-633-6967
wilner@nclej.org
krugman@nclej.org
lau@nclej.org

s/ Premal Dharia
Premal Dharia (DC #484091)*
Jonas Wang (NY #5531769)*, **
CIVIL RIGHTS CORPS
910 17th Street NW, Suite 200
Washington, DC 20006
202-670-4809
premal@civilrightscorps.org
jonas@civilrightscorps.org

s/ Josh Spickler
Josh Spickler (TN #21019)*
JUST CITY
902 South Cooper Street
Memphis, TN 38104
901-206-2226
josh@justcity.org

* Pro Hac Vice
** Admitted to practice in New York; not admitted
in the District of Columbia. Practice is limited
pursuant to D.C. App. R. 49(c)(3)

## CERTIFICATE OF SERVICE

I hereby certify that on the 19th day of December 2017, a copy of the foregoing document was served via the Court's ECF system to:

Andrew B. Campbell
Assistant Attorney General
Public Interest Division
P.O. Box 20207
Nashville, TN 37202
*Counsel for Purkey*

Katherine M. Dix
Special Counsel
Public Interest Division
P.O. Box 20207
Nashville, TN 37202
*Counsel for Purkey*

Scott C. Sutherland
Deputy Attorney General
Law Enforcement &
Special Prosecutions Division
P.O. Box 20207
Nashville, TN 37202
*Counsel for Purkey*

Kristin Ellis Berexa
Mark Ennis McGrady
Farrar & Bates
211 Seventh Ave., North, Suite 500
Nashville, TN 37219
*Counsel for Mt. Juliet, Gaskill, Wilson
County, Moss, Lebanon, and Linville*

Edward Evan Cope
Josh A. McCreary
Cope, Hudson, Reed & McCreary, PLLC
16 Public Square, North
P.O. Box 884
Murfreesboro, TN 37133
*Counsel for Rutherford County, Harrell*

Michael Ray Jennings
326 N Cumberland Street
Lebanon, TN 37087
*Counsel for Wilson County, Moss*

Louis Gino Marchetti,
Charles S. Michels
Taylor, Pigue, Marchetti & Blair, PLLC
2908 Poston Avenue
Nashville, TN 37203
*Counsel for Mt. Juliet*

Phillip Andrew Wright, Jr.
City of Lebanon
200 Castle Heights Avenue,
N Lebanon, TN 37087
*Counsel for Lebanon, Linville*

/s/ Matthew G. White
Matthew G. White

46