UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| FRED ROBINSON, *et al.,* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| | ) | |
| v. | ) | No. 3:17-cv-01263 |
| | ) | JUDGE TRAUGER |
| | ) | |
| DAVID PURKEY, in his official | ) | |
| capacity as Commissioner, Tennessee | ) | |
| Department of Safety and Homeland | ) | |
| Security, *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |

---

## COMMISSIONER DAVID PURKEY'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION TO DISMISS PLAINTIFFS ROBINSON, SPRAGUE AND GIBBS

---

Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), David W. Purkey, the Commissioner for the Department of Safety and Homeland Security ("the Commissioner" and "the Department"), respectfully requests that the Court dismiss all claims asserted by Plaintiffs Robinson, Sprague and Gibbs ("Plaintiffs"). The Court lacks subject matter jurisdiction over (1) Plaintiffs' claims, pursuant to the *Rooker-Feldman* doctrine; (2) claims pertaining to Tenn. Code Ann. § 55-50-502(a)(1)(I), as none of the Plaintiffs allege any actionable injury relating to any "failed to appear" suspension; and (3) all claims on the basis of lack of standing, as their driver's licenses would be revoked under another applicable statute even if they were not suspended under Tenn. Code Ann. § 55-50-502(a)(1)(H) or (a)(1)(I).[1]

---

[1] Tenn. Code Ann. § 55-50-502(a)(1)(H) or (a)(1)(I) may be referred to as "the Statute."

1

In addition, Plaintiffs also fail to state a claim upon which relief can be granted, as (1) the Court cannot grant the specific relief sought (reinstatement of driving privileges) by finding Tenn. Code Ann. § 55-50-502(a)(1)(H) and (a)(1)(I) unconstitutional; (2) the applicable statute of limitations bars the claims asserted by Plaintiffs Sprague and Gibbs, and (3) Tenn. Code Ann. § 55-50-502(a)(1)(H) and (a)(1)(I) do not violate the Equal Protection and Due Process Clauses.

## BACKGROUND

### A. Plaintiffs' Driver's License Suspensions/Revocations

As set forth in their Amended Complaint, each of the Plaintiffs asserts that he or she is indigent and has had his or her driver's licenses suspended "for nonpayment of fines, court costs, and litigation taxes arising from driving offenses . . . ." Amended Complaint, D.E. 111, at ¶¶ 1 and 6. As discussed below, Plaintiffs improperly categorize such monetary assessments as "Traffic Debt." *Id*. at ¶ 1.

#### 1. Plaintiff Robinson

Plaintiff Robinson alleges that, on June 24, 2016, he received traffic citations in Wilson County for speeding and driving without valid insurance. *Id*. at ¶ 116. As a consequence of pleading guilty to those citations, the Wilson County General Sessions Court "assessed $169 for speeding and $272 for driving without proof of valid insurance" in a judgment against Mr. Robinson. *Id*. at ¶¶ 123-24.

Plaintiff Robinson contends that he cannot pay his court-ordered assessments because of his indigency.[2] *Id*. at ¶¶ 117 and 122. Plaintiff Robinson asserts that, through *pro bono* counsel,

---

[2]     The Court, however, may take judicial notice of the fact that Plaintiff Robinson, in compliance with the Court's prior Order, *see* D.E. 38, was able to pay an insurance premium and secure insurance coverage, effective 9/26/17. *See* D.E. 41-1.

2

he sought the opportunity to participate in a payment plan through the Clerk of the General Sessions Court, but the Clerk denied the request. *Id*. at ¶¶ 126 and 128.[3] Accordingly, because of his failure to pay this assessment, Plaintiff Robinson alleges that the Department (after receiving notice of non-payment from the court clerk) suspended his license on December 23, 2016. *Id*. at ¶ 133. Plaintiff Robinson acknowledges, however, that the Department also suspended his license one month earlier pursuant to Tenn. Code Ann. § 55-12-115, for failing to abide by the State's financial responsibility statutes. *Id*. at ¶ 132.

Plaintiff avers that he is in ill-health, *id*. at ¶¶ 112, 114-15, that without his driver's license he relied on family members to drive him to and from his various doctor's appointments in Nashville and elsewhere, and that, when family members are unavailable, he missed some of these appointments. *Id*. at ¶¶ 139-41. He asserts that these problems now have been ameliorated since his driving privileges were restored upon entry of the Court's TRO. *Id*. at ¶¶ 142-43.

### 2. **Plaintiff Sprague**

Plaintiff Sprague alleges that, in April of 2015, she received a municipal traffic citation in Mr. Juliet for speeding and driving without proof of valid insurance. *Id*. at ¶ 147. She asserts that the "maximum fine" for each violation was $50.00, "but with costs and litigation taxes the total amount was $477.50."[4] *Id*. at ¶ 149. She also alleges that, in September of 2015, the Department

---

[3]     As pointed out in Commissioner Purkey's prior Motion to Dismiss, Plaintiff Robinson does not state whether or not he (or his counsel) made any similar requests to the judge of the general sessions court, *see* Tenn. Code Ann. §§ 40-24-101(a)(3), 40-24-104(a), or whether he sought any other forms of relief from the general sessions judge. *See* Tenn. Code Ann. §§ 40-24-102 and 40-25-123(b). Since Plaintiffs sought to amend their pleadings in response to arguments raised by Defendants' prior Motions to Dismiss, one may logically conclude either that Plaintiff Robinson did not make any such requests for relief directly to the general sessions court, or that such requests *were* made to the judge and denied by the court.

[4]     The actual 4/29/15 citation received by Ms. Sprague (attached as *Exhibit A*) reflects that the "fine" for the financial responsibility offense was $209.75 and the "fine" for the speeding

(without prior notice to her) suspended her license for failure to pay this ticket. *Id*. at ¶¶ 152-53.

Plaintiff Sprague asserts that, thereafter, in March of 2016, she received another traffic citation (this time in Lebanon), also for driving without proof of valid insurance. *Id*. at ¶ 156. *See also Exhibit B* (attached hereto). She further alleges that the police officer did not inform her that her license already had been suspended. *Id*. According to Ms. Sprague, this citation carried an additional assessment of $224.50, which she could not afford to pay. *Id*.

Two months later, in May of 2016, Plaintiff Sprague was issued a third citation (again in the City of Lebanon) for (a) driving on an expired registration, (b) driving without proof of valid insurance, and (c) driving on a suspended license (a criminal misdemeanor), for an additional assessment of $244. *Id*. at ¶ 157. *See also Exhibit C* (attached hereto). Ms. Sprague asserts that the aggregate value of fines, court costs, and litigation tax[5] assessed against her for all of these traffic citations amounts to $946, with about half due to Mt. Juliet and Lebanon, respectively. *Id*. at ¶ 158. Plaintiff Sprague also asserts that, in July of 2016, she attempted to make partial payment of $80 towards her tickets related to her Lebanon municipal convictions, but was not permitted to do so by the Lebanon Municipal Court Clerk. *Id*. at ¶¶ 159.

Also, on July 25, 2016, she appeared in Wilson County General Sessions Court, pled guilty to the misdemeanor charge of driving on a suspended license, and in March of 2017 was assessed an additional $439.50 by the general sessions court for that charge. *Id*. at ¶¶ 160 and 173. She acknowledges that she was permitted to enter into a payment plan related to her guilty plea for

---

offense was $167.75, for a total of $377.50.

As matters of public record, the submission of this and the other citations that follow do not convert this Motion to one for summary judgment. *Nollner v. Southern Baptist Convention, Inc.,* 3:14-1065, 2014 WL 3749522 at *2 n.2 (M.D. Tenn. July 30, 2014).

[5] Plaintiff Sprague does not apportion any amount to any specific category.

driving on a suspended license. *Id*. at ¶ 174. Plaintiff asserts that she "has managed to make minimal payments on this plan," *id*., but she "now cannot make any payments at all" on her Mt. Juliet and Lebanon tickets. *Id*. at ¶ 184.

Plaintiff Sprague alleges that, in September and October of 2016, the Department suspended her license for a second and third time, for failing to pay the Lebanon municipal tickets issued to her in March and May of that year. *Id*. at ¶ 164. She further states that, as a consequence of the suspension of her license, she could not "maintain a job for more than a few months at a time" and that she lost certain jobs "because she did not have adequate transportation." *Id*. at ¶¶ 181-82. She asserts that, because of her inability to obtain and hold "a higher paying job," she cannot support her family or pay the outstanding amounts of fines, court costs, and/or litigation tax "in one lump sum." *Id*. at ¶¶ 186 and 188.[6]

### 3. Plaintiff Gibbs

Plaintiff Gibbs alleges that his license has been suspended since 1999 for truancy from school. *Id*. at ¶ 198. Since that suspension, he does not assert that his driving privileges ever have been restored. Before turning 21, Plaintiff Gibbs received a ticket in 2002 in Rutherford County for driving on a suspended license, and was ordered to pay $404.50.[7] *Id*. He alleges that "he did not have enough money to pay" this assessment in 2002. *Id*. After turning 21,[8] Plaintiff Gibbs

---

[6] As with Plaintiff Robinson, Ms. Sprague was able to pay an insurance premium and secure insurance coverage (also effective 9/26/17), in compliance with the Court's prior Order, D.E. 38. *See* D.E. 41-2.

[7] Again, driving on a suspended license is a criminal misdemeanor, punishable by both imprisonment and/or fine. *See* Tenn. Code Ann. § 55-50-504(a). Thus, this "ticket" was actually a criminal citation. Plaintiff Gibbs does not describe the nature of this assessment other than "Traffic Debt."

[8] As discussed below and based on his representation of his current age, Mr. Gibbs was born in 1981 and turned 21 in 2002.

5

attempted to obtain a valid driver's license, but was unsuccessful because he failed to pay the $404.50 ordered by the Rutherford County court for his criminal conviction. *Id.* at ¶¶ 198-99. He also alleges that the Rutherford County court sentenced him to "jail time and probation" for the 2002 criminal citation, and assessed additional "supervision fees and court fines and fees" of an unspecified amount. *Id.* at ¶ 201.

Thereafter, in 2006, with his license still suspended, Plaintiff Gibbs received another ticket for driving on a suspended license, for which he was assessed an additional $742. *Id.* at ¶ 203.

As a consequence of these criminal traffic offenses, Plaintiff Gibbs asserts that he owes $1,146.50 of unspecified fines, costs and/or litigation taxes, together with an additional $236 reinstatement fee, which "he cannot afford to pay." *Id.* at ¶ 210. Plaintiff Gibbs also avers that he owes additional "fines, court costs and litigation taxes" (of unspecified amounts) relating to "separate, unrelated criminal proceedings" (also unspecified), and that, in addition to his suspensions, his driver's license also was revoked for failure to pay court-assessed criminal judgments pursuant to Tenn. Code Ann. § 40-24-105(b). *Id.* at ¶ 205.[9]

Plaintiff Gibbs claims to be "caught in a vicious cycle" in which his lack of a driver's license "has directly harmed his employment opportunities and prevent[ed] him from earning enough money to meet minimal basic needs." *Id.* at ¶¶ 211-12.

**B. Tennessee's Driver's License Laws**

Plaintiffs challenge the constitutionality of Tenn. Code Ann. § 55-50-502(a)(1)(H) and (a)(1)(I). These statutes authorize the Department to suspend a driver's license if a person

---

[9]    Thus, even if his suspension is somehow vacated by this action, his license still would not be restored unless the conditions of its revocation also are resolved. *See* Tenn. Code Ann. § 40-24-105(b)(1).

"convicted" of a "driving offense" has failed to pay any fine or costs "imposed" by the court as a consequence of that conviction (Section 502(a)(1)(H)), or if a person has failed to appear in court to answer or to satisfy any monetary assessment associated with a traffic offense for which such person received a citation (Section 502(a)(1)(I)).

Throughout their Amended Complaint, Plaintiffs label monetary assessments associated with their traffic offenses as mere "Traffic Debt." By this nomenclature, Plaintiffs attempt to downplay the significance of their convictions arising from their driving offenses and the "fine[s] and costs imposed for [those] offense[s]." Tenn. Code Ann. § 55-50-502(a)(1)(H). However, this case is not about mere "debts" and "debtors." Rather, this case is about drivers who admittedly have been "convicted" of one or more "driving offense[s] in . . . court." *Id.* Accordingly, before Plaintiffs' constitutional claims can be addressed, a discussion of sections 502(a)(1)(H) and (a)(1)(I), how those provisions fit within the larger structure of Title 55, and the State's overall framework for regulation of driving privileges and administration of justice is necessary.

With regard to the regulation of driving privileges, section 502(a)(1)(H)-(I) is only one of a number of statutes that require or authorize the suspension or revocation of a Tennessee driver's license. Based on the facts alleged in the Complaint, the driving privileges of Robinson, Sprague and Gibbs also are subject to three other statutes: Tenn. Code Ann. §§ 55-12-115, 55-50-504(a), and 40-24-105(b).[10] Each relevant statute is discussed in turn.

---

[10]     Plaintiffs do not challenge Tenn. Code Ann. § 40-24-105(b) in this action. Instead, the constitutionality of that statute is at issue in *Thomas et al. v. Purkey*, Case No. 3:17-cv-0005, which also is pending in this Court. Nevertheless, based on the facts alleged, the statute remains relevant, as it pertains to the relief which the Plaintiffs request as well as the class for which Plaintiffs seek certification.

### 1. Failure to Appear and/or to Satisfy Fines and Costs Imposed for Driving Offenses— Tenn. Code Ann. § 55-50-502(a)(1)(H)-(I)

Sections 502(a)(1)(H) and (a)(1)(I) state as follows:

(a)(1) The department is authorized to suspend the license of an operator or chauffeur upon a showing by its records or other sufficient evidence that the licensee:

. . . .

> (H) Has been finally convicted of any driving offense in any court and has not paid or secured any fine or costs imposed for that offense; . . . . ; [or]

> (I) Has failed to appear in any court to answer or to satisfy any traffic citation issued for violating any statute regulating traffic. . . .[11]

The "driving offense[s]" referred to in the statute can be set by state law or by local ordinance. Each Plaintiff violated one or more of the following four driving offenses: (a) speeding, (b) driving with expired registration, (c) failure to show financial responsibility, and (d) driving on a suspended or revoked license.

### a. Speeding- A Criminal Offense Under State Law and a Civil Offense Under Municipal Law

State law prohibits driving on a state highway or public road in excess of 65 miles per hour. Tenn. Code Ann. § 55-8-152(a). Violating this state law is a Class C misdemeanor. Tenn. Code Ann. § 55-8-103. Class C misdemeanors are punishable by up to 30 days imprisonment and a fine up to $50. Tenn. Code Ann. § 40-35-111(e)(3). Plaintiff Robinson admits that he was charged with a criminal misdemeanor for speeding on June 24, 2016. *See* Amended Complaint, D.E. 111, at ¶ 116.

In contrast, Plaintiff Sprague alleges that in April of 2015 she received a "municipal

---

[11] In this context, the term "conviction" includes the "failure to satisfy a citation . . . ." Tenn. Code Ann. § 55-50-503(c)(2).

8

ordinance violation" speeding ticket in Mt. Juliet. *Id.* at ¶ 147. On this point, the actual 4/29/15 citation is somewhat ambiguous, as it charges a "VIOLATION OF MT. JULIET CODE & T.C.A." *See Exhibit A*. Nevertheless, municipalities also are authorized by statute to set and enforce speed limits under certain circumstances by municipal ordinance. Tenn. Code Ann. § 55-8-152(d), (f)(1)(C) and § 55-8-153(c). *See also* Mt. Juliet, TN, Code ch. 2, art. VI, § 2-154.[12] Court proceedings relating to the violation of municipal ordinances are considered generally civil for the purposes of procedure and appeal. *See City of Chattanooga v. Myers*, 787 S.W.2d 921, 928 (Tenn. 1990). However, municipal courts also are authorized to use certain mechanisms of state criminal procedure in adjudicating "violation[s] of municipal ordinances." Tenn. Code. Ann. § 40-24-101(a). *See also* Tenn. Code Ann. §§ 40-24-102, 104.

If a municipal court finds a driver guilty of violating a municipal speeding ordinance, the driver can appeal to the circuit court of the county in which the municipality is located and receive trial *de novo* in the circuit court. *See* Tenn. Code Ann. § 16-18-307.[13] Further, as with any circuit court case, a driver can appeal the circuit court judgment to the Court of Appeals.

### b. Expired Registration- A Criminal Offense Under State Law and a Civil Offense Under Municipal Law

Plaintiff Sprague also received a citation in Lebanon in May of 2016 for driving on an expired registration. *See* Complaint at ¶ 157. She asserts that this citation charges her with a "municipal ordinance violation." *Id.* However, the actual 5/3/16 citation (*see Exhibit C*) appears

---

[12]     While provided under a separate Notice of Filing, the Code of the City of Mt. Juliet also can be accessed at https://library.municode.com/tn/mt._juliet/codes/code_of_ordinances.

[13]     "Appeals from city court are governed by the same procedure applicable to appeals from general sessions court to circuit court." *Tubwell v. City of Memphis*, 413 S.W.3d 77, 79 (Tenn. Ct. App. 2013). Accordingly, while Tenn. Code Ann. § 16-18-307 requires an appeal bond in the amount of $250, a pauper's oath also may be submitted in lieu of a bond. *Id.*

9

to charge her with a violation of Tenn. Code Ann. § 55-4-104. *See also* Lebanon, TN, Code tit. 15, ch. 1, § 15-120 (city judge authorized to "impose[]" a maximum "State fine" of $50.00).[14]

Tennessee law requires drivers to renew their car registration on an annual basis, and it is a Class C misdemeanor to drive a vehicle that is not registered or for which the appropriate fee has not been paid. *See* Tenn. Code Ann. § 55-3-102(a)(1). Similarly, Lebanon also prohibits operation of a motor vehicle on public streets without proper registration. *See* Lebanon, TN, Code tit. 15, ch. 1, § 15-120.

### c. Violation of Financial Responsibility Law- A Criminal Offense Under State Law and a Civil Offense Under Municipal Law

Plaintiffs Robinson and Sprague were convicted of driving without proof of proper insurance. *See* Amended Complaint, D.E. 111, at ¶¶ 116 and 123 (Robinson), 147 (Sprague – first citation), 156 (Sprague – second citation), and 157 (Sprague – third citation).

Plaintiff Robinson acknowledges that his June 24, 2016, offense was criminal. *Id.* at ¶¶ 116 and 123. As part of its "financial responsibility" requirements, state law mandates that all drivers possess proof of proper insurance in order to operate a motor vehicle. Tenn. Code Ann. § 55-12-139(b) and (c)(1).[15] When an officer charges a driver with other driving violations, he or she must also request evidence of financial responsibility. Tenn. Code Ann. § 55-12-139(b)(1). If the driver does not have evidence of financial responsibility, that driver is guilty of a Class C misdemeanor "punishable only by a fine of not more than three hundred dollars ($300)." Tenn. Code Ann. § 55-12-139(c)(2).

---

[14]     While provided under a separate Notice of Filing, the Code of the City of Lebanon also can be accessed at https://www.lebanontn.org/177/Lebanon-Municipal-Code-Charter.

[15]     This Court itself recognized the "[i]mportant policy grounds [which] undergird the financial responsibility requirements . . . contained within Chapter 12 of Title 55." *See* Order of Court, D.E. 38, at 1.

10

Plaintiff Sprague alleges that her citations were for "municipal" violations. *Id.* at ¶¶ 147, 156-57. However, as noted above, her 4/29/15 Mt. Juliet citation charges violations of both the "MT. JULIET CODE" and the "T.C.A." *See Exhibit A.* Further, her 3/21/16 and 5/3/16 Lebanon citations both reference violations of Tenn. Code Ann. § 55-12-139. *See also* Lebanon, TN, Code tit. 15, ch. 1, § 15-120 (city judge authorized to "impose[]" a maximum "State fine" of $50.00).

Nevertheless, the cities of Mt. Juliet and Lebanon also impose financial responsibility requirements by local ordinance. *See* Mt. Juliet, TN, Code ch. 28, art. X, §§ 28-271, 28-272; Lebanon, TN, Code tit. 15, ch. 1, § 15-120. These ordinances mirror the language of Tenn. Code Ann. § 55-12-139(b) and provide that violations are punishable by a civil penalty of up to $50, which "shall be in addition to any other penalty prescribed by the laws of this state" or by the city's respective codes. *See* Mt. Juliet, TN, Code ch. 28, art. X, § 28-272; Lebanon, TN, Code tit. 15, ch. 1, § 15-120.

### d. Driving on a Suspended or Revoked License- A Criminal Offense Under State Law

Plaintiff Gibbs admits that he received two citations (one in 2002 and one in 2006) for driving on a suspended license. *See* Amended Complaint, D.E. 111, at ¶¶ 198 and 203. Plaintiff Sprague also admits that she received, and was convicted of, a misdemeanor citation for driving on a suspended license. *Id.* at ¶¶ 157, 160, and 173. A first offense of driving on a suspended or revoked license is a Class B misdemeanor, *see* Tenn. Code Ann. § 55-50-504(a)(1), which is punishable by up to six months imprisonment and a $500 fine. *See* Tenn. Code Ann. § 40-35-111(e)(2). A second or subsequent offense for driving on a suspended or revoked license is a Class A misdemeanor, *see* Tenn. Code Ann. § 55-50-504(a)(2), punishable by up to eleven months, twenty-nine days imprisonment and a fine of up to $2,500. *See* Tenn. Code Ann. § 40-35-111(e)(1). Unless a court orders the suspension or revocation of a license or requires the driver to

11

surrender the license to the court, revocation or suspension of a license does not take effect until ten days after notice has been sent to the last known address of the driver. *See* Tenn. Code Ann. § 55-50-504(i).

A suspension of a driver's license carries different consequences than the revocation of a license. Generally, a first-offense suspension may not last more than six months, and a subsequent offense may not last more than one year. *See* Tenn. Code Ann. § 55-50-502(f)(1). At the end of the period of suspension, the Department may "require a reexamination of the licensee as a prerequisite to the reissuance of the license." *Id.*

When a person is convicted of an offense that requires mandatory license revocation, by contrast, the court is required to have the driver actually surrender his license to the court and to send that license to the Department along with the record of conviction. Tenn. Code Ann. § 55-50-503(a). The driver is not entitled to apply for a new license unless the cause of the revocation has been removed and a year has elapsed, except for a first-time revocation, for which the driver can apply for a new license six months after surrendering his license. *See* Tenn. Code Ann. §§ 55-50-502(f)(3) and (f)(4).

## 2. Failure to Comply with Tennessee's Financial Responsibility Requirements— Tenn. Code Ann. § 55-12-115

As noted above, Plaintiffs Robinson and Sprague were convicted of driving without proof of proper insurance. *See* Amended Complaint, D.E. 111, at ¶¶ 123, 132, 147, 156, and 157. While Plaintiff Sprague contends that her violations were "municipal" in nature, it is undisputed that Plaintiff Robinson's conviction was for violation of Tenn. Code Ann. § 55-12-115. *Id.* at ¶¶ 116 and 123. Further, Plaintiff Robinson acknowledges that the Department suspended his license for violation of Tennessee's financial responsibility statute. *Id.* at ¶ 132. *See also* Tenn. Code Ann. § 55-12-115(a) (providing that "the commissioner shall suspend the driver license of the person

12

convicted of [failing to show evidence of financial responsibility]"). Such a suspension imposes additional reinstatement requirements, which are separate and apart from the payment of fines and court costs. Specifically, to obtain reinstatement after a conviction of failing to show evidence of financial responsibility, an individual must submit evidence of financial responsibility, pay the fee provided for in § 55-12-129, and successfully pass a driver license examination. Tenn. Code Ann. § 55-12-115(b).

In this respect, Plaintiff Robinson's contention that he has complied with the State's statutory financial responsibility requirements "to the Department's satisfaction," *id.* at ¶ 142, is erroneous as a matter of law. Plaintiff Robinson has failed to fulfill the license re-examination statutory requirement, *see* Tenn. Code Ann. § 55-12-115(b)(2), and has made no factual allegation to the contrary. Thus, under section 115(b)(2), he is not entitled to the license he currently holds.

### 3. Failure to Pay Criminal Court Judgments Within One Year- Tenn. Code Ann. § 40-24-105(b)

Lastly, in addition to the suspensions under Tenn. Code Ann. §§ 55-50-502(a)(1)(H)-(I) and 55-12-115(a), the Commissioner also must revoke licenses under Tenn. Code Ann. § 40-24-105(b) for failure to pay criminal court judgments within one year.[16]

For a number of reasons, the licenses of some drivers may be subject both to suspension under section 502 and to revocation under section 105(b). Indeed, Plaintiff Gibbs acknowledges that his license is suspended under section 502 and also revoked under section 105(b). *See* Amended Complaint, D.E. 111, at ¶ 205.

### C. Suspensions for Non-Payment of Fines, Court Costs, and Litigation Tax

As a prelude to their challenge to section 502(a)(1)(H) and (a)(1)(I), Plaintiffs complain

---

[16] Again, the constitutionality of that statute is at issue in *Thomas et al. v. Purkey*, Case No. 3:17-cv-0005, which is currently pending in this court.

13

that "[o]ver the past five years, Tennessee has suspended more than a quarter of a million driver's licenses for non-payment of fines, court costs, and litigation taxes." Amended Complaint, D.E. 111, at ¶ 1. Plaintiffs improperly lump these court-ordered assessments under the catch-all term "Traffic Debt."[17] *Id.* However, each serve distinct purposes.

### 1. Fines

While they do not specify the amounts, all of the Plaintiffs claim to have been assessed fines by a court for their traffic offenses. Simply put, a "fine" is punishment, imposed by the court. *State v. Blevins*, 968 S.W.2d 888, 895 (Tenn. Crim. App. 1997). *See also* Tenn. Code Ann. § 40-24-101(a); Mt. Juliet, TN, Code ch. 2, art. VI, § 2-154; Lebanon, TN, Code tit. 3, ch. 1, § 3-108. Even in the context of a violation of a municipal ordinance, which is considered a civil proceeding "at least in terms of technical application of procedure and for purposes of appeal," a fine may be an instrument of punishment. *City of Chattanooga v. Davis*, 54 S.W.3d 248, 259, 261 (Tenn. 2001). *See also City of Knoxville v. Brown*, 284 S.W.3d 330, 388 (Tenn. App. 2006) (finding the "clear intent" of $50 fine for violation of municipal red light camera enforcement ordinance to be "punish[ment]" of the registered owner of the vehicle and to deter similar conduct in the future"). Thus, when imposing a fine, a court is required to take into account certain "factors," including "prior history, potential for rehabilitation, financial means, and mitigating and enhancing factors, that are relevant to an appropriate, total sentence." *Blevins*, 968 S.W.2d at 895 (emphasis added).

Although intended to punish, a defendant (even one convicted of a traffic offense) has recourse to obtain a release from a fine (either in part or completely). In fact, the sentencing trial court *retains* jurisdiction—even after entry of final judgment—to revisit an individual's ability to

---

[17]     Plaintiffs also include "litigation tax" within this catch-all, even though section 502(a)(1)(H) speaks to "fine[s] or costs" only. Nevertheless, it is addressed below.

pay an assessment. *Id.* at 895 n.1 ("The trial court retains jurisdiction, even after final judgment, to modify the payment schedule or to reduce or remit entirely the amount of fines for which the defendant may be obligated.") (citing Tenn. Code Ann. §§ 40-24-101, 102, and 104). Tenn. Code Ann. § 40-24-102 states:

> The several courts in which a cause is finally adjudged are authorized, *either before or after final judgment, for good cause*, to release the defendants, or any one (1) or more of them, from the whole or any part of fines or forfeitures accruing to the county or state.

*Id.* (emphasis added). In turn, Tenn. Code Ann. § 40-24-104(a) states:

> If the defendant fails to pay the fine as directed, or is unable to pay the fine and so represents upon application to the court, the court, *after inquiring into* and making further investigation, if any, which it may deem necessary with regard to the *defendant's financial . . . situation . . ., including whether the nonpayment was . . . due to indigency*, may enter any order that it could have entered under § 40-24-101, or may reduce the fine to an amount that the defendant is able to pay . . . .

*Id.* (emphasis added).[18] Further, at the time of conviction, section 40-24-101(a) allows a court imposing a fine to direct the defendant to pay the entire amount at the time of sentencing, pay the entire amount at a later date, or pay the fine in "specified portions or installments at designated periodic intervals." *Id.* at § 40-24-101(a)(1)-(a)(3). *See also* Tenn. Code Ann. §§ 55-50-303(d)(1), and 55-50-502(d)(2) (permitting court-ordered payment plans, after suspension of license).

---

[18]    Plaintiffs may object to citation to Title 40, Chapter 24, on the basis that it is part of Tennessee's code of criminal procedure and at least one Plaintiff (Sprague) claims to have received citations for "municipal ordinance violation[s]." *See, e.g.*, Complaint at ¶¶ 147, 156-57. As stated above, however, fines imposed for municipal ordinance violations also are intended to have a punishment and deterrence purpose. More importantly, the Code itself makes clear that these provisions pertain to "*any* court of this state, *including* municipal courts for violation of municipal ordinances . . . ." Tenn. Code Ann. § 40-24-101(a) (emphasis added). Accordingly, even if Plaintiff Sprague (or the other Plaintiffs) received citations for violations of municipal ordinances, these statutes are applicable.

15

## 2. Court Costs

 In the criminal context, "court costs" are comprised of "all costs . . . due and incident to the prosecution and conviction, and incident to carrying out the judgment or sentence of the court into effect."  Tenn. Code Ann. § 40-25-104.[19]  For municipal courts, court costs also may be set by municipal ordinance.  *See* Tenn. Code Ann. § 16-18-305(a).

While the amount of costs may be calculated by the court clerk, costs themselves are "adjudged."  Tenn. Code Ann. § 40-25-104.  *See also* Mt. Juliet, TN, Code ch. 2, art. VI, § 2-154; Lebanon, TN, Code tit. 3, ch. 1, § 3-108.  They are, in other words, assessed by the trial court judge, and are part of the court's order.  While applicable statutes require the defendant to pay court costs upon conviction, *see* Tenn. Code Ann. § 40-25-123(a), the sentencing court nevertheless has the authority and discretion to waive the payment of court costs as circumstances of the defendant may require, both at the time the costs are adjudged *and* at any time thereafter.  In general sessions cases,[20] the presiding judge "may suspend the court costs and litigation tax . . . *for any indigent criminal defendant*, as in the presiding judge's opinion the equities of the case require."  Tenn. Code Ann. § 40-25-123(b) (emphasis added).  This statute is not restricted to the time of sentencing: the presiding judge of the general sessions court may suspend such assessments at any time.  *See also* Tenn. Code Ann. § 40-25-114 (giving the court "discretion in controlling the taxation of costs").

In addition, for cases originating in municipal court, but appealed to circuit court for *de novo* disposition pursuant to Tenn. Code Ann. § 16-18-307, the circuit court may apportion costs

---

[19]     Costs also may include "all costs accruing . . . for the faithful prosecution and safekeeping of the defendant, including the cost of boarding juries and that of the jailer. . . ."  Tenn. Code Ann. § 40-25-133.  *See also* Complaint at ¶ 201 (referring to "jail time" served by Plaintiff Gibbs).

[20]     *See* Amended Complaint, D.E. 111, at ¶¶ 116, 123, 160, 198, and 203-04.

"as in the presiding judge's opinion the equities of the case demand."  Tenn. Code Ann. § 20-12-119(b).  *See also* Tenn. Code Ann. § 20-12-118 (for cases not expressly covered by the Tennessee Code, the circuit judge "may make such disposition of the costs as, in its sound discretion, may seem right.").  Further, as a general matter, indigent parties may avoid the payment of court costs by submission of a pauper's oath in accordance with Tennessee Supreme Court Rule 29.  *See* Tenn. Code Ann. §§ 8-21-401(m) and 409(c).  *See also* Tenn. Code Ann. § 8-21-401(a) ("In cases where payment of the clerk's fees would create a substantial hardship for a party, judges are encouraged to use the discretion provided in Rule 29 of the Tennessee Rules of the Supreme Court to find that the party is indigent, even if that person does not meet the Legal Services Corporation's poverty guidelines.").

### 3.  Litigation Tax

A state litigation tax in the amount of $29.50 is "levied . . . on all criminal charges, upon conviction or by order."  Tenn. Code Ann. § 67-4-602(a).  For cases in municipal courts, the state privilege tax is $13.75.  Tenn. Code Ann. § 16-18-305(a), (c).  In addition, "counties and municipalities . . . have authority to levy a local litigation tax . . .," Tenn. Code Ann. § 67-4-601(a), which, if adopted, "shall not exceed ten dollars ($10.00) per case" and "shall be used exclusively for the purposes of jail or workhouse construction, reconstruction or upgrading, or to retire debt, including principal and interest and related expenses, on such construction, reconstruction or upgrading or for courthouse renovation."  Tenn. Code Ann. § 67-4-601(b)(1).  Finally, pursuant to Tenn. Code Ann. §§ 67-4-601(b)(5) and/or (b)(6), a county legislative body may adopt "a privilege tax on litigation in . . . criminal cases" which "may be levied in an amount not to exceed twenty-five dollars ($25.00) per case," and that such privilege tax "may . . . use those funds . . . for the purpose of obtaining and maintaining software and hardware associated with collecting, receiving

17

and maintaining records for law enforcement agencies, including county sheriff offices . . . ." Tenn. Code Ann. § 67-4-601(b)(7)(B)(i).

While "[t]he clerks of the various courts" are charged with "collect[ion]" of litigation taxes, the "judge of any court" may "suspend[], release[], waive[], remit[] or order[] the clerk of the court not to collect" such taxes. Tenn. Code Ann. § 67-4-605(c). Indeed, in general sessions court, the presiding judge "may suspend" the imposition of litigation tax "for any indigent criminal defendant, as . . . the equities of the case require." Tenn. Code Ann. § 40-25-123(b).

## LEGAL STANDARD

"A Rule 12(b)(1) motion can either attack the claim of jurisdiction on its face, in which case all allegations of the plaintiff must be considered as true, or it can attack the factual basis for jurisdiction, in which case the trial court must weigh the evidence and the plaintiff bears the burden of proving that jurisdiction exists." *DLX, Inc. v. Kentucky*, 381 F.3d 511, 516 (6th Cir. 2004). Defendant Purkey presents a purely facial attack to jurisdiction, based solely on the allegations in the Complaint and applicable law.

To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* A pleading that merely offers "labels and conclusions," or a "formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007). The court does not need to accept as true unwarranted inferences, unreasonable conclusions, or arguments. *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 903 (6th Cir. 2009). Additionally, in reviewing a Rule 12(b)(6) motion to dismiss, a court may look to documents

18

attached to the motion to dismiss that are integral to the complaint and authentic, and may also take judicial notice of matters of public record. *Nollner v. Southern Baptist Convention, Inc.*, 3:14-1065, 2014 WL 3749522 at *2 n.2 (M.D. Tenn. July 30, 2014) (citing *Weiner v. Klais & Co., Inc.*, 108 F.3d 86, 89 (6th Cir. 1997)).

**ARGUMENT**

I. **This Court Does Not Have Subject Matter Jurisdiction.**

A. **The *Rooker-Feldman* Doctrine Deprives the Court of Jurisdiction Over All of Plaintiffs' Claims.**

[F]or Plaintiffs and class members, *Traffic Debt serves as an absolute barrier to regaining their driver's licenses*.

Amended Complaint, D.E. 111, at ¶ 6 (emphasis added). With this allegation, Plaintiffs now state explicitly in their Amended Complaint what they implied in their original pleading: "Traffic Debt," i.e., the fines, costs and litigation tax imposed upon the Plaintiffs – not by the Department – but by the courts, is the source of their asserted injury. For this reason, this Court lacks subject matter jurisdiction under the *Rooker-Feldman* doctrine. *See D.C. Court of Appeals v. Feldman*, 460 U.S. 462 (1983); *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923).

The *Rooker-Feldman* doctrine "provides that district courts lack subject-matter jurisdiction of 'cases brought by state court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments.'" *Davis v. Wells Fargo, NA*, No. 3:12-CV-1181, 2013 WL 392616, at *3 (M.D. Tenn. Jan. 31, 2013) (Trauger, J.) (quoting *Lawrence v. Welch*, 531 F.3d 364, 368 (6th Cir. 2008)). *See also Exxon Mobil Corp. v. Saudi Basic Ins. Corp*., 544 U.S. 280, 284 (2005). Its fundamental purpose is to "prohibit end runs around state court judgments" via civil rights challenges in federal court. *Kovacic v. Cuyahoga County Department of Children and Family*

19

*Services*, 606 F.3d 301, 308 (6th Cir. 2010).

     *Rooker-Feldman* applies not only to issues that actually were raised before the state court, but also to claims that are "inextricably intertwined" with state court determinations. *Feldman*, 460 U.S. at 482 n.16; *accord Exxon*, 544 U.S. at 286 n.1. As the Sixth Circuit explained,

> *The inquiry then is the source of the injury* the plaintiff alleges in the federal complaint. If the source of the injury is the state court decision, then the *Rooker-Feldman* doctrine would prevent the district court from asserting jurisdiction. If there is some other source of injury, such as a third party's actions, then the plaintiff asserts an independent claim.

*McCormick v. Braverman*, 451 F.3d 382, 393 (6th Cir. 2006) (emphasis added); *see also id.* at 395 ("[T]he phrase 'inextricably intertwined' only describes the conclusion that a claim asserts an injury whose *source* is the state court judgment, a claim that is thus barred by *Rooker–Feldman*.") (emphasis added)); *Davis*, 2013 WL 392616, at *3. Furthermore, the Supreme Court has warned that "a petitioner's failure to raise his constitutional claims in state court does *not* mean that a United States district court should have jurisdiction over the claims." *Feldman*, 460 U.S. at 482 n.16 (emphasis added).

     Plaintiffs' Amended Complaint demonstrates that the "source" of their "injury" is not "independent" from the underlying state court proceedings. *McCormick*, 451 F.3d at 393. To the contrary, Plaintiffs predicate their "injury" (i.e., suspension of their licenses) directly upon the underlying court judgments rendered against them – i.e., that the "Plaintiffs and putative class members . . . are too poor to pay" the monetary assessments imposed on them by state and/or city judges. Amended Complaint, D.E. 111, at ¶ 3; *see also id.* at ¶ 243 (alleging "most of the individuals whose licenses were suspended for nonpayment were too poor to pay the amount due" to the court). In their newly-amended pleading, the Plaintiffs unambiguously state their injury unequivocally: "for Plaintiffs and class members, *Traffic Debt* serves as an absolute barrier to

regaining their driver's licenses." *Id.* at ¶ 6 (emphasis added).

Plaintiffs acknowledge that this so-called "Traffic Debt" consists of "fines, court costs, and litigation tax" imposed as part of judgments rendered by state and/or municipal courts. *See* Amended Complaint, D.E. 111, at ¶¶ 1 and 40. Thus, properly re-stated, *court judgments* "serve[] as an absolute barrier [to Plaintiffs and class members] to regaining their driver's licenses." *Id.* at ¶ 6.

Indeed, notwithstanding Plaintiffs' repeated use of the term "Traffic Debt," this is not a "debts" and "debtors" issue. Plaintiffs have been "convicted" of one or more "driving offense[s] in . . . court." Tenn. Code Ann. § 55-50-502(a)(1)(H). As a consequence of those convictions, the sentencing court—not the clerk—"assessed" fines, court costs and litigation tax. *See*, *e.g.*, Amended Complaint, D.E. 111, at ¶ 124 (alleging that Plaintiff Robinson was "assessed" $169 for speeding and $272 for driving without valid insurance by "the Wilson County General Sessions Court"). Moreover, while Plaintiffs use the phrase "Traffic Debt" to paint an "administrative" gloss over the process, *id.* at ¶ 3, the fact remains that court-ordered fines (which are a part of these assessments) are imposed for the purpose of punishment and deterrence, even in municipal court. *Blevins*, 968 S.W.2d at 895; *Brown*, 284 S.W.3d at 388.

This direct connection between the court judgment and the license suspension also is demonstrated by the text of Section 502 itself. The Department does not suspend a driver's license *until* it receives notification from a court clerk that a driver has not complied with the terms of a court judgment. *See* Tenn. Code Ann. § 55-50-502(a)(1)(H)-(I); Amended Complaint, D.E. 111, at ¶ 3. Further, if a driver is unable to pay the "fines or costs" imposed, he or she may establish a payment plan "subject to the approval of *the court* . . . ." Tenn. Code Ann. § 55-50-502(d)(2)

21

(emphasis added).[21]  Thereafter, the Department may "reinstate a person's driving privileges" upon receipt of "certification from the local *court*, or *court clerk*" of the existence of such a payment plan.  Tenn. Code Ann. § 55-50-502(d)(3) (emphasis added).  *See also* Tenn. Code Ann. § 55-50-303(d)(2) (reinstatement predicated on receipt of "certification from the local court to which the fines and costs are owed").  Thus, the "source[s]" of Plaintiffs' injury, *McCormick*, 451 F.3d at 393, are the underlying court judgments, which Plaintiffs contend serve as "absolute barrier[s] to regaining their driver's licenses."  Amended Complaint, D.E. 111, at ¶ 6.

Plaintiffs attempt to side-step this conclusion by asserting that "[n]o court orders these suspensions . . . ." *Id.* at ¶ 3.[22]  While that assertion may be true with respect to Plaintiffs Robinson, Sprague and Gibbs (although not necessarily true for all of the class members they seek to represent) it does not change the analysis.  The *Rooker-Feldman* doctrine applies not only to matters specifically ordered by a state or municipal court, but also to matters "inextricably intertwined" with such court orders.  *Feldman*, 460 U.S. at 482 n.16.  Here, Plaintiffs admit that the license suspensions are a direct consequence of court-ordered monetary assessments, which they contend they cannot pay.  *See* Amended Complaint, D.E. 111, at ¶ 5 ("Upon being notified of nonpayment by a clerk's office, the Department . . . suspends driver's licenses automatically . . . .").

---

[21]    *See also* Tenn. Code Ann. § 55-50-303(d)(1) ("A person whose license has been suspended, *subject to the approval of the court*, may pay any fines or costs, arising from the convictions or failure to appear in any court, by establishing a payment plan with the clerk of the court to which the fines and costs are owed.") (emphasis added).

[22]    In a similar vein, Plaintiffs also allege that the suspensions are "not part of the punishment for any traffic-related infraction."  *Id.* at ¶ 3.  Apart from being a conclusion of law and not an assertion of fact, the contention is wrong.  A fine, which Plaintiffs acknowledge to be a component of Traffic Debt, is punishment.  Thus, a suspension of a driver's license for failure to pay such fine, is a method of enforcing that punishment.

22

Plaintiffs further allege that sections 502(a)(1)(H) and 502(a)(1)(I) violate their due process and equal protection rights because these suspensions (a) occurred "without any inquiry into or consideration of the license holder's ability to pay," *id*. at ¶ 248, (b) occurred "without providing [drivers] notice and an ability to pay hearing," *id*. at ¶ 249, and (c) as related to "indigent" drivers, violate the Equal Protection Clause. *Id*. at ¶ 251. These contentions essentially challenge the merits and substance of the "fine[s] or costs imposed" by the courts upon "convict[ion] of any driving offense." Tenn. Code Ann. § 55-50-502(a)(1)(H). Moreover, these contentions turn a blind eye to the fact that Plaintiffs *did* have the "ability" to plead their financial circumstances to the court that entered judgments against them.

Plaintiffs essentially put the onus of such "inquiry" and the responsibility to hold such an "ability to pay hearing" on the wrong parties. As discussed above, each and every component of what Plaintiffs describe as "Traffic Debt" (i.e., fines, court costs, and litigation taxes) is "imposed" by the court upon "convict[ion] of any driving offense . . . ." Tenn. Code Ann. § 55-50-502(a)(1)(H). Accordingly, it is *the court* – in the exercise of its discretion – which is best suited to make "inquiry" into Plaintiffs' "ability to pay," and provide the opportunity for Plaintiffs to demonstrate their indigency.

This conclusion is hardly novel. Again, whether the court at issue is a criminal court, general sessions court, or municipal court, such court is authorized "before or after final judgment, for good cause, to release [a] defendant[] . . . from the whole or any part of fines" imposed. Tenn. Code Ann. § 40-24-102. Further, when imposing a fine, the court has the discretion to allow the driver to "pay the fine in specified portions or installments at designated periodic intervals. . . ." Tenn. Code Ann. § 40-24-101(a)(3). Lastly, if a driver "fails to pay the fine as directed, *or is unable to pay the fine*," the court – upon receipt of a proper application – and "*after inquiring*

23

*into* . . . the defendant's financial . . . situation," is authorized to "*reduce* the fine to an amount that the [driver] is able to pay . . . ." Tenn. Code Ann. § 40-24-104(a) (emphasis added). The court also can implement a post-conviction payment plan. *Id.* All of these statutory provisions stand in recognition of the fact that Tennessee state courts must take into account, among other things, "financial means" (i.e., the ability to pay) before imposing a fine. *Blevins*, 968 S.W.2d at 895.

With respect to court costs and litigation taxes, the presiding judge of the general sessions court in every judicial district "may suspend the court costs and litigation tax . . . *for any indigent criminal defendant*, as in the presiding judge's opinion the equities of the case require." Tenn. Code Ann. § 40-25-123(b) (emphasis added). This statute is not restricted to the time judgment is rendered. Instead, the presiding general sessions judge may suspend such assessments at *any* time. Similarly, if a municipal court imposes court costs and litigation taxes, a driver has the ability to appeal that judgment to circuit court pursuant to Tenn. Code Ann. § 16-18-307, and the circuit court has the discretion to apportion costs as "the equities of the case demand," or in whatever way disposition of costs "may seem right." Tenn. Code Ann. §§ 20-12-119(b) and 118. Further, the "judge of any court" may "suspend[], release[], waive[], remit[] or order[] the clerk of the court not to collect" such litigation taxes. Tenn. Code Ann. § 67-4-605(c). *See also* Tenn. S. Ct. Rule 29 (recognizing that, in civil actions, an indigent litigant may submit an "affidavit of indigency" for relief from court costs and litigation taxes).

To summarize, the courts that imposed Plaintiffs' "Traffic Debt" did (and do) have the discretion to make "inquiry" into their ability to pay. The processes and mechanisms to address all of these injuries were available (and, in some respects, still are available[23]) in the state court

---

[23]      *See* Tenn. Code Ann. §§ 40-24-102 (post-conviction relief from fines), 40-24-104(a) (post-conviction reduction of a fine *or* implementation of a payment plan as "could have [been] entered under § 40-24-101"), and 40-25-123(b) (post-conviction relief from costs and litigation tax). *See*

24

system. Fines, restitution, court costs, and litigation tax all are imposed by the state court (or may be appealed to state court for *de novo* consideration[24])—and all may be waived and/or suspended by the state court—based upon the facts and evidence (including the defendant's ability to pay, if raised) in each case. Indeed, Tenn. Code Ann. §§ 40-24-101, 102, and 104 provide criminal, general sessions and municipal courts with *continuing* jurisdiction to revisit the propriety of fines. *Blevins*, 968 S.W.2d at 895 n.1. Thus, because "Traffic Debt serves as an absolute barrier to regaining their driver's licenses," Amended Complaint, D.E. 111, at ¶ 6, Plaintiffs' asserted injuries were "caused by the state-court judgments" which *created* that "Debt," *Davis*, 2013 WL 392616 at *3. Thus, for the purposes of *Rooker-Feldman*, their instant lawsuit constitutes an "end run[]" around those judgments and the retained jurisdiction of those courts. *Kovacic*, 606 F.3d at 308.[25]

A similar situation was addressed by the Northern District of New York in *King v. Creed*, No. 1:14-CV-0165 LEK/TWD, 2015 WL 893573, at *1 (N.D.N.Y. Mar. 2, 2015), *reconsideration denied*, No. 1:14-CV-0165 LEK/TWD, 2016 WL 204492 (N.D.N.Y. Jan. 15, 2016). In *King*, a court found the plaintiff guilty of speeding and assessed a fine against him. *Id.*, 2015 WL 893573 at *1. After one year, with the fine unpaid, the court clerk (defendant Creed) sent a letter to plaintiff "detailing the fine Plaintiff owed." *Id.* Several months after that, Creed sent plaintiff another letter

---

*also* Tenn. Code Ann. §§ 55-50-303(d)(1), and 55-50-502(d)(2) (post-suspension payment plans).

[24]      *See* Tenn. Code Ann. § 16-18-307.

[25]      Plaintiffs' assertion that the Department of Safety should conduct "an ability to pay hearing," Amended Complaint, D.E. 111, at ¶ 249, essentially proposes that the Commissioner (or a designated hearing officer) should substitute his own judgment for that of the court which "imposed," Tenn. Code Ann. § 55-50-502(a)(1)(H), the monetary assessment in the first place. Such a contemplated procedure would trespass on the separation of powers construct of the state government. *See* Tenn. Const. art. II, § 2 ("No person or persons belonging to one of these [three] departments shall exercise any of the powers properly belonging to either of the others, except in the cases herein directed or permitted.").

25

advising that "his driver's license was suspended" for failure to pay the fine. *Id*. Plaintiff King never received a notice of suspension from the New York Department of Motor Vehicles. *Id*.

In his federal civil rights case, plaintiff King challenged (among other things) the court clerk's and DMV Commissioner's attempt to "enforce" the judgment by "unlawfully suspend[ing] [his] driver's license . . . ." *Id*. at *2. Plaintiff further alleged that defendant Barbara Fiala, the Commissioner of the state DMV, "lacked authority to require Plaintiff to pay the assessment in violation of [his] due process and equal protection rights." *Id*.

Defendants Creed and Fiala argued that the plaintiff's claims were barred by *Rooker-Feldman*, and the district court agreed:

> "*Rooker-Feldman* bars a losing party in state court from seeking what in substance would be appellate review of the state judgment in a United States district court, based on the losing party's claim that the state judgment itself violates the loser's federal rights." Plaintiff's claims against [clerk] Creed fall squarely within this scenario and thus are not properly before the court.

*Id*. at *3 (quoting *Exxon*, 544 U.S. at 287); *see also id*. at *7 (dismissing the claims against Commissioner Fiala pursuant to *Rooker-Feldman* as well).

In his motion for reconsideration, plaintiff King argued that *Rooker-Feldman* did not apply because "his due process claims [were] based on allegations of 'discretionary acts' that were not required by the state court judgment." *King v. Creed*, 2016 WL 204492, at *3 (N.D.N.Y. Jan. 15, 2016). *Compare with* Complaint at ¶ 1 (alleging "suspensions are not part of the punishment for any traffic-related infraction"). Thus, King contended that he had asserted an "independent claim" against Creed and Fiala, which was distinct from the state court judgment itself. *Id*. The district court disagreed:

> [A] federal suit does not raise an independent claim where it "alleg[es] that actions taken pursuant to a court order violate [the plaintiff's] rights." *Because Creed and Fiala acted to enforce the state court order*, the Court found that Plaintiff's

26

allegations against them were essentially challenges to the underlying state court judgment. The Court is not persuaded by Plaintiff's argument that Creed and Fiala's actions to enforce the state court judgment were "voluntary" or "discretionary" acts.

*Id*. at \*3 (emphasis added) (quoting *Hoblock v. Albany City Bd. Of Elections*, 422 F.3d 77, 88 (2d Cir. 2005) (emphasis in original) (record citations omitted).

Here, Plaintiffs describe themselves as "*judgment* debtors," Amended Complaint, D.E. 111, at ¶ 251 (emphasis added), whose licenses have been suspended by the Commissioner after "being notified of nonpayment by a clerk's office . . . ." *Id*. at ¶ 5. Thus, Plaintiffs' claims against the Commissioner are identical to those raised in *King*. For this reason, Plaintiffs' claims regarding revocation are "inextricably intertwined" with the state court judgments. *Feldman*, 460 U.S. at 482 n.16.

This conclusion also was reached by the District Court of Arizona in *Normandeau v. City of Phoenix*, 516 F. Supp. 2d 1054 (D. Ariz. 2005). In *Normandeau*, the plaintiff initially was convicted of driving on an expired registration and without proof of insurance, and fined \$420. *Id*. at 1059. Plaintiff was given a payment plan for the fine, but failed to make any payments in accordance with it. *Id*. In the interim, the plaintiff received four additional citations for the same offenses. *Id*. After failing to appear for these additional citations, the city court fined plaintiff an additional \$3,040. *Id*. After the court entered default judgments, it notified plaintiff that "if he did not remit the entire \$3,468.00 he then owed, the Motor Vehicle Division of the Arizona Department of Transportation ("MVD") would be asked to suspend Plaintiff's driver's license pursuant to [state statute]." *Id*. Plaintiff refused to pay, and the Arizona MVD suspended his license. *Id*. Among his federal civil rights claims, plaintiff Normandeau asserted that the Arizona suspension statute was "unconstitutional on its face and as applied to him," *id*. at 1060, and he sought a preliminary injunction against the MVD Division Director from suspending his driver's

27

license.  *Id.*

As in the *King* case, the MVD Director argued that, in order "to entertain Plaintiff's claims against the State defendants, this Court could not avoid reviewing the city court decisions convicting plaintiff . . . ."  *Id*. at 1062.  The district court agreed.  Applying *Rooker-Feldman*, the court stated that "'the fundamental and appropriate question to ask is whether the injury alleged by the federal plaintiff *resulted* from the state court judgment itself, or is distinct from that judgment.'"  *Id*. at 1063 (emphasis added) (quoting *Garry v. Geils*, 82 F.3d 1362, 1365 (7th Cir. 1996)).[26]  The district court explained: "The court 'cannot simply compare the *issues* involved in the state-court proceeding to those raised in the federal-court plaintiff's complaint.  Rather, '[it] must pay close attention to the *relief* sought by the federal-court plaintiff.'"  *Id*. at 1063 (emphasis and alteration in original) (quoting *Bianchi v. Rylaarsdam*, 334 F.3d 895, 900 (9th Cir. 2003)); *accord Kenmen Eng'g v. City of Union*, 314 F.3d 468, 476 (10th Cir. 2002) (same)).  Accordingly, the district court held that the *Rooker-Feldman* doctrine precluded the relief the plaintiff requested: "Most obviously, because Plaintiff asks this Court to find a specific Arizona statute unconstitutional as state courts have applied it to him, to comply with Plaintiff's request would require this Court to find that the state courts erred."  *Id*. at 1064.  Thus, even though the state court judgments only assessed fines against the plaintiff, and the suspension of his license was a statutory enforcement mechanism to compel payment of those fines, the district court found that *Rooker-Feldman* required dismissal of plaintiff's claims related to the constitutionality of the statute.  *Id*.[27]

---

[26]  *Accord Exxon*, 544 U.S. at 284 (holding *Rooker-Feldman* applies to "cases brought by state-court losers complaining of injuries *caused* by state-court judgments") (emphasis added).

[27]  The district court held that one of plaintiff's claims survived *Rooker-Feldman* scrutiny, because it was "based on events subsequent to Plaintiff's license suspension" and therefore independent of the underlying state court proceedings.  *Id*.  That remaining claim, however, was dismissed on statute of limitations grounds.  *Id*. at 1064 n.3.

28

The relief sought by Plaintiffs here (i.e., a declaration of a violation of the Fourteenth Amendment for failure to provide notice, and an opportunity to be heard, and to conduct an inquiry regarding a person's ability to pay court-assessed fines, costs and litigation taxes) is directly and inextricably connected to the underlying state court judgments. For this reason, *Rooker-Feldman* bars Plaintiffs' causes of action.

### B. Plaintiffs' Lack of Standing Deprives the Court of Jurisdiction Over Claims Alleging that Tenn. Code Ann. § 55-50-502(a)(1)(I) is Unconstitutional.

To demonstrate standing to pursue a claim in federal court, a plaintiff must show "three elements: (1) that he has suffered an 'injury in fact,' (2) that there is a 'causal connection between the injury and the conduct complained of,' and (3) that it is 'likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *Kiser v. Reitz*, 765 F.3d 601, 607 (6th Cir. 2014) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).

Plaintiffs challenge the constitutionality of Section 502(a)(1)(I), which requires the Commissioner to suspend a license when the driver has "failed to appear in any court to answer or to satisfy any traffic citation issued for violating any statute regulating traffic . . . ." Tenn. Code Ann. § 55-50-502(a)(1)(I). However, the only allegation in the Amended Complaint about a failure to appear is made by Mr. Robinson. Specifically, he alleges that, in August 2016, the Commissioner notified him his license would be suspended in 30 days, based on his failure to appear in court. *See* Amended Complaint, D.E. 111, at ¶ 120. However, he also alleges that, in October 2016, the Department removed that suspension. *Id.* at ¶ 130. Thus, neither Mr. Robinson nor any of the other Plaintiffs allege that their license *currently* is suspended on the basis of Section 502(a)(1)(I). As a result, none of them can demonstrate an injury arising from this statute, and there is no causal connection between their asserted injury (loss of driving privileges) and the conduct about which they complain (the Commissioner's suspension of their driver's license for

29

failing to appear). Accordingly, the Plaintiffs do not have standing to challenge the constitutionality of section 502(a)(1)(I), and the Court should dismiss those claims for lack of subject matter jurisdiction.

### C. As to the Constitutional Challenge to Section 502(a)(1)(H) and (a)(1)(I), Plaintiffs Have No Standing or, Alternatively, Have Failed to State a Claim Upon Which Relief Can Be Granted.

Even if the Court finds Tenn. Code Ann. § 55-50-502(a)(1)(H) and/or (a)(1)(I) unconstitutional, that would not remedy the injury Plaintiffs have identified—loss of their driver's licenses. Each named Plaintiff has lost his or her driving privileges by operation of at least three other statutes, the constitutionality of which Plaintiffs do not challenge in this case. First, as discussed above, the Commissioner was required to suspend Plaintiffs Sprague's and Robinson's driver's license for failure to comply with the financial responsibility statute. Tenn. Code Ann. § 55-12-115(a). *See also* Amended Complaint, D.E. 111, at ¶¶ 132 and 177. Although they have now provided the Court with proof of insurance, the statute requires that a driver seeking reinstatement also pay a $50 fee and, more importantly, take and pass a driver's license examination. *See* Tenn. Code Ann. § 55-12-115(b). Plaintiffs do not allege that they have fulfilled these requirements.

Second, the Commissioner has also revoked *all* of the Plaintiffs' driver's licenses for the misdemeanor criminal offenses of driving on suspended or revoked licenses in violation of Tenn. Code Ann. § 55-50-504(a). Plaintiff Sprague was convicted of driving on a suspended license in May 2016, and Plaintiff Gibbs was convicted in 2002 and again in 2006. *See* Amended Complaint, D.E. 111, at ¶¶ 157, 198, and 203. As discussed above, a criminal conviction for driving on a suspended license results in suspension of a driver's license for an additional six months (for a first offense) or a full year (for subsequent offenses) from the date of conviction. Tenn. Code Ann.

§ 55-50-502(f)(1). At the end of a period of suspension, the Department has the authority to "require a reexamination of the licensee as a prerequisite to the reissuance of the license." Tenn. Code Ann. § 55-50-502(f)(1). Although not disclosed in the Amended Complaint, Plaintiff Robinson pled guilty in April 2017 to a June 2016 citation for driving on a revoked license. *See* Citation (*Exhibit D* hereto); Judgment (*Exhibit E*, hereto). Plaintiff Robinson is not entitled to apply for a new license unless the cause of the revocation has been removed and a year has elapsed, except for a first-time revocation, for which he can apply for a new license six months after surrendering his license. *See* Tenn. Code Ann. §§ 55-50-502(f)(3) and (f)(4).

Third, Plaintiff Gibbs acknowledges that his license also has been revoked pursuant to Tenn. Code Ann. § 40-24-105(b), the statute challenged in the *Thomas* case pending in this Court, because he owes fines, costs and/or litigation taxes for other "unrelated" criminal charges. *See* Amended Complaint, D.E. 111, at ¶ 205. He cannot recover his driving privileges until those court-ordered assessments are satisfied. *See* Tenn. Code Ann. § 40-24-105(b)(1).

Plaintiffs seem to anticipate this standing problem by asking the Court to remove suspensions of their driver's licenses just under this Statute, as opposed to completely reinstating the licenses. *See* Amended Complaint, D.E. 111, at pp. 44 (Prayer for Relief "f"). However, Plaintiffs' injuries are the loss of their driver's licenses, consistent with the way they have defined the interest at stake for purposes of their procedural due process claim.

In *Heimberger v. School District of City of Saginaw*, 881 F.2d 242 (6th Cir. 1989), the Sixth Circuit considered a similar standing argument. In that case, plaintiffs challenged the constitutionality of public school disciplinary policies which allowed school officials to suspend a student for bad conduct and thereby cause the student not to receive a free school lunch as provided by federal statute. The Court concluded that, because the students would lose their school lunches

31

under a different, unchallenged, school disciplinary policy even if the Court struck down the challenged policy, the students had no standing. *Id.* at 246.

Plaintiffs in this case lack standing for the same reason articulated in *Heimberger*. Even if the Court declares Tenn. Code Ann. §§ 502(a)(1)(H) and/or 502(a)(1)(I) unconstitutional, Plaintiffs and others in the class they seek to represent still would not have the right to the restoration of their driving privileges. The three statutes discussed above are not the only that statutes that require suspension or revocation of driving privileges. *See*, *e.g.*, Amended Complaint, D.E. 111, at ¶ 198 (discussing Gibbs' suspension for truancy). Thus, as the three named Plaintiffs demonstrate, the putative class members will have any number of reasons that their driving privileges have been suspended or revoked other than the Commissioner's enforcement of Tenn. Code Ann. § 55-50-502(a)(1)(H) or 55-50-502(a)(1)(I).

Whether the Court analyzes this as a lack of standing or the failure to state a claim, the constitutional challenge to section 502(a)(1)(H) and (a)(1)(I) are subject to dismissal. Plaintiffs lack standing because there is no causal connection between their alleged injury (loss of driving privileges) and the conduct complained of (the Commissioner's enforcement of section 502(a)(1)(H) and (a)(1)(I)) and because their injury cannot be "redressed by a favorable decision" on their constitutional challenge to the Statute. *Lujan*, 504 U.S. at 560–61.

Plaintiffs also have failed to state a claim upon which relief can be granted because they cannot establish causation, which is required for them to prevail on a § 1983 claim. "A 'public official is liable under § 1983 only if he *causes* the plaintiff to be subjected to a deprivation of his constitutional rights.'" *McKinley v. City of Mansfields,* 404 F.3d 418, 438 (6th Cir. 2005) (emphasis added) (quoting *Baker v. McCollan,* 443 U.S. 137, 142 (1979)). "Traditional tort concepts of causation inform the causation inquiry on a § 1983 claim." *Powers v. Hamilton Cty.*

32

*Pub. Def. Comm'n*, 501 F.3d 592, 608 (6th Cir. 2007) (citing *McKinley*, 404 F.3d at 438)).  Thus, courts must consider whether a public official's conduct was both the cause in fact and the proximate cause of a plaintiff's injury.  *Id.*  "'Conduct is the cause in fact of a particular result if the result would not have occurred but for the conduct.  Similarly, if the result would have occurred without the conduct complained of, such conduct cannot be a cause in fact of that particular result.'"  *Id.* (quoting *Butler v. Dowd*, 979 F.2d 661, 669 (8th Cir.1992)).  As demonstrated above, the Commissioner's enforcement of Section 502(a)(1)(H) and (I) is not the "but for" cause of the loss of driving privileges.

Accordingly, the Court should dismiss Plaintiffs' claims with respect to the constitutionality of Tenn. Code Ann. § 55-50-502(a)(1)(H) or 55-50-502(a)(1)(I) for lack of standing or, in the alternative, failure to state a claim upon which relief can be granted.

## II.     Sprague's and Gibbs' Claims Are Barred by the Statute of Limitations.

The Court should dismiss Sprague's and Gibbs' claims for failure to state a claim under Rule 12(b)(6), as they are barred by the statute of limitations. In the context of section 1983 actions, federal courts apply the most closely analogous state statute of limitations.  *Wilson v. Garcia*, 471 U.S. 261, 280 (1985).  Accordingly, for section 1983 actions brought in Tennessee, a one-year statute of limitations applies.  *See* Tenn. Code Ann. § 28-3-104(a)(1)(B); *see also Roberson v. Tennessee*, 399 F.3d 792, 794 (6th Cir. 2005).  While state law establishes the statute of limitations for a § 1983 action, federal law determines when a cause of action accrues.  *Wallace v. Kato*, 549 U.S. 384, 388 (2007).  "Ordinarily, the limitations period starts to run 'when the plaintiff knows or has reason to know of the injury which is the basis of his action.'"  *Kuhnle Bros., Inc. v. Cty. Of Geauga*, 103 F.3d 516, 520 (6th Cir. 1997) (quoting *Sevier v. Turner*, 742 F.2d 262, 273 (6th Cir. 1984)).  Under this rule, federal courts looks to "what event should have alerted the typical lay

person to protect his or her rights." *Id*. (quoting *Dixon v. Anderson*, 928 F.2d 212, 215 (6th Cir. 1991)). *Accord Roberson*, 399 F.3d at 794 (holding that a plaintiff has reason to know of his injury when he should have discovered it through the exercise of reasonable diligence).

Plaintiffs filed this action on September 13, 2017. Based upon the facts alleged in the Complaint, the claims asserted by Plaintiffs Sprague and Gibbs are barred by Tenn. Code Ann. § 28-3-104(a)(1)(B).

Plaintiff Sprague alleges that the Department suspended her license in September 2015, but failed to provide her any notice of that suspension. *See* Amended Complaint, D.E. 111, at ¶¶ 152-153. However, Plaintiff Sprague admits that she learned of this suspension in May 2016, when she received additional traffic citations. *Id*. at ¶ 157. Yet, Plaintiff Sprague did not file this lawsuit under section 1983 until more than a year after she had learned that the Department suspended her license.[28] *See Sharpe v. Cureton*, 319 F.3d 259, 266 (6th Cir. 2013) ("[T]he 'discovery rule' applies to establish the date on which the statute of limitations begins to run . . . .").

Similarly, Plaintiff Gibbs admits that his license was suspended in 1999 until the age of 21 due to truancy from school. *Id*. at ¶ 198. He further admits that in 2002, before he turned 21, he received a ticket for driving on a suspended license. *Id*. While he alleges that he never received

---

[28]     At the October 4, 2017, hearing on Plaintiffs' Temporary Restraining Order, the Court asked why Plaintiff Sprague delayed bringing her claims to court. Plaintiffs' counsel simply stated that she was "trying very hard to get by without [her license]" and that "for a while" Ms. Sprague was "able to get help from family members" with regard to driving to and from work. Transcript of Hearing at 30. Plaintiffs' counsel further represented, however, such help "is no longer readily available . . . ." *Id*. This is an insufficient basis to toll the statute of limitations. *See Gardner v. Morriss*, 3:17-00747, 2017 WL 4805205 at *1 (M.D. Tenn. 2017) (holding that to demonstrate the propriety of tolling the statute of limitations, "the plaintiff must establish (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance has stood in his way").

notice from the Department of any license suspension, *id*. at ¶ 200, Plaintiff Gibbs also admits that "[a]fter . . . [he] turned 21," he learned that he was unable to obtain a valid driver's license because "the Department's records still listed Mr. Gibbs's status as suspended." *Id*. at ¶ 199. Plaintiff Gibbs avers that he is 36 years old. *See* Gibbs Declaration, D.E. 17, at ¶ 2. Thus, he was born in 1981, and turned 21 in 2002. Accordingly, he first learned of his suspension approximately 15 years ago. Thereafter, in 2006, Plaintiff Gibbs again learned of his license suspension, when he "received a second ticket for driving on a suspended license. . . ." Amended Complaint, D.E. 111, at ¶ 203. Therefore, Plaintiff Gibbs did not file this section 1983 lawsuit until 15 years after he first learned of his license suspension, and 11 years after he again learned of his license suspension.

Through their Amended Complaint, both Plaintiffs Sprague and Gibbs allege additional facts in an effort to avail themselves of the "continuing violation" exception to the statute of limitations. *See Sharpe*, 319 F.3d at 266-67. Specifically, Plaintiff Sprague alleges that, after her license suspension in September of 2015, the Department suspended her license again on September 15 and October 17, 2016. *See* Amended Complaint, D.E. 111, at ¶ 164. She contends that these successive suspensions "imposed additional procedural requirements, reinstatement fees, and other hurdles to regaining her driver's license." *Id*. In turn, Plaintiff Gibbs alleges that, on November 21, 2016, and September 7, 2017, he obtained "Reinstatement Requirements" letters from the Department which specified the requisite steps needed for reinstatement of his license but did not "provide information about alternatives for people who are too poor to pay Traffic Debt, [or] . . . offer the opportunity to be heard on the ability to pay Traffic Debt." *Id*. at ¶¶ 206 and 208.[29] These additional factual allegations do not breathe new life into their stale claims.

---

[29]     Plaintiff Sprague also alleges obtaining similar Reinstatement Requirements letters. *Id*. at ¶¶ 168, 170, and 177.

Application of the "continuing violations doctrine" is very limited, and the Sixth Circuit "rarely extends it to § 1983 actions." *Sharpe*, 319 F.3d at 267. In order to proceed under a continuing violation theory, Plaintiffs Sprague and Gibbs must satisfy the following three factors: (1) the allegedly wrongful conduct "must continue after the precipitating event that began the pattern," (2) the alleged injury "must continue to accrue after that event," and (3) further injury to the plaintiff must have been avoidable if the defendant[] had at any time ceased [the] wrongful conduct." *Eidson v. Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 635 (6th Cir. 2007) (quoting *Tolbert v. State of Ohio Dep't of Transp.*, 172 F.3d 934, 940 (6th Cir. 1999)). In this manner, the continuing violation doctrine requires "an overt act by the defendant . . . to restart the statute of limitations." *DXS, Inc. v. Siemens Med. Sys., Inc.*, 100 F.3d 462, 467 (6th Cir. 1996); *see also Eidson v. State of Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 635 (6th Cir. 2007) ("[A] continuing violation is occasioned by continual unlawful acts, not continual ill effects from an original violation. Passive inaction does not support a continuing violation theory") (internal citations and quotation marks omitted)). Furthermore, such an "overt act" must "'be a new and independent act that is not merely a reaffirmation of a previous act' and must 'inflict new and accumulating injury on the plaintiff.'" *Med. Ctr. at Elizabeth Place v. Premier Health Partners*, No. 3:12-CV-26, 2016 WL 9460026, at *17 (S.D. Ohio Oct. 6, 2016) (quoting *DXS, Inc.*, 100 F.3d at 467). Neither Plaintiff Sprague, nor Plaintiff Gibbs, can satisfy this standard.

While Plaintiff Sprague asserts that her successive license suspensions in September and October of 2016 "imposed additional procedural requirements, reinstatement fees, and other hurdles to regaining her license," Amended Complaint, D.E. 111, at ¶ 164, she confuses a monetary injury with her asserted constitutional injury. Her alleged constitutional injury (i.e., the lack of an opportunity to be heard on her inability to pay the underlying court-assessed fines/costs/taxes

36

assessed *before* suspension of her license) occurred outside of the applicable one-year statute of limitations. The two later suspensions of her license in September 15 and October 17, 2016, did not create a new alleged injury: it already had occurred, as her license already had been suspended and remained in that uninterrupted state at the time of the successive suspensions. *See id.* at ¶¶ 152, 157, and 164. Thus, Plaintiff Sprague's cause of action is based on "continual ill effects from an original violation." *Eidson*, 510 F.3d at 635. Further, the allegation that these later suspensions "imposed additional procedural requirements, reinstatement fees, and other hurdles to regaining [her] license," *id.* at ¶ 164, is a red-herring. Those suspensions actually imposed *the same* "procedural requirements" on Ms. Sprague for each of the underlying and unpaid traffic judgments (i.e., satisfaction of both judgments and payment of the reinstatement fee).[30]

Moreover, because her license originally was suspended in September of 2015, *id.* at ¶ 152, and remained in that status at the time of the later suspensions, *id.* at ¶ 157, Plaintiff Sprague cannot obtain any of the relief that she seeks against Commissioner Purkey: i.e., (a) a declaration of equal protection and due process violations, (b) "remov[al] of *all* suspensions" from her license, (c) waiver of "*all* reinstatement fees", and (d) reinstatement of Plaintiffs' license. *Id.* at Prayers for Relief "b," "f," and "g". Since her original September 2015 suspension remains in effect, and Plaintiff Sprague is barred by the statute of limitations from pursuing any claim relating to it, she cannot obtain any of this relief.

Plaintiff Gibbs' new allegations also fail to resurrect his claims. The "Reinstatement Requirements" letters from the Department, on which he relies, reflect only "a reaffirmation" the

---

[30] Indeed, Plaintiff Sprague's assertion that requiring payment of the two 2016 Lebanon traffic judgments, *id.* at ¶¶ 156-57 and 162, constitutes "additional" conditions to regaining her license, further indicates that her constitutional claims are "inextricably intertwined" with the underlying court orders. *Feldman*, 460 U.S. at 482 n.16.

37

prior suspension. *DXS, Inc.*, 100 F.3d at 467. Such "passive inaction does not support a continuing violation theory." *Eidson*, 510 F.3d at 635.[31]

To summarize, the Department suspended Plaintiff Gibbs' license in 2002 and suspended Plaintiff Sprague's license in September 2015. The ongoing harm that Plaintiffs Gibbs and Sprague allege to have suffered is traceable to those suspensions – both of which occurred before the expiration of the one-year statute of limitations. Accordingly, the claims of Plaintiffs Sprague and Gibbs are time-barred by Tenn. Code Ann. § 28-3-104(a)(1)(B). *See Singer v. Bureau of Prof. and Occup. Affairs*, 523 F. App'x 185, 187 (3d Cir. 2013) (rejecting continuing violations theory where "[t]he Board suspended Singer's [professional] license 20 years ago and the ongoing harm that he has suffered is traceable to that suspension"); *Hull v. State of New Mexico Tax. and Rev. Dep't Motor Vehicle Div.*, 179 F. App'x. 445, 447 (10th Cir. 2006) (dismissing complaint about driver's license suspension for failure to state a claim as it was time barred, having been filed "at least six years since she claimed she learned of the harm") ; *Sessler v. C.C.C.S.E.A.*, No. 1:14-CV-0058, 2014 WL 3014513, at *3 (N.D. Ohio July 3, 2014) (dismissing as time barred plaintiffs' challenge to suspension of his driver's license for non-payment of child support *sua sponte*); *Normandeau*, 516 F. Supp. 2d at 1066-67 (rejecting continuing violations theory where "the gravamen of [Plaintiff's] claim is that the impacts on him from his license suspension and the assessment of fines, such as the inability to drive and maintain his employment, are themselves discrete illegal acts. As set forth above, discrete illegal acts do not escape the statute of limitations challenge.").

**III.    Plaintiffs' Claims that the Statute Violates Their Constitutional Rights Fail as a**

---

[31]    This analysis applies equally to Plaintiff Sprague's reliance on similar Reinstatement Requirements letters. *See* Amended Complaint, D.E. 111, at ¶¶ 168, 170, and 177.

**Matter of Law.**

Even if the Court were not deprived of subject matter jurisdiction pursuant to the *Rooker-Feldman* doctrine and lack of standing, the Court should dismiss each of Plaintiffs' claims for failure to state a claim because they fail as a matter of law. To prevail on a claim brought under 42 U.S.C. § 1983, a plaintiff must prove that (1) he or she was deprived of a right secured by the Constitution or laws of the United States; and (2) the deprivation was caused by a person acting under color of law. *Robertson v. Lucas*, 753 F.3d 606, 614 (6th Cir. 2014). Plaintiffs cannot show that they were deprived of a right secured by the Constitution.

As a preliminary matter, as discussed below in more detail, the Commissioner notes that the *Griffin/Bearden* line of Supreme Court cases which Plaintiffs rely on for both their equal protection and due process[32] claims do not apply in this context.[33] Indeed, as this Court's TRO order explained, the Sixth Circuit explicitly held that the *Bearden* cases were "concerned [with] fundamental interests subject to heightened scrutiny." TRO Order, D.E. 62, at 15 (quoting *Johnson v. Bredesen*, 624 F.3d 742, 749 (6th Cir. 2010)). The conclusions reached by this Court and the

---

[32]     *See* Amended Complaint, D.E. 111, at ¶ 12.

[33]     The *Griffin/Bearden* line of cases stands for the proposition that a state may not imprison individuals for inability to pay a fine or court costs. *Bearden v. Georgia*, 461 U.S. 660, 667 (1983) (holding unconstitutional a state's revocation of an individual's probation for failure to pay a fine or make restitution without first finding that the probationer was responsible for that failure or that alternative forms of punishment were inadequate); *Tate v. Short*, 401 U.S. 395, 399 (1971) (holding that a statute allowing imprisonment of an indigent person for failure to pay traffic fine violates the Equal Protection Clause); *Williams v. Illinois*, 399 U.S. 235, 242 (1970) (holding a statute allowing a court to impose a longer jail term on an indigent defendant who is unable to pay fines arising from his conviction violates the Equal Protection Clause); *Griffin v. Illinois*, 351 U.S. 12, 17-20 (1956) (holding unconstitutional a state's failure to provide trial transcripts (or devise an alternative solution) to criminal defendants seeking appellate review). Although Plaintiffs may argue that this line of cases apply in the civil context as well, the Supreme Court clearly has held that the *Griffin/Bearden* analysis only applies in the civil context in the "narrow category" of cases in which a fundamental right is at stake. *M.L.B.*, 519 U.S. at 113-16.

Sixth Circuit are consistent with a long line of cases in which the Supreme Court repeatedly has held that "[a]bsent a fundamental interest or classification attracting heightened scrutiny . . . the applicable equal protection standard 'is that of rational justification.'" *M.L.B. v. S.L.J.*, 519 U.S. 102, 115-16 (1996) (quoting *Ortwein v. Schwab*, 410 U.S. 656, 660 (1973) (per curiam)); *see also id.* at 113-16 (summarizing cases). The suspension of Plaintiffs' driver's licenses clearly do not implicate the liberty interest of incarceration that typically is at stake in this line of cases. Thus, the Commissioner analyzes Plaintiffs' claims under the correct constitutional standards here.

### A. The Statute Does Not Violate Plaintiffs' Right to Equal Protection.

The Statute neither implicates a fundamental right nor targets a suspect class. Accordingly, Plaintiffs' equal protection claim is subject to—and comfortably satisfies—rational basis review, especially under *Johnson v. Bredesen*, 624 F.3d 742, 746 (6th Cir. 2010). In addition, Plaintiffs' equal protection claim that the Statute impermissibly allows the State to engage in unfair collection practices is without merit, as the case they rely on, *James v. Strange*, 407 U.S. 128 (1972), does not apply where no fundamental interests are at stake. *See* Complaint at ¶ 10.

### 1. The Statute Satisfies Rational Basis Review.

Plaintiffs allege that sections 502(a)(1)(H) and (a)(1)(I) violate the Equal Protection Clause of the Fourteenth Amendment because they make no allowance for inability to pay and thus unfairly disadvantage indigent people who owe court-assessed traffic-related fines and costs. To state an equal protection claim, a plaintiff must adequately plead that the government treated the plaintiff disparately, as compared to similarly situated persons, and that such disparate treatment either (1) burdens a fundamental right, (2) targets a suspect class, or (3) has no rational basis. *Club Italia Soccer & Sports Org., Inc. v. Charter Twp. of Shelby, Mich.,* 470 F.3d 286, 299 (6th Cir. 2006).

40

The Commissioner's suspension of drivers' licenses under this statute neither burdens a fundamental right nor targets a suspect class. "[T]here is no fundamental right to drive a motor vehicle." *Duncan v. Cone*, No. 00-5705, 2000 WL 1828089, at *2 (6th Cir. Dec. 7, 2000) (citing *Miller v. Reed,* 176 F.3d 1202, 1205-06 (9th Cir. 1999); *accord Roberts v. State,* 229 F.3d 1164, 2000 WL 1275606, at *2 (10th Cir. 2000) (table) (same). Further, to the extent Plaintiffs seem to allege that the statute targets them because of their indigency, *see, e.g.,* Amended Complaint, D.E. 111, at ¶¶ 12, 92, and 104, the Sixth Circuit has held that "wealth-based classifications do not discriminate against a suspect class." *Johnson*, 624 F.3d at 746 (citing *Papasan v. Allain*, 478 U.S. 265, 283-84 (1986); *Maher v. Roe*, 432 U.S. 464, 470-71 (1977)). Thus, because the statute does not implicate a fundamental right or target a suspect class, it is subject to rational basis review.

"To survive rational basis scrutiny, the statute need only be rationally related to legitimate government interests." *Johnson*, 624 F.3d at 746. Under this standard, the statute "'*must* be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.'" *Id.* (emphasis added) (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993)). "The elementary rule is that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality." *Hooper v. California*, 155 U.S. 648, 657 (1985); *accord Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988) (same). Under rational basis review, courts "will not strike down a statute on equal protection grounds 'unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that [the court] can only conclude that the legislature's actions were irrational.'" *Johnson*, 624 F.3d at 747 (quoting *Vance v. Bradley*, 440 U.S. 93, 97 (1979)). "A plaintiff may demonstrate that the government action lacks a rational basis either by negating every

41

conceivable basis which might support the government action, or by demonstrating that the challenged government action was motivated by animus or ill-will." *Id.* (internal quotation marks, punctuation, and citations omitted). Finally, the existence of better methods for achieving governmental ends is irrelevant under rational basis review. *Tuan Anh Nguyen v. INS*, 533 U.S. 53, 77 (2001); *Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 316 (1976) (per curiam) ("[T]he State perhaps has not chosen the best means to accomplish this purpose. But where rationality is the test, a State 'does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect.'") (quoting *Dandridge v. Williams*, 397 U.S. 471, 485 (1970)).

Here, the Statute is rationally related to the State's legitimate interests in (1) protecting public safety by punishing and deterring unsafe driving; (2) protecting those who are injured or have property damaged in car accidents by requiring that drivers be insured; (3) ensuring compliance with court orders; (4) furthering accountability of those who violate traffic laws; and (5) having a cost-effective method and increasing the likelihood of collecting court-assessed traffic fines and court costs.

Certainly, Tennessee has a legitimate interest in protecting public safety by punishing and deterring unsafe driving and by requiring drivers to be insured. In *Shoemaker v. City of Howell*, 795 F.3d 553 (6th Cir. 2015), the Sixth Circuit upheld the constitutionality of a city ordinance requiring homeowners or occupants to mow the grass between a sidewalk and street curb adjacent to their property because it advanced legitimate government interests, including traffic safety, public health, safety, and welfare. *Id.* at 567 (citing *H.D.V. -Greektown, LLC v. City of Detroit*, 568 F.3d 609, 623 (6th Cir. 2009) (holding that safety and aesthetics are legitimate governmental interests), *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 509–510 (1981)); *Harris v. Akron*

42

*Dept. of Public Health*, 10 F. App'x. 316, 319 (6th Cir. 2001) (identifying property values, aesthetics, and the health, safety, and welfare of the public as legitimate governmental interests)); *see also Warren v. City of Athens, Ohio*, 411 F.3d 697, 711 (6th Cir. 2005) (holding that concerns about traffic congestion and safety are legitimate state interests). Tennessee's interests in punishing and deterring unsafe driving and providing for the well-being of drivers and passengers who are involved in car accidents is clearly as important as the safety implications of grass growing too tall between a homeowner's sidewalk and the street.

The Sixth Circuit has also held that Tennessee has a valid interest in encouraging compliance with court orders. *Johnson*, 624 F.3d at 747. In *Johnson*, the Court held that Tennessee's voter re-enfranchisement statute, which conditioned restoration of felons' statutory voting rights upon payment of court-ordered victim restitution and child support obligations, satisfied rational basis review and thus did not violate the equal protection rights of felons whose indigency precludes them from making the necessary payments. *Id.* (citing *inter alia*, *Blackhawk Mining Co. v. Andrus*, 711 F.2d 753, 757-58 (6th Cir. 1983) (upholding statute requiring prepayment of proposed penalty assessments against due process challenge where government had legitimate interest in preventing collection problems and ensuring compliance with the law); *Carter v. Lynch*, 429 F.2d 154, 157–58 (4th Cir. 1970) (upholding state civil arrest and release statutes as legitimate legislative functions "well within the State's power to secure enforcement of the judgments of its courts")). Here, Plaintiffs have violated traffic laws that are both civil and criminal, and the state's interest in encouraging compliance with the fines and court costs assessed as the result of traffic offenses is clearly legitimate.

The State also has a legitimate interest in having a cost-effective method of collecting court-imposed traffic fines and costs. In *Mickelson v. City of Ramsey*, the Eighth Circuit noted

43

that a county's collection of a booking fee from a detained arrestee's cash upon booking involved "little or no discernable collection costs," while post-conviction attempts to collect the fee would "inevitably incur costs . . . [that] would frustrate the purpose of collecting the fee as a means to defray the expenses associated with booking."  823 F.3d 918, 925 (8th Cir. 2016); *cf. Mathews v. Eldridge*, 424 U.S. 319, 347 (1976) (noting that convenience, efficiency, and administrative cost are appropriate considerations in determining what kind of hearing is necessary in context of procedural due process challenge).  The cost to the State of collecting assessed traffic fines and costs as a civil debt can easily be more than the driver owes.  Suspending the license of a driver who has not timely paid assessed traffic fines and costs is a cost-effective way to secure the driver's cooperation with his obligations.

Lastly, the State's method of collecting court-ordered assessments—suspending a driver's license for non-payment—increases the likelihood of driver's paying those assessments precisely because of the importance of driver's licenses.  This issue was addressed directly in *Wells v. Malloy*, 402 F. Supp. 856, 859 (D. Vt. 1975), *aff'd*, 538 F.2d 317 (2d Cir. 1976), wherein the district court rejected an equal protection challenge to a Vermont statute that allowed the suspension of a driver's license for failure to pay a four percent state vehicle purchase tax.  Similar to the allegations here, the plaintiffs alleged that the statute violated their equal protection rights because they were unable to pay the tax as a result of their indigency.  *Id.* at 857.  Applying the rational basis test (because there was no suspect class and no fundamental right involved[34]), the court concluded: "The rational basis is readily apparent because the [tax] is a revenue collecting

---

[34]     *See Wells*, 402 F. Supp. at 858-59 (finding that "there is no fundamental right to drive" and that the statute does not "draw[] a suspect classification based on race, nationality, or alienage"). *See also id.* at 863 ("poverty alone does not create an unreasonable classification").

44

measure and [the statute] is clearly designed to aid in the collection of the tax. Since losing one's right to drive is a great inconvenience, the potential loss operates as an incentive to make prompt payment." *Id.* at 859. The court further held that "[a] state may place restrictions on a citizen's right to use his car on public highways for reasons which are not directly related to health, safety, and welfare of society," and rejected the plaintiffs' argument that the statute was not effective: "To the contrary, the fact that [plaintiff] Wells brought this lawsuit indicates that he believes the State's strategy is too effective to ignore." *Id.* at 860.

The district court further noted that "[t]he fact that plaintiffs are unable to pay the tax does not make a coercive collection method unreasonable":

> [P]laintiffs' current financial straits may well be temporary, [and] Vermont has a legitimate interest in collecting the tax from assets which plaintiff may acquire in the future. Perhaps it would be more apt to suspend driving privileges at such time as plaintiffs may acquire the means to pay the tax, yet it is a practical impossibility, not to mention an invasion of privacy for Vermont to maintain so vigilant a surveillance of plaintiffs' finances. Rather than be a watch dog, Vermont has taken this tack to remind plaintiffs of their continuing obligation. Furthermore, this kind of indirect collection technique may well be the only method which is financially feasible. The cost of direct collection methods when added to the amount of tax due might exceed the value of plaintiffs' available property. Given the future orientation of [the statute] and the practical shortcomings of direct collection techniques, we cannot say that plaintiffs' present inability to pay makes a suspension of their driving privilege improper.

*Id*. at 861.

In this case, the considerations articulated in *Wells* are even more compelling. Unlike the imposition of a civil tax that was challenged in *Wells*, the Statute is intended to enforce payment of assessed traffic fines and costs, which, in turn, are intended to serve as punishment and deterrence for violating state and municipal traffic laws that keep people safe. Without a mechanism to enforce payment of court-assessed fines and costs for violating these laws, drivers could continue with impunity to engage in unsafe driving conduct such as speeding, running stop

45

lights and stop signs, and driving recklessly. Further, the statutory car insurance requirement is extremely important for protecting drivers who are involved in car accidents on the state's roadways. If a driver is responsible for an accident and does not have car insurance, the injured party's ability to obtain redress is significantly impaired. That is a far more substantial interest than the state interest in *Wells*. Thus, the court's analysis in *Wells* directly supports the conclusion that the Statute comfortably satisfies rational basis review.

The Supreme Court has held, as a general matter, that "the power of the State to regulate the use of its highways is broad and pervasive." *Bibb v. Navajo Freight Lines Inc.,* 359 U.S. 520, 523 (1959). *See also Sullins v. Butler*, 175 Tenn. 468, 135 S.W.2d 930, 932 (1940) (legislature, through its police power, may prescribe conditions under which the "privilege" of operating automobiles on public highways may be exercised). Tennessee has chosen to use its regulatory power regarding the use of its highways in a manner that "remind[s]" drivers of their "continuing obligation[s]" to pay their court-assessed traffic fines and costs. *Wells*, 402 F. Supp. at 861.

The challenged statute bears "a direct and rational relationship to the advancement" of numerous state interests and, accordingly, withstands rational basis scrutiny. *Johnson*, 624 F.3d at 747. Plaintiffs have not demonstrated that the government action lacks a rational basis, "either by negativing every conceivable basis which might support the government action, or by demonstrating that the challenged government action was motivated by animus or ill-will." *Id.* Nor is there any basis for the Court to "conclude that the legislature's actions were irrational." *Vance*, 440 U.S. at 97 (1979); *Johnson*, 624 F.3d at 747. To the contrary, this "collection strategy . . . is rationally related to [the State's] interest in collecting [court-assessed traffic fines and costs] which the [court] has imposed." *Wells*, 402 F. Supp. at 860.

Simply put, the fact that indigent drivers have difficulty paying their court-assessed traffic

fines and costs does not render Tennessee's statute contrary to the Equal Protection Clause. *Id.* at 859 (upholding Vermont statute even though "suspending the right to drive causes [the plaintiffs] personal hardship"). As the Sixth Circuit has held, a "law will be sustained if it can be said to advance a legitimate government interest, even if the law seems unwise or works to the disadvantage of a particular group, or if the rationale for it seems tenuous." *E. Brooks Books, Inc. v. Shelby County, Tenn.*, 588 F.3d 360, 364 (6th Cir. 2009) (quoting *Romer v. Evans*, 517 U.S. 620, 632 (1996); *accord Johnson*, 624 F.3d at 748 (same); *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985)) ("When social or economic legislation is at issue, the Equal Protection Clause allows the States wide latitude, and the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes."); *James v. Strange*, 407 U.S. 128, 133 (1972) ("We do not inquire whether this statute is wise or desirable, or whether it is based on assumptions scientifically substantiated. Misguided laws may nonetheless be constitutional Plaintiffs' arguments that the Statute is unwise, is supported by a tenuous rationale, and works to the disadvantage of indigent offenders are unavailing under the rational basis standard.

Indeed, in *Johnson*, the dissenting judge opined that Tennessee's felon re-enfranchisement statute could not "survive constitutional scrutiny even under this highly deferential standard," because "'preconditioning suffrage on a payment that a person is unable to make is [not] in any rational way related to the government's interest in promoting that payment.'" 624 F.3d at 747-48 (quoting dissent at 756). However, the *Johnson* majority specifically rejected that view, holding: "While the dissent would prefer that the state not discriminate on the basis of wealth when providing statutory benefits, this is an argument that must be resolved by the legislature, not this Court." *Id.* at 748. The court specifically explained that, "the statute is not aimed at encouraging

the collection of payments from *indigent* felons, but from *all* felons," and that "the legislature may have been concerned that an exemption for indigent felons would provide an incentive to conceal assets and would result in the state being unable to compel payments from some non-indigent felons." 624 F.3d at 748 (emphasis in original). As the *Johnson* court colorfully phrased it, "That the state used a shotgun instead of a rifle to accomplish its legitimate end is of no moment under rational basis review." *Id.*

In an identical manner, the statute at issue here is aimed broadly at encouraging the collection of court-assessed traffic fines and costs from *all* drivers, not merely from *indigent* drivers. It is clear, under the binding authority of *Johnson*, that the statute at issue here survives rational basis review. *See also* W*ells*, 402 F. Supp. at 859. Accordingly, the Commissioner is entitled to judgment on Plaintiffs' equal protection claim.

### 2. The Statute Does Not Violate the Equal Protection Clause Under *James v. Strange*.

Plaintiffs allege that the Statute violates the Equal Protection Clause by subjecting individuals who fail to pay criminal court judgments to unduly harsh and discriminatory treatment as compared to other debtors, as prohibited by the Supreme Court in *James v. Strange*, 407 U.S. 128 (1972). Amended Complaint, D.E. 111, at ¶ 12. In *Strange*, the Supreme Court held that a Kansas statute intended to recoup from criminal defendants the cost of their court-appointed counsel violated the Equal Protection Clause because—by its very terms—it stripped indigent criminal defendants of statutory protections *specifically designed* to help indigent debtors. *Strange*, 407 U.S. at 141.

Two years later, in *Fuller v. Oregon*, 417 U.S. 40 (1974), the Supreme Court upheld an Oregon statute that required "a person convicted of a criminal offense to repay to the State the costs of providing him with effective representation of counsel, when he is indigent at the time of

48

the criminal proceedings but subsequently acquires the means to bear the costs of his legal defense." *Id.* at 41. The Court concluded that the Oregon statute did not suffer from the "infirmity" that condemned the Kansas statute in *Strange* because the "convicted person from whom recoupment is sought [] retains all the exemptions accorded other judgment debtors, in addition to the statutory right to show at any time that recovery of the costs of his legal defense will impose 'manifest hardship.'" *Id.* at 47 (quoting the Ohio statute).

*Strange* and its progeny do not apply here. The analysis of Plaintiffs' *Strange* claim starts and ends with the Sixth Circuit's holding in *Johnson*, in which the court explicitly held that *Strange* does not apply outside the context of "fundamental interests subject to heightened scrutiny." *Johnson*, 624 F.3d at 749. As the Statute does not implicate fundamental interests, *Strange* does not apply.[35]

Even if *Strange* were applicable, the Statute does not run afoul of its holding. In *Strange*, the Court struck down a statute that "strip[ped] the indigent defendant of the very exemptions designed primarily to benefit debtors of low and marginal incomes." *Strange*, 407 U.S. at 139. The Tennessee statute challenged here, like the Oregon recoupment statute challenged in *Fuller*, does not eliminate any protections normally afforded to judgment creditors. To the contrary, it treats all drivers who owe court-assessed traffic fines and costs the same. The Commissioner has found no authority that extends *Strange* to a statute such as sections 502(a)(1)(H) and (a)(1)(I).

Other district courts have rejected similar equal protection claims brought pursuant to *Strange*. For example, in *United States v. Cunningham*, 866 F. Supp. 2d 1050 (S.D. Iowa 2012), the court distinguished *Strange* in rejecting an equal protection challenge brought by a federal

---

[35] In addition, virtually all of the cases that apply *Strange* involve challenges to state efforts to recoup the specific costs of providing indigent legal defense, which is not at issue here.

criminal defendant challenging the government's garnishment of her state disability retirement benefits to enforce the federal court's restitution judgment arising from her fraud conviction:

> Although the statute in *James* dealt with indigent criminal defendants, the debts involved—and afforded disparate treatment—were all civil in nature. Here, the nature of debts afforded disparate treatment are, in fact, different. Restitution is part of a criminal sentence and is penal in nature. Unlike the Government's interest in recouping debts from civil judgments debtors, the [Mandatory Victim Restitution Act] seeks primarily to assure that victims of a crime receive full restitution. Providing fewer exemptions to restitution debtors is rationally related to the legitimate twin interests of making crime victims whole and punishing criminals. Thus, discriminating against criminal judgment debtors by denying them state law exemptions does not violate the equal protection guarantee of the Fifth Amendment.

*Id.* at 1058 (internal quotation marks and citations omitted); *see id.* at 1058-59 (holding that prohibiting a criminal defendant owing restitution from invoking exemptions afforded civil judgment debtors did not violate equal protection). Here, the Statute does not eliminate exemptions otherwise available for those who owe court-assessed traffic fines and costs.

Thus, contrary to Plaintiffs' arguments, the Statute plainly treats the Plaintiffs, and those indigent drivers whom they seek to represent, in exactly the same fashion as any other driver who is required to pay court-assessed fines and costs imposed upon convictions for driving offenses. It is not an unreasonable "coercive collection method." *Wells*, 402 F. Supp. at 861. The statute does not single out the indigent; nor, does it deprive the indigent of the other previously-discussed statutory mechanisms which are designed to help indigent criminal defendants.

As binding Sixth Circuit precedent compels the conclusion that *Strange* does not apply where, as here, fundamental interests are not implicated, *Johnson*, 624 F.3d at 749, and as the Statute would not violate *Strange* even if it were applicable, the Court should dismiss Plaintiffs' *James v. Strange* equal protection claim.

**B.      The Statute Does Not Violate Plaintiffs' Right to Due Process.**

50

Plaintiffs contend that their due process rights have been violated because they received no notice or opportunity to be heard on their ability to pay before the Commissioner suspended their licenses. To begin with, it is important to notice that Plaintiffs conflate procedural and substantive due process issues. They not only assert a procedural due process right to have a pre-suspension hearing, but also implicitly assert a substantive due process right to have indigency be considered as a substantive defense to suspension at that hearing. These issues are considered together in *Bearden* and its progeny because those cases hold that a state cannot imprison individuals just because they are poor. It makes sense, in that context, to require the state to inquire into an individual's ability to pay whatever cost has been imposed—such as a fine, probation fees, or indigent counsel fees—before incarcerating an individual for failure to pay. However, as discussed above, this Court has already held that the *Bearden* cases do not apply in this case because the *Bearden* cases were "concerned [with] fundamental interests subject to heightened scrutiny." TRO Order, D.E. 62, at 15 (quoting *Johnson v. Bredesen*, 624 F.3d 742, 749 (6th Cir. 2010)).

Because *Bearden* does not apply here, Plaintiffs' equal protection, procedural due process, and substantive due process claims must be considered separately. Plaintiffs' procedural due process claim fails because they received adequate process in the underlying proceedings that led to the imposition of traffic fines and costs. Under *Dixon v. Love*, 431 U.S. 105, 112 (1977), the Due Process Clause does not require a pre-suspension hearing in such a circumstance. Plaintiffs' substantive due process claim fails because there is no authority for the proposition that the Department must consider a licensee's ability to pay traffic fines and costs before revoking a driver's license.

## 1. The Statute Does Not Violate Plaintiffs' Right to Procedural Due Process.

"Procedural due process requires that the government, prior to depriving an individual of

their property, provide that individual with notice of the proposed action and an opportunity to be heard." *Paterek v. Vill. of Armada, Mich.*, 801 F.3d 630, 649 (6th Cir. 2015) (citing *Morrison v. Warren*, 375 F.3d 468, 473 (6th Cir. 2004)). "To establish a procedural due process claim, a plaintiff must show (1) the existence of a protected property interest at issue, (2) a deprivation of that protected property interest, and (3) that he or she was not afforded adequate procedures." *Id.* (citing *Daily Servs., LLC v. Valentino*, 756 F.3d 893, 904 (6th Cir. 2014)).

The Supreme Court held that suspension of drivers' licenses implicates "important interests" (as opposed to property interests), but nonetheless held that "licenses are not to be taken away without that procedural due process required by the Fourteenth Amendment." *Dixon*, 431 U.S. 105 at (quoting *Bell v. Burson,* 402 U.S. 535, 539 (1971)) (alterations in original). Courts "weigh several factors in deciding exactly how much process is due":

> [1] the private interest that will be affected by the official action; [2] the risk of an erroneous deprivation[;] . . . [3] the probable value, if any, of additional or substitute procedural safeguards; and [4] the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Shoemaker*, 795 F.3d at 559 (alterations in original) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)). The "requirements of due process are fluid and fact dependent." *Id.* (citing *Mathews*, 424 U.S. at 334). Courts also consider pre-and post-deprivation processes "together as a single package": "'[T]he sufficiency of predeprivation procedures must be considered in conjunction with the options for postdeprivation review; if elaborate procedures for postdeprivation review are in place, less elaborate predeprivation process may be required. In some cases, postdeprivation review may possibly be sufficient, and no predeprivation process is required.'" *Id.* (alteration in

original) (quoting *Leary v. Daeschner*, 228 F.3d 729, 742-43 (6th Cir. 2000)).[36]

In *Dixon*, the Supreme Court upheld a procedural due process challenge to an Illinois statute that provided for the summary revocation or suspension of drivers' licenses whenever a driver accumulated a set number of penalty points assessed for traffic offense convictions. 431 U.S. at 107-10. The Illinois statute provided only a post-deprivation notice and hearing. The Court held that a state is not required to conduct a pre-deprivation administrative hearing before suspending a driver's license. 431 U.S. at 115. The Court held as to the first *Mathews* factor that "a driver's license may not be so vital and essential" as the social security payments at issue in *Goldberg v. Kelly*, 397 U.S. 254, 264 (1970). *Dixon*, 431 U.S. at 113. As the Court held, the "nature of the private interest here is not so great as to require us 'to depart from the ordinary principle, established by our decisions, that something less than an evidentiary hearing is sufficient prior to adverse administrative action.'" *Id.* (quoting *Mathews*, 424 U.S. at 343). As to the second factor, the Court concluded that "the risk of an erroneous deprivation in the absence of a prior hearing is not great." *Id.* The Court noted that, although the suspension and revocation decisions "are largely automatic" under the applicable regulations, the licensee "had the opportunity for a full judicial hearing in connection with each of the traffic convictions" on which the suspension decision was made and had not "challenged the validity of those convictions or the adequacy of his procedural rights at the time they were determined." *Id.* For the third *Mathews* factor, the Court concluded that "requiring additional procedures would be unlikely to have significant value

---

[36]     In addition to quoting its earlier opinion in *Leary*, the Sixth Circuit also relied on Supreme Court and Second Circuit precedent. *See id.* (citing *Mathews*, 424 U.S. at 349 (finding that "an evidentiary hearing is not required prior to the termination of disability benefits") and *Spinelli v. City of New York*, 579 F.3d 160, 171 (2d Cir. 2009) ("Under the circumstances, . . . the City was not required to provide Spinelli with pre-deprivation due process before suspending her license and seizing her firearms.")).

53

in reducing the number of erroneous deprivations." *Id.* at 114. In reaching that conclusion, the Court noted that the licensee "does not dispute the factual basis" for the suspension of his license, but "is really asserting the right to appear in person only to argue that the Secretary should show leniency and depart from his own regulations." *Id.* at 113. As to the fourth factor, the Court held that "the substantial public interest in administrative efficiency would be impeded by the availability of a pretermination hearing in every case," as the opportunity to "automatically . . . obtain a delay in the . . . suspension or revocation" of a license "would encourage drivers routinely to request full administrative hearings." *Id.* at 114 (citing *Mathews*, 424 U.S. at 347).

The *Dixon* Court noted that the case demonstrated that "procedural due process in the administrative setting does not always require application of the judicial model":

> When a governmental official is given the power to make discretionary decisions under a broad statutory standard, case-by-case decisionmaking may not be the best way to assure fairness. Here the Secretary commendably sought to define the statutory standard narrowly by the use of his rulemaking authority. The decision to use objective rules in this case provides drivers with more precise notice of what conduct will be sanctioned and promotes equality of treatment among similarly situated drivers. The approach taken by the District Court would have the contrary result of reducing the fairness of the system, by requiring a necessarily subjective inquiry in each case as to a driver's "disrespect" or "lack of ability to exercise ordinary and reasonable care."

*Id.* at 115 (citation omitted).

*Dixon* dictates the outcome of Plaintiffs' procedural due process challenge to the Statute. As to notice, unlike the Illinois statute at issue in *Dixon*, the Tennessee Statute requires pre-deprivation notice for suspensions under Tenn. Code Ann. § 55-50-502(a)(1)(H) and (a)(1)(I):

> Prior to suspending the license of any person as authorized in this subsection (a), the department shall notify the licensee in writing of the proposed suspension and, upon the licensee's request, shall afford the licensee an opportunity for a hearing to show that there is an error in the records received by the department; provided, that the request is made within thirty (30) days following the notification of proposed suspension or cancellation.

54

Tenn. Code Ann. § 55-50-502(a)(1)(I). Indeed, Mr. Robinson acknowledges receiving such a notice. Amended Complaint, D.E. 111, at ¶ 120.

As to procedure, state law specifically provides a procedural mechanism for aggrieved drivers. Under the Uniform Administrative Procedures Act, Tenn. Code Ann. § 4-5-101 *et seq*. (UAPA), an individual whose driver's license has been suspended or revoked by the Department has the right to a contested case hearing. *See* Tenn. Code Ann. § 4-3-2005; *see id.* at §4-5-301 to -325 (contested case hearing provisions). An administrative law judge in the administrative procedures division of the office of the Secretary of State reviews initial orders by the Department of Safety suspending or revoking driver's licenses. *See* Tenn. Code Ann. § 4-3-2005(b). Review of final orders is then "subject to further review and final disposition by the commissioner." *Id.* A driver is entitled to judicial review of a final decision in the contested case in the Chancery Court of Davidson County. *See* Tenn. Code Ann. § 4-5-322(a)(1), (b)(1)(A). A driver may also be entitled to attorneys' fees if he or she prevails in overturning the Commissioner's decision. *See* Tenn. Code Ann. § 4-5-325.

Of course, these administrative procedural remedies for reviewing a suspension by the Commissioner are in addition to the procedures available at the time a court adjudicates a driver's guilt on the underlying traffic and criminal offenses. As outlined above, many of the costs about which Plaintiffs complain are the result of criminal convictions for driving offenses, for which Plaintiffs—like all Tennessee drivers—have a right to a jury trial,[37] a right to *de novo* review in

---

[37]     *See State v. Dusina*, 764 S.W.2d 766, 768 (Tenn. 1989) (recognizing the state constitutional right to trial by jury is more expansive than the federal constitutional right, the latter of which guarantees the right to a jury trial only where the fine exceeds $50 or confinement of more than six months); *State v. Powell*, No. M2001-02955-CCA-R3CD, 2002 WL 708047, at *2 (Tenn. Crim. App. Apr. 24, 2002) (holding right to jury trial for a charge of violating state speeding law— a Class C misdemeanor—the waiver of which must be clearly documented in the record of the

55

circuit court,[38] and a right to appeal the circuit court's judgment to the Tennessee Court of Criminal Appeals.[39]  Further, a court may not sentence an indigent criminal defendant to a term of imprisonment unless the State has afforded him the right to assistance of appointed counsel in his defense."  *Scott v. Illinois*, 440 U.S. 367, 373–74 (1979).  Other costs about which Plaintiffs complain are fines levied by municipal courts for non-criminal driving offenses, for which they had the right to contest the allegations; the right to *de novo* review in the circuit court of the county in which the municipality is located; and the right to appeal the circuit court judgment to the Court of Appeals.[40]

Also outlined above are the plethora of opportunities for drivers to request that the trial courts adjudicating the underlying traffic offenses consider their ability to pay, whether at the time of imposition of costs, upon motion thereafter, or upon request for a payment plan (when and where payment plans are an option). Specifically, drivers have the right in all courts to demonstrate their financial resources and status with respect to the ability to pay fines, court costs and litigation taxes.  *See* Tenn. Code Ann. §§ 40-24-101(a)(3), 40-24-102, 40-24-104(a), 40-25-123(b), 20-12-119(b), and Tenn. Code Ann. § 67-4-605(c).  Indeed, drivers have the ability—at the time a monetary assessment is imposed—to request the ability to pay in specific installments, or to be

---

general sessions or city court to waive the right to a jury trial in the circuit court appeal); Tenn. Code Ann. § 40-35-111(e)(3) (providing that a Class C misdemeanor, the lowest level criminal offense, carries not greater than 30 days in confinement or a fine not to exceed $50 or both, unless otherwise provided by statute).

[38]     *State v. Kirk*, 392 S.W.3d 622, 624 (Tenn. Crim. App. 2011) ("Appeals from general sessions court 'shall be heard de novo in the circuit court.'") (quoting Tenn. Code Ann. § 27–5–108(c)); *Powell*, 2002 WL 708047, at *1-2 (describing *de novo* review of Class C misdemeanor for violation of state speeding law from city court with concurrent jurisdiction with general sessions court to hear criminal matters by circuit court).

[39]     Tenn. R. App. P. 3(b).

[40]     *See* Tenn. Code Ann. § 16-18-307 (providing right to appeal municipal court judgment to circuit court); Tenn. R. App. P. 3(a) (providing appeal as of right in civil actions).

56

released from a fine completely. *See* Tenn. Code Ann. § 40-24-101(a)(3) and 102. After the entry of judgment, a driver may go back to court, and seek a reduction of a fine or permission to make installment payments at any time. *See* Tenn. Code Ann. § 40-24-104(a). Even after suspension of a license, a driver still may, in some instances, be able to seek a payment plan. *See* Tenn. Code Ann. §§ 55-50-303(d)(1) and 502(d)(2).

To be clear, these opportunities to present ability to pay to sentencing courts or through payment plans are state statutory rights only. Courts are not constitutionally required to consider ability to pay before imposing or enforcing judgments. As the Supreme Court has held, "[t]he State is not powerless to enforce judgments against those financially unable to pay a fine; indeed, a different result would amount to inverse discrimination since it would enable an indigent to avoid both the fine and imprisonment for nonpayment whereas other defendants must always suffer one or the other conviction." *Williams v. Illinois*, 399 U.S. 235, 244 (1970); *accord United States v. Pagan*, 785 F.2d 378, 382 (2d Cir. 1986) ("[T]he mere imposition of interest against an indigent defendant raises no constitutional problems."); *Frazier v. Jordan*, 457 F.2d 726, 729 (5th Cir.1972) (same). "It is at the point of enforced collection of the principal or additional amounts, where an indigent may be faced with the alternatives of payment or imprisonment, that he 'may assert a constitutional objection on the ground of his indigency.'" *Pagan*, 785 F.2d at 382 (quoting *U.S. v. Hutchings*, 757 F.2d 11, 14-15 (2d Cir. 1985)).

In sum, before the Commissioner suspends driver's licenses under the Statute, Tennessee drivers have had the right to a trial and appeal on their underlying traffic-related offenses (whether civil or criminal in nature), an opportunity to present ability-to-pay court-assessed traffic fines and costs at the time of assessment, at any time thereafter upon motion, and in some instances, at the time of entering into a payment plan. They also have received a notice informing them of the basis

for the proposed suspension and that they have thirty days to request a hearing to show an error in the Department's records. They also have an administrative remedy of pursuing a declaratory order, either before or after deprivation, which is subject to judicial review. Last, Tennessee drivers whose licenses have been suspended or revoked under the Statute have the post-deprivation right to a contested case hearing before an ALJ, to review of the ALJ's decision by the Commissioner, to review in Chancery Court of any adverse administrative decision, and to appeal to the Court of Appeals and Tennessee Supreme Court for any adverse court orders.

Analyzing the procedural remedies provided to Tennessee drivers under *Dixon*, it is clear that the Statute satisfies procedural due process. Pursuant to *Dixon*, it is clear that the nature of the private interest at stake (i.e., the first *Mathews* factors) does not require that the Department conduct an evidentiary hearing before suspending a driver's license for failure to pay traffic fines and costs. *See id.* at 113. Second, as in *Dixon*, the risk of an erroneous deprivation is small as Plaintiffs "had the opportunity for a full judicial hearing in connection with each of the [underlying offenses]." *Id.* As discussed above, drivers have the right to appear in court to challenge even a civil traffic violation with appeal rights to the appropriate courts, and obviously the right to a trial for traffic offenses that are criminal in nature. Third, as in *Dixon*, additional procedures would not "have significant value" in reducing the number of erroneous suspensions because Plaintiffs do not dispute the factual basis for their suspensions but instead seek leniency and departure from the statutes that bind the Department. *See id.* at 113-14. Fourth, as in *Dixon*, there is substantial public interest in administrative efficiency which would be impeded by the availability of a pre-termination hearing in every case. *Id.* at 114. Also, as in *Dixon*, section 502(a)(1)(H) and (a)(1)(I) provide "objective rules" which give drivers "precise notice of what conduct will be sanctioned and promotes equality of treatment among similarly situated drivers." *Dixon*, 431 U.S. at 115.

Here, as in *Dixon*, it is "clear that a licensee . . . eventually can obtain all the safeguards procedural due process could be thought to require before a discretionary suspension or revocation becomes final." *Id.* at 112.

A plaintiff "may not seek relief under Section 1983 without first pleading and proving the inadequacy of state or administrative processes or remedies to redress her due process violations." *See Jefferson v. Jefferson County Pub. Sch. Sys.,* 360 F.3d 583, 588 (6th Cir. 2004). As a matter of law, Plaintiffs cannot show that state processes and remedies are inadequate to redress their rights under the Due Process Clause. Accordingly, the Court should dismiss Plaintiffs' procedural due process claim.

### 2. The Statute Does Not Violate Plaintiffs' Right to Substantive Due Process.

Plaintiffs not only assert a right to a pre-suspension hearing before the Department, but also, implicitly, a substantive due process right to have the Department disregard assessed traffic fines and costs on the basis of indigency in that pre-suspension hearing. There is no authority that supports this claim.

In *Bennis v. Michigan*, 516 U.S. 442 (1996), the Supreme Court considered a claim by a woman who co-owned a car with her husband. Michigan authorities "abated" the car after the woman's husband, unbeknownst to her, engaged in an unlawful encounter with a prostitute in it. *Id.* at 444. Mrs. Bennis framed her claim as a procedural due process claim, but the Supreme Court concluded that she was actually claiming that "she was entitled to contest the abatement by showing she did not know her husband would use it to violate Michigan's indecency law." *Id.* at 446. The *Bennis* court declined to "import[] a culpability requirement" into Michigan's abatement scheme. *Id.* at 451-53.

Relying on *Bennis*, another district court "decline[d] to rewrite" an ordinance that

59

authorized the city of Chicago to dispose of cars whose owners had "repeatedly ignored lesser civil penalties" for parking infractions "by importing a requirement that the City ascertain, prior to disposition, that the owner intends to abandon her impounded vehicle." *Robledo v. City of Chicago*, 778 F.Supp.2d 887, 896 (N.D. Ill. 2011).

Here, Plaintiffs similarly seek to have this Court import an indigency defense to the enforcement of the Statute, but they have no authority to support such a holding. Clearly, under the *Bearden* cases, the State could not imprison an individual for failure to pay court court-assessed traffic fines and costs or reinstatement fees. *Bearden*, 461 U.S. at 667; *Tate*, 401 U.S. at 399; *Williams*, 399 U.S. at 242. However, suspending a license for such a failure without considering ability to pay is not unconstitutional. *Williams*, 399 U.S. at 244; *Pagan*, 785 F.2d at 382; *Hutchings*, 757 F.2d at 14–15; *Frazier*, 457 F.2d at 729; *Evans v. Rhodes*, No. 3:14CV466/MCR/CJK, 2016 WL 5019202, at *7 (N.D. Fla. Feb. 29, 2016) ("The Department is not constitutionally required to provide Evans with a pre-suspension hearing to determine his ability to pay court costs before suspending his driver's license."), *report and recommendation adopted*, No. 3:14CV466/MCR/CJK, 2016 WL 5024202 (N.D. Fla. Sept. 16, 2016). *State v. Ma*, 195 Wash. App. 1036 (2016) (table), 2016 WL 4248585 at *6 ("We reject the argument that imposition of mandatory [fines and court costs] on indigent defendants violates substantive due process because some of those defendants may be unable to pay them."). Similarly, the State is not constitutionally required to consider ability to pay before imposing a tax on the purchase of a car; imposing annual fees for registering a car; requiring annual inspection of a car; requiring drivers to maintain car insurance; or foreclosing on a house as a result of the homeowner's failure to pay property taxes, all of which would logically follow from Plaintiffs' arguments.

Plaintiffs may disagree with Tennessee's public policy of requiring that drivers pay their

traffic citations and court costs to maintain the privilege of driving in the state. But as the Sixth Circuit held in *Johnson*, this policy preference must be taken up with the legislature, not the courts. 624 F.3d at 748. To the extent that Plaintiffs implicitly raise a substantive due process claim, it fails as a matter of law.

## CONCLUSION

For the stated reasons, the Court should grant the Commissioner's motion to dismiss the Complaint.

Respectfully submitted,

HERBERT H. SLATERY III
Attorney General and Reporter

/s/ Andrew B. Campbell
ANDREW B. CAMPBELL (14258)
Assistant Attorney General
Public Interest Division
Andrew.Campbell@ag.tn.gov (615) 532-0356

KATHERINE M. DIX (22778)
Special Counsel
Public Interest Division
Katherine.Dix@ag.tn.gov (615) 532-5817

SCOTT C. SUTHERLAND (29013)
Deputy Attorney General
Law Enforcement &
Special Prosecutions Division
P.O. Box 20207
Nashville, TN   37202
Scott.Sutherland@ag.tn.gov (615) 532-7688

*Counsel for Commissioner Purkey*

61

## CERTIFICATE OF SERVICE

I hereby certify that on the 16th day of January, 2018, a copy of the foregoing document was served by CM/ECF to:

| | |
|---|---|
| **Premal Dharia**<br>**Edward P. Krugman**<br>**Jonas Wang**<br>Civil Rights Corps<br>910 17th Street NW, Suite 500<br>Washington, DC 20006<br>*Counsel for Plaintiffs* | **Kristin Ellis Berexa**<br>Farrar & Bates<br>211 Seventh Ave., North, Suite 500<br>Nashville, TN 37219<br>*Counsel for Mt. Juliet, Gaskill, Wilson County, Moss, Lebanon, Rutherford County, Linville, and Harrell* |
| **Claudia Wilner**<br>**Theresa Lau**<br>National Center for Law and Economic Justice<br>275 Seventh Avenue, Suite 1506<br>New York, NY 10001<br>*Counsel for Plaintiffs* | **Edward Evan Cope**<br>**Josh A. McCreary**<br>Cope, Hudson, Reed & McCreary, PLLC<br>16 Public Square, North<br>P.O. Box 884<br>Murfreesboro, TN 37133<br>*Counsel for Rutherford County, Harrell* |
| **Josh Spickler**<br>Just City<br>902 South Cooper Street<br>Memphis, TN 38104<br>*Counsel for Plaintiffs* | **Michael Ray Jennings**<br>326 N Cumberland Street<br>Lebanon, TN 37087<br>*Counsel for Wilson County, Moss* |
| **Matthew G. White**<br>Baker, Donelson, Bearman, Caldwell & Berkowitz, PC<br>165 Madison Avenue, Suite 2000<br>Memphis, TN 38103<br>*Counsel for Plaintiffs* | **Louis Gino Marchetti, Jr.**<br>**Charles S. Michels**<br>Taylor, Pigue, Marchetti & Blair, PLLC<br>2908 Poston Avenue<br>Nashville, TN 37203<br>*Counsel for Mt. Juliet* |
| **Mark Ennis McGrady**<br>Farrar & Bates<br>211 Seventh Ave., North, Suite 500<br>Nashville, TN 37219<br>*Counsel for Mt. Juliet, Gaskill, Wilson County, and Moss* | **Phillip Andrew Wright, Jr.**<br>City of Lebanon<br>200 Castle Heights Avenue, N<br>Lebanon, TN 37087<br>*Counsel for Lebanon, Linville* |

/s/ Andrew B. Campbell
ANDREW B. CAMPBELL

62