# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **FRED ROBINSON; ASHLEY SPRAGUE; JOHNNY GIBBS; and BRIANNA BOOHER, on behalf of themselves and all others similarly situated,** | ) ) ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | **Case No. 3:17-cv-01263** |
| | ) | **Judge Aleta A. Trauger** |
| **DAVID W. PURKEY, Commissioner of the Tennessee Department of Safety and Homeland Security, in his official capacity; DEBBIE MOSS, Circuit Court Clerk of Wilson County, Tennessee, in her official capacity; MELISSA HARRELL, Circuit Court Clerk of Rutherford County, Tennessee, in her official capacity; COREY LINVILLE, Court Clerk of the Municipal Court of Lebanon, Tennessee, in his official capacity; SUSAN GASKILL, Court Clerk of Mt. Juliet, Tennessee, in her official capacity; WILSON COUNTY, TENNESSEE; RUTHERFORD COUNTY, TENNESSEE; LEBANON, TENNESSEE; and MT. JULIET, TENNESSEE,** | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| **Defendants.** | ) ) | |

### MEMORANDUM

Fred Robinson, Ashley Sprague, and Johnny Gibbs have filed a Motion to Certify Class (Docket No. 13) and a Motion for Preliminary Injunction (Docket No. 25). Susan Gaskill, Corey Linville, and the cities of Lebanon and Mt. Juliet, Tennessee, ("City Defendants") have filed a Motion to Dismiss (Docket No. 118), as have Melissa Harrell, Debby Moss, and Rutherford and Wilson Counties, Tennessee, ("County Defendants") (Docket No. 121). David W. Purkey, the Commissioner of the Tennessee Department of Safety and Homeland Security ("TDSHS"), has

1

filed a Motion to Dismiss Plaintiffs Robinson, Sprague, and Gibbs (Docket No. 128) and a separate Motion to Dismiss Plaintiff Brianna Booher (Docket No. 131), a later-added plaintiff. For the reasons set forth herein, the City and County Defendants' motions will be granted in part and denied in part, Purkey's motion regarding Booher will be denied, Purkey's motion regarding the other plaintiffs will be granted in part and denied in part, and the plaintiffs' class certification motion will be granted in part and denied without prejudice, in part, as moot. The court will set an evidentiary hearing regarding the plaintiffs' motion for preliminary injunction.

## I. BACKGROUND AND PROCEDURAL HISTORY[1]

### A. Driving in Tennessee

The State of Tennessee generally prohibits drivers from using its streets and highways without a driver's license. Tenn. Code Ann. § 55-50-301(a)(1). An applicant for a Tennessee driver's license must furnish certain required information and submit to an examination, including "an actual demonstration of ability to exercise ordinary and reasonable control in the operation of a motor vehicle." Tenn. Code Ann. §§ 55-50-321, 55-50-322(a)(1)(A). Upon fulfilling the necessary requirements, a qualifying applicant will be granted a Tennessee driver's license.

A license to drive, though, is not a license to drive however one wants. A driver has an ongoing obligation to comply with Tennessee's traffic laws—the violation of which, generally speaking, amounts to at least a Class C misdemeanor. Tenn. Code Ann. § 55-8-103. For example:

- "[I]t is unlawful for any person to operate or drive a motor vehicle upon any highway or public road of [Tennessee] in excess of sixty-five miles per hour,"

---

[1] Unless otherwise noted, the facts, as alleged in the Corrected Amended Complaint (Docket No. 111), are taken as true for purposes of the Motions to Dismiss.

with an exception for certain designated "controlled-access highways with four (4) or more lanes," where it is lawful to drive up to seventy miles per hour. Tenn. Code Ann. § 55-8-152(a), (c).

- A driver who comes to a crosswalk that is not governed by a traffic-control signal "shall yield the right-of-way, slowing down or stopping if need be to so yield, to a pedestrian crossing the roadway within a crosswalk when the pedestrian is upon the half of the roadway upon which the vehicle is traveling, or when the pedestrian is approaching so closely from the opposite half of the roadway as to be in danger." Tenn. Code Ann. § 55-8-134(a)(1).

- "The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of the vehicles and the traffic upon and the condition of the highway." Tenn. Code Ann. § 55-8-124(a).

The list goes on. Many, if not most, of the ordinary rules of the road that Tennesseans follow are not just good ideas or accepted customs, but codified entries into the state's criminal statutes.

In addition to the state's criminal prohibition of those impermissible driving practices, local governments often set forth their own traffic laws that overlap significantly with the state's. *See, e.g.,* Mt. Juliet, Tenn., Code, ch. 2, art. VI § 2-154; Lebanon, Tenn., Code, tit. 15, ch. 1 § 15-120. "[P]roceedings for a municipal ordinance violation are civil in nature, at least in terms of technical application of procedure . . . ." *City of Chattanooga v. Davis*, 54 S.W.3d 248, 259 (Tenn. 2001). Nevertheless, Tennessee courts have observed that such ordinances reflect a "clear intent . . . to punish the [violator] and to deter similar conduct in the future" that is akin to the concerns animating the state's criminal traffic laws. *City of Knoxville v. Brown*, 284 S.W.3d 330, 338 (Tenn. Ct. App. 2008).

**B. Traffic Violations and the Accumulation of "Traffic Debt"**

Not every violation of a traffic law, of course, results in an enforcement action. Indeed, it does not go beyond the bounds of ordinary judicial notice to observe that some prohibitions, such as the laws against speeding or following too closely, are violated routinely on the state's roads by ordinary drivers and that, often, those drivers simply go on with the rest of their day without facing any legal consequences for their violations. Sometimes, though, a violation does result in enforcement—often, because the violation was witnessed by a law enforcement officer who elected to perform a traffic stop. Between 2011 and 2015, there were nearly two million traffic stops in the Nashville metropolitan area alone—about 786 per 1,000 driving-aged residents.[2] (Docket No. 111 ¶ 104.e.) The plaintiffs estimate that, in Wilson and Rutherford Counties, there are about 400 traffic stops per 1,000 driving-aged residents per year. (*Id.* ¶ 104.f.)

Prosecution of a traffic violation typically begins with "a written citation or an electronic citation prepared by a law enforcement officer on paper or on an electronic data device with the intent the citation shall be filed, electronically or otherwise, with a court having jurisdiction over the alleged offense." Tenn. Code Ann. § 55-10-207(a). "The traffic citation . . . demand[s] the person cited to appear in court at a stated time and . . . state[s] the name and address of the person cited, the name of the issuing officer, and the offense charged." Tenn. Code Ann. § 55-10-207(c)(1). A driver may choose to simply concede the violation and pay any related fines and costs before the scheduled court date. Tenn. Code Ann. § 55-10-207(f). Otherwise, a driver must appear in court to either contest or concede the violation. Tenn. Code Ann. § 55-10-207(g).

If the driver is convicted of the traffic offense for which she was cited, she may face a number of consequences. *See, e.g.*, *Metro. Gov't of Nashville & Davidson Cty. v. McClard*, No.

---

[2] Of course, some of those stops were presumably of non-residents, and some individual drivers presumably account for more than one stop each.

01A01-9312-CV-00543, 1994 WL 665214, at *1 (Tenn. Ct. App. Nov. 23, 1994) (discussing driver, cited and found guilty of speeding, ordered into the state's Driver Improvement Program); *see also* Tenn. Code Ann. §§ 55-10-601 to -618 (Motor Vehicle Habitual Offenders Act); Tenn. Comp. R. & Regs. 1340-01-04-.02 (discussing TDSHS's "driver point system . . . designed to identify those drivers whose records reflect a continuous disrespect for traffic laws, and a disregard for the safety of other persons on the highways" using a system of "point value[s] . . . assessed for each accident and moving violation conviction"). As relevant to this case, a driver found guilty of a traffic violation may find herself obligated to pay not only the fine associated with her violation, but a substantial additional amount consisting of costs and litigation taxes. The plaintiffs refer to these combined financial liabilities as "traffic debt," a nomenclature the court will adopt for ease of discussion.

### *1. Fines*

Generally speaking, a Class C misdemeanor is punishable by "not greater than thirty (30) days [imprisonment] or a fine not to exceed fifty dollars ($50.00), or both." Tenn. Code Ann. § 40-35-111(e)(3). Some traffic violations, however, may result in higher fines. *See. e.g.*, Tenn. Code Ann. § 55-12-139(c)(2) (imposing fine of up to $300 based on driver's violation of driver financial responsibility statute). Fines based on the defendant's violation of municipal ordinances covering the same conduct may add to the driver's liability. *See, e.g.*, Lebanon, Tenn., Code. tit. 15, ch. 1 § 15-128(4) (imposing civil municipal fine of $50 for financial responsibility violation "in addition to any other penalty prescribed by the laws of this state."). "[T]he defendant's ability to pay the fine is a factor in the establishment of the fine," but "it is not a controlling factor." *State v. Butler*, 108 S.W.3d 845, 854 (Tenn. 2003) (citing Tenn. Code Ann. § 40-35-207(a)(7)).

The court imposing a fine is permitted to choose from a number of options regarding the timeline for payment:

> When any court of this state, including municipal courts for violation of municipal ordinances, imposes a fine upon an individual, the court may direct as follows:
>
> (1)    That the defendant pay the entire amount at the time sentence is pronounced;
>
> (2)    That the defendant pay the entire amount at some later date;
>
> (3)    That the defendant pay the fine in specified portions or installments at designated periodic intervals and that the portions be remitted to a designated official, who shall report to the court in the event of any failure to comply with the order; or
>
> (4)    Where the defendant is sentenced to a period of probation as well as a fine, that payment of the fine be a condition of the sentence.

Tenn. Code Ann. § 40-24-101(a). A court that imposes a fine retains jurisdiction and is empowered to release the fine, in whole or in part, "for good cause." Tenn. Code Ann. § 40-24-102; *see also* Tenn. Code Ann. § 40-24-104(a) (permitting court to waive all or portion of fine or revise payment schedule based on defendant's inability to pay).

### *2. Assessed Costs*

Tennessee requires that, generally speaking, "[a] defendant convicted of a criminal offense shall pay all the costs that have accrued in the cause." Tenn. Code Ann. § 40-25-123(a). "Costs" are defined to include "all costs accruing under existing laws on behalf of the state or county, as the case may be, for the faithful prosecution and safekeeping of the defendant, including the cost of boarding juries and that of the jailer," Tenn. Code Ann. § 40-25-133, as well as "all costs incident to the arrest and safekeeping of the defendant, before and after conviction, due and incident to the prosecution and conviction, and incident to the carrying of the judgment or sentence of the court into effect," Tenn. Code Ann. § 40-25-104. With regard to

municipal violations, Tennessee law allows court costs to be set by ordinance. *See* Tenn. Code Ann. § 16-18-304.

 "[T]he presiding judge of a court of general sessions may suspend the court costs . . . for any indigent criminal defendant, as in the presiding judge's opinion the equities of the case require." Tenn. Code Ann. § 40-25-123. If costs were assessed for a civil violation in a municipal court, then the defendant may appeal *de novo* to circuit court, where "the presiding judge shall be authorized, in the presiding judge's discretion, to apportion the cost . . . as in the presiding judge's opinion the equities of the case demand." Tenn. Code Ann. § 20-12-119(b). The Tennessee Supreme Court has held that, regardless of whether a defendant is indigent, "the decision of whether to grant a waiver of costs still rests within the court's discretion." *State v. Black*, 897 S.W.2d 680, 684 (Tenn. 1995); *see also Waters v. Ray*, No. M2008-02086-COA-R3-CV, 2009 WL 5173718, at *5 (Tenn. Ct. App. Dec. 29, 2009) (endorsing holding of *Black*).

### *3. Litigation Tax*

Tennessee's constitution grants the General Assembly a number of specific powers of taxation, including the "power to tax . . . privileges." Tenn. Const. art. II, § 28. Pursuant to that power, the state levies "privilege tax[es] on litigation" in various amounts, depending on the type of case at issue. Tenn. Code Ann. § 67-4-602. For example, "[t]here is levied a privilege tax on litigation of seventeen dollars and seventy-five cents ($17.75) in all civil cases in this state in general sessions court, when not exercising state court jurisdiction," and a "a privilege tax on litigation of thirteen dollars and seventy-five cents ($13.75) in all civil cases in this state in the court of appeals or the supreme court." Tenn. Code Ann. § 67-4-602(c), (d). In criminal cases, "[t]here is levied a privilege tax on litigation instituted in this state, of twenty-nine dollars and

fifty cents ($29.50) on all criminal charges, upon conviction or by order." Tenn. Code Ann. § 67-4-602(a).

Just as the amount of the tax varies between different types of cases, so too does the issue of when the litigation tax becomes due. *See, e.g.*, Tenn. Code Ann. § 67-4-603(a)(1) (directing the clerk to collect tax "[u]pon the commencement of an original civil action, from the plaintiff, except when such action is brought pursuant to a pauper's oath"); (a)(3) (directing the clerk to collect tax "[u]pon the filing in any civil action of an appeal, or of an appeal in the nature of a writ of error or certiorari, from one court to another, from the appellant, except when such appeal is brought pursuant to a pauper's oath"). In a criminal case, the tax is due "[u]pon a finding of guilt, plea of guilty, or submission to fine in a criminal action from the defendant." Tenn. Code Ann. § 67-4-603(a)(2).

The collection of litigation taxes is delegated to "[t]he clerks of the various courts" in which litigation takes place. Tenn. Code Ann. § 67-4-603(a). The clerk then has an obligation to remit the state litigation tax to Tennessee's department of revenue. If the clerk fails to transmit the tax collected, the amount improperly withheld "shall be a debt of the clerk." Tenn. Code Ann. § 67-4-605(a)(1).

Counties and municipalities are also given authority to levy certain "local litigation tax[es]" devoted to specific, statutorily defined purposes, including building or upgrading the jails and workhouses, Tenn. Code Ann. § 67-4-601(b)(1); purchasing and maintaining hardware and software related to record keeping, Tenn. Code Ann. § 67-4-601(b)(7)(B); providing security to courthouses, Tenn. Code Ann. § 67-4-601(b)(6); and "substance abuse prevention purposes," Tenn. Code Ann. § 67-4-601(h).

Tennessee's statutes appear to acknowledge that it is within a judge's power to waive litigation tax, although they also suggest that doing so improperly could result in judicial discipline. *See* Tenn. Code Ann. § 67-4-605(c).

## C. Mechanisms for Recouping Traffic Debt

If an individual fails to pay her traffic debt, the clerk's office charged with collecting the debt has a number of options. "[A] fine may be collected in the same manner as a judgment in a civil action." Tenn. Code Ann. § 40-24-105(a). The same is true for costs and litigation taxes: "The district attorney general or the county or municipal attorney, as applicable, may, in that person's discretion, and shall, upon order of the court, institute proceedings to collect the fine, costs and litigation taxes as a civil judgment." Tenn. Code Ann. § 40-24-105(c). The tools available for collection of a judgment—and, therefore, for collection of traffic debt—include garnishment of wages or other sources of income (Tenn. R. Civ. P. 69.05), execution on realty (Tenn. R. Civ. P. 69.07), and execution on personalty (Tenn. R. Civ. P. 69.06). *See also* Tenn. Op. Att'y Gen. No. 06-135 (Aug. 21, 2006) (discussing application of Rule 69 collection mechanisms in criminal cases).

A clerk's office, moreover, is not forced to rely purely on its own personnel to effect collection. "After a fine, costs, or litigation taxes have been in default for at least six (6) months, the district attorney general or criminal or general sessions court clerk may retain an agent to collect, or institute proceedings to collect, or establish an in-house collection procedure to collect, fines, costs and litigation taxes." Tenn. Code Ann. § 40-24-105(d)(1). Similarly, "[t]he governing body of any municipality may by ordinance authorize the employment of a collection agency to collect fines and costs assessed by the municipal court where the fines and costs have not been collected within sixty (60) days after they were due." Tenn. Code Ann. § 40-24-

105(e)(1). A municipal court also "may authorize the chief of police to collect and receipt for fines and costs." Tenn. Code Ann. § 6-21-507(b).

If traditional collection methods are insufficient, more coercive options are available against defendants who are capable of paying but refuse to, in particular with regard to fines. The court that imposes a fine also has the option of holding a person who has failed to pay in "contempt upon a finding by the court that the defendant has the present ability to pay the fine and willfully refuses to pay." Tenn. Code Ann. § 40-24-105(a).

## D. Permissive Suspension of a Driver's License for Nonpayment of Traffic Debt

The plaintiffs do not challenge the fact that traffic debt was assessed against them or that the relevant clerks' offices can resort to the ordinary tools of collection to recoup that debt. They challenge one specific consequence of nonpayment: TDSHS's suspension of a driver's license when it receives a notice of nonpayment of traffic debt from a clerk's office. *See* Tenn. Code Ann. § 55-50-502(a)(1), (a)(1)(H)–(I). TDSHS "is authorized to suspend the license of an operator or chauffeur upon a showing by its records or other sufficient evidence that the licensee," *inter alia*, "[h]as been finally convicted of any driving offense in any court and has not paid or secured any fine or costs imposed for that offense" or "[h]as failed to appear in any court to answer or to satisfy any traffic citation issued for violating any statute regulating traffic."[3] Tenn. Code Ann. § 55-50-502(a)(1), (a)(1)(H)–(I). The parties agree that the "driving offense[s]" mentioned in Tenn. Code Ann. § 55-50-502 (a)(1)(H) include violations of both state and local driving laws.

---

[3] Notably, neither Tenn. Code Ann. § 55-50-502 (a)(1)(H) or (I) makes any mention of litigation taxes. It does not appear, then, that TDSHS would have the authority to suspend a license for failure to pay litigation taxes on traffic offenses. Nor is it clear, to the court, why failure to pay litigation taxes would be an obstacle to reinstatement, as long as a driver has paid fines and costs. In any event, the question of whether litigation tax amounts are being included in the total traffic debt that drivers are being required to pay to avoid or defeat suspension is a factual one and not relevant to the disposition of the pending motions.

Under Tennessee law, county and municipal court clerks are required to report convictions for violations of traffic laws to TDSHS. Tenn. Code. Ann. § 55-10-306(b)(1). The local clerks' offices are not, however, required to provide TDSHS with any particular information regarding their success—or lack thereof—in securing payment. (Docket No. 111 ¶ 31.) Accordingly, while the power granted to TDSHS under Tenn. Code Ann. § 55-50-502(a)(1)(H) and (I) technically arises whenever TDSHS discovers "by its records or other sufficient evidence" that the driver is eligible for suspension, there appears to be no practical or legal reason that TDSHS would have that necessary information without an affirmative decision by local authorities to relay it.

According to the plaintiffs, "most if not all county and municipal court clerks" have adopted a policy and practice of informing TDSHS of a driver's nonpayment after a certain period of time. (Docket No. 111 ¶ 32.) That notice, the plaintiffs allege, invariably results in a suspension, because, while the language of Tenn. Code Ann. § 55-50-502(a) is, on its face, plainly permissive in nature—giving TDSHS only the authority, but not the duty, to suspend the license of the driver—TDSHS's practice is "to suspend the license of every person about whom it has received notification of nonpayment of Traffic Debt, unless the Department receives subsequent notification from the clerk that the Traffic Debt has been paid." (Docket No. 111 ¶ 34.)

TDSHS is required to notify a driver facing suspension in writing "[p]rior to suspending the license." Tenn. Code Ann. § 55-50-502(a)(1)(I). The driver is then permitted to request "a hearing to show that there is an error in the records received by the department." *Id.* That right to a hearing, however, does not contemplate any consideration of a driver's ability to pay her traffic debt. While Tenn. Code Ann. § 55-50-502(a) does not, by its language, preclude TDSHS from

declining to suspend the licenses of drivers who are indigent, it has no policy of doing so and no process for assessing a driver's indigence. (Docket No. 111 ¶ 34.)

**E. Availability of Payment Plans as an Alternative to Suspension**

Tennessee law expressly contemplates that a county or municipal court may offer a driver the option of agreeing to a payment plan that would allow her to retain her license, despite failing to pay her traffic debt immediately in full:

> A person whose license has been suspended, pursuant to subdivision (a)(1)(H) or (a)(1)(I), subject to the approval of the court, may pay any local fines or costs, arising from the convictions or failure to appear in any court, by establishing a payment plan with the local court or the court clerk of the jurisdiction. Notwithstanding § 55-50-303(b)(2), the fines and costs for a conviction of driving while suspended, when the conviction was a result of a suspension pursuant to subdivision (a)(1)(H) or (a)(1)(I), may be included in such payment plan, subject to the approval of the court.

Tenn. Code Ann. § 55-50-502(d)(2). TDSHS is authorized to reinstate the individual's driving privileges upon receipt of certification that the payment plan was approved and the driver has "satisfied all other provisions of law relating to the issuance and restoration of a driver license." Tenn. Code Ann. § 55-50-502(d)(3).

Subsection (d), however, does not on its face require a court or clerk's office to "approv[e]" payment plans or to "establish[]" a payment plan system.[4] Nor does it set forth any specific situation in which a driver would be entitled to a payment plan or any standard to which payment plans must adhere. Moreover, the provision of the statute governing the apportionment

---

[4] There does appear to be one exception to Tennessee's rule that local courts can decide whether or not to offer payment plans. Section 55-50-502(a)(1)(H) requires that pre-suspension installment plans be made available to drivers in "any county having a population of not less than eight hundred ninety-seven thousand four hundred (897,400) nor more than eight hundred ninety-seven thousand five hundred (897,500), according to the 2000 federal census or any subsequent federal census"—in other words, only in Shelby County. *See* Population, Housing Units, Area, and Density: 2000—State-County/County Equivalent, *available at* https://factfinder.census.gov/; Population, Housing Units, Area, and Density: 2010—State-County/County Equivalent, *available at* https://factfinder.census.gov/.

of costs for payment plan administration appears to acknowledge that some counties may participate in the offering of such plans while some counties may not:

> *Any county that participates* in the payment plan authorized by this subsection (d) shall pay to the state any expense required to be paid for state implementation of this subsection (d). The payment shall be divided pro rata among the counties to which this subsection (d) applies. The payment shall be made prior to the implementation by the county of this subsection (d).

Tenn. Code Ann. § 55-50-502(d)(6) (emphasis added). For jurisdictions that do offer payment plans, there is no statutory requirement that the plan be calculated to be affordable based on the driver's economic status. *See* Tenn. Code Ann. § 55-50-502(d)(3)–(4).

## F. Consequences of Suspension and Possibility of Reinstatement

TDSHS has suspended over 250,000 driver's licenses for nonpayment of traffic debt since 2012. (Docket No. 111 ¶ 91.) The plaintiffs argue that statistics suggest that suspension rates correlate closely with poverty rates:

> Across Tennessee, there is a strong, positive, and statistically significant correlation between the number of poor people in a county and the number of suspensions in that county. Controlling for county size, counties with higher poverty rates have significantly more suspensions than do counties with lower poverty rates.

(*Id.* ¶ 94.) Driving on a suspended license is a Class B Misdemeanor, for the first offense, punishable by up to six months in jail, a fine of up to $500, or both. Tenn. Code Ann. §§ 40-35-111(e)(2), 55-50-504(a)(1). For the second and subsequent offenses, driving on a suspended license is a Class A Misdemeanor, punishable by up to 11 months and 29 days in jail, a fine of up to $2,500, or both. Tenn. Code Ann. §§ 40-35-111(e)(1), 55-50-504(a)(2). As a result, a person's conviction for driving on a suspended license may lead to the imposition of additional fines, costs, and litigation taxes.

The extent of hardship that a particular person will suffer from complying with her license suspension will, of course, vary depending on the person's resources, needs, and lifestyle. Generally speaking, however, the plaintiffs have identified grounds for concluding that driving in Tennessee is, among other things, often important to obtaining and/or maintaining gainful employment. Specifically, the plaintiffs allege that more than 92% of workers drive to work in a number of identified metropolitan areas, including Memphis, Nashville, Knoxville, Chattanooga, Johnson City, Clarksville, and Jackson. (Docket No. 111 ¶ 96.) The plaintiffs further note that many common professions require a driver's license because of the associated travel. (*Id.* ¶ 97.) The public transportation available in the state, the plaintiffs note, is widely insufficient to meet the needs of these workers. (*Id.* ¶ 98.)

A driver whose license was suspended for nonpayment of traffic debt may seek reinstatement. TDSHS, however, takes the position that it will not reinstate a license suspended for nonpayment of traffic debt unless the debtor "[s]ubmit[s] certification from the court(s) where convicted that all fines and costs have been paid." (*Id.* ¶ 79 (quoting TDSHS "Reinstate Requirements document.").) The driver must also pay certain applicable reinstatement fees. Such fees vary, based on the particulars of the individual suspension, and TDSHS regulations permit individuals with reinstatement fees over $200 to enter into payment plans. Those plans, however, require a $200 down payment along with a $25 processing fee and minimum quarterly payments of $300. Tenn. Comp. R. & Regs. 1340-02-05-.02, -.04, -.10.

## G. Loss of Driving Privileges on Other Grounds

As a practical matter, Tennessee's system of suspending driver's licenses for nonpayment of traffic debt often overlaps with, or functions alongside, other aspects of the state's traffic laws, including, at times, other grounds for rescinding an individual's driving privileges. A few of

those other grounds are particularly relevant to this case, either because they illustrate the broader structure in which TDSHS's permissive suspensions operate or because the application or non-application of those grounds to the individual plaintiffs is relevant to the issues raised by the defendants.

### 1. Mandatory Revocation/Court-Ordered Loss of Driving Privileges for Conviction of Offenses Particularly Indicative of a Threat to Public Safety

The Tennessee General Assembly has determined that convictions of certain offenses— particularly those reflecting a serious threat to public safety—warrant an automatic, mandatory loss of one's driving privileges. *See* Tenn. Code Ann. § 55-50-501. For example, "Tennessee Code Annotated sections 39–13–213(c) and 55–50–501(a)(3) require the revocation of a defendant's license when the defendant has been convicted of vehicular homicide." *State v. Claffey*, No. W2016-00356-CCA-R3-CD, 2016 WL 7239018, at *8 n.6 (Tenn. Crim. App. Dec. 14, 2016). The same is true for any person convicted of "[f]ailure to stop and render aid as required under the laws of [Tennessee] in the event of a motor vehicle accident resulting in the death or personal injury of another," Tenn. Code Ann. § 55-50-501(a)(4), or any person convicted of reckless driving twice within the same twelve months, Tenn. Code Ann. § 55-50-501(a)(6). Indeed, revocation is mandated upon the TDSHS's receipt of notice of "[a]ny felony in the commission of which a motor vehicle is used." Tenn. Code Ann. § 55-50-501(a)(3).

If an individual is convicted of DUI, the convicting court "shall prohibit [her] from driving a vehicle in [Tennessee] for" a period of increasing length for each conviction—one year for the first offense, two for the second, six for the third, and eight for any thereafter. Tenn. Code Ann. § 55-10-404(a)(1). TDSHS also revokes the defendant's driver's license based on the DUI conviction. Tenn. Code Ann. § 55-50-501(a)(2).

### *2. Mandatory Suspension for Violation of Financial Responsibility Law*

Tennessee's "Financial Responsibility Law requires motorists who have been involved in an accident where anyone is killed or injured, or an accident resulting in more than $400 in damage to the property of any one person, to show proof of financial responsibility"—most commonly through proof of insurance. *Purkey v. Am. Home Assur. Co.,* 173 S.W.3d 703, 706 (Tenn. 2005) (citing Tenn. Code Ann. §§ 55–12–105,–139). A driver is also required to show proof of financial responsibility "[a]t the time the driver of a motor vehicle is charged with any violation under [the state's motor vehicle safety laws or] any other local ordinance regulating traffic." Tenn. Code Ann. § 55-12-139(b)(1)(A). Violation of the financial responsibility law is a Class C misdemeanor. *Am. Home Assur. Co.*, 173 S.W.3d at 706 (citing § 55–12–139(c)). By statute, the TDSHS "shall suspend the driver license of the person convicted of" a violation of the law "[u]pon receipt by the commissioner of a record of conviction of failing to show evidence of financial responsibility." Tenn. Code Ann. § 55-12-115(a). A driver seeking reinstatement of a license that was suspended for violation of the Financial Responsibility Law must submit evidence of financial responsibility, in addition to paying required fees. Tenn. Code Ann. § 55-12-115(b).

### *3. Mandatory Revocation for Failure to Pay Criminal Fines, Costs, and/or Litigation Tax for Over One Year*

Since 2011, Tennessee statutes have required the revocation of the driver's license of anyone who fails to pay fines, costs, and litigation taxes related to a criminal conviction for over a year. Tenn. Code Ann. § 40-24-105(b)(1). "The license shall remain revoked until such time as the person whose license has been revoked provides proof to the commissioner of safety that all litigation taxes, court costs, and fines have been paid." *Id.* A person whose license was revoked may apply to the court that imposed the debt for the issuance of a restricted license for the

purposes of engaging in certain limited activities. Tenn. Code Ann. § 40-24-105(h). The issuance of a restricted license, however, is within the "authority and discretion" of the court. *Id.* A section 40-24-105(h) license is valid for one year, after which the driver may seek renewal.

## H. The Plaintiffs' Suspensions

### *1. Robinson*

Fred Robinson is a 32-year-old resident of Murfreesboro, Tennessee. (Docket No. 111 ¶ 112.) Robinson suffers from severe ulcerative colitis and cirrhosis of the liver, as well as severe internal bleeding due to chronic stomach ulcers. (*Id.*) Robinson's medical conditions place him in constant pain and have rendered him unable to perform remunerative work. (*Id.* ¶¶ 112–13.) Robinson has substantial medical expenses, including a regimen of approximately twenty prescription medications, some of which he sometimes forgoes because he cannot afford them. (*Id.* ¶ 113.) He is treated by a gastroenterologist over thirty miles from his home, whose office he cannot practicably visit without relying on motor vehicle transportation. (*Id.* ¶ 114.) Robinson's physician has recommended that Robinson begin consultation for a liver transplant with doctors based in Memphis, approximately 250 miles from his home. (*Id.* ¶ 115.) Robinson's sole source of income is a monthly Social Security Disability benefit of $759, which falls significantly short of his living expenses. (*Id.* ¶ 113.)

On June 24, 2016, while driving his sister's car in Wilson County, Robinson received misdemeanor traffic citations for speeding and failure to provide evidence of financial responsibility at the time of his citation. (*Id.* ¶ 116.) Those citations threatened to impose a total of $441 in traffic debt, should Robinson fail to successfully contest the charges. (*Id.*) Robinson's initial court appearance was scheduled for August 1, 2016, but he did not attend, due, he says, to his ongoing medical conditions. (*Id.* ¶ 118.) On August 16, 2016, the Wilson County Circuit

Court Clerk's Office sent TDSHS notification that Robinson had failed to appear for his court date. (*Id.* ¶ 119.) The next day, TDSHS sent Robinson a letter informing him that his license would be suspended in thirty days if he did not pay his traffic debt. (*Id.* ¶ 120.) Consistently with TDSHS's policy, the letter informed Robinson that he could request a hearing "limited to the issue of whether or not the citation has been satisfied prior to the proposed date of suspension." (*Id.* ¶ 121.)

On October 20, 2016, Robinson, represented by counsel, pled guilty, in Wilson County General Sessions Court, to speeding and failing to provide evidence of financial responsibility. (*Id.* ¶ 123.) The court assessed $441 of traffic debt—$169 for the speeding charge and $272 for the violation of the Financial Responsibility Law. (*Id.* ¶ 124.) Robinson's attorney requested, to the Wilson County General Sessions Clerk's Office, that Robinson be placed on a payment plan. (*Id.* ¶ 126.) The clerk, however, had, and continues to have, a policy of not allowing payment plans or partial payment through her office. (*Id.* ¶ 127.)

On October 23, 2016, TDSHS lifted Robinson's suspension for failure to appear. Shortly thereafter, however, the Wilson County Court Clerk's office notified TDSHS that Robinson had not paid his traffic debt. (*Id.* ¶¶ 130–31.) On November 23, 2016, TDSHS suspended Robinson's license, under Tenn. Code Ann. § 55-12-115, based on his conviction under the Financial Responsibility Law. On December 23, 2016, TDSHS placed an additional suspension on his license for nonpayment of his traffic debt. (*Id.* ¶¶ 132–33.) In order to lift the traffic debt-related suspension, Robinson would need to pay both the $441 in traffic debt that he owes to the clerk's office and an additional $323 reinstatement fee. (*Id.* ¶¶ 136–38.)

### *2. Sprague*

Ashley Sprague is a 26-year-old resident of Lebanon, Tennessee. She is a single mother of five children, one of whom lives with her. Her other four children live with their grandparents, over thirty miles from Sprague's home, because Sprague cannot afford to care for them. (*Id.* ¶ 146.) At the time that Sprague received the traffic citations that initially gave rise to her involvement in this case, she was working as a Waffle House server, making $2.13/hour plus tips. (*Id.* ¶ 150.) Later, after a period of unemployment, Sprague started working at a Speedway service station, where she earned slightly more than she made at Waffle House. (*Id.* ¶ 155.) Neither job allowed her to meet her ordinary living expenses, nor was she able to maintain either form of employment after, as described below, she lost her lawful ability to drive to and from work. (*Id.* ¶¶ 150, 155, 182.) Without reliable transportation, Sprague's only employment option was working for her parents' cleaning business, from which she was only able to take home $150 per week. (*Id.* ¶ 183.) Since her license was restored via a temporary restraining order issued in this case, Sprague has been able to find work at another Waffle House location, where her pay— though still limited—exceeds what she was able to make working for her parents. (*Id.* ¶ 188.)

In April 2015, Sprague was issued a civil traffic citation by the City of Mt. Juliet for speeding and failure to provide evidence of financial responsibility. Although the maximum fine for each municipal violation was $50, the total traffic debt arising out of those violations amounted to $477.50. (*Id.* ¶ 147–49.) In July 2015, the Mt. Juliet Municipal Court Clerk informed TDSHS that Sprague had not paid her traffic debt. (*Id.* ¶ 151.) In September 2015, TDSHS suspended Sprague's driver's license based on that nonpayment. (*Id.* ¶ 152.) Sprague does not believe that she received any notice of her suspension, despite the fact that she was residing at the address on file with TDSHS. (*Id.* ¶¶ 153–54.)

Unaware of her suspension, Sprague continued to drive. In March 2016, Sprague was issued a civil traffic citation by the City of Lebanon in the amount of $224.50 for failure to provide evidence of financial responsibility. The officer who issued the March 2016 citation did not inform Sprague that she was operating on a suspended license or cite her for doing so. (*Id.* ¶ 156.) In May 2016, Sprague was again issued civil traffic citations by the City of Lebanon, this time for driving with an expired registration, failure to have proof of insurance, and driving on a suspended license. The total amount of these citations was $244. According to Sprague, the May 2016 citation was her first notice that her license had been suspended. (*Id.* ¶¶ 157.) Altogether, Sprague had accumulated $946 in traffic debt to the Cities of Mt. Juliet and Lebanon by the end of May 2016. (*Id.* ¶ 158.)

In July 2016, Sprague attempted to pay $80 toward her Lebanon traffic debt but was informed, by the Lebanon Municipal Court Clerk, that the office did not accept partial payment. Accordingly, Sprague would be required to pay her traffic debt in lump sums of nearly $500 each to the relevant jurisdictions. (*Id.* ¶ 159.) On July 25, 2016, Sprague entered a conditional guilty plea, in Wilson County General Sessions Court, to the charge of driving on a suspended license. (*Id.* ¶ 160.) By the terms of her plea, Sprague's charges would be dropped if she could get her license reinstated by her next court date on March 27, 2017. (*Id.* ¶ 161.)

On August 16 and September 16, 2016, the Lebanon Municipal Court sent notice to TDSHS indicating that Sprague had not paid her traffic debt in Lebanon. (*Id.* ¶ 162.) TDSHS entered additional suspensions related to those notices on September 15 and October 17, 2016. (*Id.* ¶ 164.) Sprague has obtained her driver record from TDSHS and claims that it contains no indication that her license has been suspended for violation of the financial responsibility statute; all of the listed suspensions are related to traffic debt. (*Id.* ¶¶ 164–67.)

On March 27, 2017, Sprague pled guilty to driving on a suspended license. The Wilson County General Sessions Court gave Sprague until April 3, 2017, to enter into a payment plan with the court's clerk for the $439.50 in traffic debt related to that charge. Sprague did enter into such a payment plan. She has, in her words, "managed to make minimal payments on this plan." (*Id.* ¶¶ 173–74.) The payment plan, however, does not address the $946 that Sprague owes regarding the Mt. Juliet and Lebanon municipal charges. (*Id.*) In order to have her traffic debt suspensions lifted under TDSHS's policies, Sprague would have to satisfy the $946 in traffic debt and pay a minimum of $200 (plus a $25 fee) toward a total of $388 in reinstatement fees. (*Id.* ¶ 178.)

### *3. Gibbs*

Johnny Gibbs is a 36-year-old resident of Murfreesboro, Tennessee. (*Id.* ¶ 193.) When this case was filed, Gibbs was living in a hotel room with his mother, father, and sister. Both of Gibbs's parents have suffered from significant health problems. (*Id.* ¶¶ 194–95.) At some point, Gibbs's mother was hospitalized and—after a brief respite made possible by charitable assistance—the Gibbs family was evicted from the hotel for nonpayment of rent. Lacking any other affordable option, the family began living in a car and tent. (*Id.* ¶¶ 195–96.) Gibbs and his family struggle to afford the basic necessities of life and have gone entirely without food for as long as two days. (*Id.* ¶ 197.) In 2016, while riding his bicycle home in the dark following a closing shift he had worked at an Outback Steakhouse, Gibbs was struck by a car, which irreparably damaged the bicycle and left Gibbs injured. (*Id.* ¶ 214.) Gibbs now works as a day laborer. He is able to find work once or twice a week and typically earns $30 to $40 per day when he does. (*Id.* ¶ 212.)

In 1999, Gibbs's license was suspended, for truancy, until he turned 21 years old. (*Id.* ¶ 198.) In 2002, while that suspension was still in force, Gibbs received a citation in Rutherford County for driving on a suspended license. That violation resulted in $404.50 in traffic debt, which he was unable to pay due to the limited income he was receiving for part-time construction work. (*Id.*) After Gibbs turned 21, he attempted to obtain a new driver's license but was told that he could not do so because his license remained suspended. (*Id.* ¶ 199.) In 2006, Gibbs received another citation for driving on a suspended license. That citation resulted in $742 in traffic debt. (*Id.* ¶ 3) Gibbs'stotal traffic debt owed to Rutherford County is now $1,146.50. (*Id.* ¶ 212.)

In July 2017, Gibbs's license was revoked, pursuant to Tenn. Code Ann. § 40-24-105(b), for nonpayment of fines, costs, and litigation taxes arising out of criminal charges other than the traffic violations at issue here. (*Id.* ¶ 205.) Gibbs is challenging the constitutionality of that revocation in *Thomas v. Purkey*, No. 3:17-cv-00005 (M.D. Tenn.).

### *4. Booher*

Brianna Booher is a 21-year-old resident of Bristol, Tennessee. She is a single mother of two children, ages 2 and 4. (*Id.* ¶ 215.) At the time of the filing of the plaintiffs' Corrected Amended Complaint, Booher had most recently worked at a call center, where she made $9 per hour. That call center, however, was located about a forty-minute drive from her home, and she was unable to maintain her employment because she could not reliably commute to work. (*Id.* ¶ 219–22.) She relies on family support for her and her daughters' basic subsistence. (*Id.* ¶ 222.)

In June 2016, Booher received two citations in Bristol City Court for driving with a broken taillight and speeding. Those citations resulted in traffic debt of $219.50. (*Id.* ¶¶ 224–25.) In August 2016, she received three citations in Bristol City Court, for failing to wear a seatbelt,

driving with a broken taillight, and failure to show proof of financial responsibility. Those citations resulted in additional traffic debt of $164.75. (*Id.* ¶ 227.)

Sometime before the end of 2016, the City of Bristol sent notice of Booher's nonpayment to TDSHS. On December 31, 2016, TDSHS suspended her license. (*Id.* ¶¶ 227–29.) On August 3, 2017, Booher was stopped and charged with driving on a suspended license and driving with a broken tail light. She says that this stop was the first time that she learned her license had been suspended. (*Id.* ¶¶ 231–32.) She went to the Bristol City Clerk's Office and sought to make a partial payment toward her traffic debt, but the city's policy was to require payment in full. (*Id.* ¶¶ 233–34.) In October 2017, Booher was stopped two more times. The first time, she was charged with driving on a suspended license and failure to provide evidence of financial responsibility. The second time, she was charged with driving on a suspended license and speeding. (*Id.* ¶¶ 235–36.) She does not allege that she has yet accrued traffic debt related to these new charges.

Booher has paid TDSHS a $140 reinstatement fee, for which she borrowed money from her family while under the mistaken belief that paying the reinstatement fee alone would be sufficient to have her driving privileges restored. After paying the fee, however, Booher was still required to satisfy her $384.25 in existing traffic debt before she will be eligible to have her suspension lifted. (*Id.* ¶¶ 237–39.)

While investigating this case, however, TDSHS discovered that three of the citations against Booher lacked necessary signatures. (Docket No. 132–5 ¶ 4.) Based on that discovery, TDSHS lifted Booher's suspension and announced that it would return her reinstatement fee. (*Id.*)

## I. Procedural History

On September 13, 2017, Sprague, Gibbs, and Robinson filed the initial Class Action Complaint in this matter, naming the following defendants: Purkey, in his official capacity as TDSHS Commissioner; Moss, in her official capacity as Circuit Court Clerk of Wilson County; Harrell, in her official capacity as Circuit Court Clerk of Rutherford County; Linville, in his official capacity as Court Clerk of the Municipal Court of Lebanon; Gaskill, in her official capacity as Court Clerk of the City Court of Mt. Juliet; Wilson County; Rutherford County; the City of Lebanon; and the City of Mt. Juliet. (Docket No. 1 at 1.)

On September 19, 2017, the plaintiffs filed a Motion to Certify Class. (Docket No. 13.) They seek certification of a Statewide Class defined as "[a]ll persons whose Tennessee driver's licenses have been or will be suspended under Tenn. Code Ann. § 55-50-502(a)(1)(H) or (I) for nonpayment of traffic debt and who cannot now and could not at the time of suspension afford to pay such debt." (*Id.* at 1.) They also seek the certification of three subclasses:

> ***The Wilson County Subclass.*** All members of the Statewide Class whose driver's licenses have been or will be suspended at the instance of Wilson County and/or its Clerks.
>
> ***The Rutherford County Subclass.*** All members of the Statewide Class whose driver's licenses have been or will be suspended at the instance of Rutherford County and/or its Clerks.
>
> ***The Multi-Barrier Subclass.*** All members of the Statewide Class who, as of the date of judgment in this action, also had outstanding driver's license revocations under Tenn. Code Ann. § 40-24-105(b) for nonpayment of fines, fees, costs and restitution arising from criminal proceedings ("Court Debt").

(*Id.*)

On September 21, 2017, Robinson and Sprague filed a Motion for Temporary Restraining Order ("TRO"), requesting that Purkey immediately be required to restore Robinson and Sprague's driver's licenses without payment of traffic debt or reinstatement fees. (Docket

No. 24.) Gibbs, Robinson, and Sprague also filed a Motion for Preliminary Injunction, requesting, more broadly, that the court: (1) order Purkey to reinstate the driver's licenses of all persons currently suspended for nonpayment of traffic debt and provide appropriate notice; (2) enjoin Purkey from engaging in further suspensions for nonpayment of traffic debt without an appropriate procedure that would allow the driver to demonstrate her inability to pay, entitling her to be excepted from suspension; and (3) ordering all City and County Defendants to refrain from sending TDSHS notice of nonpayment unless they implement a process by which the relevant debtor can demonstrate her inability to pay, entitling her to be excepted from suspension. (Docket No. 25 at 1–2.)

On September 22, 2017, the court filed an Order noting that, although Robinson and Sprague sought immediate restoration of their driving privileges, their Complaint did not challenge the constitutional validity of their suspensions for violating the Financial Responsibility Law. The court therefore ordered them to file proof that they had come into compliance with the law by obtaining adequate insurance. (Docket No. 38.) On November 26, 2017, they did so, filing proof of insurance for both drivers. (Docket No. 41.)

On October 4, 2017, the court held a hearing on the requested TRO. The next day, the court issued an order granting the TRO and ordering the restoration of Robinson's and Sprague's driver's licenses. (Docket No. 63.) The court originally set a hearing regarding whether the TRO should be converted to a preliminary injunction for October 20, 2017. (*Id.* at 2.) On October 16, 2017, the parties filed a Joint Motion to Suspend Briefing Deadlines and Continue Hearing Date, in which they informed the court that they had agreed to an extension of the terms of the TRO until such future time that the request for a preliminary injunction could be full addressed. (Docket No. 68.) In that joint motion, the parties stated that they anticipated that a full

preliminary injunction hearing would be held between January and March 2018. (*Id.* at 1.) The court granted the motion and suspended deadlines until the parties could submit a joint briefing schedule. (Docket No. 69.) On November 9, the parties submitted a proposed case management order stating that the parties now anticipated a preliminary injunction hearing in April or May 2018. (Docket No. 79 at 10.) An initial case management conference was held on November 13, 2017, after which the court set deadlines for motions to dismiss and responses. (Docket No. 87.) That order did not set a date certain for a preliminary injunction hearing. (*Id.* at 1.) In accordance with the agreed briefing schedule, the defendants filed a number of potentially dispositive motions. (Docket Nos. 88, 92, 95.) While those motions were pending, however, the plaintiffs filed an Amended Complaint, which, among other things, added Booher as a plaintiff. (Docket No. 109). Shortly thereafter, the plaintiffs filed a Corrected Amended Complaint making minor corrections. (Docket No. 111.)

The Corrected Amended Complaint, like the original Complaint, raises three constitutional challenges to the state's laws governing suspension of driver's licenses for nonpayment of traffic debt pursuant to 42 U.S.C. § 1983:

1. Count I alleges that the defendants' effecting and continuing the suspension of people's driver's licenses for nonpayment of traffic debt without any inquiry into, or consideration of, the license holder's ability to pay violates the right to fundamental fairness guaranteed by the Fourteenth Amendment (*Id.* ¶ 248);

2. Count II alleges that the defendants' effecting the suspension of driver's licenses with no notice or insufficient notice and no right to an ability-to-pay hearing violates the right to procedural fairness guaranteed by the Fourteenth Amendment (*Id.* ¶¶ 249–50); and

3. Count III alleges that the defendants' effecting and continuing the suspension of driver's licenses from indigent people who owe traffic debt to the state and its counties and municipalities, but not imposing similar sanctions on other judgment debtors, violates the right to equal protection under law guaranteed by the Fourteenth Amendment (*Id.* ¶ 251).

The plaintiffs seek declaratory and injunctive relief that would make permanent terms largely mirroring those requested in their request for preliminary injunction, as well as costs and reasonable attorneys' fees. (*Id.* at 44–45.)

In light of the original Complaint's allegations being superseded, the court denied the then-pending motions to dismiss as moot. (Docket No. 112.) That order, however, did not address the pending class certification and preliminary injunction motions. (*Id.*) On January 12, 2018, the City and County Defendants filed renewed Motions to Dismiss. (Docket Nos. 118, 121.) On January 16, 2018, Purkey filed a Motion to Dismiss directed at the claims of Robinson, Sprague, and Gibbs (Docket No. 128) and a separate Motion to Dismiss directed at Booher (Docket No. 131).

## II. LEGAL STANDARD

### A. Rule 12(b)(1)

"Rule 12(b)(1) motions to dismiss . . . generally come in two varieties: a facial attack or a factual attack." *Gentek Bldg. Prods., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007) (citing *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990)). When a Rule 12(b)(1) motion contests subject matter jurisdiction factually, the court must weigh the evidence in order to determine whether it has the power to hear the case, without presuming the challenged allegations in the complaint to be true. *Id.*; *DLX, Inc. v. Kentucky*, 381 F.3d 511, 516

(6th Cir. 2004). When the facts are disputed in this way, "[t]he district court has broad discretion to consider affidavits, documents outside the complaint, and to even conduct a limited evidentiary hearing if necessary," without converting the motion into one for summary judgment. *Cooley v. United States*, 791 F. Supp. 1294, 1298 (E.D. Tenn. 1992), *aff'd sub nom. Myers v. United States*, 17 F.3d 890 (6th Cir. 1994); *see also Gentek*, 491 F.3d at 330. It is then the plaintiff's burden to show that jurisdiction is appropriate. *DLX*, 381 F.3d at 516. If a Rule 12(b)(1) motion challenges subject matter jurisdiction based on the face of the complaint, to the contrary, the plaintiff's burden is "not onerous," and the plaintiff need only demonstrate that the complaint alleges a "substantial" federal claim, meaning that prior decisions do not inescapably render the claim frivolous. *Musson Theatrical Inc. v. Fed. Express Corp.*, 89 F.3d 1244, 1248 (6th Cir. 1996). A court evaluating this sort of facial attack to the assertion of subject matter jurisdiction must consider the allegations of fact in the complaint to be true. *Gentek*, 491 F.3d at 330. Thus, "the plaintiff can survive the motion by showing any arguable basis in law for the claim made." *Musson Theatrical*, 89 F.3d at 1248.

## B. Rule 12(b)(6)

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). The Federal Rules of Civil Procedure require only that a plaintiff provide "a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). The court must determine only whether "the claimant is entitled to offer evidence to support the claims," not

whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679; *Twombly*, 550 U.S. at 556.

### III. PROCEDURAL ISSUES

#### A. Standing to Challenge Tenn. Code Ann. § 55-50-502(a)(1)(H)

Each of the defendants argues that some or all of the plaintiffs' claims should be dismissed for lack of standing. Article III of the Constitution gives the federal courts jurisdiction only over "cases and controversies," of which the component of standing is an "essential and unchanging part." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); *see also Warth v. Seldin*, 422 U.S. 490, 498 (1975). A party seeking to invoke the court's jurisdiction must establish the necessary standing to sue before the court may consider the merits of that party's cause of action. *Whitmore v. Arkansas*, 495 U.S. 149, 154 (1990). A plaintiff is required to show standing to sue at each stage in the litigation. *Lujan*, 504 U.S. at 561–62. To establish standing under the Constitution, a plaintiff must show that: (1) he has suffered an "injury in fact" that is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as

opposed to merely speculative, that the injury will be redressed by the relief requested. *Gaylor v. Hamilton Crossing CMBS*, 582 F. App'x 576, 579–80 (6th Cir. 2014) (citing *Lujan*, 504 U.S. at 560–61); *see also Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). These mandatory minimum constitutional requirements—commonly known as (1) injury-in-fact, (2) causation, and (3) redressability—apply in every case.

### *1. Injury-in-Fact*

The defendants do not dispute that a person's loss of her driving privileges constitutes a concrete and particularized injury-in-fact, and the defendants' standing arguments, therefore, mostly skip ahead to issues of causation and redressability. That seeming concession allows the defendants to frame the latter two standing elements narrowly, looking only to whether the plaintiffs' suspensions are the sole reason they lack driver's licenses and whether lifting the suspensions would result in the plaintiffs' immediately getting their driving privileges back.

Those arguments, though, assume that the defendants have defined the plaintiffs' injuries-in-fact correctly. The "elements of standing" are "interlocking and related." *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 302 (2008) (Roberts, C.J., dissenting). Precisely defining injury-in-fact is especially important, because causation and redressability both hinge on an analysis of that predicate injury-in-fact—in particular *how it was caused* and whether it *can be redressed*:

> [I]n order to have Article III standing, a plaintiff must adequately establish: (1) an injury in fact (i.e., a concrete and particularized invasion of a legally protected interest); (2) causation (i.e., a fairly . . . trace[able] connection *between the alleged injury in fact and the alleged conduct of the defendant*); and (3) redressability (i.e., it is likely and not merely speculative *that the plaintiff's injury will be remedied by the relief plaintiff seeks* in bringing suit).

*APCC Servs.* 554 U.S. at 273–74 (emphasis added) (internal quotation marks & citations omitted).

As the defendants point out, Robinson, Sprague, and Gibbs all face (or, at the time of filing, faced) additional obstacles to their having their driving privileges restored, over and above TDSHS's permissive suspension of their licenses for nonpayment. For example, both Robinson and Sprague had, at the time the initial Complaint was filed, committed violations of the Financial Responsibility Law that provided independent grounds for suspension pursuant to Tenn. Code Ann. § 55-12-115(b). Gibbs, as the plaintiffs have consistently admitted, has also had his license revoked pursuant to Tenn. Code Ann. § 40-24-105(b)(1). The question, therefore, inevitably arises: Does a driver on whom a suspension is imposed suffer a cognizable injury-in-fact by dint of the suspension itself, even if TDSHS has also imposed other, separate suspensions and/or revocations that pose additional obstacles to the full restoration of her driving privileges?

The answer, under the clear precedents of the Supreme Court and the Sixth Circuit, is yes. A plaintiff who seeks removal of a barrier to obtaining a particular outcome "need not allege that he would have obtained the benefit but for the barrier in order to establish standing." *Lac Vieux Desert Band of Lake Superior Chippewa Indians v. Michigan Gaming Control Bd.*, 172 F.3d 397, 404 (6th Cir. 1999) (quoting *Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993)). Insofar as that principle was ever in doubt, the Supreme Court resolved the question in *Regents of University of California v. Bakke*, 438 U.S. 265 (1978), where it held that a plaintiff challenging a school's admissions policy establishes an adequate injury-in-fact simply by alleging that she was denied the opportunity to "compete for" a spot in the incoming class. *Id.* at 281 n.14; *see also Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 718–19 (2007) (finding injury-in-fact based on a plaintiff's "being forced to compete in a . . . system that may prejudice the plaintiff," regardless of the outcome of that competition). The question of whether the *Bakke* plaintiff was actually entitled to admission, the

Court explained, was "merely one of relief." *Id.* By the same token, a driver seeking to be released from a suspension for nonpayment alleges an injury in the form of the denial of the opportunity to establish her right to drive by meeting all of the other necessary requirements. Whether she has met all of those other requirements at any particular moment is a question of relief—i.e., whether she is entitled to immediate restoration of her license—not whether she was injured. As long as a driver can get her license back by jumping through the right hoops, she can be injured by the government's adding hoops or raising them higher.

The injury imposed by a cumulative suspension becomes even clearer when one considers the issue from a practical perspective. Sometimes the injury-in-fact inquiry requires the court to venture into the realm of abstraction, to consider whether certain "intangible injuries" can nevertheless be sufficiently "concrete" to give rise to standing. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549 (2016). But there is nothing abstract or difficult to grasp about how much a person has to pay to get her driver's license back. When TDSHS imposes a suspension for nonpayment of traffic debt on a driver who has a preexisting suspension or revocation, TDSHS is, in effect, adding to the price of reinstatement. For example, a person facing only a suspension based on her lack of insurance can get her license back by spending however much the insurance costs, plus any legally permissible reinstatement fees. A person facing the same financial responsibility suspension, but also facing a suspension based on her nonpayment of $900 in traffic debt, will have to pay the same amount as the first hypothetical reinstatement applicant— plus more than $900. It can hardly be argued that having to pay an extra several hundred dollars for something is not really an injury. Quite to the contrary—establishing "[a]n economic injury which is traceable to the challenged action" is one of the surest and simplest routes to establishing an injury-in-fact. *Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 282 (6th Cir.

1997) (quoting *Linton by Arnold v. Comm'r of Health & Env't, State of Tenn.*, 973 F.2d 1311, 1316 (6th Cir. 1992)).

The court, accordingly, will consider the issues of causation and redressability based on the premise that the plaintiffs' concrete and particularized injuries-in-fact include not only the simple fact of not having a driver's license, but also the particular barriers placed between the plaintiffs and reinstatement.

### *2. Causation*

The defendants argue that the plaintiffs' injuries are not fairly traceable to the defendants' respective actions under the state's suspension scheme. Purkey's argument to that effect, however, is premised on a too-narrow conception of plaintiffs' injuries. Purkey suggests that the plaintiffs' injuries are not fairly traceable to their suspensions under Tenn. Code Ann. § 55-50-502(a)(1)(H) because the plaintiffs face or faced other, additional grounds for suspension and/or revocation. But the plaintiffs' injuries, as the court has explained, include the specific barriers created by their Tenn. Code Ann. § 55-50-502(a)(1)(H) suspensions, regardless of whether they also face other cumulative barriers to full reinstatement.

The question of causation with regard to the City and County Defendants is more complicated. "[T]he Department of Safety, not the trial court has the authority to revoke"—or suspend—"a defendant's driver's license." *State v. Teasley*, No. No. M2014-00507-CCA-R3-CD, 2015 WL 395668, at *3 (Tenn. Crim. App. Jan. 30, 2015). Moreover, unlike some other types of suspension or revocation, a suspension for nonpayment of traffic debt under Tenn. Code Ann. § 55-50-502(a)(1)(H) is not required by statute. The City and County Defendants argue, therefore, that all they do is send truthful and accurate notices of nonpayment to TDSHS, and it

is only TDSHS's intervening policy of suspending all qualifying licenses that actually causes the suspensions.

The scheme adopted by the General Assembly in Tenn. Code Ann. § 55-50-502(a)(1)(H), however, envisions that a driver will typically only have her license suspended if TDSHS and local authorities work in concert toward that end. TDSHS's suspension authority under Tenn. Code Ann. § 55-50-502(a)(1)(H) arises only when the agency comes to know of the driver's nonpayment "upon a showing by its records or other sufficient evidence." The statute, though, imposes no duty upon TDSHS to monitor traffic debt and provides no mechanism for TDSHS to have the requisite information other than by the local government's choosing to relay it. The plaintiffs, moreover, have specifically alleged that the respective clerks' offices were aware that TDSHS suspends every license about which it receives a notice of nonpayment, and the City and County Defendants have identified no reason for their having transmitted the plaintiffs' nonpayment information to TDSHS other than in an expectation that the plaintiffs' licenses would be suspended. The City and County Defendants' respective nonpayment notification policies, therefore, were intentional, foreseeable, but-for causes of the plaintiffs' suspensions.

The City and County Defendants liken their position to that of a law enforcement officer who relays truthful information to a prosecutor, only to find herself sued for wrongful prosecution based on the prosecutor's own independent decision to bring charges. But insofar as the law enforcement/prosecutor analogy is apt, it works against the defendants, not in their favor. Indeed, courts in this circuit consider malicious prosecution charges brought against law enforcement routinely, on the premise that an officer may be liable for an eventual prosecution decision if the officer "influence[d] . . . or participate[d] in the decision to prosecute." *Sykes v. Anderson*, 625 F.3d 294, 308 (6th Cir. 2010) (quoting *Fox v. DeSoto*, 489 F.3d 227, 237 (6th Cir.

2007); citing *McKinley v. City of Mansfield*, 404 F.3d 418, 444 (6th Cir. 2005); *Darrah v. City of Oak Park*, 255 F.3d 301, 312 (6th Cir. 2001); *Skousen v. Brighton High Sch.*, 305 F.3d 520, 529 (6th Cir. 2002)). Even if the plaintiff fails to show influence or participation, the result is that the claim fails on the merits—not that the court never had jurisdiction. *See, e.g., Halasah v. City of Kirtland, Ohio*, 574 F. App'x 624, 631 (6th Cir. 2014) (affirming grant of summary judgment on malicious prosecution claim where officer did not influence or participate in decision to prosecute).

The Sixth Circuit addressed the question of standing to sue one government entity based on its transmittal of information to other government entities in *Parsons v. U.S. Department of Justice*, 801 F.3d 701 (6th Cir. 2015), concluding that, as long as a sufficient causal link exists to the ultimate injury, the intervening involvement of the agency that received the information does not preclude standing to sue the agency that transmitted it. *Id.* at 715. In *Parsons*, the plaintiffs had sued the Department of Justice ("DOJ") based on the DOJ's allegedly improper designation of a particular group—namely "Juggalos," fans of the musical group Insane Clown Posse—as a "loosely-organized hybrid gang." *Id.* at 707. That gang designation then led other law enforcement to single out the plaintiffs, who were publicly identifiable as Juggalos or likely Juggalos, for scrutiny. *Id.* at 707–10. The plaintiffs sued DOJ, and the Sixth Circuit left little doubt that DOJ's relaying information to another entity may present a sufficient causal nexus to support standing:

> In support of its finding that causation is broken by the independent law enforcement officers' voluntary conduct, the district court noted that the Agencies did not direct the third-party law enforcement entities to stop, detain and question Plaintiffs . . . . But, it is still possible to motivate harmful conduct without giving a direct order to engage in said conduct. The Juggalos allege that the injurious third-party actions were motivated by the DOJ gang designation. In the nebulous land of "fairly traceable," where causation means more than speculative but less

35

> than but-for, the allegation that a defendant's conduct was a motivating factor in
> the third party's injurious actions satisfies the requisite standard.

*Id.* at 714 (citations omitted); *see also Lambert v. Hartman*, 517 F.3d 433, 437 (6th Cir. 2008) (holding that injury caused by third-party identity thief was fairly traceable to conduct of officials who made her personal information publicly accessible). The causal link held to be adequate in *Parsons* was considerably more tenuous than the link between the City and County Defendants' notices of nonpayment and the plaintiffs' suspensions. Although TDSHS technically has statutory authority not to suspend a person's license upon receipt of a notice of nonpayment, the plaintiffs have alleged that, in practice, TDSHS simply suspends the driver's license of every person about whom it receives such a notice. Moreover, the City and County Defendants were aware of that policy when they sent the relevant notices. Accordingly, the City and County Defendants did significantly more than merely "influence" TDSHS's suspensions; they acted, effectively, as the decision makers, in light of their own understanding of TDSHS's policies. That relationship is more than sufficiently fairly traceable to support standing.

### *3. Redressability*

The defendants' arguments on redressability largely mirror Purkey's unavailing argument regarding causation. Specifically, the defendants argue that the declaratory and injunctive relief sought would not redress the plaintiffs' injuries, because lifting of their nonpayment suspensions alone would not guarantee the return of their driving privileges. A plaintiff, however, "satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself. He need not show that a favorable decision will relieve his *every* injury." *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982) (citing *Bakke*, 438 U.S. at 281 n.15.) The Supreme Court has held that, even if "[a]n injunction would not . . . guarantee that" a plaintiff

will achieve her desired final outcome, the injunction will have provided constitutionally sufficient redress if it "removed" a "barrier" to doing so. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 261 (1977). For example, the Federal Circuit has held that, where an aspiring generic drug manufacturer is blocked from the market by multiple patents and sues to have just one of those patents invalidated, it has pled a redressable injury—even though removal of that one patent, alone, would be insufficient to bring its generic drug to the market. *Caraco Pharm. Labs., Ltd. v. Forest Labs., Inc.*, 527 F.3d 1278, 1293 (Fed. Cir. 2008). By the same reasoning, the plaintiffs' past or current additional grounds for suspension or revocation, therefore, pose no obstacle to a finding of redressability.

A different analysis might prevail if any of the plaintiffs had become categorically and irrevocably ineligible for obtaining a new driver's license. For example, if Tennessee law imposed a lifetime revocation on any of the plaintiffs, then defendants might be able to successfully argue that an additional, effectively meaningless suspension did not amount to a redressable injury-in-fact. That plaintiff would face a situation similar to the one addressed by the Sixth Circuit in *Heimberger v. School District of the City of Saginaw*, 881 F.2d 242, 246 (6th Cir. 1989). In *Heimberger*, plaintiff students sued their school district, alleging that the district's policy of subjecting them to lunchtime-only suspensions unlawfully denied them their federally subsidized school lunches. The district, however, responded by changing its policy to replace lunchtime suspensions with full-day suspensions—a policy that, the plaintiffs conceded, did not violate federal school lunch laws. Because the plaintiffs would then face lawful full-day suspensions, a declaration or injunction targeting lunchtime suspensions would have provided them no benefit. The Sixth Circuit, accordingly, found no redressability and no standing. *Id.* at 246. *Heimberger* establishes that, when an insurmountable, lawful barrier stands between a

plaintiff and redress for her injury, there will be no standing. All of the obstacles facing these plaintiffs, however, can be overcome. The removal of a barrier to reinstatement, therefore, redresses an injury, even if other barriers, for the time being, remain. The plaintiffs, therefore, have standing to challenge their suspensions for nonpayment of traffic debt.

## **B. Standing to Challenge Suspensions for Failure to Appear Under Tenn. Code Ann. § 55-50-502(a)(1)(I)**

The defendants argue next that the plaintiffs have no standing to challenge suspensions made pursuant to Tenn. Code Ann. § 55-50-502(a)(1)(I), because that provision only involves suspending driver's licenses for failure to appear, not for failure to pay traffic debt. The plaintiffs assert that the defendants' argument misreads Tenn. Code Ann. § 55-50-502(a)(1)(I), which the plaintiffs construe as covering both failure to appear and nonpayment of traffic debt. The plaintiffs note that that provision's use of the conjunction "or" creates some ambiguity with regard to its scope. Subsection (I) refers to drivers who have "failed to appear in any court to answer *or* to satisfy any traffic citation issued for violating any statute regulating traffic." *Id.* (emphasis added). It is unclear, from that sentence alone, whether "or" separates "failed to appear" from "failed . . . to satisfy"—in which case subsection (I) does, indeed, cover nonpayment—or whether it separates "appear in any court to answer" from "appear in any court . . . to satisfy"—in which case subsection (I) covers only failures to appear.

The defendants are correct that none of the plaintiffs has standing to challenge the state's practice of suspending driver's licenses purely for failure to appear. It does not seem to the court, however, that the plaintiffs are making that challenge. The plaintiffs seek to represent a class defined to include "[a]ll persons whose Tennessee driver's licenses have been or will be suspended under Tenn. Code Ann. § 55-50-502(a)(1)(H) or (I) *for nonpayment of Traffic Debt* and who cannot now and could not at the time of suspension afford to pay such debt." (Docket

No. 111 ¶ 242 (emphasis added).) If the defendants are correct, and there are no drivers whose driver's licenses were suspended for nonpayment of traffic debt under subsection (I), then that portion of the class will have no members. There is no need, though, to dismiss any challenge to suspensions based solely on failure to appear, because the plaintiffs have raised no such challenge.

## C. Mootness of Booher's Claims

Purkey argues that Booher's claims are moot because her license has now been reinstated. Booher responds that, even if her license has been reinstated for now, she still has live claims against the defendants because she is still at risk of Purkey re-suspending her license for nonpayment of traffic debt. Moreover, she argues that, insofar as her claims are moot, she is entitled to an exception from mootness.

The federal courts have an ongoing obligation under Article III to limit their jurisdiction to cases that may actually affect the rights of the litigants. *Coal. for Gov't Procurement v. Fed. Prison Indus.*, Inc., 365 F.3d 435, 458 (6th Cir. 2004) (citing *Sw. Williamson Cty. Cmty. Ass'n, Inc. v. Slater*, 243 F.3d 270, 276 (6th Cir. 2001)). When, therefore, the issue presented by a case is "no longer live" or when "the parties lack a legally cognizable interest in the outcome," the case becomes moot and falls outside the boundaries of Article III. *Ford v. Wilder*, 469 F.3d 500, 504 (6th Cir. 2006) (quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969)). "A federal court has no authority to render a decision upon moot questions or to declare rules of law that cannot affect the matter at issue." *Cleveland Branch, Nat'l Ass'n for the Advancement of Colored People v. City of Parma, Ohio*, 263 F.3d 513, 530 (6th Cir. 2001) (citing *Church of Scientology v. United States*, 506 U.S. 9, 12 (1992)).

"The test for mootness is whether the relief sought would, if granted, make a difference to the legal interests of the parties . . . ." *McPherson v. Mich. High Sch. Athletic Ass'n*, 119 F.3d 453, 458 (6th Cir. 1997) (quoting *Crane v. Ind. High Sch. Athletic Ass'n*, 975 F.2d 1315, 1318 (7th Cir. 1992)). The "completion of activity is not the hallmark of mootness. Rather, a case is moot only where no effective relief for the alleged violation can be given." *Coal. for Gov't Procurement*, 365 F.3d at 458 (citing *McPherson*, 119 F.3d at 458). As federal courts "possess broad discretion to fashion equitable remedies," they "may craft declaratory and injunctive relief designed to preclude [an] agency from acting in contravention of its . . . authority." *Id.* at 460.

Purkey has not advanced any argument that Booher's claim was moot before TDSHS lifted her suspension. The determinative question, then, is whether Purkey's lifting of the suspension caused Booher to lose her cognizable interest in her claims. Purkey claims that TDSHS lifted the suspension because the judgments against Booher were void *ab initio* due to their lack of required signatures. (Docket No. 132 at 2.) Purkey has not, however, identified any ruling by any Tennessee court vacating those judgments. Nor has he presented any reason why, insofar as the judgments against Booher lack a signature, that lack of a signature will not simply be corrected. Tennessee law provides that, if "a court's judgment was not entered on the date the judge intended . . . due to the inadvertence or mistake of the court," then the court may, at least in certain situations, remedy the oversight "by an entry of the judgment *nunc pro tunc*." *Blackburn v. Blackburn*, 270 S.W.3d 42, 50 (Tenn. 2008); *see Gregg v. Gregg*, No. 96-P-0263, 1997 WL 750853, at *2 (Ohio Ct. App. Nov. 21, 1997) (discussing judgment's lack of signatures being rectified *nunc pro tunc*); *cf. Int'l Cargo & Sur. Ins. Co. v. M/V "Hreljin"*, No. 88 CIV. 3807 (BN), 1993 WL 426651, at *4 n.4 (S.D.N.Y. Oct. 19, 1993) (discussing admission of originally unsigned deposition being admitted at trial after being rectified *nunc pro tunc*). Even

in a criminal setting, "the court may at any time," upon notice, "correct clerical mistakes in judgments, orders, or other parts of the record, and errors in the record arising from oversight or omission." Tenn. R. Crim. P. 36. Purkey's noticing that the judgments against Booher lack a signature, therefore, is no guarantee that Booher is out of the woods with regards to the underlying citations or debt.

As Purkey has repeatedly reminded the court, *see infra*, this court has no jurisdiction to exercise an appellate function over Bristol City Court. Accordingly, even if this court believed that the judgments against Booher should be considered void under Tennessee law, it would have no power to set them aside. Purkey has identified no authority that would permit his own agency to do so either; while TDSHS may choose, within its discretion, not to act on a judgment that it considers invalid, it still appears that only the state's courts can actually determine, definitively, whether a judgment will stand. The only ground for concluding that Booher has lost her stake in this case, then, is TDSHS's unilateral decision to stop recognizing the validity of judgments of the municipal court.

Generally, a defendant's "voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice. If it did, the courts would be compelled to leave the defendant free to return to his old ways." *Friends of the Earth*, 528 U.S. at 189 (citing *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283. 289 (1982)). However, although "voluntary cessation" of wrongful conduct does not automatically render a case moot, the case may nevertheless be moot if the defendant can demonstrate that there is no reasonable expectation that the wrong will be repeated. *See Youngstown Publ'g Co. v. McKelvey*, 189 F. App'x 402, 405 (6th Cir. 2006) (quoting *Mosley v. Hairston*, 920 F.2d 409, 415 (6th Cir. 1990)); *see also Ammex, Inc. v. Cox*, 351 F.3d 697, 705 (6th Cir. 2003). The party asserting mootness

bears a "heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to stand up again." *Youngstown*, 189 F. App'x at 405 (quoting *United States v. Dairy Farmers of Am., Inc.*, 426 F.3d 850, 857 (6th Cir. 2005)). The burden is significant because courts want to "protect a party from an opponent who seeks to defeat judicial review by temporarily altering its behavior." *Id.* (quoting *United States v. City of Detroit*, 401 F.3d 448, 451 n.1 (6th Cir. 2005)).

Purkey has not established that Booher is actually definitively free of the traffic debt that she owed to Bristol Municipal Court—only that Purkey's agency has, for now, stopped recognizing that debt's legitimacy. TDSHS's reaction to its discovery of Booher's allegedly faulty judgments, moreover, belies any suggestion that TDSHS actually considers suspensions such as Booher's impermissible as a matter of law. When TDSHS obtained and reviewed the judgments against Booher, it did not merely come across a single oversight on one judgment. Bristol City Court entered three separate judgments against Booher, on three separate dates, each of which lacked the signature of a judge. (Docket Nos. 132-2, -3, -4.) The fairly obvious implication of that discovery is that Bristol City Court may have a larger problem of sending notices of nonpayment based on unsigned judgments and that, therefore, some unknown number of drivers may be suffering from suspensions that, by TDSHS's own interpretation of the law, were improper. Purkey, however, explains that TDSHS's position is that it has "no duty" to take any steps to address those outstanding, improper suspensions, because the drivers suffering from those suspensions did not avail themselves of TDSHS's process for contesting the validity or accuracy of a nonpayment notice. (Docket No. 144 at 4.) But Booher did not avail herself of that process either. If those other defendants waived their rights to have their suspensions set aside, then so did she. The only thing that sets Booher apart from those other drivers—who continue to

labor under, structure their lives around, and potentially face arrest and criminal conviction for violating the suspensions that TDSHS contends are illegal but apparently experiences no compunction to identify and fix—is the fact that Booher sued Purkey. Quickly rectifying a plaintiff's injury because she sued you, while taking no steps to address the injury's source, is precisely the kind of activity that the case law on voluntary cessation was crafted not to reward. Purkey asks the court to consider Booher's injury resolved because the judgments against her turned out to have been unsigned. TDSHS's policy for every driver but Booher, though, is apparently that such suspensions are proper and may continue. The court, therefore, has no choice but to conclude that this is an instance of voluntary cessation that would not rob the court of jurisdiction. It, therefore, will not dismiss Booher's claims as moot.[5]

## D. Availability of Injunctive and/or Declaratory Relief Against City and County Defendants

The City and County Defendants argue next that any claims for injunctive relief against them should be dismissed because the court has no power to enter such relief under § 1983. As these defendants note, Congress has amended § 1983 to limit the availability of injunctive relief against judicial officers. *See Ward v. City of Norwalk*, 640 F. App'x 462, 467 (6th Cir. 2016) (citing *Brandon E. ex rel. Listenbee v. Reynolds*, 201 F.3d 194, 197–98 (3d Cir. 2000)). Specifically, § 1983, as amended, provides that, "in any action brought against a judicial officer

---

[5] The court notes, also, that Booher's claims may be subject to an augmented, and more forgiving, mootness inquiry, because she is the plaintiff in a class action complaint. *See United States v. Sanchez-Gomez*, No. 17-312, 2018 WL 2186177, at *4 (U.S. May 14, 2018) (citing *Gerstein v. Pugh*, 420 U.S. 103, 110–111, n.11 (1975)). Purkey notes that Booher was not a plaintiff when the original class certification motion was filed, and she, therefore, is technically not the movant on any such motion. However, the class action nature of the Corrected Amended Complaint, to which Booher is a party, is unambiguous, and the court has never denied that pending motion as moot. Regardless of whether Booher was a movant on that motion, then, she remains on deck to be a class representative if it is granted. She has not registered any opposition to the certification motion, which, the court presumes, she supports. In any event, because the court would not find mootness regardless of the class-action status, there is no need to consider whether the unique procedural wrinkle in Booher's case would deny her the consideration normally afforded to class plaintiffs.

for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. 42 U.S.C. § 1983. The City and County Defendants argue that this language prevents the court from entering injunctive relief against them, because the requested relief would reach judicial officers based on acts taken in their judicial capacity.

The plaintiffs respond that some of the City and County Defendants—in particular, the city and county governments themselves—are plainly not judicial officers. The court clerk defendants, however, do fall within the class of actors that at least may be considered judicial officers under § 1983, depending on the capacity in which they are acting. *See Coleman v. Governor of Mich.*, 413 F. App'x 866, 873 (6th Cir. 2011) ("Absolute judicial immunity applies not only to judges, but has extended, in the form of quasi-judicial immunity, to any person acting as an arm of the absolutely immune judicial officer.") (citing *Bush v. Rauch*, 38 F.3d 842, 847 (6th Cir. 1994)).

The plaintiffs argue that, insofar as the clerk defendants are judicial officers, the injunctive relief sought targets only actions they have taken in their purely administrative capacities. The plaintiffs seek the following injunctive relief against the City and County Defendants:

> d.     On behalf of the Wilson and Rutherford County Subclasses, preliminarily and permanently enjoining the Counties and Defendants Moss and Harrell from notifying the Department of nonpayment of Traffic Debt without either:
>
>> i.     notice to the licensee that includes the offer of a fact-based inquiry, with participation by the licensee, as to the licensee's ability to pay and, if such inquiry is requested, a factual determination, prior and as a prerequisite to license suspension, that the amount sought is within the licensee's ability to pay; or

ii. until such time as Defendant Purkey establishes procedures and policies pursuant to which the Department will provide all elements of such notice, inquiry, and factual determination if the Counties do not;

e. On behalf of Plaintiff Sprague, preliminarily and permanently enjoining Defendants Linville, Gaskill, and Mt. Juliet and Lebanon, Tennessee, from notifying the Department of nonpayment of Traffic Debt without either:

i. notice to the licensee that includes the offer in each instance of a fact-based inquiry, with participation by the licensee, as to the licensee's ability to pay and, if such inquiry is requested, a factual determination, prior and as a prerequisite to license suspension that the amount sought is within the licensee's ability to pay; or

ii. until such time as Defendant Purkey establishes procedures and policies pursuant to which the Department will provide all elements of such notice, inquiry, and factual determination if the municipalities do not . . . .

(Docket No. 111 at 43–44.) The plaintiffs' request is notable for what they do not seek. The plaintiffs do not seek to have the judgments against them set aside or altered; they do not ask that the judges of the respective courts change the terms of their payment obligations; indeed, they do not even ask that the local government defendants be categorically required to grant them a consideration of their indigence. The requested relief targets one particular act: the sending of a notice of nonpayment to TDSHS.

The plaintiffs' theories of liability ultimately mirror the relief they seek. Admittedly, the Corrected Amended Complaint could be seen to muddy the waters a bit by touching on some issues that implicate judicial functions—such as, for example, the fact that the plaintiffs have not been given the option to pay their traffic debt in installments over time. Insofar as the plaintiffs challenged the fact that the judgments against them lacked terms allowing for such plans, their claims likely would arise out of actions taken in the judges' official capacities. Those judges, however, are not defendants in this action, and the actual theories of liability that the plaintiffs

have advanced do not hinge on the substance of the judgments against them. The plaintiffs bring suit based on the City and County Defendants' participation in the state's system for suspending driver's licenses based on nonpayment of traffic debt. The City and County Defendants' participation in that system takes the form of the notices of nonpayment sent to TDSHS—not any aspect of the actual adjudication of the plaintiffs' violations.

The Sixth Circuit has "relied on a functional analysis to determine which acts are protected" by judicial immunity, meaning that one must determine whether the actions are truly judicial acts or 'acts that simply happen to have been done by'" judicial officers. *Morrison v. Lipscomb*, 877 F.2d 463, 465 (6th Cir. 1989) (quoting *Forrester v. White*, 484 U.S. 219, 227 (1988)). Courts that have considered whether a particular act amounts to a judicial function "have found that 'paradigmatic judicial acts' are those that involve 'resolving disputes between parties who have invoked the jurisdiction of a court.'" *Barnes v. Winchell*, 105 F.3d 1111, 1116 (6th Cir. 1997) (quoting *Forrester*, 484 U.S. at 227). The notices of nonpayment at issue here do not involve the adjudication of any disputed facts or law. Sending a notice of nonpayment is, in and of itself, an essentially clerical act that bears little resemblance to any core judicial function. Indeed, the non-adjudicative nature of the notice is highlighted by the fact that, even after the notice is sent, the driver has a right to a hearing at TDSHS regarding its accuracy.

The defendants accuse the plaintiffs of seeking a backdoor path to forcing local judges to alter the payment terms of the traffic debt they assess. But the requested relief would not require any court to do anything. Indeed, it would not even force any particular action onto the named defendants themselves. If the plaintiffs are granted the injunctive relief they seek, the City and County Defendants can easily comply with that injunction in future cases simply by doing nothing at all—that is to say, not sending any notices of nonpayment to TDSHS and going about

their business of collecting traffic debt through ordinary means. If the defendants do wish to continue invoking TDSHS's suspension powers, the injunctive relief would require them to make sure that some appropriate entity is assessing the defendant's ability to pay—either at the local level or at TDSHS. Simply because one route to meeting that requirement would involve relying on local courts, however, does not change the fact that the subject of the injunctive relief is the purely administrative exchange of information.

The City and County Defendants argue, next, that declaratory relief against them would be inappropriate under the Sixth Circuit's test for when a court should exercise its authority to grant declaratory relief. The Declaratory Judgment Act provides that, "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). "Since its inception, the Declaratory Judgment Act has been understood to confer on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995). The Supreme Court has "repeatedly characterized the Declaratory Judgment Act as an enabling Act, which confers discretion on the courts rather than an absolute right upon the litigant." *Id.* at 287 (internal citations omitted).

To guide district courts in the exercise of that discretion, the Sixth Circuit has articulated five factors for consideration:

(1) whether the declaratory action would settle the controversy;

(2) whether the declaratory action would serve a useful purpose in clarifying the legal relations at issue;

(3) whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race for res judicata;"

(4) whether the use of a declaratory judgment action would increase the friction between our federal and state courts and improperly encroach on state jurisdiction; and

(5) whether there is an alternative remedy that is better or more effective.

*Grand Trunk v. W. R.R. Co. v. Consol. Rail Corp.*, 746 F.2d 323, 326 (6th Cir. 1984). Contrary to the defendants' argument, those factors plainly favor considering plaintiffs' claims for declaratory relief. A declaration of the constitutionality of the state's suspension regime would clarify the powers, responsibilities, and permissible courses of action of all of the parties involved, including the City and County Defendants. The declaratory relief sought would leave plenty of flexibility for the governments involved to assure compliance with the law, while setting forth the minimum standards they must meet, and the court sees no superior alternative remedy other than, possibly, the injunctive relief also sought in this case. The court, moreover, sees no reason to expect this litigation to be a cause for any friction between federal and state courts. State courts are well-accustomed to the fact that the parties who come before them may later pursue related claims in federal court. Such patterns are wholly routine and involve no encroachment on state court jurisdiction. The court sees no reason to dismiss the plaintiffs' requests for declaratory relief against the City and County Defendants.

**E. *Rooker-Feldman***

Purkey, the City Defendants, and the County Defendants have all argued that the claims against them are barred by the *Rooker-Feldman* doctrine. *Rooker-Feldman*—which takes its name from two Supreme Court cases, *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923), and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983)—places certain constraints on what types of claims a district court can consider when the underlying subject

matter also implicates a preexisting state-court adjudication. Because the defendants perform different roles in the state's overall system for assessing traffic debt and suspending driver's licenses, the extent of protection that *Rooker-Feldman* will afford them—if any—will depend on the particular actions and responsibilities of each defendant.

### 1. Basic Principles

On the most fundamental level, *Rooker-Feldman* stands for the proposition that a federal district court lacks subject matter jurisdiction to conduct an appellate review of a state court decision. *Pittman v. Cuyahoga Cty. Dep't of Children & Family Servs.*, 241 F. App'x 285, 287 (6th Cir. 2007). By extension, a federal court cannot issue injunctive relief that would, as a practical matter, amount to an exercise of the interjurisdictional appellate function that *Rooker-Feldman* forbids. *See Lawrence v. Welch*, 531 F.3d 364, 371–72 (6th Cir. 2008) ("[C]laims seeking injunctive relief are barred by *Rooker-Feldman* if they necessarily require the federal court to determine that a state court judgment was erroneously entered."). Accordingly, even if a plaintiff has raised legitimate concerns under federal law, this court cannot exercise jurisdiction if doing so would amount to exercising an appellate function reserved to the state appellate courts and, eventually, the U.S. Supreme Court.

The *Rooker-Feldman* doctrine, however, is "not a panacea to be applied whenever state court decisions and federal court decisions potentially or actually overlap." *McCormick v. Braverman*, 451 F.3d 382, 395 (6th Cir. 2006); *see also Givens v. Homecomings Fin.*, 278 F. App'x 607, 609 (6th Cir. 2008) (referring to the "narrow range of cases" implicated by *Rooker-Feldman*). The Supreme Court has stated that *Rooker-Feldman* "is confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings

commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005). The Sixth Circuit, accordingly, has "distinguished between plaintiffs who bring an impermissible attack on a state court judgment— situations in which *Rooker-Feldman* applies—and plaintiffs who assert independent claims before the district court—situations in which *Rooker-Feldman* does not apply." *Pittman*, 241 F. App'x at 287.

In making this distinction, the court must look to "the source of the injury the plaintiff alleges in the federal complaint. If the source of the injury is the state court decision," then the *Rooker-Feldman* doctrine prevents the federal court from deciding the case. *McCormick*, 451 F.3d at 393. "If," however, "there is some other source of injury, such as a third party's actions, then the plaintiff asserts an independent claim." *Id.* The court must decide whether it is being called on to consider whether the state court judgment "in and of [itself] violate[s] the federal Constitution or federal law," or whether the complaining party bases its argument on some unlawful action or policy outside the four corners of that judgment. *Id.* at 392. "The appropriate inquiry is not whether the district court would be required to 'overrule' in some technical way the state court judgment, but is instead whether the constitutional claim presented by the plaintiff is so intertwined with the state court proceedings that a federal court review of the claim would necessarily constitute a review of the state court's decision, such that a federal court decision in the plaintiff's favor would call the state court decision into question." *Pancake v. McCowan*, 64 F. App'x 464, 466 (6th Cir. 2003).

Under *Rooker-Feldman*, this court cannot penetrate the relationship between the litigants and the court in a state case. But "sometimes a state-court judgment gives rise to a new problem . . . and that . . . new problem can get federal review without impermissible examination

of the initial state-court decision." *Market. v. City of Garden City, Kan.*, No. 16-3293, 2017 WL 6388812, at *3 (10th Cir. Dec. 14, 2017). The reality of our legally complex, multi-jurisdictional system is that the judgment of a court may be the catalyst of a far-reaching array of events and consequences that go well beyond what the court itself decided. A court entering a money judgment in one jurisdiction may be creating the basis for collection proceedings a thousand miles away, involving assets, rules, obligations, and interests that appear nowhere in the court's reasoning or judgment. *See Condaire, Inc. v. Allied Piping, Inc.*, 286 F.3d 353, 356 (6th Cir. 2002) (discussing procedures for collecting judgment entered in one federal district against property in another federal district pursuant to 28 U.S.C. § 1963). A judgment of guilt in a criminal trial may give rise to collateral consequences that neither the defendant nor the court foresaw because the statutory basis for those consequences had not even been enacted at the time of the conviction. *See Doe v. Bredesen*, 507 F.3d 998, 1007 (6th Cir. 2007) (upholding retroactive application of Tennessee's sexual offender registration requirements). Court A's criminal verdict may play a role in Court B's parental rights case or Agency C's decision on whether to grant a license. *See, e.g.*, Tenn. Code Ann. § 36-1-113(g)(6) (establishing basis for termination of parental rights based on incarceration under a sentence of ten or more years); Tenn. Code Ann. § 68-140-311(a)(1)(E) (providing for denial of emergency medical services licensure based on conviction of a crime of moral turpitude). In other words, a judgment may echo throughout the life of a litigant, in ways foreseeable or unforeseeable, far beyond the facial terms of the judgment itself. *Rooker-Feldman* protects the judgment, but not necessarily its far-reaching consequences.

## 2. Rooker-Feldman *and Purkey's Suspension of Driver's Licenses*

Several courts have considered *Rooker-Feldman* in the context of judgment collection mechanisms and have generally held that the doctrine poses no obstacle to federal jurisdiction, as long as the plaintiff raises "a challenge to the *manner* of collecting on the state-court judgment," rather than a "claim . . . contingent upon the invalidity of the underlying debt." *Moore v. Idealease of Wilmington*, 465 F. Supp. 2d 484, 490 (E.D.N.C. 2006) (emphasis added) (citing *Todd v. Weltman, Weinberg & Reis Co., L.P.A.*, 434 F.3d 432, 437 (6th Cir. 2006); *Senftle v. Landau*, 390 F. Supp. 2d 463, 469 (D. Md. 2005); *Wyles v. Excalibur I, LLC*, No. 05-2798JRTJJG, 2006 WL 2583200, at *2 (D. Minn. Sept. 7, 2006)); *see also Hageman v. Barton*, 817 F.3d 611, 614–16 (8th Cir. 2016) ("Through his federal complaint, [plaintiff] seeks relief from neither the Missouri judgment nor the Illinois garnishment order. Rather, he alleges statutory violations seeking statutory penalties based on [defendant's] actions in the process of obtaining the judgment and order. [Therefore,] *Rooker-Feldman* does not apply, and we may exercise jurisdiction over [plaintiff's] federal claims."); *Moran v. Greene & Cooper Attorneys LLP*, 43 F. Supp. 3d 907, 911–12 (S.D. Ind. 2014) ("Plaintiff does not challenge the validity of the state court judgment against him—neither its amount nor the methods used by the creditor to obtain it. . . . [W]e could find that Defendant violated the statute without 'reviewing' the state court judgment, and [the] *Rooker-Feldman* doctrine therefore presents no impediment to our exercise of jurisdiction."); *Ness v. Gurstel Chargo, P.A.*, 933 F. Supp. 2d 1156, 1162–63 (D. Minn. 2013) ("These allegations appear to attack Defendants' debt-collection practices rather than the state-court judgments, so for the purposes of deciding this motion, the Court determines that *Rooker-Feldman* does not bar these . . . claims."); *Meyer v. Debt Recovery Sols. of Ohio, Inc.*, No. 1:10CV363, 2010 WL 3515663, at *4 (N.D. Ohio Sept. 2, 2010) (holding that *Rooker-*

*Feldman* did not apply "[b]ecause the plaintiffs challenged the manner of collection rather than the underlying debt").

The Sixth Circuit addressed the issue in *Todd v. Weltman, Weinberg & Reis Co.*, in which a judgment debtor filed suit under the Fair Debt Collection Practices Act based on the judgment creditor's filing of an allegedly false affidavit under Ohio's garnishment statute. 434 F.3d at 437. The Sixth Circuit concluded that *Rooker-Feldman* did not bar jurisdiction, because the plaintiff "d[id] not complain of injuries caused by th[e] state court judgment, as the plaintiffs did in *Rooker* and *Feldman*," but rather raised "an independent federal claim that Plaintiff was injured by" the defendant's collection activities. *Id.* at 437. The same principle would apply to permit jurisdiction here. Indeed, the Sixth Circuit has already held, albeit passingly, that *Rooker-Feldman* does not bar a suit based on independent actions taken during proceedings to enforce payment of a fine. *See Powers v. Hamilton Cty. Pub. Def. Comm'n*, 501 F.3d 592, 606 (6th Cir. 2007) (holding that *Rooker-Feldman* did not bar claims based on public defenders' failure to request indigence hearings for clients facing jail time for willing failure to pay a fine).

Fundamental to *Rooker-Feldman* is the question of whether the federal courts are being asked, either actually or practically, to exercise an appellate function. "Where federal relief can only be predicated upon a conviction that the state court was wrong, it is difficult to conceive the federal proceeding as, in substance, anything other than a prohibited appeal of the state-court judgment." *Catz v. Chalker*, 142 F.3d 279, 293 (6th Cir. 1998) (quoting *Keene Corp. v. Cass*, 908 F.2d 293, 296–97 (8th Cir. 1990)). None of the plaintiffs argue that Tennessee courts committed error in assessing fines, costs, or litigation taxes against them. Nor do they challenge the court clerks' rights to enforce that debt against them through the various ordinary collection mechanisms that the law makes available to creditors. The plaintiffs seek only one thing: that the

state not take away their lawful ability to drive based on the fact that they cannot currently pay the amounts they owe. Their challenge is to one post-judgment coercive tool used in the state's collection regime—not to any judgment itself.[6] The plaintiffs' claims against Purkey, therefore, are not barred by *Rooker-Feldman*.

### *3.* **Rooker-Feldman** *and the City and County Defendants' Notices of Nonpayment*

Unlike Purkey, the City and County Defendants' involvements in the plaintiffs' traffic cases entailed more than merely administering the driver's license suspension scheme. Indeed, there are aspects of the local defendants' actions that are likely shielded by *Rooker-Feldman*. For example, if the plaintiffs challenged the city and county clerks' entry of the judgments against them on the ground that the judgments were unconstitutional, those challenges would likely fall squarely within the class of claims that *Rooker-Feldman* forbids.

The City and County Defendants' roles, however, did not end with the entry of the relevant judgments. Rather, it was those defendants' decisions—of their own volition and subject to their own policies—to send TDSHS notices of nonpayment that gave rise to TDSHS's authority to suspend the plaintiffs' driver's licenses. In that sense, the City and County Defendants are much like the creditor defendant in *Todd. See* 434 F.3d at 437. The *Todd* court held that *Rooker-Feldman* did not apply because the plaintiff did not claim to be injured by the

---

[6] Purkey urges the court to follow the lead of two district courts that applied *Rooker-Feldman* to bar *pro se* plaintiffs' claims challenging their driver's license revocations or suspensions. *King v. Creed*, No. 1:14-CV-0165, 2016 WL 204492, at *2–3 (N.D.N.Y. Jan. 15, 2016); *Normandeau v. City of Phoenix*, 516 F. Supp. 2d 1054, 1064 (D. Ariz. 2005). Purkey cites these cases for the proposition that *Rooker-Feldman* bars suits challenging suspensions that have a "causal relationship" to state-court judgments. (Docket No. 148 at 4 (quoting *McKithen v. Brown*, 481 F.3d 89, 98 (2d Cir. 2007)).) Insofar as those cases are based on such a rule, it is plainly incompatible with the Sixth Circuit's recognition, in *Todd*, that suits based on a judgment creditor's collection efforts are permissible as long as they do not challenge the original judgment. 434 F.2d at 437. The Supreme Court, moreover, has stated unambiguously that a causal connection is a necessary, but not sufficient, condition for applying *Rooker-Feldman*, writing that the doctrine reaches "cases [1] brought by state-court losers [2] complaining of injuries caused by state-court judgments [3] rendered before the district court proceedings commenced *and* [4] inviting district court review and rejection of those judgments." *Exxon*, 544 U.S. at 284 (emphasis added).

underlying state court judgment itself, but rather argued that he "was injured by [the defendant] when [the defendant] filed a false affidavit" in support of its attempt to garnish the plaintiff's wages. *Id.* Similarly, the plaintiffs here do not premise their constitutional claims on any injury inflicted on them by the initial imposition of their traffic debt; rather, the plaintiffs argue that they were injured by subsequent actions that included the City and County Defendants' sending notices of nonpayment that they knew would result in suspensions. The City and County Defendants present no convincing reason why an affidavit in support of garnishment would constitute a later action outside the bounds of *Rooker-Feldman*, but a notice of nonpayment would not.

The City and County Defendants liken the claims against them to those held by the Sixth Circuit to be barred by *Rooker-Feldman* in its unpublished opinion in *Coleman v. Governor of Michigan*, 413 F. App'x at 872. In *Coleman*, several indigent prisoners brought a § 1983 suit challenging "Michigan Complied Laws § 600.2963, which require[d] prisoners to pay full or partial court fees prior to filing civil claims." *Coleman*, 413 F. App'x at 868. The Sixth Circuit held that *Rooker-Feldman* barred the challenge, because the plaintiffs' challenge to Michigan courts' refusal to hear their claims intruded upon "a 'judicial inquiry in which the court was called upon to investigate, declare, and enforce liabilities as they stood on present or past facts and under laws supposed already to exist.'" *Id.* at 872 (quoting *Feldman*, 460 U.S. at 479). The City and County Defendants suggest that, because the claims against them also target a consequence of court-imposed litigation debt, those claims are comparable to those at issue in *Coleman*. The *Coleman* plaintiffs, however, were challenging the courts' own "refusal to file judicial-review claims, duration-of-confinement claims and petitions for writ of habeas corpus" and "refusal to grant fee waivers." *Id.* The statute at issue in *Coleman*, therefore, touched directly

on the core adjudicative functions with which *Rooker-Feldman* is concerned. The plaintiffs' claims here, to the contrary, are premised on court clerks' decisions to call on the power of a wholly separate state agency—one whose primary functions are regulatory and not adjudicative—to impose a sanction that, unlike a filing bar, bears no inherent relationship to the business of the court. This court, therefore, sees little reason to assume that the logic of *Coleman* would extend to this case. In any event, insofar as *Coleman* could be so broadly construed, such a construction would come into conflict with the Sixth Circuit's published decision in *Todd*.

## F. *Younger* Abstention

Next, the City Defendants argue that the court should exercise *Younger* abstention to decline to consider Sprague's claims. In *Younger v. Harris*, 401 U.S. 37 (1971), the Supreme Court held that, absent extreme circumstances, federal courts should not intervene to review constitutional challenges to state statutes brought by parties subject to pending state criminal proceedings under those statutes. *Id.* at 54. The Supreme Court later extended the *Younger* doctrine to apply where certain state civil and administrative enforcement proceedings are pending in which the state is a party and that involve enforcement of state law. *See Middlesex Cty. Ethics Comm'n v. Garden State Bar Ass'n*, 457 U.S. 423, 437 (1982) (applying *Younger* abstention where there were pending state bar disciplinary proceedings and holding that application of the doctrine is appropriate where there are ongoing civil proceedings that implicate an important state interest and provide an adequate opportunity to raise constitutional challenges); *see also Danner v. Bd. of Prof'l Responsibility of the Tenn. Supreme Court*, 277 F. App'x 575, 580–81 (6th Cir. 2008) (same).

The first prerequisite of *Younger* abstention is that the state proceeding must be both ongoing and judicial in nature. *See New Orleans Pub. Serv., Inc. ("NOPSI") v. Council of City of*

*New Orleans*, 491 U.S. 350, 369–70 (1989). When no state proceeding is pending, "considerations of equity, comity, and federalism are therefore diminished," and a federal court may consider constitutional challenges to state enactments and grant declaratory and injunctive relief. *Norfolk & W. Ry. Co. v. Pub. Utils. Comm'n of Ohio*, 926 F.2d 567, 572 (6th Cir. 1991) (quoting *WXYZ, Inc. v. Hand*, 658 F.2d 420, 423 (6th Cir.1981)). The second *Younger* prerequisite requires a court to consider the "substantiality of a State's interest in its proceedings" by looking "not narrowly . . . to its interest in the *outcome* of a particular case . . . but to the importance of the generic proceedings to the State." *See GTE Mobilnet of Ohio v. Johnson*, 111 F.3d 469, 482 (6th Cir. 1997) (quoting *NOPSI*, 491 U.S. at 365). The third and final *Younger* prerequisite asks whether the plaintiff would have an adequate opportunity at the state level to raise constitutional challenges. *See Norfolk*, 926 F.2d at 572.

As the plaintiffs point out, the City Defendants fail both the first and third prongs of the *Younger* abstention test. First, Sprague does not challenge any pending state-court proceeding. Her claims are directed at the City Defendants' participation in the suspension of her license— specifically, their post-adjudication sending of notices of nonpayment to TDSHS, knowing that the result would be a suspension of her driver's license. Those notices were distinct from the judgments against her and the proceedings from which those judgments flowed.

The City Defendants seek to premise their *Younger* abstention argument on the hypothetical pendency of proceedings pursuant to which Sprague could seek some relief from her traffic debt from the imposing courts. Hypothetical proceedings, however, are not enough to bring *Younger* abstention into play. "The first condition for the application of *Younger* abstention is that the state proceeding must be pending on the day the plaintiff sues in federal court." *Nimer v. Litchfield Twp. Bd. of Trustees*, 707 F.3d 699, 701 (6th Cir. 2013). "[T]here is no doctrine that

the availability . . . of state judicial proceedings excludes the federal courts." *Leatherworks P'ship v. Boccia*, 246 F. App'x 311, 317–18 (6th Cir. 2007) (quoting *NOPSI*, 491 U.S. at 373.) Moreover, even if such proceedings were pending, they would not provide Sprague with an adequate opportunity to raise her claims. The courts that assessed the violations against Sprague may have a number of mechanisms pursuant to which they could alleviate the burden or reduce the extent of Sprague's traffic debt. Sprague's claims, though, are not about whether she owes that debt. They are about a particular post-judgment collection mechanism. Because Sprague's liability for suspension of her driver's license for nonpayment was not, in fact, a contested or adjudicated issue in the traffic violation hearings of which she was a part, proceedings before those courts do not offer the opportunity for an adequate consideration of that issue on the merits.

## G. Political Question Doctrine

Finally, as the last justiciability doctrine that might, in some way, be implicated by this case, the City and County Defendants argue that the plaintiffs have presented a non-justiciable political question. The political question doctrine is a "narrow exception" to the court's "responsibility to decide cases properly before it," limited to matters that "involve[] a political question . . . where there is a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it." *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 195 (2012) (quoting *Nixon v. United States*, 506 U.S. 224, 228 (1993)).

The City and County Defendants do not appeal to the actual formulation of the political question doctrine endorsed by the Supreme Court, but instead note, generally, that the alleged problems that the plaintiffs have identified could be solved by the Tennessee General Assembly,

rather than by court injunction. This is a true assertion that could be made in any case challenging a state policy. *See, e.g., Green Party of Tenn. v. Hargett*, 767 F.3d 533, 541 (6th Cir. 2014) (discussing Tennessee General Assembly's amending of a statute to address issue also raised in litigation). If the political question doctrine barred suit to challenge any constitutional violation that could be remedied by the General Assembly, it would eviscerate the principle of judicial review altogether. The defendants have not identified any textually demonstrable constitutional commitment of the issues raised by the plaintiffs to a political department of government, nor have the defendants established any lack of judicially discoverable and manageable standards underlying the plaintiffs' claims. Indeed, as the court's discussion below will attest, the federal courts have decided numerous cases under the rubric that the plaintiffs raise here. Indeed, dealing with issues of indigence is a common task of courts throughout the country.

Based on the court's reading of the City and County Defendants' arguments on this issue, their ultimate concern appears to be with the possibility that the court might craft injunctive relief that would not allow flexibility in the mechanisms pursuant to which the state and its local governments might address the need for indigence determinations. Those concerns, though legitimate, do not render the plaintiffs' claims non-justiciable and can be considered by the court at the remedies stage, should the plaintiffs prevail.

## H. Municipal Liability Under § 1983

The City and County Defendants argue, in the alternative, that the court should dismiss the claims against the cities and counties themselves because the plaintiffs have not alleged unconstitutional policies or customs on behalf of the respective cities and counties. To plead a claim for municipal liability under § 1983, a plaintiff must plausibly allege that her constitutional

rights were violated and that a policy or custom of the local government was the "moving force" behind the deprivation of her rights. *Miller v. Sanilac Cty.*, 606 F.3d 240, 254–55 (6th Cir. 2010) (citing *Powers*, 501 F.3d at 606–07). There are effectively four ways to establish municipal liability under § 1983:

> Plaintiff can challenge [1] the official action of a municipal legislative body, agency, or board; [2] a policymaking decision by an individual with final decision-making authority; [3] [the government's] deliberately indifferent failure to screen, train, or supervise its employees; or [4] [the government's] deliberate indifference to a clear and persistent pattern of illegal activity (a "custom") about which . . . policymakers knew or should have known.

*Okolo v. Metro. Gov't of Nashville*, 892 F. Supp. 2d 931, 941 (M.D. Tenn. 2012) (Sharp, J.) (citing *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483–84 (1986); *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989); *Thomas v. City of Chattanooga*, 398 F.3d 426, 433 (6th Cir. 2005)).

Whether one thinks of the respective clerks' practices regarding sending notices of nonpayment to TDSHS as policies or merely customs, they are plainly sufficient to support a claim of municipal liability under § 1983. As described by the plaintiffs, the clerks' notification policies are uniform and well-known. Although the City and County Defendants seek to downplay the policymaking authority of the clerk defendants, it is plain that, with regard to collection of traffic debt, the clerk is precisely the person with decision-making authority sufficient to support a claim of municipal liability, at least as the process is described in the Corrected Amended Complaint. Moreover, even if the clerks are not, in fact, the appropriate decision-makers, their respective governments have "acquiesce[d] in a longstanding practice or custom which constitutes the 'standard operating procedure' of the local governmental entity." *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989) (quoting *Pembaur*, 475 U.S. at 485–87

(White, J., concurring)). The court will not dismiss the plaintiffs' claims for failure to plead a policy or custom by the City and County Defendants.

**I. Propriety of Naming Cities as Defendants/Naming Clerks in their Official Capacities**

The City Defendants argue that the cities themselves should not have been named as defendants because the Mt. Juliet and Lebanon municipal courts are distinct from the cities themselves and, therefore, the cities should not be held liable for actions of the court clerks. In *Mancini v. City of Garfield Heights*, 37 F.3d 1499 (Table), 1994 WL 548830 (6th Cir. Oct. 6, 1994), the Sixth Circuit held, in an unpublished decision, that an Ohio municipality could not be held liable for the acts of its municipal courts "because municipal courts are part of the state court system and are not subject to the supervision of municipal governments." *Id.* at *2. As the plaintiffs point out, however, it appears that the City Defendants do possess some powers of supervision over their municipal courts. Mt. Juliet and Lebanon each have ordinances and/or charter provisions governing the structure and jurisdiction of their municipal courts, including provisions touching on powers related to traffic debt. *See* Lebanon, Tenn., City Charter, Art. X § 1 (defining jurisdiction of Lebanon City Court); id. § 2 (governing "[c]ollection and disposition of fines and court costs"); Lebanon, Tenn., Code. tit. 3, ch. 1 § 3-101 to -110 (setting forth ordinances governing Lebanon city court); Mt. Juliet, Tenn., Code, ch. 2, art. VI, § 2-148 to -146 (setting forth duties, powers, and qualifications for city judges).

Ultimately, the extent to which the clerk defendants operate under the supervision of, or independently from, the local governments in which they sit appears, to this court, to involve as many questions of fact as of law. It may be that the respective entities are so distinct that the Sixth Circuit's analysis in *Mancini* would similarly apply here. Based only on the allegations in

61

the Corrected Amended Complaint, however, the court cannot conclude that the cities should be dismissed on that ground before sufficient discovery has taken place.

The ambiguity that renders the court unable to dismiss the cities as unrelated to the underlying allegations also prevents the court from dismissing the clerks as duplicative parties. An official-capacity claim against a government officer "generally represent[s] only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985) (citing *Monell*, 436 U.S. at 690 n.55 (1978)). As the Sixth Circuit has noted, in an official-capacity suit, the government entity is "the only true defendant[ ]." *Alkire v. Irving*, 330 F.3d 802, 810 (6th Cir. 2003). Therefore, an official-capacity suit is "to be treated as a suit against the entity," so long as the entity "receives notice and an opportunity to respond" to the allegations. *Graham*, 473 U.S. at 166 (citing *Brandon v. Holt*, 469 U.S. 464, 471–72 (1985)). Further, an official-capacity claim against a government officer may be dismissed in favor of proceeding against the entity that is the true defendant. *See, e.g.*, *Turner v. Blount County*, No. 3:06–cv–471, 2008 WL 3852358 (E.D. Tenn. Aug. 14, 2008) (holding that county was actual defendant in official-capacity suit and dismissing claims against individual officers in their official capacities); *Hester v. City of Memphis*, No. 06–2407 B, 2007 WL 708568 (W.D.Tenn. Mar. 5, 2007) (dismissing official-capacity claims against individual officers where government employer was also named as a defendant).

Accordingly, insofar as the clerks are, indeed, in their official capacities merely stand-ins for the named city and county entities, dismissing the claims against them as duplicative, as the City and County Defendants urge, would be appropriate. As the City Defendants make clear, however, the relationship between a court clerk and the city or county in which the relevant court is situated is more fraught and unclear than, for example, whether Purkey, in his official

capacity, merely stands in for TDSHS as a whole. While it may, at some point, be appropriate to select one of these options—either dismissing some defendants as unrelated to the underlying practices or dismissing the respective clerks as named duplicatively—the court is unable, at this stage, to discern, with confidence, which of the two would be more appropriate, at least absent discovery. Accordingly, the court will not dismiss the named parties on these grounds.

## J. Timeliness of Claims Raised by Sprague and Gibbs

Purkey and the City Defendants argue that the court should dismiss the claims raised by Sprague and Gibbs as untimely, because they were filed more than a year after those plaintiffs became aware of the suspension of their licenses.[7] The statute of limitations applicable to a § 1983 action is the state statute of limitations applicable to personal injury actions under the law of the state in which the § 1983 claim arises." *Eidson v. Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 634 (6th Cir. 2007). The applicable limitations period in Tennessee is one year. Tenn. Code Ann. § 28-3-104(a); *see Howell v. Farris*, 655 F. App'x 349, 351 (6th Cir. 2016). "Although the applicable time period is borrowed from state law, the 'date on which the statute of limitations begins to run in a § 1983 action is a question of federal law.'" *Howell*, 655 F. App'x at 351 (quoting *Eidson*, 510 F.3d at 635). Under federal law, the limitations period ordinarily begins to run "when the plaintiff knows or has reason to know of the injury which is the basis of his action." *Id.* That is, the cause of action accrues upon the occurrence of the event that "should have alerted the typical lay person to protect his or her right." *Id.* (quoting *Kuhnle Bros., Inc. v. Cty. of Geauga*, 103 F.3d 516, 520 (6th Cir. 1997)). At that point, the plaintiff has a "complete and present cause of action," such that she may "file suit and obtain relief." *Johnson v. Memphis Light Gas & Water Div.*, 777 F.3d 838, 843 (6th Cir. 2015) (quoting *Wallace v. Kato*, 549 U.S. 384, 388 (2007)).

---

[7] The County Defendants do not raise the issue of timeliness in their Motion to Dismiss.

Sprague and Gibbs concede that their procedural due process claims based on suspensions that occurred more than a year before they filed suit are barred. Sprague, however, notes that she suffered later cumulative suspensions based on traffic debt to the City of Lebanon on September 15, 2016, and October 17, 2016, less than a year before the filing of the initial Complaint in this case. (Docket No. 111 ¶ 164.) The defendants argue that Sprague cannot rely on those later suspensions to state her claims under § 1983, because the relevant injury, the loss of her license, had already occurred. As the court has already explained, the defendants misconceive the nature of Sprague's injury. Each successive suspension or revocation poses a new, cumulative burden on the driver, at least as long as the driver has a bona fide and reasonable desire to obtain reinstatement. That burden is real, concrete, and quantifiable. The defendants identify no reason why Sprague should be prevented from challenging the independent burdens placed on her in 2016 simply because she was similarly injured the year before, when she received her traffic debt from the City of Mt. Juliet. Moreover, even with regard to Sprague's earlier, August 2016 Lebanon suspension, there is nothing in the Corrected Amended Complaint to suggest that Sprague had knowledge of that suspension until a point in time within the statute of limitations. Whether that particular challenge is timely, therefore, remains an issue of fact.

Sprague and Gibbs argue next that their constitutional claims, other than their procedural due process claims, can proceed with regard to all of the cited suspensions because the ongoing imposition of the suspensions amounts to a continuing violation of their rights. Under the continuing violation doctrine, a court may toll limitations periods for allegedly wrongful conduct that is continuing in nature. *See Nat'l R.R. Passenger Corp. V. Morgan*, 536 U.S. 101, 114 (2002). The doctrine applies when (1) the defendant's wrongful conduct continued after the

precipitating event; (2) injury to the plaintiff continued to accrue after that event; and (3) further injury to the plaintiff was avoidable if the defendants had at any time ceased their wrongful conduct. *Eidson*, 510 F.3d at 635 (citing *Tolbert v. State of Ohio Dep't of Transp.*, 172 F.3d 934, 940 (6th Cir.1999)). Federal courts are generally reluctant to apply the continuing violations doctrine to § 1983 actions. *See Sharpe v. Cureton*, 319 F.3d 959 (6th Cir. 2003) ("This Circuit employs the continuing violations doctrine most commonly in Title VII cases, and rarely extends it to § 1983 actions."); *McCune v. City of Grand Rapids*, 842 F.2d 903, 906 (6th Cir. 1988) (refusing to consider false arrest claim as a "continuing violation"); *Mann v. Compton*, 2007 WL 854725, at *2 (E.D. Ky. Mar. 16, 2007) (holding that continuing violation doctrine did not apply to toll false arrest claim, where plaintiff remained incarcerated following arrest). Nevertheless, the Sixth Circuit has made clear that the doctrine "applies in appropriate contexts" in § 1983 cases. *Guba v. Huron Cty.*, 600 F. App'x 374, 380 (6th Cir. 2015).

As another judge of this court recently observed, determining whether a particular § 1983 claim presents a continuing violation depends, in significant part, on the court's determining "what constitutes the defendant's 'wrongful conduct'"—as identifying the wrongful conduct at issue is central to both the first and third elements of the Sixth Circuit's test. *Doe v. Haslam*, No. 3:16-CV-02862, 2017 WL 5187117, at *11 (M.D. Tenn. Nov. 9, 2017) (Crenshaw, C.J.). Defining the wrongful conduct, in turn, "is closely related to the nature of the constitutional protection at issue." *Id.* at *12. As the Sixth Circuit demonstrated in *Kuhnle Brothers., Inc. v. County of Geauga*, 103 F.3d 516 (6th Cir. 1997), the same general pattern of events may present either a continuing or a non-continuing violation, depending on the constitutional lens through which those events are viewed. In *Kuhnle Brothers*, the plaintiff, relying on a number of different constitutional provisions, challenged a county resolution that barred truck traffic from a

particular stretch of road that had been the subject of a prior settlement agreement between the plaintiff and the county. *Id.* at 518–19. The court held that the plaintiff's Takings Clause claim and its substantive due process claim based on deprivation of property were time-barred because the plaintiff sued more than two years after the county passed its resolution in alleged violation of the settlement agreement, thereby allegedly depriving the plaintiff of its property interest. *Id.* at 521. The court, however, held that the plaintiff's substantive due process claim for deprivation of liberty was timely because the county's ongoing prohibition of use of the road constituted a continuing violation:

> The resolution . . . barred Kuhnle from using the roads in question on an ongoing basis, and thus actively deprived Kuhnle of its asserted constitutional rights every day that it remained in effect. A law that works an ongoing violation of constitutional rights does not become immunized from legal challenge for all time merely because no one challenges it within two years of its enactment. "[T]he continued enforcement of an unconstitutional statute cannot be insulated by the statute of limitations."

*Id.* at 521–22 (quoting *Va. Hosp. Ass'n v. Baliles*, 868 F.2d 653, 663 (4th Cir. 1989), *aff'd sub nom. Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498 (1990)).

TDSHS's ongoing deprivation of the plaintiffs' rights to drive—and its ongoing maintenance of barriers to reinstatement—seem to this court analogous to the right to use of the roads at issue in *Kuhnle Brothers*. The plaintiffs do not merely challenge the fact that their driver's licenses were taken away a few years ago. They challenge the fact that they cannot get those licenses back today or in the future without satisfying traffic debt that they are unable to pay due to their current, not merely historical, indigence. Viewed from the perspective of equal protection, the plaintiffs' injuries include the fact that the state's scheme currently treats them differently from otherwise identical non-indigent drivers, by allowing those drivers to have their suspensions lifted by making payments that the plaintiffs cannot make. That injury arises out of

the situation that TDSHS is currently imposing on the plaintiffs based on their current economic circumstances—not merely the past suspension decision.

Purkey's argument that TDSHS is not engaged in ongoing allegedly wrongful conduct might be more persuasive if, once a debtor's license was suspended, that suspension lasted for a fixed period of time, regardless of whether the debtor paid her debt. Continuing such a suspension arguably would not involve continuing to treat indigent debtors differently than non-indigent debtors, because the suspensions, once on the books, would be identical. TDSHS's implementation of its regime, however, expressly assumes that a driver may have her suspension lifted once her debt is paid. The differential treatment between indigent and non-indigent debtors, therefore, is ongoing. The plaintiffs' injuries, moreover, could have been remedied at any time by TDSHS dropping their suspensions. Sprague and Gibbs, therefore, satisfy the first and third requirements for a continuing violation with regard to Purkey. They also satisfy the second requirement, because their injury has continued to accrue as along as their suspensions have been in place. Sprague and Gibbs, therefore, have pled a continuing violation with regard to Purkey.

Satisfying the elements of a continuing violation with regard to Purkey, however, does not necessarily establish a continuing violation with regard to the City Defendants. Because TDSHS oversees the state's system of licensing drivers and would administer any reinstatement or denial thereof, Purkey's involvement in the alleged deprivation of the plaintiffs' rights is ongoing. The City Defendants' active roles in the plaintiffs' suspensions, in contrast, concluded when they sent their initial notices of nonpayment to TDSHS, thereby giving rise to TDSHS's authority to suspend under Tenn. Code Ann. § 55-50-502(a)(1)(H) or (I). While the City Defendants have done nothing to alleviate the burden they played a role in initially imposing,

mere inaction is generally insufficient to establish a continuing violation. *Eidson*, 510 F.3d at 637 (finding no continuing violation, where plaintiff alleged that state "continued to fail to conduct the sort of thorough investigation that would have exonerated him"). Accordingly, a defendant's "failure to rectify a prior [wrongful] act is not sufficient to meet the standard for invoking the continuing-violations doctrine." *Pittman v. Spectrum Health Sys.*, 612 F. App'x 810, 813 (6th Cir. 2015).

Sprague suggests that Mt. Juliet may have engaged in a continuing violation or later-arising wrongful acts by failing to permit her to enter into payment plans with regard to her traffic debt. That argument, though, flies in the face of Sprague's own theory of the case—a theory of the case that, the court notes, was instrumental in allowing her to overcome several jurisdictional limitations discussed above. Sprague is not suing for the right to a payment plan; the cases she cites do not support a right to a payment plan; and if the court were to consider her right to a payment plan, the risk of running afoul of *Rooker-Feldman* would be much higher. What Sprague is actually suing about is the suspensions that have been placed on her driver's license. Mt. Juliet's role in imposing those suspensions concluded when its notice was sent to TDSHS. Sprague, therefore, cannot establish the first element of a continuing violation—continuing wrongful conduct—with regard to her claims against Mt. Juliet. Those claims, therefore, must be dismissed.

Finally, Sprague and Gibbs ask the court to recognize timely procedural due process claims based on "Reinstatement Requirements" letters that they obtained from TDSHS between November 2016 and September 2017. (Docket No. 111 ¶¶ 168, 170, 177, 206, 208.) The Corrected Amended Complaint describes little about the process pursuant to which the letters were generated or issued, although it does suggest that they were "sought and obtained" by the

plaintiffs. (*Id.* ¶¶ 177, 206.) The Corrected Amendment Complaint does not state that the letters were tied to any particular precipitating event, other than their having been requested. In their briefing, the plaintiffs state that they obtained the letters "from [TDSHS's] website." (Docket No. 143 at 61.)

Gibbs and Sprague argue that those letters are the equivalent of a denial of reinstatement without providing the hearing to which they claim to be entitled—and, therefore, the letters constitute fresh deprivations of procedural due process. Purkey responds that those letters were simply statements of TDSHS's policy with regard to their cases, not any fresh deprivation or violation. Purkey's characterization is borne out by the Corrected Amended Complaint itself. The plaintiffs do not allege that the letters were issued in response to any particular request for a hearing or a reconsideration of their suspensions. As described, they seem to be essentially informational documents.

Generally speaking, "[i]n procedural-due-process claims . . . , a plaintiff's injury accrues at the time that process was denied because 'the allegedly infirm process is an injury in itself.'" *Am. Premier Underwriters, Inc. v. Nat'l R.R. Passenger Corp.*, 839 F.3d 458, 461 (6th Cir. 2016) (quoting *Nasierowski Bros. Inv. Co. v. City of Sterling Heights*, 949 F.2d 890, 894 (6th Cir. 1991)). Accordingly, the plaintiffs have pleaded causes of action for deprivation of procedural due process that accrued at the time when TDSHS implemented each suspension without the plaintiff having been afforded the opportunity for a hearing on his/her indigence. The plaintiffs do not dispute that interpretation, but argue that the denial of due process re-accrues each time they inquire about reinstatement and are similarly told they are not entitled to an indigence hearing. A "mere[] . . . reaffirmation" of a previous position, however, is not enough to start a plaintiff's statute of limitations anew. *DXS, Inc. v. Siemens Med. Sys.*, Inc., 100 F.3d 462, 467

(6th Cir. 1996). The plaintiffs have identified no cases suggesting that, when a plaintiff is denied a hearing in violation of due process but the statute of limitations fully runs on her claim, she can state a new claim simply by obtaining a letter from the defendant confirming its position that no such hearing is due. The letters merely restating TDSHS's policies, therefore, do not give rise to new causes of action.

The court, accordingly, will dismiss (1) the claims, raised by Sprague and Gibbs against any defendant, for violation of procedural due process with regard to suspensions of which they had notice prior to September 13, 2016; and (2) all other claims, raised by Sprague against the City Defendants, based on those same suspensions—resulting, consequently, in the dismissal of Gaskill and the City of Mt. Juliet as parties.

## IV. MERITS OF THE UNDERLYING CLAIMS[8]

The defendants argue that, insofar as the court concludes that the plaintiffs' claims are timely and justiciable, it should still dismiss those claims because the plaintiffs have failed, on the merits, to state actionable claims. To prevail on a claim under § 1983, a plaintiff must prove two elements: (1) that she was deprived of a right secured by the Constitution or laws of the United States; and (2) that the deprivation was caused by a person acting under color of law. *Robertson v. Lucas*, 753 F.3d 606, 614 (6th Cir. 2014). The defendants argue that the plaintiffs fail to satisfy the first element, because they cannot establish that the suspension of their driver's licenses for nonpayment of traffic debt deprived them of any constitutional right. In response, the plaintiffs argue that the state's system of suspending traffic violators' licenses for nonpayment of traffic debt regardless of ability to pay is unconstitutional under a straightforward application of a number of Supreme Court cases, starting with *Griffin v. Illinois*, 351 U.S. 12 (1956). *See also*

---

[8] The court's analysis of the merits of the plaintiffs' claims overlaps, in significant part, with its consideration of the same constitutional principles, and their application to driver's license revocations, in *Thomas v. Purkey*, No. 3:17-cv-00005 (M.D. Tenn.).

*Williams v. Illinois*, 399 U.S. 235 (1970); *Tate v. Short*, 401 U.S. 395 (1971); *Mayer v. City of Chicago*, 404 U.S. 189 (1971); *James v. Strange*, 407 U.S. 128 (1972); *Bearden v. Georgia*, 461 U.S. 660 (1983). The defendants argue that the state's scheme is subject only to rational basis review, which it survives. *See Midkiff v. Adams Cty. Reg'l Water Dist.*, 409 F.3d 758, 770 (6th Cir. 2005) ("Under rational basis review, the governmental policy at issue will be afforded a strong presumption of validity and must be upheld as long as there is a rational relationship between the disparity of treatment and some legitimate government purpose." (citations & internal quotation marks omitted)).

## A. Indigence Exceptions in Criminal and Quasi-Criminal Cases under the Constitution

### 1. The Griffin Cases

Starting with *Griffin*, and continuing through several cases decided over the ensuing decades, the Supreme Court set forth certain core protections due to indigent persons—primarily criminal defendants—under the constitutional guarantees of due process and equal protection. In *Griffin*, the Supreme Court, through divided opinions, held that the State of Illinois had violated both the Due Process and Equal Protection Clauses of the Fourteenth Amendment by failing to furnish trial transcripts to criminal defendants who needed the transcripts to obtain appellate review of their convictions but were unable to afford the required fees. Justice Black, writing the lead opinion, explained that, although Illinois' requirements, on their face, applied equally to all criminal appellants, their effect was "to deny adequate appellate review to the poor while granting such review to all others," which, the full majority agreed, was impermissible under the Constitution. *Griffin*, 351 U.S. at 13.

There are aspects of the analysis in *Griffin*—though not, necessarily, its holding—that seem to pose a challenge in terms of reconciling the case with the rules that govern constitutional

cases today. Now, every law student is encouraged to learn the ordinary formula for considering a challenge under the Equal Protection Clause: "If a protected class or fundamental right is involved, [the court] must apply strict scrutiny, but where no suspect class or fundamental right is implicated, this Court must apply rational basis review." *Midkiff,* 409 F.3d at 770 (citing *Hadix v. Johnson*, 230 F.3d 840, 843 (6th Cir. 2000)). The *Griffin* Court, however, did not explain its holding in terms of either "rational basis" or "strict scrutiny," presumably because those rubrics had not yet taken the firm hold they now possess over so much constitutional litigation. *See Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2327 (2016) (Thomas, J., dissenting) (observing that "[o]nly in the 1960's did the Court begin in earnest to speak of 'strict scrutiny' versus reviewing legislation for mere rationality, and to develop the contours of these tests"). Rather, Justice Black explained the Court's holding as an extension of the basic principle, dating in its roots at least back to the Magna Carta, that "due process and equal protection both call for procedures in criminal trials which allow no invidious discriminations between persons and different groups of persons." *Griffin*, 351 U.S. at 16–17.

Justice Black stressed that Illinois' scheme offended the Constitution, even though the Constitution itself did not require Illinois to provide any appellate courts at all. *Id.* at 18 (citing *McKane v. Durston*, 153 U.S. 684, 687–88 (1894)). Justice Frankfurter's opinion completing the majority echoed Justice Black in the relevant respects, observing that "[l]aw addresses itself to actualities," and "[i]t does not face actuality to suggest that Illinois affords every convicted person, financially competent or not, the opportunity to take an appeal," if indigent persons do not have a mechanism to receive an adequate transcript. *Id.* at 22 (Frankfurter, J., concurring in judgment). Accordingly, "when a State deems it wise and just that convictions be susceptible to review by an appellate court, it cannot by force of its exactions draw a line which precludes

convicted indigent persons . . . from securing such a review merely by disabling them from bringing" an effective notice of appeal. *Id.* at 23.

In the years following *Griffin*, the Supreme Court decided several cases expanding that case's principle to secure additional rights to indigents working their way through the criminal justice system. *See, e.g.*, *Douglas v. California*, 372 U.S. 353, 357–58 (1963) (holding that indigent defendants are entitled to counsel on their first direct appeal); *Roberts v. LaVallee*, 389 U.S. 40, 42 (1967) (holding that indigent defendants are entitled to a free transcript of the preliminary hearing for use at trial). In *Williams v. Illinois*, the Court extended the logic of *Griffin* to hold that a court could not increase an indigent defendant's imprisonment past her maximum sentence, based solely on her inability to pay fines arising out of her conviction. 399 U.S. at 242. In so doing, the Court stressed that a statute's lack of an exception for indigent persons was the equivalent of improperly imposing a greater punishment based solely on an individual's inability to pay:

> Since only a convicted person with access to funds can avoid the increased imprisonment, the Illinois statute in operative effect exposes only indigents to the risk of imprisonment beyond the statutory maximum. By making the maximum confinement contingent upon one's ability to pay, the State has visited different consequences on two categories of persons since the result is to make incarceration in excess of the statutory maximum applicable only to those without the requisite resources to satisfy the money portion of the judgment.

*Id.* The Court stressed that its holding did not render the state "powerless to enforce judgments against those financially unable to pay a fine," but rather merely required it to avail itself of the "numerous alternatives" on which it could rely to enforce the convicted person's debts without unconstitutionally imposing a greater maximum sentence on the indigent than the non-indigent. *Id.* at 244. The purpose of *Griffin*, the *Williams* Court explained, was not to eliminate costs and

fees, but to "to alleviate discrimination against those who are unable to meet the costs of litigation in the administration of criminal justice." *Id.* at 241.

In *Tate v. Short*, the Court considered whether the rule set out in *Williams* applied to a debtor who, unable to pay the fines he had accumulated for traffic offenses, had been committed by a court to service at a municipal farm where he would work "to satisfy the fines at the rate of five dollars for each day." 401 U.S. at 397. The court ordering him to the farm had original jurisdiction over only offenses for which there was no possibility of confinement, but it had been granted the authority to order confinement based on failure to pay fines. *Id.* at 396 n.2. The Supreme Court concluded that, "[a]lthough the instant case involves offenses punishable by fines only, petitioner's imprisonment for nonpayment constitutes precisely the same unconstitutional discrimination [as in *Williams*] since, like Williams, petitioner was subjected to imprisonment solely because of his indigency." *Id.* at 397–98. Again, the Court emphasized that the constitutional defect was not in the act of imposing a consequence on nonpayment, but in the fact that applying that consequence to a truly indigent person had the practical effect of imposing greater punishment based on the economic status of the violator. *Id.* at 401 ("We emphasize that our holding today does not suggest any constitutional infirmity in imprisonment of a defendant with the means to pay a fine who refuses or neglects to do so.").

In *Mayer v. City of Chicago*, the Court considered whether the *Griffin* right to an adequate appellate record applied in cases where the defendant faced only the threat of a fine, rather than imprisonment. The defendant in *Mayer* "urge[d]" the Court to adopt a "distinction to set this case apart from *Griffin* and its progeny": namely, "that the defendants in all the transcript cases previously decided . . . were sentenced to some term of confinement," whereas the accused in *Mayer* was "not subject to imprisonment, but only a fine." 404 U.S. at 196. The Court rejected

any suggestion that the rights set forth in *Griffin* and subsequent cases were at all contingent on a person's facing the threat of incarceration:

> This argument misconceives the principle of *Griffin* . . . . [I]ts principle is a flat prohibition against pricing indigent defendants out of as effective an appeal as would be available to others able to pay their own way. The invidiousness of the discrimination that exists when criminal procedures are made available only to those who can pay is not erased by any differences in the sentences that may be imposed.

404 U.S. at 196–97. The Court explained that the basis for its holdings since *Griffin* was that refusing to allow an exception for the indigent was, as a constitutional matter, no different from adopting an "unreasoned distinction" punishing indigents more severely than non-indigents for reasons unrelated to their guilt or culpability. *Id.* at 193 (quoting *Rinaldi v. Yeager*, 384 U.S. 305, 310 (1966)). The Court also rejected the argument that it should decline to apply the *Griffin* cases because the offenses at issue were misdemeanors, reasoning that "[t]he size of the defendant's pocketbook bears no more relationship to his guilt or innocence in a nonfelony than in a felony case." *Id.* at 196.

Finally, in *Bearden v. Georgia*, the Court held that Georgia could not revoke an individual's probation for failure to pay a fine or make restitution without first finding that the probationer was responsible for that failure or that alternative forms of punishment were inadequate. 461 U.S. at 672–73. The Court explained that "depriv[ing] the probationer of his conditional freedom simply because, through no fault of his own, he [could not] pay the fine" was "contrary to the fundamental fairness required by the Fourteenth Amendment." *Id.* The *Bearden* Court took the opportunity to consider the *Williams* line of cases in the context of developments in the law emphasizing the now-commonplace tiered system of judicial review of state actions, noting that "[t]he parties, following the framework of *Williams* and *Tate*, have argued the question primarily in terms of equal protection, and debate vigorously whether strict

scrutiny or rational basis is the appropriate standard of review." *Id.* at 665. The Court, however, noted that the considerations at issue occupied a place in the Court's constitutional case law where "[d]ue process and equal protection principles converge" and required a more searching analysis:

> Whether analyzed in terms of equal protection or due process, the issue cannot be resolved by resort to easy slogans or pigeonhole analysis, but rather requires a careful inquiry into such factors as "the nature of the individual interest affected, the extent to which it is affected, the rationality of the connection between legislative means and purpose, [and] the existence of alternative means for effectuating the purpose . . . ."

*Id.* at 666–67 (quoting *Williams*, 399 U.S. at 260 (Harlan, J., concurring)).

### *2.* **Johnson v. Bredesen**

The Sixth Circuit gave substantial consideration to the *Griffin* line of cases in *Johnson v. Bredesen*, in which the court held that Tennessee's law requiring felons to pay child support and restitution before having their voting rights restored did not offend constitutional principles, despite lacking an indigence exception. 624 F.3d 742, 750 (6th Cir. 2010). The majority opinion in *Johnson* faulted *Griffin* and *Williams* for "fail[ing] to articulate a precise standard of review" but ultimately concluded that the *Griffin* line of cases was inapposite, because those cases "concerned fundamental interests"—namely, physical liberty and access to the courts—that made the laws at issue "subject to heightened scrutiny." *Id.* at 749. Because the *Johnson* court considered the felons' re-enfranchisement interests non-fundamental and because "a class of less wealthy individuals is not a suspect class," *Molina-Crespo v. U.S. Merit Sys. Prot. Bd.*, 547 F.3d 651, 660 (6th Cir. 2008) (citing *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 29 (1973)), the court applied only rational basis review.

*Johnson v. Bredesen* is the law of this circuit, and the court will apply it here. The court pauses to note, however, that the simple tiers-of-scrutiny analysis that the Sixth Circuit

considered adequate in *Johnson* cannot simply be substituted for a consideration of the full line of *Griffin* cases without losing quite a bit in the translation. As the court will explain, one must be careful not to read *Johnson* in a way that (1) directly contradicts *Bearden*, (2) misstates the basis of the rights set forth in the earlier *Griffin* cases, or (3) loses a level of nuance that, as even the *Johnson* majority itself acknowledged, applies in cases where the statute at issue not only affects indigents but threatens to exacerbate their already precarious economic circumstances. The court's application of *Johnson* then, will be one that strives to read its holding in harmony with, rather than as a repudiation of, the Supreme Court cases that preceded it.

The parties in *Bearden* "debate[d] vigorously whether strict scrutiny or rational basis [was] the appropriate standard of review," but the Court rejected those arguments on the ground that such "easy slogans" and "pigeonhole analysis" were insufficient to the "careful analysis" required by the overlap of the due process and equal protection interests at issue under *Griffin*. *Bearden*, 461 U.S. at 665–66. Fitting the principles underlying *Griffin* into the simple categories sufficient for an ordinary equal protection case, the Court wrote, was a task "too Procrustean to be rationally accomplished." *Id.* at 667 n.8 (quoting *North Carolina v. Pearce*, 395 U.S. 711, 723 (1969)). The Sixth Circuit, in *Johnson*, acknowledges these statements but nevertheless applies its own gloss on *Bearden*, assuring the reader that, whatever the Supreme Court said, what it meant was that the Court was applying heightened scrutiny because the fundamental right to physical liberty was at issue. 624 F.3d at 749. It is difficult for this court to see how *Bearden* supports such a reading. In any event, it is sufficient to say that the Sixth Circuit's conclusion was that the nature of the rights at issue in *Bearden* and *Johnson* justified the differing analyses, but that *Bearden* remained and remains good law.[9]

---

[9] Purkey seems to suggest that the reasoning set forth in *Griffin* through *Bearden* was rendered obsolete by the Supreme Court's brief analysis of those cases in *M.L.B. v. S.L.J.*, 519 U.S. 102 (1996). In *M.L.B.*,

Moreover, the *Johnson* majority's contention that the puzzle of the *Griffin* cases can be solved by noting that those cases involved "fundamental interests"— freedom from confinement and access to courts—seems, at first, to be difficult to square with the precedents themselves. In *Mayer v. City of Chicago*, the Supreme Court, considering a scheme involving fines only, expressly considered and rejected the argument that the rule of *Griffin* was premised on a threat to the defendant's physical liberty. 404 U.S. at 196–97. To the contrary, the Court explained that its holdings arose from the premise that imposing a harsher punishment on a person due to his indigence amounted to relying on an "'unreasoned distinction' proscribed by the Fourteenth Amendment." 404 U.S. at 193, 196 (quoting *Rinaldi*, 384 U.S. at 310); *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 111 (1996) ("*Griffin*'s principle has not been confined to cases in which imprisonment is at stake."). On the other end of the spectrum, the possibility that the *Griffin* cases are about freedom from physical restraint and access to the courts is belied by the fact that the Supreme Court has expressly *declined* to apply them in some cases where those interests were implicated. *See United States v. MacCollum*, 426 U.S. 317, 328–29 (1976) (holding that *Griffin* does not apply in cases involving an indigent person's right to obtain a transcript to assist him in obtaining collateral relief); *Ross v. Moffitt*, 417 U.S. 600, 618 (1974) (holding that *Griffin* does not grant a right to appointed counsel in a discretionary appeal). Whatever principle is at work in *Griffin*, then, it is clearly less simple than determining whether access to courts or a risk of confinement is directly implicated, even if that distinction was sufficient to resolve the issue presented by *Johnson*.

---

the Supreme Court considered the constitutionality of a Mississippi scheme that premised a parent's appeal of the termination of her parental rights on her payment of over $2,000 in record preparation fees. *Id.* at 106. In striking down Mississippi's scheme, the Court did indeed use the language of "fundamental interest[s]." *Id.* at 113. The analysis in *M.L.B.*, however, was expressly premised on the fact that the proceeding at issue was neither criminal nor quasi-criminal in nature. *Id.* at 112–13.

Ultimately, even the *Johnson* majority opinion concedes that more is going on in its talk of "fundamental interests" than a binary question of whether the statute at issue impinges on something that the courts have identified as a "fundamental right" under the Constitution. At one point, the *Johnson* court is called on to distinguish *James v. Strange*, 407 U.S. 128, which the court will discuss in more detail with regard to Count III below. The law at issue in that case, like this one, involved the collection of court-related debt from people who had faced criminal charges. The Court invalidated the *Strange* scheme under what appeared to be rational basis review, although the *Johnson* court construed the *Strange* opinion as having set a higher bar than was required for Tennessee's re-enfranchisement statute. The *Johnson* court, rather, concluded that the analysis in *Strange* did not apply to *Johnson* because *Strange* involved a scheme that, by further impoverishing already-indigent debtors, endangered "the hopes of indigents for self-sufficiency and self-respect," whereas *Johnson* involved a "mere 'statutory benefit.'" *Johnson*, 624 F.3d at 749 (quoting *Strange*, 407 U.S. at 135; *Harvey v. Brewer*, 605 F.3d 1067, 1079 (9th Cir. 2010).). But self-sufficiency and self-respect have never been recognized by the Sixth Circuit or the Supreme Court as fundamental rights in a constitutional sense. *Cf. Cutshall v. Sundquist*, 193 F.3d 466, 479 (6th Cir. 1999) (recognizing the lack of cases recognizing a constitutional "general right to private employment"). Under *Johnson* then, an at least somewhat elevated version of rational basis review would seem to be required in a case where a scheme was alleged to discriminatorily endanger an indigent person's basic subsistence and capacity for self-sufficiency.

The tiered system of scrutinies has its advantages and, for a large portion of constitutional cases, is sufficient to resolve the questions at hand. The problem is that this is one area of law where the Supreme Court has said, in no uncertain terms, that a different set of tools is called for.

Ignoring those holdings in favor of a two-sizes-fit-all approach does not afford the Supreme Court's cases the precedential weight to which they are entitled. As much as Purkey may argue that the standard, tiered framework is inescapable and unbending, the reality is that the jurisprudence of the Supreme Court says otherwise. In *Bearden* and elsewhere, the Supreme Court has recognized that, in select areas, "more is involved . . . than the abstract question whether [the challenged law] discriminates against a suspect class, or whether [the matter at issue] is a fundamental right." *Plyler v. Doe*, 457 U.S. 202, 223 (1982). While this court has no appetite for inventing new areas for departure from the standard framework, it also sees no ground for ignoring the exceptions that the Supreme Court has already established.

## B. Count I

Count I challenges the state's suspension scheme, under the Due Process and Equal Protection Clauses, based on the framework first set forth in *Griffin* and refined, in this Circuit, by *Johnson*. The above caveats aside, the defendants are correct that *Johnson* calls on us to consider whether suspensions under Tenn. Code Ann. § 55-50-502(a)(1)(H) and (I) bear on a fundamental interest and apply rational basis review if they do not. The Sixth Circuit has held that "there is no fundamental right to drive a motor vehicle" under the Constitution. *Duncan v. Cone*, No. 00-5705, 2000 WL 1828089, at *2 (6th Cir. Dec. 7, 2000). The use of a motor vehicle is, however, closely tied to the exercise of rights that have been found to give rise to heightened constitutional protection. It is well settled that "the Supreme Court has recognized a protected right to interstate travel." *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 534 (6th Cir. 2007) (citing *Saenz v. Roe*, 526 U.S. 489, 500 (1999)). The Sixth Circuit, moreover, has gone a step further and "has recognized a protected right to intrastate travel, i.e., 'a right to travel locally through public spaces and roadways.'" *Id.* (quoting *Johnson v. City of Cincinnati*, 310

F.3d 484, 494–98 (6th Cir. 2002)); *see also Fowler v. Johnson*, No. CV 17-11441, 2017 WL 6379676, at *8 (E.D. Mich. Dec. 14, 2017). That right, as recognized in this circuit, does not generally prohibit the state from denying "a single mode of transportation," such as driving, to an individual. *Fowler*, 2017 WL 6379676, at *8 (collecting cases). A law may "implicate[] the right to travel," however, "when it actually deters travel, when impeding travel is its primary objective, or when it uses a classification that serves to penalize the exercise of the right." *League of United Latin Am. Citizens*, 500 F.3d at 535 (citing *Attorney Gen. of N.Y. v. Soto-Lopez*, 476 U.S. 898, 903 (1986)).

The Sixth Circuit has demonstrated a willingness to consider laws governing the right to drive under that rubric, to determine whether "[s]omething more than a negligible or minimal impact on the right to travel" exists, thereby potentially triggering a heightened level of scrutiny. *Id.* (citing *State of Kansas v. United States*, 16 F.3d 436, 442 (D.C. Cir. 1994)). Attention to modes of transport would seem to be particularly important where, as here, the legal matter at issue, by definition, involves people with especially limited resources. A right to intrastate travel that assumes that a homeless person who cannot afford to pay a speeding ticket can simply hop into a cab or summon an Uber or a Lyft on a regular basis would not seem to be a right that recognizes the specific solicitude afforded to indigent persons in the criminal justice system under *Griffin*, *Williams*, *Tate*, *Mayer*, and *Bearden*.

Consistently with the Sixth Circuit's prior decisions, the court will not consider the state's license suspension regime as subject to heightened scrutiny merely because it bears, in some way, on a person's ability to use the roads. At the same time, however, the court notes that, as the degree of the burden imposed increases, a scheme that hinges on taking away one's right to drive gets closer and closer to the rights to which the Constitution affords special protection.

Moreover, the right at issue here bears substantially on the debtor's interest in self-sufficiency, which the Sixth Circuit recognized, in *Johnson*, to justify an at least somewhat more searching standard of review. The defendants' contention that *Johnson* mandates the application of ordinary rational basis review here, therefore, is questionable.

Nevertheless, even if only the lowest standard of judicial review applies, this court cannot conclude, categorically, that the state's policy of suspending the license of every driver about whom it receives a notice of nonpayment, without any inquiry into the driver's indigence, passes constitutional muster. "Under rational basis review, a law is upheld so long as it is rationally related to a legitimate government purpose. There is a strong presumption of constitutionality and the regulation will be upheld so long as its goal is permissible and the means by which it is designed to achieve that goal are rational." *Liberty Coins, LLC v. Goodman*, 748 F.3d 682, 694 (6th Cir. 2014) (citing *Nat'l Ass'n for Advancement of Psychoanalysis v. Cal. Bd. of Psychology*, 228 F.3d 1043, 1050 (9th Cir. 2000)). The plaintiffs do not dispute that collecting fines, costs, and taxes from traffic law violators who can actually pay them is, generally speaking, a legitimate government purpose. Insofar as the state's suspension scheme applies to traffic law violators who can actually pay their fines, costs, and litigation taxes, the rational relationship between suspensions and that purpose is clear: the threat of a suspension is likely to coerce the driver into paying a debt that she might otherwise avoid. That rationale, however, does not extend to the policy at issue here—suspending the licenses of indigent drivers who are simply incapable of paying the debts imposed on them, as opposed to being unwilling to do so. Visiting a harsh consequence on "someone who through no fault of his own is unable to make" the payment sought "will not make [payment] suddenly forthcoming." *Bearden*, 461 U.S. at 670. No person can be threatened or coerced into paying money that she does not have and cannot get.

*See Johnson*, 624 F.3d at 757–58 (Moore, J., dissenting) ("The attempt to incentivize payments that an individual is simply incapable of making . . . , particularly when there are other collection methods available, advances no purpose and embodies nothing more than an attempt to exercise unbridled power over a clearly powerless group, which is not a legitimate state interest.").

The defendants also appeal to a broad range of other legitimate government purposes related to the regulation of traffic in the state, such as promotion of public safety and the need to ensure that drivers on the state's roads are insured. *See, e.g.*, *Shoemaker v. City of Howell*, 795 F.3d 553, 567 (6th Cir. 2015). Those purposes may justify the traffic laws that traffic debt flows out of, but the plaintiffs do not challenge those laws or the fact that violating traffic laws may result in fines. They are challenging the imposition of a particular collection mechanism in a particular way. Even under rational basis review, the state must show that the actual law challenged is rationally related to a legitimate purpose—not that it is adjacent to laws that are related to that purpose. There is no rational-basis-by-association. The defendants are correct, however, that the state has legitimate government interests in promoting compliance with court orders and collection of traffic debt. *See Johnson*, 624 F.3d at 747 ("Tennessee possesses valid interests in . . . requiring criminals to fulfill their sentences, and encouraging compliance with court orders.") (citing *Blackhawk Mining Co. v. Andrus*, 711 F.2d 753, 757–58 (6th Cir. 1983)). Insofar as the defendants wish to argue that the suspension regime furthers the purposes of the state's traffic laws, because collection of traffic debt makes those laws more effective, it is of no moment, because, in order to reach that wide range of additional ostensible purposes, the suspensions regime still must pass the initial test of showing its rational relationship to debt collection. It makes no difference to rational basis review if the defendants show "rational relationship to debt collection" or "rational relationship to debt collection and, therefore, several

other, also-legitimate, second-order objectives." In any event, the existence of a legitimate government purpose is undisputed.

However, the defendants, in their assertion of rational basis scrutiny, have skipped an important preliminary inquiry. As the *Griffin* cases demonstrate, before the court applies any level of scrutiny, it must take the preliminary analytic step of defining precisely what "the law" that is being challenged is. Under *Griffin* and its progeny, the answer is clear: this court is bound to consider the defendants' imposition of suspensions for nonpayment of traffic debt, without providing for an exception for those willing, but unable, to pay, as the equivalent of a statute that imposes a harsher sanction on indigent debtors than their non-indigent peers. *See Griffin*, 351 U.S. at 13 ("There is no meaningful distinction between a rule which would deny the poor the right to defend themselves in a trial court and one which effectively denies the poor an adequate appellate review accorded to all who have money enough to pay the costs in advance."); *Williams*, 399 U.S. at 242 ("Since only a convicted person with access to funds can avoid the increased imprisonment, the Illinois statute in operative effect exposes only indigents to the risk of imprisonment beyond the statutory maximum. By making the maximum confinement contingent upon one's ability to pay, the State has visited different consequences on two categories of persons since the result is to make incarceration in excess of the statutory maximum applicable only to those without the requisite resources to satisfy the money portion of the judgment."); *Mayer*, 404 U.S. at 193 (reaffirming that *Griffin* established a prohibition on laws that, in practical effect, created an "unreasoned distinction[]" between the indigent and non-indigent).

In other words, if the scheme at issue affords no adequate exception based on indigence, *Griffin* and the cases applying it instruct this court to consider that scheme as the constitutional

equivalent of the state's "us[ing,] as the sole justification for" its action, "the poverty of" the

defendant. *Bearden*, 461 U.S. at 671. The court must "address[] itself to actualities," *Griffin*, 351

U.S. at 22, and treat TDSHS's policy as what it, as a practical matter, is: a rule that guarantees

that an indigent person will lose her license while giving a non-indigent person the opportunity

not to. That the law is "nondiscriminatory on its face" does not negate the fact that imposing a

payment obligation on the indigent "may be grossly discriminatory in its operation."[10] *Williams*,

399 U.S. at 242 (quoting *Griffin*, 351 U.S. at 17 n.11). Such a distinction poses constitutional

problems, the Supreme Court has stressed, not merely because it might, in some instances, bear

on a fundamental right, but because the distinction itself is "unreasoned." *Mayer*, 404 U.S. at 193

(quoting *Rinaldi* , 384 U.S. at 310).

The *Johnson* court grappled with this question and concluded that the differential

treatment of indigent prospective voters was permissible in relation to the state's goal of ensuring

payment of child support and restitution generally. The court wrote that "[t]he legislature may

have been concerned, for instance, that a specific exemption for indigent felons would provide an

incentive to conceal assets and would result in the state being unable to compel payments from

some non-indigent felons." 624 F.3d at 748. The *Johnson* majority reasoned that, although the

lack of an indigence exception rendered the statute arguably overbroad, that overbreadth was not

fatal due to the low level of scrutiny that applied. "That the state used a shotgun instead of a rifle

to accomplish its legitimate end," the court wrote, "is of no moment under rational basis review."

*Id.*

That analysis, though, becomes difficult to sustain when the privilege lost is the ability to

operate a car on the state's roadways. Unlike the power to vote, the ability to drive is crucial to

---

[10] The court notes, however, that the issue of facial neutrality regarding indigence is something of a red herring here. If a statute imposes a sanction on a person for not paying a sum of money, the statute is not, in any meaningful way, neutral on the question of how much money the person has.

the debtor's ability to actually establish the economic self-sufficiency that is necessary to be able to pay the relevant debt. It does not require reams of expert testimony to understand that an individual who cannot drive is at an extraordinary disadvantage in both earning and maintaining material resources. "[D]riving an automobile" is "a virtual necessity for most Americans." *Wooley v. Maynard*, 430 U.S. 705, 715 (1977). Even solely on the basis of the features of ordinary life in Tennessee of which the court can take judicial notice, the substantial economic disadvantages associated with being unable lawfully to drive are apparent.

Most obviously, being unable to drive in Tennessee limits the jobs available to a person and makes holding a job difficult, once the person has it. "Automobile travel . . . is a basic, pervasive, and often necessary mode of transportation to and from one's home [and] workplace." *Delaware v. Prouse*, 440 U.S. 648, 662 (1979). Some jobs require a person to drive as part of her duties, and even those jobs that do not themselves involve driving generally require the employee to be somewhere, reliably, on time.

The damage that the lack of a driver's license does to one's employment prospects is just the beginning. Being unable to drive is the equivalent of a recurring tax or penalty on engaging in the wholly lawful ordinary activities of life—a tax or penalty that someone who committed the same traffic violation, but was able to pay her initial traffic debt, would never be obligated to pay. When the State of Tennessee takes away a person's right to drive, that person does not, suddenly and conveniently, stop having to transport oneself and family members to medical appointments, stop having to report to court dates, or stop having to venture into the world to obtain food and necessities. Maybe public transportation will work for some of those activities some of the time, and maybe it will not. Similarly, while some individuals with suspended licenses may be able to rely on family or charitable assistance for some purposes, there is no

reason to conclude that such options will be available or adequate in most cases. What, then, is a person on a suspended license to do? The lawful options are simple: she can simply forgo the life activities, no matter how important, for which she cannot obtain adequate transportation, or she can incur additional transportation expenses—making herself that much less likely ever to satisfy her traffic debt.

Of course, an indigent person with a suspended license has another option, besides accepting the practical limitations that the state has placed on her: she can, faced with the need to navigate the world and no feasible, affordable, and legal option for doing so, break the law and drive. The court very deliberately uses "can" here, not "may" or "should," but it would simply be willful blindness to ignore the fact that some debtors with suspended licenses will be tempted to disregard the suspension, at least for pressing needs. By defying her license suspension, however, the indigent debtor puts herself at the risk of incurring more fines, more court costs, and more litigation taxes that will be likely to render the restoration of her rights an even more improbable proposition. *See* Tenn. Code Ann. §§ 40-35-111(e), 55-50-504(a). If the purpose of such a scheme were to make an indigent driver's first traffic violation her entrée into an endless cycle of greater and greater debt, it could be said to serve that purpose well. But the defendants, to their credit, do not assert that they have any legitimate interest in building inescapable debt traps for indigent Tennesseans. Rather, they argue that suspensions for nonpayment of traffic debt are made in furtherance of debt collection. Toward that end, it is hard to say the policies are rationally calculated.

The defendants may respond that rational basis review permits even arguably counterproductive policies a presumption of constitutionality. Nothing about the case law, however, suggests that the Constitution's tolerance for legislative or administrative self-sabotage

is limitless. *Cf. Cleveland Bd. of Educ. v. LaFleur*, 414 U.S. 632, 653 (1974) (Powell, J., concurring in the result) (arguing that policy would fail rational basis review because it is "either counterproductive or irrationally overinclusive"). The Supreme Court has made clear that, "even in the ordinary equal protection case calling for the most deferential of standards," a law may be struck down if its substance is "so discontinuous with the reasons offered for it" that any pretense of rationality cannot be sustained. *Romer v. Evans*, 517 U.S. 620, 632 (1996). That review includes considering whether, "in practical effect, the challenged classification simply does not operate so as rationally to further" the legitimate purpose professed. *U. S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 537 (1973). There is reason to believe that taking away a driver's license is not merely out of proportion to the underlying purpose of ensuring payment, but affirmatively destructive of that end—so much so that whether the policies at issue here can lay any claim to rationality is open to serious question.

The court finds itself returning to the Sixth Circuit's reminder that, under rational basis review, a state is free to "use[] a shotgun instead of a rifle to accomplish its legitimate end." 624 F.3d at 748. The Sixth Circuit invoked that colorful aphorism to demonstrate that the state is free to resort to policies that are imprecise and overbroad. But the question unavoidably arises: Is it actually always rational to reach for the metaphorical shotgun, no matter the task at hand? Previously in this case, this court suggested that taking a person's driver's license away to try to make him more likely to pay a fine is more like using a shotgun to treat a broken arm. In the parallel litigation involving Purkey's revocation of driver's licenses, the court suggested that taking away one's driving privileges as a debt collection mechanism may be more like using that shotgun to shoot oneself in the foot. However one wants to think about it, the aspect of the Sixth Circuit's metaphor that is easy to miss is that, while the state is not required to use the best tool

for the job, it still has to use *a* tool for the job. There is substantial reason to doubt that imposing driver's license suspensions on indigent debtors makes any sense at all as a tool for collecting traffic debt.

Admittedly, Tennessee courts have some discretion to afford relief to defendants facing greater traffic debt than they can pay. However, absent some actually articulated standard explaining when—if ever—a defendant is entitled to that relief, those mechanisms are inadequate for vindicating the constitutional interests here. The *Griffin* line of cases does not simply guarantee indigent defendants, in the relevant situations, the opportunity to appeal generally to the broad discretion of their sentencing court to alleviate their burden. Rather, the Court set forth certain situations in which a qualifying indigent is, as a matter of law, entitled to an exception from bearing a certain negative consequence that she could and would avoid if she were able to pay.[11] *See, e.g.*, *Mayer*, 404 U.S. at 198 ("We conclude that appellant *cannot be denied* a 'record of sufficient completeness' to permit proper consideration of his claims." (emphasis added)).

Every statutory opportunity for relief is left entirely to the discretion of the court. *See* Tenn. Code Ann. § 40-24-102 ("The several courts in which a cause is finally adjudged are *authorized*, either before or after final judgment, *for good cause*, to release the defendants, or any one (1) or more of them, from the whole or any part of fines or forfeitures accruing to the county

---

[11] Indeed, it appears that the complaining parties in at least some of the post-*Griffin* cases may have already been denied just that kind of discretionary relief. *See Williams*, 399 U.S. at 237 (noting that Williams "petitioned the sentencing judge to vacate that portion of the order requiring that he remain imprisoned upon expiration of his one year sentence because of nonpayment of the fine and court costs" and quoting a portion of the sentencing court's decision including discussion of prudential concerns), *reversing People v. Williams*, 41 Ill. 2d 511, 513 (1969) (noting, in case below, that the relevant sentencing statute provided that "the court *may* further order that upon non-payment of such fine, the offender *may* be imprisoned until the fine is paid" (emphasis added)); *Bearden*, 461 U.S. at 663, 673–74 (discussing parole hearing afforded in *Bearden* case), *reversing Bearden v. State*, 288 S.E.2d 662, 663 (1982) (explaining that a trial court's revocation decision was reviewable, under Georgia law, only for abuse of discretion).

or state."); Tenn. Code Ann. § 40-24-104(a) ("If the defendant . . . is unable to pay the fine . . . the court . . . *may* enter any order that it could have entered under § 40-24-101, *or may* reduce the fine to an amount that the defendant is able to pay . . . ."); Tenn. Code Ann. § 40-25-123(b) ("[T]he presiding judge of a court of general sessions *may* suspend the court costs and the litigation tax . . . , for any indigent criminal defendant, *as in the presiding judge's opinion the equities of the case require*.").[12] Those mechanisms, moreover, are not targeted at the specific issue of driver's license suspensions, but rather deal with the general assessment of fines, costs, and litigation taxes. Accordingly, a court's exercise of its discretion may, and may well, be guided by factors wholly apart from the debtor's indigence or her need to drive.

Tennessee courts have made clear that, when a court is, by statute, given discretion to grant a debtor relief from a particular type of debt related to criminal proceedings, that discretion includes the authority to deny relief, despite the debtor's indigence. *See Black*, 897 S.W.2d at 683 (upholding denial of waiver of costs for indigent defendant); *State v. Lafever*, No. M2003-00506-CCA-R3CD, 2004 WL 193060, at *7 (Tenn. Crim. App. Jan. 30, 2004) (applying *Black* to discretion to waive fines). For example, the state courts have upheld the denial of a waiver of fines to a person who was earlier found to be indigent, based purely on the speculative possibility that, "[b]y the time [he was] required to begin paying the fines, his financial circumstances may have altered significantly, for instance, through an inheritance." *Lafever*, 2004 WL 193060, at *7; *see also State v. Ryan*, No. E2013-02135-CCA-R3CD, 2014 WL 3611508, at *7 (Tenn. Crim. App. July 22, 2014) (affirming assessment of court costs against defendant who was found, twice, to be indigent, as within the court's discretion). The plaintiffs do not seek to deprive Tennessee courts of their discretion regarding what a defendant should owe. They simply

---

[12] Emphasis added throughout.

argue that, when it comes to one particularly harsh consequence of nonpayment, they are entitled to a more definite right to protection based on their indigence. Because Tennessee's discretionary relief statutes provide no definite right to relief from suspension based on inability to pay, they are no substitute for the type of protection required by the *Griffin* cases. The state cannot replace a right to relief with an opportunity merely to throw oneself upon the mercy of the court.

If the General Assembly concluded that the state should suspend the driver's license of every person found to have violated a traffic law, then the *Griffin* line of cases would provide no obstacle. However, because Tennessee has "deem[ed] it wise and just" that some violators be permitted to retain their licenses, "it cannot by force of its exactions draw a line" that imposes a greater sanction on another violator based solely on her indigence. *Griffin*, 351 U.S. at 23 (Frankfurter, J., concurring in judgment). Nothing about the rational basis framework or *Johnson* itself relieves Tennessee from the "basic command that justice be applied equally to all persons." *Williams*, 399 U.S. at 241. The plaintiffs' theory of § 1983 liability under Count I, therefore, is sound.

## C. Count III

Because Count III, like Count I, involves the Equal Protection Clause, the court will turn to it next. Count III targets the same features of Tennessee's system as Count I, but from a different angle. Relying largely on the Supreme Court's decision in *James v. Strange*, 407 U.S. 128, the plaintiffs argue that suspending the driver's license of an indigent driver over her unpaid traffic debt denies equal protection by subjecting debtors with liabilities to the government arising out of traffic violations to a significantly harsher collection and enforcement scheme than Tennessee prescribes with regard to people who owe other forms of debt, particularly private judgment debt. In other words, while Count I compares the difference between Tennessee's

treatment of indigent traffic debtors and non-indigent traffic debtors, Count III turns to the difference between the law's treatment of traffic debtors and its treatment of private debtors. The defendants' arguments follow much the same path that they took with Count I: they argue that this scheme is governed by rational basis review, which the state's laws should survive.

*Strange* involved a Kansas statutory scheme for recouping amounts expended by the state on legal services provided to indigent criminal defendants pursuant to the state's obligations under *Gideon v. Wainwright*, 372 U.S. 335 (1963). *Strange,* 407 U.S. at 128. Any time a sum was expended, it was promptly recorded as a debt of the defendant. That debt "bec[ame] a lien on the real estate of defendant" and could "be executed by garnishment or in any other manner provided by the Kansas Code of Civil Procedure." *Id.* at 131. The defendant debtor, however, was not "accorded any of the exemptions provided by [the Kansas Code of Civil Procedure] for other judgment debtors except the homestead exemption." *Id.*

The *Strange* court considered Kansas' scheme pursuant to a deferential standard, looking only to "whether [the law] is based on assumptions scientifically substantiated." *Id.* at 133 (quoting *Roth v. United States*, 354 U.S. 476, 501 (1957) (Harlan, J., concurring in the result)). Indeed, even the *Johnson* majority has conceded that *Strange*'s "text appeared to apply rational basis review." 624 F.3d at 749. Under that standard, the Court struck the scheme down, observing that the state may not "impose unduly harsh or discriminatory terms merely because the obligation is to the public treasury rather than to a private creditor." *Id.* at 138. The Court took particular issue with the fact that, by eliminating almost all exemptions, Kansas had subjected criminal defendant debtors to a regime that struck at their core resources. The Court explained that the protections that had been removed were ones intended to ensure that even

debtors facing an overwhelming civil judgment would not have their resources wholly wiped out by debt collection efforts. For example:

> Of the [exemptions available to a civil judgment debtor], none is more important to a debtor than the exemption of his wages from unrestricted garnishment. . . . Kansas has . . . perceived the burden to a debtor and his family when wages may be subject to wholesale garnishment. Consequently, under its code of civil procedure, the maximum which can be garnished is the lesser of 25% of a debtor's weekly disposable earnings or the amount by which those earnings exceed 30 times the federal minimum hourly wage. No one creditor may issue more than one garnishment during any one month, and no employer may discharge an employee because his earnings have been garnished for a single indebtedness.

*Id.* at 135–36. The Court recognized that "deny[ing] protections such as these to the once criminally accused is to risk denying him the means needed to keep himself and his family afloat." *Id.* at 146.

*Strange*, unlike *Griffin*, does not have a long line of later Supreme Court opinions explaining precisely what the lower courts should construe it to mean. The Court did revisit the issue, however, in *Fuller v. Oregon*, 417 U.S. 40 (1974). Oregon, like Kansas and a number of other states, had adopted a statutory scheme pursuant to which the state sought to recover the costs of counsel from defendants—in Oregon's case, only convicted defendants—who had been indigent at the time of their prosecutions and had relied on state-funded appointed counsel. Quite unlike the Kansas scheme at issue in *Strange*, however, the Oregon recoupment statutes categorically applied only to a person who "[was] or [would, in the future] be able to pay" the amounts owed. 417 U.S. at 45 (quoting Or. Rev. Stat. § 161.665(3)). As interpreted by the Oregon courts, "no requirement to repay [could] be imposed if it appear[ed] at the time of sentencing that 'there [was] no likelihood that a defendant's indigency [would] end." *Id.* (quoting *State v. Fuller*, 504 P.2d 1393, 1397 (1973)). The Oregon statute, therefore, was "quite clearly directed only at those convicted defendants who [were] indigent at the time of the criminal

proceedings against them but who subsequently gain[ed] the ability to pay the expenses of legal representation." *Id.* at 46. As the Court put it:

> Defendants with no likelihood of having the means to repay are not put under even a conditional obligation to do so, and those upon whom a conditional obligation is imposed are not subjected to collection procedures until their indigency has ended and no 'manifest hardship' will result. The contrast with appointment-of-counsel procedures in States without recoupment requirements is thus relatively small: a lawyer is provided at the expense of the State to all defendants who are unable, even momentarily, to hire one, and the obligation to repay the State accrues only to those who later acquire the means to do so without hardship.

*Id.* (footnote omitted). The Court, applying *Strange*, upheld Oregon's statute. In so doing, the Court reiterated that what it had found objectionable about Kansas' scheme was that the "elimination of the exemptions normally available to judgment debtors 'embodie[d] elements of punitiveness and discrimination which violate the rights of citizens to equal treatment under the law.'" *Fuller*, 417 U.S at 47 (quoting *Strange*, 407 U.S. at 142.) Concurring in the judgment, Justice Douglas stressed that the reason the statute survived was that it had "been stringently narrowed." 417 U.S. at 59 (Douglas, J., concurring in the judgment).

*Strange* does not require that all debt be recouped by the same mechanisms, or even by equally effective mechanisms. *See Strange*, 407 U.S. at 138 ("We recognize, of course, that the State's claim to reimbursement may take precedence, under appropriate circumstances, over the claims of private creditors and that enforcement procedures with respect to judgments need not be identical."). What *Strange* does provide, however, is a firm command that a state's uniquely harsh treatment of a class of indigent debtors cannot be carried out in "such discriminatory fashion" that it "blight[s] . . . the hopes of indigents for self-sufficiency and self-respect," merely because the indigent debtors owe a particular type of debt to the government. *Id.* at 142–43. The question, then, is whether that is the case here.

In Tennessee, traffic debt can be collected through the same basic mechanisms as a civil judgment. *See* Tenn. Code Ann. § 40-24-105(a), (c), (f). Kansas also took its system of ordinary civil collections as its baseline, but ran afoul of the Constitution by subtracting a number of protections that would have been uniquely necessary for the very indigent or recently indigent debtors to which its statute applied. Tennessee chose a different route, but one that took it in much the same direction. Whereas Kansas removed protections from its ordinary recoupment scheme, Tennessee heaped on additional tools of coercion—most notably, the loss of a driver's license. While the structure of the schemes is different, the effect is the same: one particular type of debtor is singled out for a regime uniquely capable of driving those debtors into, or further and more inextricably into, poverty.

Indeed, acknowledgment of the unique constitutional hazards of such a system can, as the court has noted, be found in the opinion of the *Johnson* Sixth Circuit majority. *Johnson* distinguished the Kansas debt scheme from Tennessee's re-enfranchisement scheme on the ground that *Johnson* involved a "mere 'statutory benefit,'" whereas *Strange* implicated the debtor's ability to "support[] himself and his family.'" *Johnson*, 624 F.3d at 749 (quoting *Harvey*, 605 F.3d at 1079; *Strange*, 407 U.S. at 135). That distinction, the *Johnson* majority explained, was why *Strange*, despite facially being a case of rational basis review, in fact applied a somewhat more demanding consideration of the factors involved.

Here, the statute and practices at issue, like the regime in *Strange*, threaten serious financial harm to those who run afoul of them. The court does not need to repeat its lengthy discussion above to establish that taking a person's driver's license away is, like Kansas' scheme of unlimited garnishment, a threat to the debtor's basic subsistence. Ultimately, then, the formal differences between Count I and Count III give way to substantial practical overlap. Although

the theories undergirding each differ, both hinge on the severity and counterproductive nature of relying on driver's license suspensions as an ostensible mechanism for recouping traffic debt. Because the plaintiffs have pled an actionable constitutional violation under *Strange*, the court will not dismiss Count III.

## D. Count II

In Count II, the plaintiffs argue that suspending traffic debtors' driver's licenses, without providing the opportunity for a hearing on ability to pay, violates the guarantees of procedural due process. The defendants do not dispute that the state's suspension of a person's driver's license requires it to afford the minimal protections of due process. They argue, instead, that the state's current procedures for challenging a suspension are sufficient.

A Fourteenth Amendment procedural due process claim depends on the existence of a constitutionally cognizable liberty or property interest with which the state has interfered. *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989); *Pusey v. City of Youngstown*, 11 F.3d 652, 656 (6th Cir. 1993). The Supreme Court has held that a driver's license meets the threshold of creating a constitutionally cognizable interest and, therefore, is "not to be taken away without that procedural due process required by the Fourteenth Amendment." *Bell v. Burson*, 402 U.S. 535, 539 (1971) (citing *Sniadach v. Family Fin. Corp.*, 395 U.S. 337 (1969); *Goldberg v. Kelly*, 397 U.S. 254 (1970)). What due process requires, however, varies depending on the nature of the scheme at issue. Even in a case where all involved agree that a person was entitled to due process, there may still be disagreement about "how much process is due." *Shoemaker v. City of Howell*, 795 F.3d 553, 559 (6th Cir. 2015). Determining precisely what process a person is entitled to in a particular situation requires the consideration of a number of factors:

> [1] the private interest that will be affected by the official action; [2] the risk of an erroneous deprivation[;] . . . [3] the probable value, if any, of additional or

substitute procedural safeguards; and [4] the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 559 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

The Supreme Court's cases in this area establish that a driver facing suspension or revocation of her license is entitled to a pre-deprivation hearing in some—but not all—situations. In *Bell v. Burson*, the Supreme Court concluded that an adequate pre-deprivation hearing was required under a Georgia law pursuant to which "the motor vehicle registration and driver's license of an uninsured motorist involved in an accident" was "suspended unless he post[ed] security to cover the amount of damages claimed by aggrieved parties in reports of the accident." 402 U.S. at 535–36. The state allowed a motorist an administrative hearing prior to the suspension, but that hearing did not consider issues of liability or fault. *Id.* at 536. Accordingly, an uninsured driver who was wholly innocent in an accident could nevertheless have her license suspended for failing to post bond in the amount of the claimed damages of another party involved—indeed, possibly the party who was actually at fault—without ever having a hearing in which she could deny her liability. *Id.* The Court held that the statute deprived a driver of due process and that, although a driver was not entitled to a full determination of liability before facing a requirement to post bond or face suspension, she was at least entitled to a "determination whether there [was] a reasonable possibility of judgments in the amounts claimed being rendered against" her. *Id.* at 540.

In *Dixon v. Illinois*, however, the Supreme Court made clear that a pre-suspension hearing is not required in all situations. 431 U.S. at 115. Under the scheme at issue in *Dixon*, Illinois had "established a comprehensive system of assigning 'points' for various kinds of traffic offenses, depending on severity, to provide an objective means of evaluating driving records."

*Id.* at 107. Pursuant to the state's regulations, a driver faced suspension or revocation, without a pre-action hearing, if he amassed a qualifying number of points. *Id.* at 108. The state did, however, provide for notice concurrent with the revocation or suspension, followed by a right to a full evidentiary hearing on the state's decision. *Id.* at 109. Applying the aforementioned *Eldridge* factors, the Court concluded that no pre-deprivation hearing was required. The Court explained that, in light of the fact that Illinois' scheme permitted exceptions based on hardship, the private interest at issue was "not so great as to require [the Court] 'to depart from the ordinary principle [that] something less than an evidentiary hearing is sufficient prior to adverse administrative action.'" *Id.* at 113 (quoting *Mathews*, 424 U.S. at 343). Moreover, although it was possible that a person might face an incorrect suspension due to a clerical error, the risk of an erroneous deprivation was ultimately "not great," because "revocation decisions [were] largely automatic." *Id.* Finally, the Court noted the "substantial public interest" in ensuring the administrative efficiency of a scheme dedicated to "safety on the roads and highways, and in the prompt removal of a safety hazard." *Id.* at 114. The Court concluded that it was this last factor, the presence of a public safety issue, that particularly distinguished the case from *Bell*. Illinois' denial of a pre-deprivation hearing was permissible, in part, because the statute at issue was "designed to keep off the roads those drivers who are unable or unwilling to respect traffic rules and the safety of others." *Id.* at 115.

The defendants argue that driver's license suspensions for nonpayment of traffic debt should be governed by the same analysis set forth in *Dixon*. That argument, however, ignores the fact that the factor that the Supreme Court appears to have considered most important in *Dixon* is comparatively weak here. The scheme in *Dixon* was targeted at drivers who had amassed traffic offenses that could give rise to a reasonable inference that they were significantly more likely

than the average driver to pose a risk to public safety if allowed on the road. While it is true that every person who faces a suspension for nonpayment of traffic debt has been held to have committed some traffic violation, it is not the violation itself, or any attendant indication of risk, that determines whether the driver will lose her license; the license is suspended or not suspended based entirely on whether or not she has paid her debt. Despite the defendants' repeated attempts to ground Tennessee's suspension scheme in the state's power to police the safety of its highways, they have demonstrated no basis for concluding that a driver who cannot pay her traffic debt is any more of a risk to the drivers around her than a driver who can. Tennessee's system of suspensions for unpaid traffic debt is not about safety; it is about payment. In that regard, it is more like the scheme at issue in *Bell*.

Ultimately, the question of what kind of process to which the plaintiffs were entitled is tightly bound up with the question of whether they are correct that Tennessee is bound to afford some form of exception for ability to pay. If a driver whose nonpayment of her traffic debt is wholly due to her inability to pay is, in fact, entitled to an exception to the state's regime of blanket suspensions, it is difficult to imagine the *Eldridge* factors countenancing a suspension without the opportunity for a hearing on that point. As to the first factor, the private interest at issue is significant, although not, per *Dixon*, so significant as to categorically require a hearing. The risk of an erroneous deprivation, moreover, is high. The question of whether a driver is truly unable to pay her traffic debt will frequently be fact-intensive and may hinge on the ability of the driver to credibly testify to the details of her economic circumstances, including her health, family situation, resources, and employment options. A failure to afford at least some hearing, therefore, would carry a substantial risk of a plaintiff's license being erroneously suspended—a risk that would be mitigated simply by providing appropriate procedures. The second and third

factors, therefore, would favor granting a hearing. Finally, the government's interest in suspending the debtor's license prior to such hearing is minimal. The purpose of suspending a license for nonpayment of traffic debt is encouraging payment, not taking dangerous drivers off the road. The defendants have identified no reason to conclude that the brief delay that might be occasioned by the need for a hearing on indigence would lessen the impact of that collection mechanism in any meaningful way. On the other hand, if a driver who is willing but unable to pay her traffic debt is not entitled to an exception, then Tennessee's regime is, at least, more like the automatic system of suspensions at issue in *Dixon* in terms of the risk of an erroneous deprivation, albeit without the same safety considerations.

If, therefore, the plaintiffs succeed in establishing that Tennessee's suspension scheme must account for their indigence, they are also likely to succeed with regard to the claim that the process afforded them was insufficient in failing to grant them a full indigence hearing prior to their suspensions going into effect. If, on the other hand, the plaintiffs do not prevail on the theory underlying their other claims, the process that TDSHS afforded them is more likely to have been sufficient—although the particular administrative details of the notice provided and the effective date of the suspensions would still present factual issues requiring resolution. The court, accordingly, will deny the motions to dismiss as to Count II.

## V. MOTION TO CERTIFY CLASS

Still pending is the plaintiffs' Motion to Certify Class filed on November 19, 2017. (Docket No. 13.) Because that motion was premised on the original Complaint, it does not reflect the inclusion of Booher as a plaintiff, nor does it reflect the fact that the court is, contemporaneously with this motion, dismissing Gaskill and the City of Mt. Juliet as parties. The question, therefore, naturally arises of whether the court should treat the plaintiffs' certification

motion as moot. Those intervening changes, however, are primarily relevant to the plaintiffs' proposed subclasses. The question of whether to certify the plaintiffs' statewide class, as a whole, remains essentially undisturbed by the plaintiffs' fleshed-out allegations and the loss of some, but not all, City Defendants. Purkey, moreover, has fully briefed his opposition to the certification motion with regard to the statewide class. (Docket No. 84.) The court, accordingly, will consider the plaintiffs' motion with regard to the statewide class and otherwise deny it as moot, with the understanding that the plaintiffs may renew their request for certification of particular subclasses in the wake of this opinion.

The principal purpose of class actions is to achieve efficiency and economy of litigation, both with respect to the parties and the courts. *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 159, (1982). The Supreme Court has observed that, as an exception to the usual rule that litigation is conducted by and on behalf of individual named parties, "[c]lass relief is 'peculiarly appropriate' when the 'issues involved are common to the class as a whole' and when they 'turn on questions of law applicable in the same manner to each member of the class.'" *Id.* at 155 (quoting *Califano v. Yamasaki*, 442 U.S. 682, 701 (1979)). The Court directs that, before certifying a class, district courts must conduct a "rigorous analysis" of the prerequisites of Rule 23 of the Federal Rules of Civil Procedure. *Falcon*, 457 U.S. at 161. The Sixth Circuit has stated that district courts have broad discretion in deciding whether to certify a class but that courts must exercise that discretion within the framework of Rule 23. *Coleman v. Gen. Motors Acceptance Corp.*, 296 F.3d 443, 446 (6th Cir. 2002); *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996).

Although a court considering class certification may not inquire into the merits of the underlying claim, a class action may not be certified merely on the basis of its designation as such in the pleadings. *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974); *In re Am.*

*Med. Sys., Inc.*, 75 F.3d at 1079. In evaluating whether class certification is appropriate, "it may be necessary for the court to probe behind the pleadings," as the issues concerning whether it is appropriate to certify a class are often "enmeshed" within the legal and factual considerations raised by the litigation. *Falcon*, 457 U.S. at 160; *see also In re Am. Med. Sys., Inc.*, 75 F.3d at 1079; *Weathers v. Peters Realty Corp.*, 499 F.2d 1197, 1200 (6th Cir. 1974). Moreover, the party seeking class certification bears the burden of establishing that the requisites are met. *See Alkire*, 330 F.3d at 820; *Senter v. Gen. Motors Corp.*, 532 F.2d 511, 522 (6th Cir. 1976).

Purkey argues that the plaintiffs are not entitled to certification of their class for five reasons: (1) they have failed to produce appropriate evidence sufficient to meet their burden under Rule 23; (2) they cannot satisfy the numerosity requirement because they have not demonstrated what portion of people with suspended licenses are indigent; (3) they cannot satisfy the commonality requirement because the population of drivers with suspended licenses involves substantial variation in the issues and postures presented by each individual case; (4) they similarly cannot satisfy the typicality requirement because the plaintiffs' proving their own right to relief would not necessarily establish the right to relief of others; and (5) they cannot satisfy Rule 23(b)(2) because they cannot identify a form of injunctive relief that would be applicable to the class as a whole.

## A. Reliance on Declarations of Claudia Wilner and Edward Krugman

Purkey objects to the plaintiffs' reliance, in their motion for class certification, on 28 U.S.C. § 1746 declarations of Claudia Wilner and Edward Krugman, which address a number of foundational facts regarding the proposed class and Tennessee's policy of suspending driver's licenses for nonpayment of traffic debt. (Docket Nos. 18 & 19.) Wilner and Krugman are among the plaintiffs' lawyers, and Purkey asks the court to disregard their declarations on the ground

that they have inappropriately proffered themselves as fact witnesses in a case where they are also serving as counsel.

Under Tennessee's Rules of Professional Conduct, "[a] lawyer shall not act as an advocate at a trial in which the lawyer is likely to be a necessary witness unless" one of three enumerated exceptions applies. Tenn. Sup. Ct. R. 8, RPC 3.7(a); *see also* Local R. 83.01(e)(4) ("The standard of professional conduct of the members of the bar of this Court shall include the current Tennessee Code of Professional Responsibility, Tenn. Sup. Ct. R. 8."). Rule 3.7(a), at least by its text, specifically applies to activity "at trial," and does not directly address preliminary stages, such as a motion for class certification. Nevertheless, Rule 3.7(a) may be implicated by these earlier proceedings if an attorney's activities or statements are such that they would make her "likely to be a necessary witness" when the time for trial arrives.

Most, if not all, of Wilner's declaration, however, falls under Rule 3.7(a)'s exception expressly permitting an attorney to provide "testimony relat[ing] to the nature . . . of legal services rendered in the case." Tenn. Sup. Ct. R. 8, RPC 3.7(a)(2). Wilner describes her role in this litigation, as well as the role of the various organizations and the Tennessee law firm that are working together in their representation of the plaintiffs in this case. (Docket No. 18 ¶¶ 1, 7–9.) These facts, moreover, are offered in support of establishing adequacy of representation under Fed. R. Civ. P. 23(a)(4)—which, Purkey concedes, he does not contest. (Docket No. 84 at 7.) The plaintiffs' reliance on the Wilner declaration, therefore, is unproblematic.

Krugman's declaration touches more broadly on facts relevant to the plaintiffs' claims, particularly background facts about the necessity of driving in Tennessee. Simply stating a fact at the class certification stage, however, does not necessarily make an attorney a necessary witness at trial. For example, many of the facts to which Krugman attests merely involve summarizing

census data. (Docket No. 19 ¶¶ 3–7.) "[P]ublic records and government documents available from reliable sources" are generally appropriate for judicial notice. *U.S. ex rel. Dingle v. BioPort Corp.*, 270 F. Supp. 2d 968, 972 (W.D. Mich. 2003). Official publications of public authorities, moreover, are self-authenticating under Rule 902(5) of the Federal Rules of Evidence. *See Fair Hous. Ctr. of Sw. Mich. v. Hunt*, No. 1:09-CV-593, 2011 WL 710666, at *3 (W.D. Mich. Feb. 23, 2011) ("Publications of the U.S. Bureau of Census are self-authenticating . . . ."). A summary of the type offered by Krugman may be admissible at trial under Rule 1006 of the Federal Rules of Evidence, which permits a party to use "a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court," or, in the alternative, may be appropriate for presentation to a factfinder as a Rule 611(a) pedagogical device. *See United States v. Bray*, 139 F.3d 1104, 1111 (6th Cir. 1998). Purkey has not raised any ground for disputing Krugman's summary of the census data—taking issue only with the messenger, not the message. Under Rule 3.7(a), however, the content of the message matters. Specifically, the rule expressly permits an attorney to provide "testimony relat[ing] to an uncontested issue." Tenn. Sup. Ct. R. 8, RPC 3.7(a)(1). Purkey has had the opportunity to establish that the census tabulations are contested, and he has not done so. Krugman's declaration is therefore permissible in that regard.

Krugman also cites to and authenticates statistics that the plaintiffs received from TDSHS regarding suspensions and reinstatements based on failure to pay traffic debt and/or failure to appear. (Docket No. 19 ¶ 11.) Purkey, again, does not dispute the accuracy or authenticity of the data presented. There is no reason, then, that Krugman should be considered a necessary witness with regard thereto.

Krugman does draw the court's attention to one third-party source related to the effects of driver's license suspensions. (*Id.* ¶ 1 (citing *Missed Opportunity: Transit and Jobs in Metropolitan America* ("Brookings Report")[13].) If Krugman were planning to testify at trial regarding the credibility and contents of that report, it would indeed likely pose a problem under Rule 3.7(a). Unless Purkey disputes the report's very existence, however, Krugman's merely informing the court that the report is available is not fact testimony on a contested issue. In any event, the court does not rely on the Brookings Report for its certification decision.

## B. Numerosity

Purkey argues next that the plaintiffs cannot establish that their proposed class is sufficiently numerous to warrant certification under Rule 23. The suspension data that TDSHS provided to the plaintiffs suggests that, from the period of January 1, 2012, to December 31, 2016, at least 183,252, and as many as 256,064, drivers had their driver's licenses suspended for failure to pay traffic debt.[14] (Docket No. 19 ¶ 11.) Although many of those drivers have had their licenses reinstated, at least 80,000 and as many as 134,235 have not. There is, therefore, plainly a numerous population of people suffering from Traffic Debt suspensions. Purkey argues, however, that there is no way to know how many of those people were indigent. The plaintiffs, he argues, have therefore failed to demonstrate numerosity.

Rule 23(a)(1) requires that the class be so numerous that joinder of all members is impracticable. Although there is no strict numerical test, substantial numbers usually satisfy the numerosity requirement. *Gilbert v. Abercrombie & Fitch Co.*, No. 2:15-cv-2854, 2016 WL

---

[13] Available at https://www.brookings.edu/research/missed-opportunity-transit-and-jobs-in-metropolitan-america/.

[14] The data provided codes suspensions as either "Failure to Pay," "Failure to Appear," or "Failure to Pay/Appear." The different numbers used by the court reflect whether "Failure to Pay/Appear" is included in the total of suspensions for failure to pay. (Docket No. 19 ¶ 11.) The court's numerosity analysis, however, does not depend on using the larger of the numbers.

4159682, at * 4 (S.D. Ohio Aug. 5, 2016) (citing *Daffin v. Ford Motor Co.*, 458 F.3d 549, 552 (6th Cir. 2006)). "There is no magic minimum number that will breathe life into a class." *Russo v. CVS Pharmacy, Inc.*, 201 F.R.D. 291, 294 (D. Conn. 2001) (quoting *Jones v. CCH-LIS Legal Info. Servs.*, 1998 WL 671446, *1 (S.D.N.Y. Sept.28, 1998)). The plaintiff must show some evidence of or reasonably estimate the number of class members, and, in assessing numerosity, the court may make common sense assumptions without the need for precise quantification of the class. *Id.*

Purkey is correct that the plaintiffs have not put forth evidence that would allow the court to know precisely how many of the people whose driver's licenses were suspended are indigent. However, "the exact number of class members need not be pleaded or proved" for a class to be certified, as long as the class representatives can show that joinder would be impracticable. *Golden v. City of Columbus*, 404 F.3d 950, 965–66 (6th Cir. 2005) (quoting *McGee v. E. Ohio Gas Co.*, 200 F.R.D. 382, 389 (S.D. Ohio 2001)). Facts, common sense, and the basic features of the statutes at issue all dictate that there is little doubt that that is the case here. The nature of Tennessee's scheme is that every person who cannot pay her traffic debt will face suspension unless she happens to receive some form of discretionary relief from a court. To deny that there are a substantial number of indigent debtors facing suspension, then, is essentially to deny that indigent debtors exist at all—or, at the very least, to assume, based on no evidence, that all or virtually all of those debtors have received relief that is, by its own terms, wholly discretionary. Such a possibility is decidedly implausible.

The plaintiffs' statewide class would be sufficiently numerous, even if only a small percentage of the people whose licenses have been suspended turned out to be indigent. Even if one relies on the lowest provided number for failure-to-pay suspensions and assumes that merely

2% of those drivers with outstanding suspensions are indigent, then the statewide class would still number more than 1,600 people, a number easily too high to make joinder practicable. See *In re Nortel Networks Corp. ERISA Litig.*, No. 3:03-MD-01537, 2009 WL 3294827, at *4 (M.D. Tenn. Sept. 2, 2009) ("[T]he sheer number of potential litigants, especially if it is more than several hundred, can be the only factor needed to satisfy Rule 23(a)(1).") (citing *Bacon v. Honda of Am. Mfg. Inc.*, 370 F.3d 565, 570 (6th Cir. 2004)); *Allard v. SCI Direct, Inc.*, No. 16-CV-01033, 2017 WL 3236448, at *3 (M.D. Tenn. July 31, 2017) ("The modern trend for meeting the numerosity factor is to require at a minimum 'between 21 and 40' class members.") (quoting *Rodriguez v. Berrybrook Farms, Inc.*, 672 F. Supp. 1009, 1013 (W.D. Mich. 1987); *Roman v. Korson*, 152 F.R.D. 101, 105-06 (W.D. Mich. 1993)). The court will not deny certification for failure to satisfy Rule 23(a)(1).

## C. Commonality and Typicality

Purkey's latter two objections under Rule 23(a) raise the same issue from different angles. Although the plaintiffs have all faced suspensions for nonpayment of traffic debt and all claim that they are willing, but unable, to pay what they owe, their particular circumstances do differ, both with regard to the details of the cases from which their traffic debt arose and with regard to their current barriers to reinstatement. The class members, as well, will differ. Tennessee has numerous judicial districts, courts, and clerks' offices that deal with a wide array of defendants. The practices for assessing and dealing with traffic debt may well vary substantially from court to court, from judge to judge, and from case to case. The questions then arise: (1) do all of the indigent people facing or living with suspensions truly suffer a common injury; and (2) are the plaintiffs' injuries truly typical of those injuries?

### *1. Commonality*

Purkey is correct that the plaintiffs seek to assert claims for a diverse class of plaintiffs. The commonality requirement, however, does not simply call for the court to list all of the traits that can be ascribed to the various class members and tally up the differences. "Commonality" refers to commonality with regard to the specific claims asserted. In order for the court to certify the class under Rule 23, the class members' claims must depend upon a common contention of such a nature that it is capable of class-wide resolution. *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 852 (6th Cir. 2013). Variation in the ancillary details of the class members' cases is insufficient to defeat certification, as long as "[i]t is unlikely that differences in the factual background of each claim will affect the outcome of the legal issue." *Bacon*, 370 F.3d at 570 (quoting *Califano v. Yamasaki*, 442 U.S. 682, 701 (1979)).

The claims of all the plaintiffs in this case share at least two central questions: (1) whether Tennessee can suspend a driver's license for failure to pay traffic debt without the opportunity to establish that the debtor is entitled to an exception based on her indigence; and (2) what minimum procedures the state must afford a debtor facing suspension. As the court has already discussed, those two questions implicate a number of legal and factual sub-issues, which will also be shared by the class. Moreover, while the individual cases of the different class members may vary substantially, those variations are immaterial to the categorical right that the plaintiffs have asserted. If the plaintiffs had cast their net more widely and sought to litigate the general fairness of Tennessee's system of traffic debt, Purkey might be correct that the substantial amount of local and case-by-case variation would make class certification impossible. The plaintiffs, however, are not asking the court to consider the constitutionality of every debt assessment, collection effort, or clerk's office policy. They complain of a specific injury: the suspension of a person's driver's license for nonpayment of traffic debt without the opportunity

to demonstrate that the person is entitled to an exception from suspension based on her indigence. That injury is common throughout the proposed class, as are the questions of law and fact underlying it.

Purkey argues next that the plaintiffs cannot show commonality, because the various members of the class will face various cumulative barriers to regaining their driving privileges. As the court has already held, however, this case is not merely about the binary question of whether each class member has or does not have a driver's license, but also the question of what barriers they must overcome to get those driver's licenses back. Commonality with regard to the barrier at issue in this case is not defeated by a lack of commonality with regard to the unrelated obstacles that the various class members face.

### *2. Typicality*

The typicality requirement is met if the class members' claims are fairly encompassed by the named plaintiffs' claims. This requirement ensures that the class representatives' interests are aligned with the interests of the represented class members so that, by pursuing her own interests, the class representative also advocates the interests of the class members. *Whirlpool*, 722 F.3d at 852–53. Thus, a plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and if her claims are based on the same legal theory. *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1082 (6th Cir. 1996). Commonality and typicality tend to merge because both of them serve as guideposts for determining whether, under the particular circumstances, maintenance of a class action is economical, and whether the plaintiff's claims and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence. *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 352, 542 (6th Cir. 2012).

In this instance, with commonality established, typicality readily follows. The plaintiffs' underlying economic situations and the details of their cases may be unique to them, but, with regard to the issues central to their claims, the plaintiffs are as typical as any member of the class. Because they have faced and received suspensions for nonpayment of traffic debt that they are unable to pay, they are typical.

## D. Rule 23(b)

Purkey's argument regarding Rule 23(b) mirrors his arguments on commonality and typicality and, ultimately, succumbs to the same flaws. After a plaintiff shows that she satisfies all of the requirements of Rule 23(a), she must establish that "the class [she] seeks to represent falls within one of the subcategories of Rule 23(b)." *Senter*, 532 F.2d at 522. The plaintiffs rely on Rule 23(b)(2), which covers situations in which "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Rule 23(b)(2) permits certification only for "those classes with homogeneous interests" relative to the relief sought. *McDonald v. Franklin Cty., Ohio*, 306 F.R.D. 548, 558 (S.D. Ohio 2015) (quoting *Coleman*, 296 F.3d at 447). Rule 23(b)(2) is well suited to cases, such as this one, where class representatives allege an injury inherent to the administration of a blanket government policy. *See Daffin v. Ford Motor Co.*, No. C-1-00-458, 2004 WL 5705647, at \*5 (S.D. Ohio July 15, 2004) ("Although not limited to civil rights suits, 23(b)(2) was plainly designed . . . to address them . . . ."), *aff'd*, 458 F.3d 549.

Purkey again attempts to defeat class certification by pointing to the array of differing cumulative barriers faced by the members of the class. This case, though, is not about those barriers. Purkey points out that some class members will pose greater safety threats than others.

Failure to pay traffic debt, however, has nothing to do with safety risk. Tennessee has other provisions for the loss of driving privileges for reasons related to safety. *See, e.g.*, Tenn. Code Ann. § 55-50-501(a)(1) (calling for revocation based on conviction for vehicular homicide), (a)(2) (calling for revocation based on conviction for driving under the influence). No driver who would receive relief under the remedies sought by the plaintiffs would be, in any way, exempt from the full panoply of laws designed to assess drivers' competence and safety on the road and to limit the risk that particularly dangerous drivers pose to themselves and those around them. A drunk driver is a drunk driver, whether she paid her traffic debt or not, and the law will treat her accordingly, regardless of whether the plaintiffs prevail on their claims here. The issues identified by Purkey create no obstacle to satisfying Rule 23(b)(2).

## E. Propriety of Certification

Purkey identifies no other grounds for denying class certification here, and the court finds that all of the remaining requirements for certification of the statewide class are met. Rule 23(a)(4) requires the court only to certify the class if "the representative parties will fairly and adequately protect the interests of the class." That requirement considers both general commonality of interests and whether the putative representative "will vigorously prosecute the interests of the class through qualified counsel." *Gonzales v. Cassidy*, 474 F.2d 67, 73 (6th Cir. 1973). Purkey has conceded that he does not dispute that requirement, and the record provides ample basis for concluding that the plaintiffs' representation will be adequate. The plaintiffs have also satisfied Rule 23(a)(1), (2), and (3) by showing numerosity, commonality, and typicality, and they have demonstrated that their case falls within the boundaries of Rule 23(b)(2). Rule 23(c)(1) directs this court to determine whether to certify a class "[a]t an early practicable time after a person sues or is sued as a class representative," and there appear to be no more

substantive questions remaining regarding whether certification is appropriate here. The court, accordingly, will certify the proposed statewide class.

## VI. MOTION FOR PRELIMINARY INJUNCTION

The plaintiffs filed their Motion for Preliminary Injunction on September 21, 2017. (Docket No. 25.) Despite the parties' representations that they expected that a hearing would have been held on that motion by now, one has not. In at least one regard, however, the parties' briefing is adequate to allow the court to move at least a step closer to addressing that long-pending motion.

The Sixth Circuit has held that the district court must balance four factors when considering a motion for preliminary injunction under Federal Rule of Civil Procedure 65: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of the injunction. *City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (citing *PACCAR Inc. v. TeleScan Techs., LLC*, 319 F.3d 243, 249 (6th Cir. 2003)). The first factor—likelihood of success on the merits—overlaps heavily, if not entirely, with the issues already briefed. In the interest of conserving resources and expediting resolution of the motion, the court will consider that factor here and set an evidentiary hearing related to the three remaining considerations.[15]

As the court has detailed at length, the plaintiffs have articulated a compelling argument, based in well-settled and viable Supreme Court precedent, that Tennessee's regime of

---

[15] The court notes, however, that, because this is a constitutional case, at least some irreparable injury is likely to be presumed, based on the rule that, "if it is found that a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated." *Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001).

suspending licenses without an effective, non-discretionary safety valve for the truly indigent violates both equal protection and due process principles. That conclusion, moreover, carries with it the inevitable implication that drivers' procedural due process rights have been violated as well, because drivers whose licenses have been suspended were never afforded the opportunity to make a showing under that standard. The only factual investigation necessary to confirm at least the general validity of the plaintiffs' theory is to confirm whether they are correct in their assertion that lack of a driver's license is, indeed, likely to exacerbate an individual's indigence and make the already-indigent debtor less able to pay her debts. While additional testimony might be helpful in understanding the precise contours of the hardship that a lack of a license inflicts, judicial notice is more than sufficient to establish that that hardship is real and substantial.

Rule 201 of the Federal Rules of Evidence permits a court, either by motion of a party or on its own motion, to "judicially notice a fact that is not subject to reasonable dispute because it" either "(1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Among other things, judicial notice permits a court to acknowledge certain indisputable foundational facts about life in a jurisdiction, such as the region's geography, *see Tucker v. Outwater*, 118 F.3d 930, 935 (2d Cir. 1997), its recurring weather conditions, *see Stephan v. Transp. Ins. Co.*, 140 F. App'x 340, 341 (3d Cir. 2005), or widely known demographic facts about its workforce, *see Caulfield v. Bd. of Educ. of City of N.Y.*, 486 F. Supp. 862, 885 (E.D.N.Y. 1979), *aff'd*, 632 F.2d 999 (2d Cir. 1980). Where appropriate, judicial notice may extend to indisputable realities of an area's economic life—for example, that a state or region lacks a certain industry, *see United States v. Ramirez*, 910 F.2d 1069, 1071 (2d Cir. 1990),

or that a particular consumer good is widely available, *see United States v. Various Articles of Obscene Merch., Schedule No. 2102*, 709 F.2d 132, 137 (2d Cir. 1983).

By the same principle, a court is permitted to take judicial notice of commonly known and indisputable facts about a city or region's transportation infrastructure. *See, e.g., Witter v. Delta Air Lines, Inc.*, 138 F.3d 1366, 1370 (11th Cir. 1998) (taking judicial notice that "Atlanta is home to Hartsfield Atlanta International Airport, one of the busiest airports in the country"). Indeed, courts have, where appropriate, specifically taken judicial notice of the necessity of motor vehicle travel for certain work or life activities. *See Southerland v. St. Croix Taxicab Ass'n*, 315 F.2d 364, 367 (3d Cir. 1963) ("The District Court was entitled to take judicial notice of the fact, as do we, that the Alexander Hamilton Airport is located in a rural part of St. Croix, some miles from the hotels and towns of the island and that it is served by no regular public transportation facilities."); *United States v. Lopez*, No. 05-CR-593, 2007 U.S. Dist. LEXIS 26170, at *13 n.14 (E.D. Pa. Mar. 26, 2007) ("The Court takes judicial notice that the motel in question is in King of Prussia, Pennsylvania, approximately 20 miles outside of Philadelphia, in an area that is not readily served by public transportation and is otherwise generally inaccessible without a car."); *cf. Susman v. N. Star Tr. Co.*, 30 N.E.3d 622, 628 (Ill. App. Ct. 2015) ("This court, which is located in Chicago, Cook County, may take judicial notice of the fact that Lake County is adjacent to Cook County and that many people commute every day from Lake County to work in Chicago."). Of particular relevance to this case, the Supreme Court itself appears to have had little hesitation in observing that "[a]utomobile travel . . . is a basic, pervasive, and often necessary mode of transportation," *Prouse*, 440 U.S. at 662, or in referring to driving as "a virtual necessity for most Americans." *Wooley*, 430 U.S. at 715.

With the foregoing principles in mind, the court takes judicial notice of the following. First, the court judicially notices that the public transportation available in Tennessee is widely insufficient to provide an adequate substitute for access to private motor vehicle transportation. Second, the court judicially notices that the services, businesses, homes, and workplaces throughout Tennessee are so geographically diffuse that navigating life in the state wholly on foot is impracticable for all but perhaps a few Tennesseans. Third, the court judicially notices that a number of obstacles prevent non-motorized transportation, such as bicycles, from providing an adequate alternative to driving in Tennessee, including (1) the aforementioned geographically diffuse pattern of development; (2) the need to travel on interstates and highways; (3) safety concerns associated with using non-motorized travel in areas without paths dedicated to that purpose; (4) the lack of such dedicated paths on numerous important roads within the state; and (5) the fact that many Tennesseans face physical limitations that would not prevent them from driving but that would sharply limit their use of a bicycle or other human-powered mode of transportation.

Based on its judicial notice of these aforementioned facts, the court concludes that it is beyond dispute that, at least as a general proposition, the cities, towns, and communities of Tennessee are pervasively structured around the use of motor vehicles. Anyone who doubts that premise is welcome to attempt to run a day's worth of errands in a rural Tennessee county with no car and very little money. The centrality of motor vehicle travel is, moreover, not solely a rural problem. Even the relatively dense city of Nashville, where the court sits, is deeply reliant on motor vehicle transport. If any city in this jurisdiction could be expected to be reasonably navigable without driving, it would be Nashville—and the court takes judicial notice that, to the contrary, Nashville is a city where motor vehicle travel is, for the vast majority of the population,

an essential part of ordinary life, particularly for anyone seeking to maintain or build economic self-sufficiency.

All of these facts, together, leave very little room for doubt regarding the plaintiffs' assertion that an indigent person who loses her driver's license is only going to be made less likely to be able to meet the ordinary expenses of life, let alone pay hundreds of dollars in traffic debt. With that premise established, the plaintiffs have also established their strong likelihood of success under the *Griffin* line of cases and under *Strange*. With regard to the other three factors, however, the court cannot yet make a determination. The court, accordingly, will set an evidentiary hearing on those issues.

## VII. CONCLUSION

For the foregoing reasons, the City Defendants' Motion to Dismiss (Docket No. 118), the County Defendants' Motion to Dismiss (Docket No. 121), and Purkey's Motion to Dismiss Plaintiffs Robinson, Sprague, and Gibbs (Docket No. 128) will be granted in part and denied in part. Purkey's Motion to Dismiss Plaintiff Brianna Booher (Docket No. 131) will be denied. The plaintiffs' claims alleging violation of procedural due process regarding suspensions of which the plaintiffs had actual notice more than one year before the filing of this case will be dismissed, as will all claims against Susan Gaskill and Mt. Juliet. The plaintiffs' Motion to Certify Class (Docket No. 13) will be granted with regard to the statewide class and otherwise denied, without prejudice, as moot. A hearing will be ordered on the plaintiffs' Motion for Preliminary Injunction (Docket No. 25).

An appropriate order will enter.

ENTER this 11th day of June 2018.

_____
ALETA A. TRAUGER
United States District Judge