UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| **FRED ROBINSON, et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | Case No. 3:17-cv-01263 |
| ) | Judge Aleta A. Trauger |
| **DAVID W. PURKEY, Commissioner** ) | |
| **of the Tennessee Department of Safety** ) | |
| **and Homeland Security, in his official** ) | |
| **capacity, et al.,** ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM AND ORDER

Tennessee Department of Safety and Homeland Security ("TDSHS") Commissioner David W. Purkey ("Commissioner") has filed a Motion for Partial Stay Pending Appeal (Docket No. 229), to which Fred Robinson, Ashley Sprague, and Johnny Gibbs have filed a Response (Docket No. 231), and the Commissioner has filed a Reply (Docket No. 234). For the reasons set out herein, the Commissioner's motion will be granted in part and denied in part.

## I. BACKGROUND

The plaintiffs have challenged the constitutionality of the Commissioner's policy of suspending the driver's licenses of Tennessee drivers who, because they are indigent, have been unable to pay fines and other fees assessed against them related to traffic violations. Those fines and other fees are also known as "traffic debt." The plaintiffs do not challenge Tennessee's authority to impose traffic debt or any local jurisdiction's right to collect it using ordinary collection mechanisms, such as garnishment or attachment. *See* Tenn. Code Ann. § 40-24-105(a); Tenn. R. Civ. P. 69.05–.07; Tenn. Op. Att'y Gen. No. 06-135 (Aug. 21, 2006). Nor do they challenge the Commissioner's authority to suspend the driver's licenses of people who are able to

1

pay their traffic debt but choose not to. *See* Tenn. Code Ann. § 55-50-502(a)(1)(H). Rather, the plaintiffs take issue with the fact that the Commissioner has historically suspended the license of every driver for whom it receives a notice of nonpayment from the relevant local jurisdiction, with no consideration of the driver's reason for nonpayment. The inevitable result has been that many poor Tennesseans have seen minor traffic infractions transformed into debilitating suspensions because the traffic debt imposed on them—which routinely numbers in the hundreds and even thousands of dollars—is more than they can afford to pay. A driver with resources who commits a traffic offense can pay a sum, begrudgingly or not, and move on. An indigent driver who commits the same offense has his life severely disrupted for an indefinite period of time. The plaintiffs argue that that policy runs afoul of the constitutional guarantees of due process and equal protection.

The plaintiffs base their argument, first, on a series of well-settled Supreme Court precedents holding that certain other criminal procedures related to costs and payment—which, like the Commissioner's policy, lacked indigence exceptions—deprived indigent defendants of due process and equal protection by irrationally and unfairly treating those defendants worse than non-indigent defendants for no reason other than their material poverty. *See Griffin v. Illinois*, 351 U.S. 12, 13 (1956) (fees for transcripts to use on appeal); *Douglas v. California*, 372 U.S. 353, 357 (1963) (counsel for direct appeal); *Roberts v. LaVallee*, 389 U.S. 40, 42 (1967) (fees for preliminary hearing transcripts); *Williams v. Illinois*, 399 U.S. 235, 240–41 (1970) (extension of sentence for failure to pay fines); *Tate v. Short*, 401 U.S. 395, 399 (1971) (required service on municipal farm for failure to pay fines); *Mayer v. City of Chicago*, 404 U.S. 189, 198 (1971) (fees for records to use on appeal in case involving fines only); *Bearden v. Georgia*, 461 U.S. 660, 672–73 (1983) (revocation of probation for failure to pay fines or restitution).

In the alternative, the plaintiffs argue that the Commissioner's policy violates *James v. Strange*, 407 U.S. 128 (1972), in which the Supreme Court struck down an unusually harsh regime for recouping attorneys' fees from indigent defendants on the ground that it "blight[ed] in such discriminatory fashion the hopes of indigents for self-sufficiency and self-respect." *Id.* at 142–43. Finally, the plaintiffs argue that, by failing to provide drivers with adequate notice and procedural mechanisms related to an indigence exception, Tennessee has deprived drivers of the procedural due process that the government owes to drivers facing the loss of their driving privileges. *See Bell v. Burson*, 402 U.S. 535, 542 (1971) ("[I]t is fundamental that except in emergency situations . . . due process requires that when a State seeks to terminate [the driver's license of a presently licensed driver], it must afford notice and opportunity for hearing appropriate to the nature of the case before the termination becomes effective." (citations and internal question marks omitted)).

The plaintiffs filed a Motion for Preliminary Injunction seeking several types of broad relief related to the Commissioner's policies, both with regard to existing suspensions and possible future suspensions. (Docket No. 25.) With regard to existing suspensions, the plaintiffs asked the court to issue a blanket order requiring the Commissioner to reinstate the licenses of all drivers suffering from traffic debt-related suspensions, with the exception of certain drivers facing other bars to licensure. (*Id.* at 2.) With regard to the prospect of future suspensions, the plaintiffs sought an order requiring the Commissioner to either discontinue suspensions or alter TDSHS's procedures to ensure that indigent drivers receive an exception and adequate notice and procedures related to that exception. (*Id.* at 1.)

The parties submitted the matter to the court on briefs, and, on October 16, 2018, the court granted the plaintiffs' motion in part and denied it in part. (Docket Nos. 222 & 223.) The court concluded that the plaintiffs had established a strong likelihood of success on the merits with

regard to their constitutional claims and that, if injunctive relief were denied, irreparable harm would be done both to the members of the plaintiff class and to the broader public interest. The court also concluded, however, that the Commissioner had demonstrated that, if the court ordered universal, immediate relief to all currently suspended drivers, then TDSHS would experience significant logistical strains and revenue shortfalls that might interfere with the agency's important public functions. Accordingly, the court granted the plaintiffs a circumscribed version of their requested relief. Pursuant to the court's order, TDSHS is required to reinstate the license of any covered driver who affirmatively applies for reinstatement, unless TDSHS provides the applicant with notice of his right to an ability-to-pay determination. Under the terms of the order, TDSHS can either make that ability-to-pay determination itself or refer the applicant to a local jurisdiction for such a determination, and TDSHS is permitted to deny reinstatement if the applicant is found not to be indigent. TDSHS is also required to waive reinstatement fees and any other reinstatement requirements specifically related to the driver's allegedly unlawful suspension (if there are any). With regard to future suspensions, the court's order permits TDSHS to continue to engage in future suspensions only if it provides notice and an opportunity for an ability-to-pay determination or receives confirmation that such a notice and opportunity were afforded at the local level. (Docket No. 223 at 1–3.)

On October 18, 2018, the Commissioner filed a Notice of Appeal. (Docket No. 228.) Contemporaneously, he filed a Motion for Partial Stay Pending Appeal, in which he asked the court to stay the portions of its preliminary injunction related to existing suspensions. (Docket No. 229.) The Commissioner informed the court that TDSHS has, for the time being, stopped imposing new suspensions for nonpayment of traffic debt, bringing it into compliance with paragraph 1 of the court's order. (Docket No. 230-1 ¶ 4.) The Commissioner complains, however, that TDSHS

4

currently has no mechanisms for making ability-to-pay determinations and no resources available for creating such a process. Specifically, the Commissioner has filed a Declaration by Director Susan Lowe of TDSHS's Financial Responsibility Division stating that TDSHS currently has only six hearing officers, none of whom has received any training with regard to making indigence determinations. (*Id.* ¶ 5.) Lowe reiterates that, as the parties and court have always understood, TDSHS had no preexisting regulations in place for making such determinations, and she confirms that TDSHS has not promulgated any such rules since the court's order. (*Id.* ¶ 6.) The Commissioner argues that, due to those limitations, the only way he can comply with paragraphs 2 and 3 of the court's order—at least over the short term—is simply to waive fees and reinstatement requirements for all applicants seeking reinstatement from their traffic debt suspensions, including those who are not indigent.

## II. LEGAL STANDARD

"A stay is not a matter of right, even if irreparable injury might otherwise result. It is instead an exercise of judicial discretion, and the propriety of its issue is dependent upon the circumstances of the particular case." *Nken v. Holder*, 556 U.S. 418, 433 (2009) (internal citations, quotation marks, and brackets omitted). When determining whether to grant a stay, courts consider "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Id.* at 434 (internal quotation marks omitted). "These [four] factors are not prerequisites that must be met, but are interrelated considerations that must be balanced together." *SEIU Local 1 v. Husted*, 698 F.3d 341, 343 (6th Cir. 2012) (internal quotation marks and citation omitted).

# III. ANALYSIS

The Commissioner argues that, because the Sixth Circuit has never ruled on whether a regime such as Tennessee's is required to include an indigence exception, there remain serious questions with regard to whether this court's order will survive the Commissioner's appeal. The Commissioner suggests that allowing paragraphs 2 and 3 of the preliminary injunction to go into effect now, only to be vacated later, would unnecessarily disrupt TDSHS's functioning and revenues. The Commissioner also argues that the court's preliminary injunction was ambiguous with regard to which reinstatement requirements it is required to suspend, in violation of Rule 65(b) of the Federal Rules of Civil Procedure—an argument that the court will construe as a request to modify the preliminary injunction, given that a fatally flawed injunction would not be remedied by a mere stay.

## A. Factors Regarding Propriety of Stay

With regard to the first factor, likelihood of success on the merits, the Commissioner is correct that, due to the unsettled nature of the law in this area, it is possible that the Sixth Circuit will reject the constitutional theories advocated by the plaintiffs. This factor, however, carries less weight than it might in other cases because the unique context of this case allowed the court to consider that possibility already and limit the requested relief accordingly. Normally, when the court enters a preliminary injunction against a party, it has no way of knowing, as a certainty, whether the party will appeal. When the party does appeal, then, it introduces a new element of uncertainty not addressed in the court's initial balancing of considerations when it crafted its injunction. *See City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (setting forth preliminary injunction factors). Here, however, there was no question of whether the Commissioner would raise the core issues of this case to the Sixth Circuit, because he had already

done so—in his appeal of the court's judgment in *Thomas v. Haslam*.[1] The court, accordingly, already considered the likelihood of a dispositive change in Sixth Circuit law when the court considered the scope of relief appropriate:

> The court . . . remains aware of the fact that, because *Thomas* is currently before the Sixth Circuit and presents an issue of first impression in the circuit, there is a possibility that the law governing this issue in Tennessee may change in the foreseeable future. The court, therefore, is hesitant to require TDSHS to expend too many resources now, when a potential clarification of its obligations is reasonably within sight.

(Docket No. 222 at 37.) The possibility of reversal on appeal—or the equivalent of reversal on appeal, via *Thomas*—has already been considered and, indeed, was one of the court's core reasons for denying the plaintiffs the full relief they sought. That possibility, therefore, only weakly favors further narrowing the relief granted by imposing a delay in the Commissioner's obligations.

The second factor governing stay requests calls on the court to consider whether a stay will spare the Commissioner some irreparable harm. The harms to TDSHS at issue here are, for the most part, economic. Typically, "economic loss does not constitute irreparable harm, in and of itself." *State of Ohio ex rel. Celebrezze v. Nuclear Regulatory Comm'n*, 812 F.2d 288, 290 (6th Cir. 1987) (citing *Wisc. Gas Co. v. F.E.R.C.*, 758 F.2d 669, 674 (D.C. Cir. 1985)). The consequences of particular economic harms, however, may be irreparable, and the Commissioner has, as he did in his opposition to the preliminary injunction, provided some evidence that the compliance costs and revenue losses associated with the preliminary injunction might, in light of current budgetary realities, interfere with TDSHS's ordinary functioning. Such effects could qualify as irreparable.

---

[1] Case No. 3:17-cv-00005.

The extent of those harms, however, is uncertain, given that TDSHS has avenues through which it can restore at least some of the relevant revenue streams, including options that would not require it to use its own hearing officers to make ability-to-pay determinations. The court's order was specifically crafted to allow TDSHS to rely on local jurisdictions for its ability-to-pay determinations. (*See* Docket No. 223 ¶¶ 2.b & .c, 3.b & .c.) For example, under paragraphs 2.c and 3.c, TDSHS has the option of giving an applicant notice of his right to an ability-to-pay determination but referring the applicant to the jurisdiction that initially reported his debt for the determination to be made. Then, if the reporting jurisdiction determines that the driver is non-indigent, TDSHS can deny reinstatement. (*Id.*) The plaintiffs, moreover, concede that some Tennessee jurisdictions have adopted ability-to-pay processes related to traffic debt that satisfy constitutional requirements—processes that any other jurisdiction could copy or adapt.

It is, of course, possible that some local jurisdictions would not participate in such a scheme, and TDSHS would, therefore, have to reinstate the licenses of all qualifying applicants from those jurisdictions. TDSHS's traffic debt suspension scheme, however, has always given local governments the first say in how a debtor should be treated. As the court has earlier explained, TDSHS has no way of knowing, in the first place, that a driver is eligible for suspension unless a local jurisdiction reports him, which the local jurisdiction has no obligation to do. (Docket No. 151 at 11.) Accordingly, if a local jurisdiction simply elects not to report its debtors, TDSHS will never get any revenues from those debtors—regardless of how much it might benefit from those revenues. Relying on local jurisdictions for indigence determinations, therefore, would merely replicate the balance of power in the program as it already exists.

In any event, there is no reason to assume that local jurisdictions would refuse to participate in such a system or that they would struggle at all in doing so. Indigence determinations are already

a pervasive, unavoidable feature of the criminal justice system, and Tennessee courts make thousands of such determinations a year. *See, e.g.*, *Gagnon v. Scarpelli*, 411 U.S. 778, 790 (1973) (acknowledging right to indigent defense in some probation and parole revocation hearings); *Miranda v. Arizona*, 384 U.S. 436, 473–74 (1967) (acknowledging right to indigent defense during a custodial interrogation); *Gideon vs. Wainwright*, 372 U.S. 335, 344–45 (1963) (acknowledging right to indigent defense at trial); Tenn. Admin. Office of the Courts, *Tennessee's Indigent Defense Fund: A Report to the 107th Tennessee General Assembly* 11–13 (2011) (providing statistics related to indigence determinations). [2] As the plaintiffs point out, those courts are typically able to make such determinations without resorting to the resource-intensive process of conducting full hearings, by relying on forms and criteria intended to identify those defendants likely to be indigent and those who likely are not. For example, jurisdictions may use presumptive indicators of poverty such as participation in the Temporary Assistance for Needy Families program, TennCare program, Supplemental Nutrition Assistance Program, or Supplemental Security Income program, may inquire into reported taxable income, or may rely on affidavits attesting to a driver's economic situation. (Docket No. 223 at 6 n.3.) Only if there is some reason for a party to dispute a claim of indigence would there ever be a need for anything resembling a hearing.

Moreover, as the Commissioner has repeatedly reminded the court, traffic debtors already have the right to seek discretionary relief from their traffic debt from the imposing court and, in doing so, are free to argue their indigence as a persuasive reason for the court's granting relief. All that would be required to provide the necessary ability-to-pay determination in such a proceeding would be to (1) adopt the reliable standards that that court already uses for indigence determinations in other settings and (2) eliminate the discretionary nature of the relief. It is entirely

---

[2] Available at http://www.tsc.state.tn.us/sites/default/files/docs/aoc_indigent_defense_fund_report.pdf.

possible, then, that TDSHS's revenue streams can be, in large part, restored without TDSHS having to turn to its own personnel and rulemaking to construct an indigence determination process from scratch.

Because the harms to TDSHS related to the preliminary injunction are speculative in scope and can be mitigated, the second factor only weakly favors granting a stay. In contrast, the third factor for considering a stay, which looks to the harm a stay would do to the party to whom the injunction was originally granted, strongly favors denying the Commissioner's request, because a lengthy stay would undoubtedly cause serious and irreparable harm to members of the plaintiff class. The court has gone on at length, here and in *Thomas*, regarding the obvious and overwhelming facts establishing the centrality of driving to life in Tennessee. Poor individuals, moreover, simply do not have the opportunities for mitigation and triage available to a large state agency with millions of dollars in its budget and a staff of seasoned public servants at its disposal. Every day without adequate transportation is a day in which a person is likely to be pulled more deeply into poverty; to grow more isolated from family and community; and to fail to receive needed medical care or perform necessary tasks. A person cannot merely put his participation in life on hold for months or years at a time and hope to return no worse for wear. Opportunities missed may never come again; good health lost may never be regained; and the stigma and isolation accumulated cannot merely be sloughed off once the original obstacle is lifted. Granting a stay pending appeal would lengthen and exacerbate the already damaging position in which plaintiff class members already find themselves.

With regard to the final factor for considering a stay, the public interest, that interest continues to lie with (1) Tennessee's complying with the Constitution and (2) Tennessee's poorest residents not being subject to a system that irrationally imposes a mere inconvenience on the rich

while upending the lives of the poor. Although the court remains sensitive to the budgetary pressures faced by TDSHS, there is, ultimately, no fiscal veto to the constitutional guarantees of due process and equal protection. Complying with the Constitution is routinely more expensive than disregarding it. It is cheaper, for example, to deny individuals the opportunity to contest their tax liability than it is to honor their right to due process and risk losing the revenues sought.[3] It is cheaper to pay property owners subject to eminent domain only a pittance than it is to pay them just compensation.[4] It is cheaper to try indigent criminal defendants without lawyers than to honor those defendants' right to appointed counsel.[5] Ultimately, however, every government must find a way to fund itself and perform its functions within the bounds of the Constitution. The court has attempted to craft the injunctive relief granted so as to reduce the strain on TDSHS, but it will not further insulate TDSHS from its obligations by issuing a stay pending the resolution of the Commissioner's appeal.

The Commissioner has asked, in the alternative, that this court grant a brief stay to allow the Sixth Circuit to consider an equivalent motion. Even a short stay would lengthen the harm imposed on individuals whose licenses have been suspended. Nevertheless, a brief stay, while the Sixth Circuit determines whether to grant a full stay pending appeal, would constitute a considerably lesser injury than the longer stay that the Commissioner seeks. The court, accordingly, will grant the Commissioner's motion, insofar as he seeks a stay to allow time for the Sixth Circuit to consider an equivalent motion at the circuit level.

---

[3] *See* U.S. Const. amend. XIV § 1.
[4] *See* U.S. Const. amend. V, cl. 5.
[5] *See* U.S. Const. amend. VI.

**B. Ambiguity of Order**

Every order granting an injunction must "state its terms specifically" and "describe in reasonable detail . . . the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1). "These prerequisites are designed to protect those who are enjoined by informing them of what they are called upon to do or refrain from doing in order to comply with the injunction or restraining order." 11A Charles Alan Wright, et al., Federal Practice & Procedure § 2955 (2d ed.). The Commissioner argues that one aspect of the court's order is ambiguous: its requirement that TDSHS, in certain situations, "[w]aive all reinstatement fees *and other reinstatement requirements related to* the suspension of any driver's license for failure to pay fines, costs, or litigation taxes related to traffic violations." TDSHS argues that "other reinstatement requirements" is ambiguous because the court has not enumerated every reinstatement requirement that must be waived.

The Commissioner—who is presumably aware of what his agency requires—has identified three types of requirements with regard to which the order is allegedly ambiguous:

1. Ordinary requirements related to the issuance of a new noncommercial license for a driver whose license would have expired during the period of his suspension (Docket No. 230 at 3; Docket No. 187-1 ¶ 39);

2. Additional proof of citizenship and medical certifications required for reissuance of a commercial license that would have expired during the period of the driver's suspension (Docket No. 230 at 4; Docket No. 187-1 ¶ 39); and

3. Fees imposed on drivers who did not surrender their physical licenses at the time of their allegedly unlawful suspensions (Docket No. 230 at 4; Docket No. 187-1 ¶ 38).

Each of these examples of alleged ambiguity, however, would seem to be resolved by the text of the preliminary injunction itself. The Commissioner is only required to waive requirements

"related to the suspension of any driver's license for failure to pay fines, costs, or litigation taxes related to traffic violations pursuant to Tenn. Code Ann. § 55-50-502(a)(1)(H) or (I)." Requirements that have accrued to a driver merely due to the passage of time, rather than as a result of his suspension, are plainly not "related to the suspension." A penalty imposed pursuant to administrative requirements ancillary to an allegedly unlawful suspension, in contrast, *is* related to the suspension. Insofar as the preliminary injunction was ambiguous in those regards, the court will amend the preliminary injunction to resolve those ambiguities below.

## CONCLUSION

For the foregoing reasons, the Commissioner's Motion for Partial Stay Pending Appeal (Docket No. 229) is hereby **GRANTED** in part and **DENIED** in part. The October 18, 2018 Order is hereby **AMENDED** to include the following language:

> The phrase "reinstatement requirements related to the suspension of a driver's license" (1) shall be read to include fees or penalties imposed for failure to surrender the driver's license at the time of the relevant suspension and (2) shall not be read to include any requirements or fees that are associated solely with the required renewal of a driver's license that would have expired during the period of the applicant's suspension.

Paragraphs 2 and 3 of the court's October 18, 2018 Order (Docket No. 223) are hereby **STAYED** until either (1) a ruling by the Sixth Circuit Court of Appeals on a timely and promptly filed Fed. R. App. P. 8(a) motion requesting a stay of this court's preliminary injunction order or (2) notification from the Commissioner that he has elected not to seek such relief in the Sixth Circuit. The Commissioner shall promptly inform the court if such a decision is made.

IT IS SO ORDERED.

ENTER this 5th day of November 2018.

_____
ALETA A. TRAUGER
United States District Judge